

1  BERNSTEIN LITOWITZ BERGER
     & GROSSMANN LLP
2  BLAIR A. NICHOLAS  (Bar No. 178428)
   (blairn@blbglaw.com)
3  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
4  Tel:  (858) 793-0070
   Fax:  (858) 793-0323
5       -and-
   SALVATORE J. GRAZIANO
6  (sgraziano@blbglaw.com)
   JOHN RIZIO-HAMILTON
7  (johnr@blbglaw.com)
   KATHERINE M. SINDERSON
8  (katherine@blbglaw.com)
   1285 Avenue of the Americas
9  New York, NY 10019
   Tel:  (212) 554-1400
10 Fax:  (212) 554-1444

11 Lead Counsel for Lead Plaintiff New
   York State Teachers' Retirement System
12

13              UNITED STATES DISTRICT COURT
14              CENTRAL DISTRICT OF CALIFORNIA

15 **NEW YORK STATE TEACHERS'**          **Case No. 2:07-cv-05756-FMC-FFMx**
16 **RETIREMENT SYSTEM,**
   **Individually and On Behalf of All**    **SECOND AMENDED**
17 **Others Similarly Situated,**           **CONSOLIDATED CLASS**
                                            **ACTION SECURITIES**
18              **Plaintiff,**              **COMPLAINT**
19
20         v.                               **JURY TRIAL DEMANDED**

21 **FREMONT GENERAL**
22 **CORPORATION, et al.,**                 **Judge:  Hon. Florence-Marie**
                                            **Cooper**
23              **Defendants.**
24
   **This Document Relates To:**
25
   **ALL ACTIONS**
26
27
28
              SECOND AMENDED CONSOLIDATED CLASS ACTION SECURITIES COMPLAINT
                        Case No. 2:07-cv-05756-FMC-FFMx

(c)COPY

FILED

2009 JAN -9  PM 1:05

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ..................................................................1

II.   JURISDICTION AND VENUE ......................................................14

III.  PARTIES ......................................................................................15

    A.    Plaintiffs ...........................................................................15

    B.    Defendants ........................................................................15

IV.  CLASS ACTION ALLEGATIONS ................................................20

V.   FACTUAL ALLEGATIONS PERTINENT
    TO PLAINTIFFS' CLAIMS FOR RELIEF ....................................22

    A.    The Company's Beginnings and Explosive Growth ...........................22

    B.    Fremont's Underwriting Quality Declined Prior to and
        Throughout the Class Period ....................................................27

        1.    The FDIC's Findings Establish That Fremont's
            Underwriting Was Dangerously "Unsafe and Unsound"
            and Not as Defendants Repeatedly Described .........................28

        2.    The First-Hand Accounts of Fremont's Former
            Employees Further Establish That the Company's
            Underwriting Was Virtually Non-Existent and Not
            "Sound" or "Appropriate" ......................................................35

        3.    The Documents That Fremont Distributed to Brokers
            Further Establish That Fremont's Underwriting Was
            Dangerously "Unsafe and Unsound" ......................................63

        4.    The Massachusetts Attorney General's Enforcement
            Action Further Establishes That Fremont's Underwriting
            Was Virtually Non-Existent And Not In Accordance
            With Interagency Guidance for Subprime Lending ..................66

        5.    Fremont's Own Business Partners Assert That Its
            Underwriting Was Deeply Flawed and Its Loans Were
            Not As Fremont Described Them .............................................75

        6.    Data Establish That Fremont's Underwriting Was the
            Worst Among Comparable Subprime Lenders and
            Further Declined After The Second Quarter Of 2006 ..............78

    C.    Fremont's Financial Statements Were Materially  Misstated
        Throughout the Class Period ....................................................99

|  |  | 1. | Defendants Materially Misstated Fremont's Assets and Financial Performance, Overvaluing Fremont's Residual Interests Throughout the Class Period ......................100 |
|---|---|---|---|
|  |  | 2. | Defendants Set Artificially Low Reserves For Repurchase Losses After Dismissing Auditor Ernst & Young LLP ......................110 |
|  |  | 3. | Defendants Rampino and Lamb's Repeated Certifications of Internal Controls Were Materially Misstated When Issued ......................118 |
| VI. | | | DEFENDANTS' MISSTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD WERE MATERIAL ......................123 |
|  | A. | | Underwriting Statements ......................123 |
|  | B. | | Residual Interests. ......................126 |
|  | C. | | Repurchase Reserves. ......................127 |
|  | D. | | Internal Controls. ......................128 |
| VII. | | | DEFENDANTS ACTED WITH SCIENTER ......................131 |
|  | A. | | Defendants Knew or Deliberately Disregarded What Was Happening At Fremont's "Primary Line of Business" ......................131 |
|  | B. | | Defendants' Obligations to the FDIC and the FDIC's Wide-Ranging Findings are Further Evidence of Scienter ......................136 |
|  | C. | | Defendants' Fraudulent Accounting Further Supports a Strong Inference of Scienter ......................139 |
|  | D. | | The Required Departures of Nearly All Defendants Further Support a Strong Inference of Scienter ......................142 |
|  | E. | | Defendants' Special Pre-Tax Bonus Incentives Further Support A Strong Inference of Scienter ......................143 |
|  | F. | | Defendant McIntyre's Unusual Insider Stock Sales Support a Strong Inference of Scienter ......................147 |
| VIII. | | | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND SUBSEQUENT POST-CLASS PERIOD DISCLOSURES ......................159 |
|  | A. | | Defendants' Materially False and Misleading Statements During the Class Period ......................159 |
|  |  | 1. | 2005 Third Quarter Statements ......................159 |
|  |  | 2. | 2005 Fourth Quarter Statements ......................169 |

3. 2006 First Quarter Statements ...............................................173

4. 2006 Second Quarter Statements ..........................................177

5. 2006 Third Quarter Statements ............................................182

B. Fremont's February 27, 2007 and Subsequent Disclosures .............193

C. Post-Class Period Disclosures ...............................................199

IX. LOSS CAUSATION ..........................................................................207

X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ......208

XI. THE PRESUMPTION OF RELIANCE ......................................................208

XII. CLAIMS FOR RELIEF ........................................................................209

COUNT ONE For Violations of Section 10(b) of the Exchange Act, On Behalf of Plaintiffs, Against all Defendants ..........................................209

COUNT TWO For Violations of Section 20(a) of the Exchange Act, On Behalf of Plaintiffs, Against all Defendants ..........................................212

XIII. JURY DEMAND ................................................................................214

XIV. PRAYER FOR RELIEF .......................................................................214

Lead Plaintiff the New York State Teachers' Retirement System and Preferred Share Purchaser Plaintiff Darryl Lazar make the following allegations upon information and belief based upon all of the facts set forth herein, which were obtained through an investigation made by and through Plaintiffs' Lead Counsel. Lead Counsel's investigation has included, among other things, a review of filings by Defendants with the United States Securities and Exchange Commission ("SEC"); the Order to Cease and Desist In the Matter of Fremont Investment & Loan, issued by the Federal Deposit Insurance Corporation ("FDIC"); the complaint filed by the Commonwealth of Massachusetts against Fremont Investment & Loan, et ano.; the complaint filed by Morgan Stanley Mortgage Capital Holdings LLC against Fremont Investment & Loan; the complaint filed by Lehman Brothers Bank against Fremont Investment & Loan Corporation; press releases and other public statements issued by Defendants; interviews with dozens of former Fremont employees; and the other data and sources set forth below. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Fremont General Corporation ("Fremont General") was one of the country's largest and most reckless subprime lenders.  Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre caused the Company to originate dangerously unsafe and unsound subprime loans (without regard for the borrower's ability to repay the mortgage over the term of the loan or the FDIC's then-existing Interagency Guidance for Subprime Lending Programs) and quickly sold the loans off to whole loan purchasers or through securitizations.  The Company's volume-driven lending practices were so harmful that the FDIC effectively forced Fremont General out of the subprime lending business in a severe regulatory action in March of 2007, for extending subprime credit "in an unsafe and unsound manner

that greatly increase[d] the risk that borrowers [would] default on the loans." Moreover, the Attorney General of Massachusetts has sought a range of civil penalties against Fremont General for "induc[ing] borrowers into purchasing subprime residential loan products that Fremont [General] knew or should have known would result in foreclosure," including a preliminary injunction which has recently been affirmed by the highest court in Massachusetts given the record before it that, contrary to then-existing interagency subprime lending guidelines, "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan.'"

2.      Despite causing Fremont to be one of the country's most deliberately reckless and harmful subprime lenders, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre each told investors repeatedly that Fremont's underwriting and lending practices were "sound," "appropriate" and "improved" and that its accounting was "conservative" and presented in accordance with Generally Accepted Accounting Principles ("GAAP").  Plaintiffs allege that Defendants' statements regarding:  (1) Fremont's purportedly "appropriate" and "sound" underwriting standards, including specific claims that the underwriting standards purportedly were "improved" and "tightened" beginning on August 8, 2006; (2) Fremont's purported compliance with GAAP; and (3) the purported adequacy of Fremont's internal controls, were each materially false and misleading when made, causing substantial harm to Fremont investors when investors were shocked to learn of the FDIC's findings and severe regulatory action against Fremont in March 2007.[1]   In fact, Fremont was the first bank to be cited so

---

[1] In section VIII of the Complaint (¶¶ 304-360 below), Plaintiffs allege in chronological order each false and misleading statement made by each individual Defendant during the Class Period, the reasons why each statement was false and misleading when made, and cross reference all facts demonstrating falsity, materiality and, collectively, supporting a strong inference of scienter for each individual Defendant.

extensively for such "unsafe and unsound" practices related to subprime mortgage lending in over five years since the implementation of the Interagency Expanded Guidance for Subprime Lending Programs in 2001.

3.      As a result of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's materially false and misleading statements and the enormous damages suffered by Fremont General investors when the true facts emerged, Plaintiffs bring this federal securities class action on behalf of themselves and all other persons and entities other than Defendants and Fremont's affiliates as specified below, who purchased or acquired Fremont General common stock or preferred shares during the time period between October 27, 2005 and March 2, 2007 (the "Class Period") and who, upon disclosure of these facts as alleged herein, were injured thereby.

4.      During the Class Period, Fremont General was a financial services holding company that primarily operated through its subsidiary, Fremont Investment & Loan ("FIL") (collectively, "Fremont" or the "Company"), to originate residential and commercial real estate loans.  Until Fremont was forced to cease its residential lending operations in March 2007, it was one of the nation's largest subprime mortgage finance companies.  In the years prior to the Class Period, the Company grew rapidly.  The Company reported $36.2 billion of total subprime residential mortgage originations for the year-ended December 31, 2005, nearly 30 times as much as the Company had originated in 2001.

5.      Fremont made money principally by originating a growing volume of subprime mortgages and then quickly selling these mortgage loans to investment banks and other purchasers of real estate-related debt.

6.      Undisclosed to investors and contrary to Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's repeated Class Period statements, in an effort to originate massive amounts of subprime mortgage loans, Fremont

commonly marketed and sold the riskiest mortgage products to home borrowers without appropriate underwriting or any meaningful analysis of the borrower's ability to repay the loan. Contrary to Defendants' repeated Class Period statements, even obvious cases of broker or borrower fraud were ignored so that subprime loan volume could continue to grow. Fremont's subprime products included adjustable-rate loans that, once adjusted, exceeded the borrowers' ability to repay; interest-only loans; so-called "80-20" combo loans providing 100% financing and requiring no down payment; and "stated-income" loans, where even W-2 wage earners did not have to bother verifying their stated income. When even these products did not generate sufficient volume, Fremont created other exotic and risky subprime mortgage products that allowed it to extend credit to more people who could not carry the debt, including 50/30 loans introduced in the third quarter of 2006, where borrowers' mortgage payments were amortized over 50 years during a 30-year term, with the 20-year amortization balance due in a balloon payment at the end of the mortgage term. Fremont also combined these products into loans that compounded the risks inherent in each one – <u>all without appropriate underwriting</u>.

7. Defendants never disclosed the truth about Fremont's deliberately reckless underwriting practices during the Class Period. To the contrary, these individuals each repeatedly assured investors that Fremont's lending practices and loan quality were "appropriate" and "sound." For example, Fremont's 2005 Form 10-K, signed by Defendants McIntyre, Rampino, Bailey and Lamb, stated:

> <u>[T]he Company seeks to minimize credit exposure through loan underwriting that is focused upon appropriate loan to collateral valuations and cash flow coverages</u>.

<p style="text-align:center">* * *</p>

> To mitigate the higher potential for credit losses that accompanies these types of borrowers, <u>the Company attempts to maintain underwriting standards that require appropriate loan to collateral valuations. The underwriting guidelines are primarily intended to assess the ability and willingness of the potential borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the loan</u>. [Emphasis added.]

Directly contrary to this and similar repeated statements and then-existing interagency subprime lending guidelines, Fremont did not maintain appropriate loan to collateral valuations or adequately assess the ability and willingness of its borrowers to repay its loans. In fact, Fremont disregarded virtually any semblance of reasonable underwriting. The undisclosed truth, demonstrated by data and numerous first-hand accounts set forth below, was that Fremont's underwriting standards were, as specifically found by the FDIC, "inadequate," "unsatisfactory," and "unsafe and unsound," and that even cases of obvious broker or borrower fraud were deliberately disregarded so that Fremont's loan volume could continue unabated. Defendants each repeatedly made specific statements about Fremont's purported underwriting that numerous sources of fact, set forth below at ¶¶ 51-181, demonstrate were materially false and misleading when made.

8. This truth finally began to come to light to Fremont investors on February 27, 2007, when Fremont announced that it would have to delay the release of its financial statements, and on March 2, 2007, when Fremont shocked the investment public by disclosing, after the close of trading on a Friday, that it would consent to a severe regulatory action, a "Cease and Desist" order (the "Cease & Desist Order") with the FDIC. On that news, the price of Fremont common stock plummeted from a close of $8.71 on March 2, 2007, to a close of $5.89 on the next trading day, March 5, 2007, on exceedingly heavy volume – a

drop of over 32%. Similarly, the price of Fremont preferred shares declined from a close of $19.45 on March 2, 2007, to a close of $16.50 on March 5, 2007, a decline of over 15% on heavy trading volume.

9. The Cease & Desist Order provides that the FDIC "had reason to believe that [Fremont] had engaged in unsafe or unsound banking practices and had committed violations of law and/or regulations." Among other things, the Cease & Desist Order sought to prevent Fremont from operating "without effective risk management policies and procedures in place in relation to the Bank's primary line of business of brokered subprime mortgage lending;" operating "with inadequate underwriting criteria and excessive risk;" and making "mortgage loans without adequately considering the borrower's ability to repay." The FDIC determined (contrary to Defendants' repeated public statements to investors) that, among other things, Fremont "had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank."

10. On March 6, 2007, a Fitch Ratings Managing Director described the FDIC's Cease & Desist Order against Fremont as one of the harshest he had ever seen, demonstrating the broad scope of the FDIC's adverse findings and its strong reaction against Fremont.

11. On March 22, 2007, the Senior Deputy Comptroller and Chief National Bank Examiner, Officer of the Comptroller of the Currency, testified before Congress that "it is clear that some subprime lenders have engaged in abusive practices . . . But, it would be wrong to equate all subprime lending with predatory lending." At the same March 22, 2007 hearing, the Director, Division of Supervision and Consumer Protection of the FDIC, specifically cited just one FDIC-regulated bank, Fremont, for "operating without adequate subprime

mortgage loan underwriting criteria" and noted the FDIC's recent, significant action against Fremont "to fight unsafe, unsound, and abusive lending practices."

12.     Thus, Fremont's "unsafe and unsound" underwriting standards are not excusable or immaterial to its investors merely because Fremont was a "subprime" lender, but so inconsistent with Defendants' public representations and then-existing Interagency Guidance for subprime lending, that Fremont was specifically singled out by the FDIC and its subprime lending was shut down in March 2007 in a severe FDIC action.

13.     As set forth below, Confidential Witness ("CW") 34 was an Assistant Vice President, Regulatory Risk Examiner at Fremont for nearly three years and throughout the Class Period. CW 34 was specifically involved with the FDIC's investigation of Fremont, including providing the FDIC with information throughout its investigation. CW 34 reports that the FDIC was investigating Fremont on site for more than one year before the Cease & Desist Order and that, at one point, there were more than 50 FDIC examiners on site, including one of the FDIC's more senior examiners, demonstrating the seriousness of the FDIC's investigation. CW 34 states that Fremont's Regulatory Risk Management group (of which CW 34 was a member) submitted numerous, repeated adverse written findings to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, in 2005 and 2006, which "mirrored" the FDIC's eventual Cease & Desist Order, one to two years later. CW 34 states that these repeated adverse reports specifically highlighted, inter alia, unfair and deceptive acts that Fremont was engaging in, "pretty obvious" poor underwriting and problematic incentive compensation. CW 34 reports, however, that Defendants McIntyre, Rampino, Bailey and other senior executives "dictated policy and procedures" and that their push was to make more and more loans with "no restraints" to increase their own personal compensation at Fremont with increasing loan volume, while deliberately

ignoring the repeated adverse findings from Regulatory Risk Management. CW 34 states that some of the broker fraud was "so egregious," yet nothing was being done about "obvious problems," including repeated broker fraud. CW 34 states that Fremont's senior executives, including Defendant McIntyre, knew after a few months of the start of the FDIC's investigation (and by the time of Defendant McIntyre's highly unusual stock sales in August 2006 described below), that an adverse action was coming from the FDIC. CW 34 further stated that Regulatory Risk Management submitted written adverse reports to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, as to the inadequacy of Fremont's loan loss reserves and Residual Interest valuations long before the FDIC's Cease & Desist Order was issued and that those reports were reviewed by the FDIC and were a part of the information the FDIC considered in reaching its conclusions.

14. Shortly after the FDIC's Cease & Desist Order, the Massachusetts Attorney General also concluded that Fremont was a dangerously unsound subprime lender. In a lawsuit filed against Fremont for unfair and deceptive loan practices, the Massachusetts Attorney General charged that Fremont deliberately disregarded borrowers' ability to repay their loans, layered those loans with multiple kinds of risk, and failed to disclose the terms and conditions governing the loans. Further, according to the Massachusetts Attorney General, Fremont financially incentivized brokers to sell loans at higher interest rates than those for which borrowers qualified, and failed to monitor the brokers' conduct in any meaningful way. In short, the Massachusetts Attorney General charges that Fremont misleadingly "induced borrowers into purchasing subprime residential loan products that Fremont knew or should have known would result in foreclosure." These consistent allegations further demonstrate the falsity of

Defendants' repeated Class Period statements that Fremont's underwriting was "appropriate," "sound" and "improved."

15. Thereafter, Fremont's own business partners concluded that Fremont falsely represented the quality of its lending practices and the loans it produced. For example, Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley"), which purchased pools of subprime loans from Fremont, sued Fremont for breach of contract based upon a spectrum of alleged misrepresentations as to the manner in which its loans were underwritten and an "unusual number of problems with Fremont's lending practices." Lehman Brothers Bank also sued Fremont in a similar action.

16. Further, first-hand accounts obtained by Lead Counsel from dozens of former Fremont employees (set forth in detail below) strongly corroborate the FDIC's and Massachusetts Attorney General's findings. Fremont's former employees explained that, beginning in 2004, Fremont intentionally abrogated its subprime underwriting standards and ignored obvious broker and/or borrower fraud to generate an increasing volume of subprime loans that it knew borrowers could not repay – all in order to fuel the Company's record-breaking loan origination volume and profits. The accounts by these witnesses -- which include all levels of former Fremont employees directly involved with underwriting Fremont's subprime loans or auditing the underwriting of those loans -- are as disturbing as they are consistent. Moreover, they strongly demonstrate the falsity of Defendants' Class Period statements regarding Fremont's purported underwriting practices. Contrary to Defendant Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's repeated Class Period statements regarding purportedly "appropriate," "sound" or "improved" subprime underwriting, these former employee accounts demonstrate that Fremont consistently approved stated-income loans with facially implausible incomes, continued to accept loans from brokers

who submitted fraudulent documentation and that these and other adverse facts were internally reported to the individuals named as Defendants herein.

17. Lead Counsel also has performed a thorough analysis of Fremont's loan performance data from 2004 through 2006. Lead Counsel has collected and reviewed data reflecting, inter alia, the increasing frequency and speed with which Fremont's loans defaulted, and how poorly those loans performed relative to loans made by other similar subprime lenders. The results of that analysis set forth below further establish the falsity of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's repeated Class Period claims as to Fremont's underwriting, loan quality and loan performance, including their specific claims beginning on August 8, 2006 that Fremont's underwriting standards were "improved" and "tightened," resulting in a purported "flight to quality." Subprime loans made after these claims performed even worse than those issued before the purported improvements were made and failed so quickly, that general industry conditions could not be to blame. It took the FDIC's severe regulatory action in March 2007 to put a real stop to Defendants' deliberately reckless subprime underwriting practices.

18. On November 28, 2007, Fitch Ratings published a "Special Report" regarding "The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS [Residential Mortgage Backed Securities] Performance." The findings of Fitch Ratings' Special Report further demonstrate the materiality of the misstatements repeatedly made by the Fremont individual Defendants during the Class Period regarding underwriting by concluding that subprime lending became particularly dangerous when combined with the absence of effective underwriting. Fitch Ratings stated: "In addition to the inherent risk of these products, evidence is mounting that in many instances these risks were not controlled through sound underwriting practices. Moreover, in the absence of effective underwriting,

products such as 'no money down' and 'stated income' mortgages <u>appear to have</u> <u>become vehicles for misrepresentation or fraud by participants throughout the</u> <u>origination process</u>." (Emphasis added.) Fitch Ratings further noted: "High risk products, <u>which require sound underwriting and which are easy targets for fraud</u>, account for some of the largest variances to expected default rates." (Emphasis added.) In other words, "poor underwriting" should not be ignored or deemed immaterial in the subprime lending context, but was particularly critical with subprime lending, and is now understood to have been a material contributor "in many instances" to the very poor performance of these loans.

19. Moreover, prior to the end of the Class Period, this "poor underwriting" was not ascertainable to Fremont investors merely because it was a "subprime" lender in light of Defendants' repeated false and misleading Class Period statements. To the contrary, Fitch Ratings' "Special Report" noted that prior to 2007, "much of the poor underwriting and fraud . . . <u>was masked by the</u> <u>ability of the borrower to refinance or quickly re-sell the property prior to the loan</u> <u>defaulting, due to rapidly rising home prices</u>." (Emphasis added.) Ultimately, "Fitch believes that poor underwriting processes did not identify and prevent and, therefore, in effect, <u>allowed willful misrepresentation by parties to the transactions</u>, which has exacerbated the effects of declining home prices and lax program guidelines." (Emphasis added.) In a word, Defendants' repeated false and misleading statements regarding Fremont's purportedly "appropriate," "sound" and "improved" underwriting guidelines <u>materially</u> deceived investors.

20. In addition to their materially false and misleading statements regarding the appropriateness of Fremont's subprime lending practices, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre also presented Fremont's financial statements in material violation of GAAP by failing to reflect the poor quality of the Company's subprime loans in its publicly-reported financial

statements, including in setting its loan repurchase reserves and in reporting its Residual Interests in securitizations. These material misstatements helped disguise the Company's complete lack of meaningful underwriting and maintain the appearance of profitability.

21. When Fremont announced that it would delay reporting its fourth quarter 2006 financial results at the end of the Class Period, investors realized that major impairment charges would follow. And they did. Residual interests in subprime loan securitizations recorded during the Class Period were reduced <u>by over 95%</u> and subprime loan repurchase reserves were increased <u>by over 300%</u>. As set forth below, these critical financial metrics were materially misstated at the time they were originally reported during the Class Period as part of Defendants' scheme to mask the very poor quality of the subprime loans issued by the Company.

22. Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's financial misstatements during the Class Period actually grew in severity after they terminated (without explanation) the Company's long-term, 35-year relationship with outside auditor Ernst & Young LLP in the 2006 second quarter. In the quarter which followed, these Defendants went so far as to <u>reduce</u> the Company's subprime loan repurchase reserve, even though then-existing facts demonstrated that an increase was required.

23. Thereafter, Grant Thornton LLP, which was engaged to replace Ernst & Young LLP, refused to stay on as Fremont's outside auditor after Fremont failed to provide it with all of the information it needed to perform its 2006 year-end audit and withdrew in a surprisingly "noisy" manner, publicly disagreeing with the Company's public statement as to the reasons for its resignation.

24. Prior to these events and throughout the Class Period, Defendants Rampino and Lamb repeatedly signed materially false and misleading sworn

certifications attesting to the presentation of Fremont's financial statements in accordance with GAAP and the adequacy of the Company's internal controls when those certified facts were not true at the time the certifications were executed.

25.   Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre also profited tremendously from their deceptive scheme.  During the Class Period, these individual Defendants collectively sold a total of 1.89 million shares of Fremont stock for proceeds of over $36 million.  Indeed, Defendant McIntyre, Chairman of the Board of Directors of Fremont General, had an extraordinary trading record during the Class Period, highly unusual in both amount and timing, which constitutes further strong circumstantial evidence of his knowing participation in the fraud.  Inconsistent with his prior trading history, he sold over 600,000 shares of his personally-held Fremont stock in August 2006, for proceeds of nearly $10 million at a time when he specifically knew about the FDIC's pending investigation and expected adverse outcome.

26.   Each of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's statements regarding the purported quality of Fremont's underwriting, loan quality, and loan performance during the Class Period, and their failure to present Fremont's financial statements, reported results and internal controls in accordance with GAAP throughout the Class Period, resulted in a material deception of the investing public.  Unfortunately for unsuspecting Fremont investors, it was only a matter of time before the Company's extremely unsafe and unsound lending practices – driven by the individual Defendants' aggressive volume targets and financial incentives – would result in substantially increased mortgage delinquencies and material losses for Fremont investors.

27.   Indeed, when the true facts were revealed, particularly through the February 27, 2007 and March 2, 2007 disclosures, the price of Fremont securities declined precipitously, causing substantial losses and damages to Plaintiffs and

members of the Class. The price of Fremont General common stock declined from over $13.95 per share to less than $5.89 per share, between February 7 and March 5, 2007, a decline of approximately 58%. Similarly, the price of Fremont preferred shares declined from $25.44 per share to $16.50 per share, during the same time period, a decline of approximately 35%. The price of Fremont securities continued to decline thereafter as additional adverse facts were revealed to investors and the Company has since filed for bankruptcy. This action seeks to hold Defendants Rampino, Bailey, Lamb, Walker, Nicolas and McIntyre liable for the substantial damages suffered by Fremont investors during the Class Period as a result of these Defendants' repeated, materially false and misleading statements.

## II. <u>JURISDICTION AND VENUE</u>

28. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

29. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

30. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this district. During the Class Period, Fremont headquarters were located at 2425 Olympic Boulevard, Santa Monica, California.

31. In connection with the acts alleged in this Second Amended Consolidated Class Action Securities Complaint (the "Complaint"), Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre, directly or indirectly, used

the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

## III. PARTIES

### A. Plaintiffs

32. On December 6, 2007, the Honorable Florence-Marie Cooper appointed the New York State Teachers' Retirement System ("NYSTRS") to serve as Lead Plaintiff in this consolidated class action. NYSTRS provides retirement, disability and death benefits to eligible New York State public school teachers and administrators. NYSTRS is one of the ten largest public retirement systems in the nation, serving over 400,000 active members, retirees and beneficiaries. As set forth in the chart attached hereto as Exhibit A, NYSTRS purchased Fremont General common stock during the Class Period and suffered damages as the result of the conduct complained of herein.

33. As set forth in the chart attached hereto as Exhibit B, Plaintiff Darryl Lazar purchased Fremont General 9% Trust Originated Preferred Securities and suffered damages as the result of the conduct complained of herein.

### B. Defendants

34. Fremont General is not named as a Defendant in this Complaint due to its filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code. During the Class Period, Fremont General primarily engaged in subprime residential real estate lending nationwide through its wholly-owned California-chartered industrial bank subsidiary, Fremont Investment & Loan ("FIL"). Fremont funded its lending activities primarily through deposit accounts insured by the FDIC and sold its subprime loans to investors or through securitizations.

35. Defendant Louis J. Rampino ("Rampino") joined Fremont in 1977 and served as President and Chief Executive Officer ("CEO") of Fremont General

from May 2004 until he was terminated by the Company on November 12, 2007, after the end of the Class Period. He served as President and Chief Operating Officer ("COO") of Fremont General from 1995 to May 2004, and as Senior Vice President and COO of Fremont General from June 1991 until 1995. Rampino served as a Director of Fremont General from 1994 until his termination. Rampino also served as Chairman of the Board of FIL. Rampino was President and CEO of Fremont Compensation Insurance Group from 1998 to 2000. During the Class Period, Defendant Rampino personally signed the following materially false and misleading disclosure documents: Fremont General's Form 10-Q for the quarter ended September 30, 2005; Form 10-K for the quarter and year ended December 31, 2005; Form 10-Q for the quarter ended March 31, 2006; Form 10-Q for the quarter ended June 30, 2006; and Form 10-Q for the quarter ended September 30, 2006. Rampino also made additional materially false and misleading statements as set forth below. Rampino profited from the inflated price of Fremont stock by selling over 415,000 shares of Fremont General stock during the Class Period, realizing proceeds of over $8.5 million.

36. Defendant Wayne R. Bailey ("Bailey") joined Fremont in 1986 and served as Executive Vice President and COO of Fremont General from May 2004 until he was terminated by the Company on November 12, 2007. Bailey served as Executive Vice President, Treasurer and Chief Financial Officer ("CFO") of Fremont General from 1995 to 2004. Bailey served as Senior Vice President and CFO of Fremont General from 1994 to 1995; as Vice President and CFO from 1990 to 1994; and as Director and officer of certain subsidiary companies from 1986 to 1990. He received his Bachelor of Arts in Economics from California State University in 1977. During the Class Period, Defendant Bailey personally signed Fremont General's materially false and misleading Form 10-K for the quarter and year ended December 31, 2005, and made additional materially false

and misleading statements as set forth below. Bailey profited from the inflated price of Fremont stock by selling over 332,000 shares of Fremont General stock during the Class Period, realizing proceeds of over $6.8 million.

37. Defendant Patrick E. Lamb ("Lamb") joined Fremont in 1986 and served as Senior Vice President, CFO, Chief Accounting Officer ("CAO") and Treasurer of Fremont General from May 2004 until he resigned from the Company on July 9, 2007. Lamb served as Senior Vice President and CAO of Fremont General from 2001 to May 2004. He received his Bachelor of Science and Master's Degrees from Brigham Young University, and had been licensed as a Certified Public Accountant since 1987. During the Class Period, Defendant Lamb personally signed the following materially false and misleading disclosure documents: Fremont General's Form 10-Q for the quarter ended September 30, 2005; Form 10-K for the quarter and year ended December 31, 2005; Form 10-Q for the quarter ended March 31, 2006; Form 10-Q for the quarter ended June 30, 2006; and Form 10-Q for the quarter ended September 30, 2006. Defendant Lamb also made additional materially false and misleading statements as set forth below. Lamb profited from the inflated price of Fremont stock by selling over 53,000 shares of Fremont General stock during the Class Period, realizing proceeds of over $1.2 million.

38. Defendant Kyle R. Walker ("Walker") joined FIL in 1994 and served as President and CEO of FIL from May 2006 until he was terminated by the Company on July 29, 2007. Before becoming President and CEO, he served as Executive Vice President and COO of FIL. Before that, he was FIL's Executive Vice President of Residential Real Estate. During the Class Period, Defendant Walker made the materially false and misleading statements set forth below. Walker profited from the inflated price of Fremont stock by selling over 21,000

shares of Fremont General stock during the Class Period, realizing proceeds of over $350,000.

39.     Defendant Ronald J. Nicolas, Jr. ("Nicolas") joined the Company in 2005 as Executive Vice President and CFO of FIL.  He also has held executive officer positions at the Company's other subsidiaries.  In July 2007, after the end of the Class Period, Nicolas replaced Lamb as Senior Vice President, Treasurer, CAO, and CFO of Fremont General.  In December of 2007, Nicolas was appointed Executive Vice President and Director of Corporate Development of Fremont General and FIL.  At the request of the FDIC, Nicolas "separated" from the Company in March 2008.  Before joining Fremont, from 2001 to 2005, Nicolas was Executive Vice President and CFO of Aames Financial Corporation, a real estate investment trust ("REIT") that specialized in residential subprime mortgages and became part of Accredited Home Lenders Inc.  Defendant Nicholas earned his Master of Business Administration in 1989 and his Bachelor of Science in Business Management in 1981 from Canisius College.  During the Class Period, Defendant Nicolas made the materially false and misleading statements set forth below.  Nicolas did not become a reporting person at Fremont General for purposes of reporting insider sales until after the end of the Class Period.

40.     Defendant James A. McIntyre ("McIntyre") joined Fremont in 1963 and served as the Company's CEO from 1976 to 2004.  He served as Chairman of the Board from 1989 until his resignation in January of 2008.  He also served as a Director of the Company from 1972 until his resignation in January of 2008.  From 1968 to 1978, he served as President of Fremont Indemnity Corporation ("FIC"), and from 1963 to 1968, he served as Secretary-Treasurer of FIC.  Before joining Fremont, he worked as a Certified Public Accountant at Ernst & Ernst, now known as Ernst & Young, LLP.  During the Class Period, Defendant McIntyre personally signed the Form 10-K filed by Fremont General for the quarter and year ended

December 31, 2005, which contained materially false and misleading statements as set forth below.  In addition, during the Class Period and while in possession of material adverse inside information, Defendant McIntyre sold a substantial portion of his personally-held Fremont General shares in a manner that was unusual in both timing and amount as compared to his prior trading history, as set forth below.  McIntyre profited from the inflated price of Fremont stock by selling over 1 million shares of Fremont General stock during the Class Period, realizing proceeds of over $19 million.

41.    As set forth below, the materially misstated information conveyed in the Company's press releases and SEC filings during the Class Period resulted from the collective actions of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre.  These individuals were each involved in drafting, producing, reviewing and/or disseminating the statements at issue in this case during their tenures with the Company.  At times during the Class Period, at set forth below, these individuals also personally made other materially false and misleading statements orally during investor conference calls and meetings.

42.    As officers and directors of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange, and governed by the federal securities laws, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre each had a duty to disseminate promptly accurate information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously-issued statements that had become materially misstated or untrue, so that the market price of the Company's publicly-traded securities would be based upon accurate information.  Defendants Rampino, Bailey, Lamb, Walker, Nicolas and McIntyre each violated these requirements and obligations during the Class Period.

43.     These individuals, because of their positions of control and authority as senior officers of Fremont, were able to and did control the content of the various press releases and SEC filings issued by Fremont during the Class Period. Each of these individuals, during his tenure with the Company, was provided with copies of the statements at issue in this action before they were issued to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of these individuals is responsible for the accuracy of the press releases and SEC filings detailed herein.

## IV.     CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired Fremont General common stock or Fremont General 9% Trust Originated Preferred Securities during the Class Period, October 27, 2005 through March 2, 2007, and who, upon disclosure of certain facts alleged herein, were injured thereby.     Excluded from the Class are:     (a) Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre; (b) members of the immediate families of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre; (c) the subsidiaries and affiliates of Fremont; (d) any person or entity who is a partner, executive officer, director, or controlling person of Fremont (including any of its subsidiaries or affiliates); (e) any entity in which any Defendant has a controlling interest; (f) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors and assigns of any such excluded party.

45.     The members of the Class are so numerous that joinder of all members is impracticable.     As of October 31, 2006, Fremont General had 77,862,000 shares of common stock issued and outstanding.     Throughout the Class

Period, Fremont General securities actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that Class members number in the thousands.

46. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the other members of the Class purchased or sold Fremont securities in the market, and sustained damages as a result of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's conduct complained of herein.

47. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

48. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

49. Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      a. whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

      b. whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

      c. whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

d.     whether and to what extent the market prices of Fremont General common stock and preferred shares were artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

e.     whether Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre acted with scienter;

f.     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

g.     whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

50.     The names and addresses of those persons and entities who purchased Fremont securities during the Class Period are available from the Company's transfer agent(s).  Notice may be provided to such purchasers and/or record owners via first class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## V.     FACTUAL ALLEGATIONS PERTINENT TO PLAINTIFFS' CLAIMS FOR RELIEF[2]

### A.     The Company's Beginnings And Explosive Growth

51.     Fremont General was founded in 1963 as Lemac Corporation and changed its name to Fremont General Corporation in 1973.  The Company went public in 1977 and largely focused on workers compensation insurance and other insurance operations.  In 1990, Fremont General acquired a small Orange County,

---

[2] In these sections V.A.-V.C of the Complaint, Plaintiffs allege detailed facts demonstrating Fremont's poor underwriting and GAAP violations during the Class Period.  These facts demonstrate the falsity of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's Class Period statements which are set forth chronologically in Section VIII below.  In Section VIII below, Plaintiffs cross reference all facts demonstrating falsity, materiality and, collectively, supporting a strong inference of scienter for each Defendant.

California-based thrift called Investors Bank Corporation, which it renamed in 1994 as Fremont Investment & Loan.

52.     Throughout the 1990s, the Company continued to focus on its insurance business, eventually becoming "one of the largest underwriters of workers compensation insurance in the nation," while FIL brought some income to the Company through its commercial real estate investments and, to a lesser extent, residential real estate investments.     After a quick run-up in its workers compensation business in the late 1990s, followed by rapidly deteriorating earnings, the California Department of Insurance took over supervision of Fremont's insurance company in 2000, and the Company agreed to cease its insurance operations.     As set forth more fully below in ¶¶ 298-299, 371, Defendants McIntyre, Rampino, and Bailey were charged with acting deceptively – and profiting handsomely – in connection with California's liquidation of Fremont's insurance business (with alleged behavior remarkably similar to that at issue in this case).

53.     In fact, because of these Fremont executives' alleged changes in "underwriting practices to solicit and write higher severity risks" and the resulting deterioration in the Company's insurance business, the California regulators found Fremont's insurance subsidiary to be "in such condition that its further transaction of business will be hazardous to its policyholders, creditors, and the public," and that the subsidiary was insolvent.     As a result, the state of California assumed conservatorship over Fremont's insurance subsidiary.

54.     Fremont's insurance operations were divested just as Fremont's subprime mortgage business began recording massive growth.     Beginning in 1999 and continuing through the Class Period, the Company originated subprime loans, lending to individuals who did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan

buyers. By the beginning of the Class Period, Fremont was one of the largest subprime mortgage lenders in the nation and the Company's reported 2004 and 2005 earnings were the highest in the Company's 42-year history. According to the Company's presentation given at its May 18, 2006 Annual Meeting of Stockholders, Fremont's subprime mortgage originations grew rapidly as follows:



55. Fremont originated subprime residential real estate loans nationwide on a wholesale basis through independent loan brokers in nearly all of the 50 states. Generally, Fremont sold most of the subprime loans it originated to other financial institutions through whole loan sales. After the sale, the Company retained no interest in the loans. Depending upon market conditions, Fremont also securitized some of its subprime loan production and retained a required junior residual interest in the cash flows earned from the loans. Fremont earned income

from the gains realized upon selling or securitizing its loans. Fremont's originations grew quickly and reached a record $36.2 billion in 2005. During 2005, Fremont sold $29.5 billion in whole loan sales and securitized $6.5 billion of its loan origination volume.

56. Loan "origination" is the process by which a lender initiates new loans. This process generally includes qualifying borrowers, appraising collateral, processing documents, loan underwriting, loan funding, and recording the debt onto title.

57. "Underwriting" is the credit analysis preceding the granting of a loan. The analysis is generally based on credit information furnished by the borrower, such as employment history, salary, and the borrower's financial statements; publicly available information, such as the borrower's credit history, which is detailed in a credit report; and the lender's evaluation of the borrower's credit needs and ability to pay.

58. Fremont's subprime loans were primarily financed through its FDIC-insured deposit accounts from its bank operations in California.

59. After originating residential real estate subprime loans, Fremont quickly sold the subprime loans to third-party investors in "whole loan sales," or, when whole loan sales were not an attractive option, securitized the loans and was required to maintain some residual interest in the securitization pool.

60. In its whole loan sales, Fremont entered into agreements to sell the loans for cash and generally relinquished the right to service the loans on a long-term basis. After the sale, the Company retained no interest in the underlying subprime loans, except for some interim servicing agreements in place until the transfer was completed. Fremont was required to provide purchasers of its subprime mortgage loans with representations and warranties regarding the underwriting standards the Company followed in originating the loans. If a

purchaser of the mortgage loans determined that Fremont violated its representations and warranties <u>or</u> if a borrower defaulted during the early months of the loan, the purchaser could require Fremont to repurchase the mortgage loan.

61. According to the Company's 2005 Form 10-K, securitization was a form of structured finance utilized by Fremont in which pools of subprime loans were packaged and sold to an entity called "Fremont Home & Trust," which was established for the sole purpose of purchasing the loans and issuing interest-bearing securities that represented interests in the loans. As explained in the Company's 2005 Form 10-K:

> The securitization is treated as a sale and the loans sold are removed from the balance sheet. The Company adds to its balance sheet the net cash received from the transaction as well as the Company's retained residual interest in the securitization transaction. The Company performs the loan servicing functions on all 11 of the securitization transactions it has completed since 2003 and expects to be the servicer on any securitizations it enters into in the future; as such, it also records an asset for the mortgage servicing rights that it retains upon the completion of each securitization.

In addition to the cash received at the time of the securitization, Fremont could receive cash flows over the life of the loans from the Residual Interest it retained in the securitized pool of loans. Although the Company generally sold a portion of its Residual Interests through net interest margin securities transactions ("NIMs") at the time of or shortly after a securitization, it still retained a portion of the Residual Interests as an asset on its balance sheet.

### B. Fremont's Underwriting Quality Declined Prior to and Throughout The Class Period

62.     Repeatedly throughout the Class Period as set forth in Section VIII below, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre publicly represented that Fremont employed underwriting standards in originating its loans that were primarily intended to assess "the ability and willingness of the potential borrower to repay the debt," that "mitigate[d] its exposure to credit risk," and that strived "to ensure appropriate loan to collateral valuations."

63.     Moreover, when subprime delinquencies and repurchases began to increase at the end of the 2006 first quarter, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre repeatedly described "modifications" to Fremont's loan underwriting practices purportedly "designed to lower early payment defaults" and "to improve the overall credit performance of the loans." As set forth in Section VIII below, these individual Defendants stated that these changes led to "a much improved" or "rather dramatic improvement" in the risk profile of Fremont's mortgage products. Defendants Bailey and Nicholas described nothing less than a "flight to quality" in terms of Fremont's subprime originations.

64.     As set forth herein, several different kinds of evidence establish that, in truth, Fremont's underwriting practices did not improve; they remained as found by the FDIC in March 2007, "unsafe and unsound." Moreover, at no time during the Class Period, did any of the Defendants disclose to investors that Fremont had effectively abandoned any meaningful underwriting standards in pursuing their goals of increasing subprime loan volume and deliberately disregarded then-existing Interagency Guidance for subprime lending, exposing Fremont to severe FDIC action.

### 1. The FDIC's Findings Establish That Fremont's Underwriting Was Dangerously "Unsafe and Unsound" and Not As Defendants Repeatedly Described

65. As revealed by the FDIC's findings, made public in connection with the issuance of the Cease & Desist Order to which the Company consented on March 7, 2007 (and numerous other data and first-hand accounts set forth below), Fremont was, in fact, "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by the Bank," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices" throughout the Class Period and at the time of Defendants' repeated public statements.

66. Fremont's underwriting standards were particularly weak in that the Company was "marketing and extending adjustable-rate mortgage ('ARM') products to subprime borrowers in an unsafe and unsound manner that greatly increase[d] the risk that borrowers [would] default on the loans or otherwise cause losses." According to the FDIC's March 7, 2007 press release:

In taking this action, the FDIC found that the bank was operating without effective risk management policies and procedures in place in relation to its subprime mortgage and commercial real estate lending operations. The FDIC determined, among other things, that the bank had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank. (Emphasis added.)

67.     According to the FDIC Cease & Desist Order, to which Fremont consented, Fremont was required to cease and desist from the following "unsafe and unsound" underwriting and business practices:

- Operating with management whose policies and practices are detrimental to Fremont;

- Operating Fremont without effective risk management policies and procedures in place in relation to Fremont's brokered subprime mortgage lending and commercial real estate construction lending businesses;

- Operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by Fremont;

- Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses;

- Operating with a large volume of poor quality loans;

- Engaging in unsatisfactory lending practices;

- Operating without an adequate strategic plan in relation to the volatility of Fremont's business lines and the kind and quality of assets held by Fremont;

- Operating with inadequate capital in relation to the kind and quality of assets held by Fremont;

- Operating in such a manner as to produce low and unsustainable earnings;

- Operating with inadequate provisions for liquidity in relation to the volatility of Fremont's business lines and the kind and quality of assets held by Fremont;

- Marketing and extending adjustable-rate mortgage ("ARM") products to subprime borrowers in an unsafe and unsound manner that greatly increased the risk that borrowers would default on the loans or otherwise cause losses to Fremont, including:

(1)    Qualifying borrowers for loans with low initial payments based on an introductory or "start" rate that will expire after an initial period, without an adequate analysis of the borrower's ability to repay the debt at the fully-indexed rate;

(2)    Approving borrowers without considering appropriate documentation and/or verification of their income;

(3)    Containing product features likely to require frequent refinancing to maintain an affordable monthly payment and/or to avoid foreclosure;

(4)    Including substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period;

(5)    Providing borrowers with inadequate and/or confusing information relative to product choices, material loan terms and product risks, prepayment penalties, and the borrower's obligations for property taxes and insurance;

(6)    Approving borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses; and/or

(7)     Approving loans or "piggyback" loan arrangements with loan-to-value ratios approaching or exceeding 100% of the value of the collateral.

- Making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms;

- Operating in violation of Section 23B of the Federal Reserve Act, in that Fremont engaged in transactions with its affiliates on terms and under circumstances that in good faith would not be offered to, or would not apply to, nonaffiliated companies; and

- Operating inconsistently with the FDIC's Interagency Advisory on Mortgage Banking and Interagency Expanded Guidance for Subprime Lending Programs. (Emphasis added.)

68.     The FDIC's actions were a significant indictment of the Company's subprime lending practices. As the press release that accompanied the FDIC's announcement of the Cease & Desist Order stated, "Our concern has always been that banks make loans that borrowers are able to repay. We believe that the agreement with Fremont addresses this basic concern." Moreover, on March 6, 2007, a Fitch Ratings Managing Director described the FDIC's Cease & Desist Order against Fremont as one of the "harshest" he had ever seen.

69.     Of the over 6,000 institutions supervised by the FDIC, only approximately 46 organizations received cease and desist orders in 2007. Of those 46, only five banks were subprime lenders that were sanctioned for "unsafe and unsound" lending practices. Fremont was the first bank to be cited so extensively for such unsafe and unsound practices related to subprime mortgage lending in over five years since the implementation of the Interagency Expanded Guidance for Subprime Lending Programs in 2001.

70.     The FDIC's formal enforcement action against Fremont followed its own extensive investigation of Fremont's underwriting and banking practices.  In the hierarchy of FDIC enforcement actions, cease and desist orders are second in severity only to termination of deposit insurance proceedings.  Despite the severity of the FDIC's action, it was entirely foreseeable to Defendants.  In its Interagency Guidance on Subprime Lending the FDIC clearly had warned since 1999 that:  "If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high risk activity that is unsafe and unsound."

71.     On March 22, 2007, the Senior Deputy Comptroller and Chief National Bank Examiner, Officer of the Comptroller of the Currency, testified before Congress that "it is clear that some subprime lenders have engaged in abusive practices . . . But, it would be wrong to equate all subprime lending with predatory lending."  He further testified:  "<u>Subprime lending is a specialized business that must be carefully managed to maintain safety and soundness, to mitigate risks, and to ensure fair treatment of borrowers</u> . . . .  Unsound underwriting standards and abusive lending practices have no place in the national banking system."  (Emphasis added.)  Similarly, the Deputy Director, Office of Thrift Supervision testified that:  "At the outset, I believe it is worth stating that what may seem obvious but often gets misconstrued in the context of discussions on subprime lending and predatory lending.  That is, these are not the same thing."  He added:  "While we want to intercede to weed out irresponsible and predatory lenders, we do not want to shut off the availability of credit to the subprime market.  Again, subprime lending is not per se predatory lending."

72.     At the same March 22, 2007 hearing, the Director, Division of Supervision and Consumer Protection of the FDIC, specifically cited just one FDIC-regulated bank, <u>Fremont</u>, for "operating without adequate subprime

mortgage loan underwriting criteria" and noted the FDIC's recent, significant action against Fremont "to fight unsafe, unsound, and abusive lending practices."

73. Accordingly, Fremont's "unsafe and unsound" underwriting standards were not excusable merely because it was a subprime lender. Instead, these undisclosed practices were so inconsistent with Defendants' public representations and then-existing interagency guidelines for subprime lending that Fremont was singled out by the FDIC and its subprime lending was shut down in March 2007 in a severe FDIC action.

74. CW 34 was an Assistant Vice President, Regulatory Risk Examiner at Fremont for nearly three years and throughout the Class Period. CW 34 was specifically involved with the FDIC's investigation of Fremont, including providing the FDIC with information throughout its investigation. CW 34 reports that the FDIC was investigating Fremont on site for more than one year before the Cease & Desist Order and that, at one point, there were more than 50 FDIC examiners on site, including one of the FDIC's more senior examiners with a "grade 15" employment status who was on site from the beginning of the FDIC's examination, demonstrating the seriousness of the FDIC's investigation. CW 34 states that Fremont's Regulatory Risk Management group (of which CW 34 was a member) submitted numerous, repeated adverse written findings to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, in 2005 and 2006, which "mirrored" the FDIC's eventual Cease & Desist Order, one to two years later. CW 34 states that these repeated adverse reports specifically highlighted, inter alia, unfair and deceptive acts that Fremont was engaging in, "pretty obvious" poor underwriting and problematic incentive compensation. CW 34 states that these reports were based on reviews performed by the Regulatory Risk Management group, including interviews of underwriters, quality control and other Fremont personnel. CW 34 reports that Defendants McIntyre, Rampino, Bailey

and other senior executives "dictated policy and procedures" and that their push was to make more and more loans with "no restraints" to increase their own personal compensation at Fremont with increasing loan volume while deliberately ignoring the repeated adverse findings from Regulatory Risk Management. CW 34 states that the Company filed repeated Suspicious Activity Reports ("SARs") regarding broker fraud as to the same brokers, but that Defendant Walker who made the decision whether to terminate a relationship with a broker would not end relationships with the identified brokers. CW 34 states that some of the fraud was "so egregious" including "ridiculous" stated income applications, yet nothing was being done about "obvious problems" including repeated broker fraud. For example, numerous SARs were filed regarding mortgage broker Dana Capital, yet Defendant Walker refused to terminate Fremont's relationship with Dana Capital because it was bringing so much business to Fremont. CW 34 states that Fremont's senior executives knew after a few months of the start of the FDIC's investigation and by the time of Defendant McIntyre's highly unusual stock sales in August 2006 (described below), that an adverse action was coming from the FDIC. CW 34 further states that Regulatory Risk Management submitted written adverse reports to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, as to the inadequacy of Fremont's loan loss reserves and Residual Interest valuations long before the FDIC's Cease & Desist Order was issued and that those reports were reviewed by the FDIC and were a part of the information the FDIC considered in reaching its conclusions.

75. The severe FDIC findings and action and the repeated adverse reports by Fremont's Regulatory Risk Management group described herein (as well as numerous other data and first-hand accounts set forth below) demonstrate that contrary to the individual Defendants' repeated Class Period statements set forth in Section VIII below, Fremont did not engage in "appropriate," "sound" or

"improved" underwriting and that Defendants' statements regarding Fremont's subprime underwriting practices were materially misstated when made.

### 2. The First-Hand Accounts of Fremont's Former Employees Further Establish That the Company's Underwriting Was Virtually Non-Existent and Not "Sound" or "Appropriate"

76.     In addition to Lead Counsel's review of the FDIC's findings, Lead Counsel also has interviewed dozens of former Fremont employees who were directly involved with underwriting Fremont's loans or auditing the underwriting of those loans. These former employees' accounts further establish that (contrary to Defendants' repeated Class Period statements regarding purportedly "appropriate," "sound" and/or "improved" underwriting) Fremont deliberately disregarded its underwriting criteria, motivated underwriters and all levels of employees with incentive compensation, consistently approved stated-income loans with facially implausible incomes, continued to accept loans from brokers who submitted fraudulent documentation, and approved complicated and high-risk mortgages for which borrowers did not qualify and could not afford. The independent personal accounts by these witnesses are as disturbing as they are consistent. Moreover, they strongly demonstrate the falsity of Defendants' Class Period statements regarding Fremont's purported underwriting practices.

77.     During the Class Period, Fremont maintained five loan production centers (located in Anaheim, California; Downers Grove, Illinois; Concord, California; Elmsford, New York; and Tampa, Florida) and two loan servicing centers (located in Ontario, California and Irving, Texas). The chart below describes the hierarchy at a typical Fremont loan origination center. As set forth below, Lead Counsel has interviewed numerous former Fremont employees who served in each of these positions:

| Title | Responsibilities |
|-------|------------------|
| Account executive | Essentially sales representatives, account executives brought in loan applications originated by brokers. |
| Sales manager | Sales managers oversaw the account executives at a branch office. |
| Underwriter | Underwriters were supposed to ensure that the loan file satisfied the Company's credit and documentation criteria. |
| Account manager | Once a loan file was received, the account manager shepherded the file through the underwriting process to closing. Account managers acted as liaisons between underwriters, account executives, brokers, and funders. Account managers worked with account executives to make sure the loan file was complete and to resolve any problems encountered at the underwriting stage. Account managers also approved exceptions. |
| Funder | After the file was approved, the funder ensured that all of the exceptions were approved, prepared the documents for the borrower to sign, and wired the funds to the title company. |
| Assistant operations manager | Assistant operations managers oversaw a team of underwriters, funders, and account managers. Assistant operations managers reviewed the loan file before it was funded and approved exceptions. |
| Operations manager | Operations managers oversaw funders, underwriters, and account managers. They also approved exceptions. |
| Quality Control or Compliance Auditor | The auditors reviewed funded and sometimes pre-funded loans and were supposed to determine whether they were properly underwritten. The auditors generated Quality Control Reports reflecting their findings for review by Fremont's executives. |
| Broker Channel Manager | Broker channel managers monitored the loan files submitted by brokers and were supposed to determine whether the documentation was bona fide. Broker channel managers also compiled Suspicious Activity Reports and Broker Channel Reports reflecting their findings for review by Fremont's executives, who ultimately decided whether to continue doing business with a broker. |

78.    Confidential Witness ("CW") 1 was a senior underwriter at Fremont's Anaheim, California center from 1997 to September 2007. CW 1 reported that as the market boomed in 2004 and 2005, Fremont loosened its underwriting standards and introduced an array of risky products, such as stated-income loans. According to CW 1, Fremont began to approve stated-income loans with loan-to-value ratios of up to 90%, whereas the prior maximum had been between 75% to 80%. Moreover, CW 1 stated that Fremont routinely approved stated-income loans with

claimed incomes that were simply "off the wall figures." Fremont also introduced a spectrum of piggyback loans that it had not offered before. Before these changes, CW 1 stated that Fremont had limited its piggyback loans to an 80/20 model, where the first loan was for 80% of the property's price and the second loan was for the remaining 20% of the price. However, around 2004, Fremont introduced 85/15, 90/10, and ultimately 95/5 piggyback loans. Further, according to CW 1, Fremont loosened its debt-to-income-ratio requirements. Before 2004, Fremont generally did not approve loans with more than a 50% debt-to-income ratio. Thereafter, according to CW 1, Fremont approved loans with a 55% debt-to-income ratio. And when CW 1 reviewed the loan files, he often determined that the debt-to-income ratios actually were between 65% or 70%. In addition to these loosening guidelines, CW 1 said that underwriters received financial incentives based on loan volume. Underwriters were expected to underwrite a minimum number of loans per month, but Fremont would pay them $25 per file for anything over that amount. According to CW 1, the top underwriter in the Company's wholesale loan division underwrote 230 loans per month. CW 1 also reported that Fremont paid brokers "yield spread premiums." A yield spread premium is a form of bonus compensation by which the broker receives a percentage of the loan's value if the broker convinces the borrower to accept a mortgage at a higher interest rate than the rate for which the borrower qualifies. CW 1 stated that Fremont maintained a computer information system that kept executive management informed of the exceptions being made to Fremont's underwriting standards. Every underwriter kept a report for each loan, which showed whether the loan was based upon any exception to Fremont's underwriting guidelines. Fremont's loan origination software – which was a program called "Uniform" until the Company switched to an even more comprehensive program called "NetOxygen" – aggregated that information and generated exception reports that Fremont

executives received. CW 1 stated that he agreed with the FDIC's Cease & Desist Order and that Fremont was engaging in unsatisfactory lending practices and originating poor quality loans.

79. CW 2 was an account executive at Fremont's Anaheim, California center from November 2005 to June 2006. CW 2 was responsible for collecting loans from brokers nationwide, performing a preliminary underwriting review of the loans, and closing the loans if they passed a final, separate underwriting review by one of Fremont's loan underwriters. According to CW 2, Fremont's underwriting processes were affected by business generation with less regard for the quality of the loans being reviewed. He stated that the account executives who brought in more loans were granted more exceptions. CW 2 further said that account executives and underwriters often made exceptions to credit score and income requirements. Further, CW 2 stated that all of Fremont's account executives were taught a variety of ways to "calculate" a potential borrower's income in order to create a number that was acceptable for the loan sought. If a loan application came in with an income that was too low to qualify and the account executive noticed the problem, CW 2 stated that Fremont's account executive would "recalculate" the income and send the loan back to the originating broker with instructions to restate the edited figure on the loan documents. If Fremont's account executive did not notice the problem before the loan got to Fremont's loan underwriter, then the underwriter would tell the account executive to resubmit the loan with a higher income calculation. CW 2 also said that fully-documented loans that underwriters had rejected were resubmitted as stated-income income loans "all the time." When this type of resubmission occurred, the loan underwriter often allowed the borrower or broker to state a higher income than the borrower had written on the fully documented mortgage application. CW 2 reported that Fremont's borrowers were "hurt" and forced into a "vicious cycle"

of refinancing adjustable rate loans every two years, but that because Fremont's account executives and the loan brokers did not mind the refinancing, it was "kind of two against one."

80.     CW 3 was a Fremont account executive from October 2004 to November 2006. As an account executive, CW 3 was responsible for collecting loans from brokers nationwide. CW 3 reported that Fremont's stated-income loans were often based on obviously falsified documents, but "everyone pretended that the documents were real."

81.     CW 4 was a Fremont sales manager in the Midwest from August 1998 through March 2007. He oversaw multiple employees in Fremont's wholesale division. CW 4 emphatically agreed with the FDIC's eventual assessments and stated that even though he had 26 years of experience in the industry, "I never saw such loose lending in my life." CW 4 stated that not only were the Company's guidelines loose, but there were frequent exceptions to the guidelines. CW 4 reported that exceptions were made on rates, debt-to-income ratios, loan sizes, and bankruptcy history limitations. According to CW 4, Fremont approved borrowers without appropriate documentation and as a result, those loans were likely to require frequent refinancing. Further, CW 4 further stated that borrowers were provided with confusing or inadequate information.

82.     CW 5 was an underwriter at Fremont's Downers Grove, Illinois center from August 2002 to January 2007. CW 5 reported that Fremont often issued stated-income loans based on obviously fabricated documentation. For example, a pizza deliveryman could claim to have a monthly income of $5,000. According to CW 5, when the underwriters brought these obviously false claims to the attention of the manager, the manager's response was always "make it work, even if it didn't make sense, make it work" and managers were always willing to sign off on loans. According to CW 5, Fremont also frequently made exceptions to its underwriting

criteria in order to appease account managers. These exceptions were made to the loan rates, FICO scores, loan-to-value ratios, and the requirement that the borrower be at least two years removed from any foreclosure or bankruptcy. When underwriters and operations managers refused to sign off on exceptions, CW 5 stated that the loans often were brought to regional managers who approved them.

83. CW 6 was an underwriter at Fremont's Downers Grove, Illinois center from June 2005 to January 2007. CW 6 has worked in the mortgage industry for nine years and spent half of that time as an underwriter. CW 6 reported that he called loan files into question on a daily basis at Fremont, especially on stated-income loans. From the summer of 2006 to January 2007, more than half of the loans at his branch were stated-income loans. With respect to fully-documented loans, CW 6 often noticed that the supporting documentation, such as bank statements and W-2 forms, had been visibly altered. Despite evidence of obvious fraud, his supervisors often approved those loans. These instances increased in frequency during the last four to six months of his employment, when Fremont purportedly was tightening its standards. In fact, during the last four to six months of his employment, CW 6 disagreed on a daily basis with either the sales team or his boss over loans that he believed were obviously fraudulent or overstated. But his supervisors were adamant about approving loans regardless of quality. CW 6 first heard talk of an increase in early payment defaults in the beginning of the summer 2006. His underwriting team held monthly meetings with the branch manager to review steps they could take to reduce the problem. However, the problems continued. According to CW 6, the underwriters were still pressured to approve loans even if they believed the borrower could not afford it or the documentation was fraudulent.

84. CW 7 worked for Fremont in Anaheim, California from March 2004 until March 2007. She worked as an underwriter II from May 2005 until March

2007. Prior to that, she was a senior funder from March 2004 until April 2005. CW 7 reported that exceptions to the Company's guidelines "were done on a daily basis," and estimated that 30% of Fremont's loans had some sort of exception. Exceptions were so common partly because anyone from an assistant manager on up could sign off on an exception; if one level of management did not sign off on an exception, an account executive could go higher in the ranks until he found a willing signer. According to CW 7, the stated-income loan program was often used to get unqualified borrowers into loans they could not afford. Fremont would allow W-2 wage earners "to go stated," even though the program was not supposed to accommodate them. CW 7 often saw "unbelievable salaries" on the state-income loan documents for landscapers, hairdressers, and seamstresses, yet managers still approved the loans. Management would say, "Push it through" because Fremont was "all about funding the loans and getting volume instead of looking at quality." CW 7 estimated that between 40% to 50% of Fremont's loans were stated-income, and of those stated loans, about 20% were made to W-2 wage earners. According to CW 7, there was an incentive to push loans through because the more loans that were funded, the more money you made.

85.    CW 8 was a senior review production appraiser at Fremont's Elmsford, New York center From July 2003 through October 2006. CW 8 stated that his responsibility was to review appraisal reports for compliance and accuracy. CW 8 reported that he had a daily quota of nine reviews per day and if he completed more than nine per day or 45 per week, he would be paid an incentive of $25 per review.

86.    CW 9 was a senior account manager at Fremont's Downers Grove, Illinois center from July 2001 to February 2007. Her job was to act as a liaison between brokers, account executives, underwriters, and funders. She received the loan file after it went through the underwriting process and worked to resolve any

outstanding issues, such as collecting missing documentation or considering whether an exception should be made to underwriting guidelines. According to CW 9, the policy at Fremont was "close the loan" regardless of whether the borrower was properly qualified. According to CW 9, managers pressured account executives to get loans in and the policy at Fremont was to get the loan done no matter what it took. Management "called it massaging the file – to get it to work however you had to." Underwriters at Fremont were instructed to "make the deal work" and were overridden if they did not. CW 9 added: "Underwriters were put into such an awkward position; everyone had goals to meet. They would pay underwriters to come in on weekends to crank out as many loans as they could." She reported that underwriters were required to underwrite at least five loans per day. According to CW 9, to "massage the file," Fremont frequently waived its requirement that a borrower reserve for at least 60 days cash equal to two mortgage payments (the "cash seasoning requirement"); its requirement that a self-employed borrower verify his income for the past two years in a letter signed by a certified public accountant; and its requirement that the borrower have no outstanding judgments against him. CW 9 refused to sign off on many of those exceptions. When she refused to sign off, the sales representative simply went above her head to her operations manager or production manager, who always approved the loans. CW 9 also noted that underwriters often failed to adequately verify a borrower's employment. Until approximately February 2006, Fremont's guidelines allowed an underwriter to verify the claimed employment by asking anyone who answered the phone at the business, even the receptionist, if the borrower was employed there. Often, the underwriters were too busy to even make that superficial call, so CW 9 would do it herself. If CW 9 learned that the borrower did not work at the business reported on the documentation, the broker would simply provide a new name and direct phone line for someone who would vouch for the borrower's

employment. If CW 9 rejected a loan for lack of proof as to the borrower's employment, the loan would still be approved over her head. CW 9 further reported that stated-income loans were often approved despite obviously fabricated or exaggerated documentation. For example, she saw loan documents on which pizza delivery men claimed to make $4,000 to $6,000 a month or window washers claimed to make $75,000 a year. If an underwriter tried to deny a file due to incredible assertions of income such as those, the sales manager or account executive simply would take the loan to the operations manager, who would sign off on it. CW 9 further said that Fremont's loan products were exceedingly risky. Loans with multiple layers of risk – particularly the 80/20, 100% stated-income loans with really poor FICO scores – were the bulk of Fremont's business. Further, Fremont often issued ARMs that reset after two years but carried a prepayment penalty for the first three years, which forced the borrower to pay the penalty or assume a fully-indexed monthly payment he or she could not afford. Moreover, Fremont often wrote loans on properties with inflated values. As a result, borrowers often owed more than their home actually was worth. This practice left borrowers with little choice but to walk away from their homes because, according to CW 9, they were "never going to get out of that." As a result of those underwriting and lending practices, Fremont "spiraled into a big, big, huge, ugly mess." CW 9 reported that there were increased early payment defaults and a higher level of documentation flaws during the last quarter of 2006.

87. CW 10 worked at Fremont's Downers Grove, Illinois center from January 2002 to July 2006. She spent her first three years at the Company as a funder before becoming an account manager II. CW 10 collected and reviewed loans from all over the country. According to CW 10, the incomes listed on Fremont's state-income loans were "totally out there" with "ridiculous salaries." CW 10 also said that her superiors would call property appraisers and request that

they inflate their appraisal values by at least a few thousand dollars, and the appraisers would do so. When she refused to sign off on the loans she reviewed because she believed that the borrowers were not qualified, loan-to-value ratios were too aggressive or additional information was required, her superiors approved them anyway. CW 10 reported that her superiors tried to push through nearly every loan and would sign off on loans even when borrower or broker fraud was brought to their attention. She always asked why flawed loans were approved, but her bosses simply told her not to worry about it. The idea at Fremont, she said, was to get the loans in, close them, and sell them. CW 10 reported that after Defendant Walker became CEO of FIL, the Company became more lax with its underwriting standards, pushing through loans that should not have been made. CW 10 stated that borrowers could not afford the loans they were given and numerous foreclosures resulted.

88. CW 11 was an account manager II at Fremont's Downers Grove, Illinois center from August 2005 to January 2007. CW 11 reviewed the loan file after it went through underwriting. If CW 11 approved the loan, she would send a stipulation sheet to the broker, which detailed the rates, terms, and conditions that must be met for money to be dispersed. The file would then go to a closer. According to CW 11, Fremont often made unsupportable exceptions to its underwriting criteria. CW 11 often reviewed and refused to approve loans where the borrower had a different job than was listed, where the pay stubs appeared to have been fabricated, where the W-2 form did not match the other documentation, or where the appraisal value was improper. But her operations manager approved all of these kinds of loans. In fact, she said if neither she nor the underwriter approved the loan, an operations manager nevertheless would approve it 95% of the time. CW 11 also said that if fully-documented loans were rejected because the borrower's income was too low, the account executives simply converted them into

stated-income loans with higher levels of stated income. According to CW 11, this practice occurred routinely, especially near the end of the month when the account executives were trying to meet their monthly quotas.

89. CW 12 was employed by Fremont from March 2003 through May 2007, serving as an account manager during his last two years at the Company. CW 12 reported that Fremont made frequent exceptions to loan guidelines and "that's how we did business on a daily basis." According to CW 12, even when the Company purportedly became stricter near the end of his time at the Company, it still allowed exceptions, including accepting letters of reference for a stated-income borrower that were not professional and could be made at "any Kinko's." CW 12 stated that he could go to anyone within the Company to get his loans approved "as a favor" including his regional manager. CW 12 reported that seasoned account executives knew that they could push for an exception by "stomping their feet" if necessary.

90. CW 13 was a senior account manager at Fremont in Downers Grove, Illinois from 2004 through May 2007. As an account manager, CW 13 worked as a liaison between sales and clients and worked on clearing conditions on loans. CW 13 reported that Fremont management turned a blind eye to many things and that exceptions were widespread. According to CW 13, anyone from account manager on up could sign off exceptions. And, if an account manager or underwriter was unwilling to sign off, the account executive could "go above them" to a sales manager for approval. Underwriters and account managers would then be admonished for not doing their jobs properly. According to CW 13, account managers had to close a minimum of 40 loans per month and more for a bonus. According to CW 13, account managers also had to fund at least $2 million in loans per month in order to start receiving commissions. CW 13 stated that underwriters also had quotas of the number of loans they were required to

underwrite per day and that underwriters were part of a team that got compensated based on the total amount of loans that were funded.

91.     CW 14 was employed by Fremont from November 1998 through June 2007, first as an account manager and then a senior underwriter starting in 2003. CW 14 reported that her superiors often would insist on pushing through loans that she did not wish to approve and that she expected Fremont to "go down" because of the types of loans that were being approved.  According to CW 14, most commonly, loans with obviously misstated income levels were approved.  When CW 14 believed that income was misstated she sought to verify it with the borrower, but her supervisors would waive this condition.

92.     CW 15 worked in Fremont's Anaheim, California center from October 2003 through January 2007.  She began as a funder and became a compliance auditor in mid-2006.  As a funder, she reviewed the loan file after it had been approved to ensure that all of the underwriting conditions were acceptable and satisfied, and if she approved of the loan herself, drew the documents for the borrower to sign.  She ensured that the borrower properly executed those documents, calculated the funds for the wire transfer, and wired the funds to the title company.  As a compliance auditor, she reviewed already-funded loans that had been originated in the Anaheim office.  According to CW 15, Fremont management often approved loans that she refused to approve as a funder because of missing documentation or potential fraud.  For example, CW 15 sometimes noticed that the borrower's signature on the loan documents did not match the borrower's signature on other documents in the file.  Because it was clear to her that the borrower did not sign the documents, CW 15 would reject the file, but these loans typically were approved by a more senior manager.  She also said that Fremont maintained a central database of information regarding the number and type of exceptions made on each loan.  Fremont's loan origination software – first

Uniform and later NetOxygen – aggregated the information generated in all stages of the loan approval and review process, including underwriting, funding, processing, auditing, and compliance. The system tracked exceptions and then generated exception reports. CW 15 also reported that Fremont paid volume-based compensation to its account executives, underwriters, and funders.

93.     CW 16 was employed by Fremont as a funder, account executive, underwriter and, most recently, training manager during the time period from 1997 through May 2006. CW 16 reported that even when Fremont's loan underwriters discovered fraud in an application, their superiors would approve the file over the underwriter's objection. CW 16 further reported that Fremont's loan underwriting guidelines were not strict enough and that she brought them to her management's attention throughout her tenure with the Company, but that her concerns were ignored. According to CW 16, "heavy hitter" account executives got whatever they wanted to keep them happy, including approving loans over underwriters' objections at least half of the time. According to CW 16, loans with fraud were easy to identify, but pushed through nonetheless.

94.     CW 17 was an assistant operations manager at Fremont's Anaheim, California center from October 2003 to January 2007. His job was to review loan files and sign off on loans that required exceptions to Fremont's underwriting guidelines. CW 17 reported that Fremont had no guidelines for exceptions and no one at the Company set standards for what exceptions were allowable; consequently, Fremont's underwriters, account executives, and operations managers consistently made exceptions to the underwriting guidelines in order to approve loans. CW 17 stated that the attitude at Fremont was "you have to make it work," even if approving a loan required making several exceptions to the underwriting guidelines. CW 17 reported that Fremont made "a lot of exceptions that weren't warranted" and the culture at Fremont was "get it done" without the

Company clearly defining what that meant. As a result, he said, "loose guidelines brought us down." CW 17 noted that it was "silly" to give a person who had a history of not paying his bills a 100% financed mortgage and not expect to have problems. According to CW 17, Fremont managers typically made exceptions to FICO score requirements; the cash seasoning requirement; the property seasoning requirement; and an array of documentation requirements. Regarding the cash seasoning requirement, even though Fremont ostensibly required the borrower to reserve for 60 days an amount of cash equal to two mortgage payments, according to CW 17, Fremont would approve the loan so long as the money was in the account at the time of the application – even if the money had been on deposit for just one day. Also, in order to avoid lending on "flip" transactions, Fremont ostensibly maintained a property seasoning requirement of six months, but, according to CW 17, Fremont managers often approved loans on property that had been purchased only three months before the instant sale. In addition, CW 17 said that managers often lowered a borrower's required FICO score by at least a few points. Further, managers also made exceptions to documentation requirements by accepting handwritten receipts, which could have been drawn up by anyone, as proof of the borrower's rent payments. According to CW 17, Fremont always tried to find some way to do the loan. And he said that Fremont's treatment of its stated-income loans was even worse. For stated-income loans, CW 17 said that the standard policy was to allow ridiculous incomes even for babysitters and gardeners. The underwriters knew that these loans would always be approved regardless of how egregiously exaggerated the incomes were. This practice was so entrenched that, according to CW 17, eventually the underwriters stopped taking the file to the operations manager for approval or even asking about the incomes. The underwriters would just sign the loans themselves because they knew their decision would be overridden otherwise. And, according to CW 17, if Fremont

could not ignore exaggerated information in the loan file, Fremont simply removed that information (such as a false pay stub) and replaced it with new information rather than turning down the loan. CW 17 stated that if a manager turned down such a newly-papered loan, a higher-ranking production manager normally approved it. Further, according to CW 17, Fremont made little effort to determine whether the broker or borrower committed the overstatement, and often continued accepting loans from that broker.

95. CW 18 was an assistant operations manager at Fremont's Downers Grove, Illinois center from November 2005 to February 2006. He was responsible for checking underwriting documents, verifying employment on stated-income loans, verifying residency, ordering supporting documents from the IRS, and ensuring that the loan fit Fremont's parameters. According to CW 18, if a stated-income loan application was likely to be rejected, Fremont's practice was to instruct the underwriters to tell the brokers exactly how to re-structure the loan so that it would be accepted. In particular, if the stated income was too low, the underwriters would instruct the brokers to send new documentation reflecting a higher income. According to CW 18, the underwriters typically searched databases to determine the standard range of income for the job title listed on the application, and then told the broker to submit an amount within that range. In that fashion, the underwriters and brokers knew that the newly-selected income "would fly." Once the loan documentation was edited accordingly, the loans were always approved. CW 18 said that this policy was an "understood rule," and that he instructed the underwriters to execute it. Each underwriter had to be instructed only once and would know to call the broker on his own from that point on. CW 18 could not estimate how many loans were resubmitted, but said that loans were never turned down because the stated income was too low; the loan was simply re-submitted

and approved. According to CW 18, instead of rejecting loans, underwriters told the account executives how to submit a loan file that would be approved.

96. CW 19 was an operations manager at Fremont's Anaheim, California center from April 2004 to January 2007. She oversaw a team of approximately 22 funders, underwriters, and account managers. CW 19 said that her production manager, to whom she reported, often approved exceptions to underwriting requirements, including loan-to-value exceptions and FICO score exceptions, such that the borrower received a larger loan than that for which he or she actually qualified. CW 19 reported that these exceptions were made every day. CW 19 also reported that Fremont accepted ridiculous income statements on its stated-income loans. She observed that Fremont's guidelines loosened over time and that the Company made the most exceptions in early to mid-2006.

97. CW 20 was a quality control auditor for Fremont from May 2005 to February 2007. He audited loans that had not yet been funded and those that already had been funded. Around August of 2006, his supervisor instructed him that auditors were not to verify income assertions for any stated-income loan applications submitted by self-employed borrowers. According to CW 20, the practice of not checking income or employment documentation continued until December of 2006.

98. Two internal Fremont email that Lead Counsel obtained and reviewed confirms CW 20's account. The first email is dated August 3, 2006, from Crystal Burton, a Fremont quality control manager, to several Fremont quality control auditors. Dave Tedesco, the vice president of quality control, is copied on the email. In that email, Burton instructs the auditors as follows:

> Please do not verify income on stated income loans at all during employment verifications. This is for the regular QC audits only for now.

> I will check with Dave [Tedesco] on the Full Verification Audits. I
> don't think we'll be verifying the stated income [on those loans] either
> but let me double check with Dave prior to implementing this change.
>
> Please implement immediately. [Emphasis added.]

Tedesco replied to the quality control auditors and Burton by email the following day, August 31, 2006, instructing them to not verify income even on supposedly "full verification" loans. His email instructs them to "[p]lease follow the same procedures on Full Reverif loans as well." Importantly, the instruction to not verify income for stated-income loans – even on supposedly "full verification" loans – was given in August of 2006 – after Defendants claimed that Fremont had improved its underwriting standards, as set forth in ¶¶ 335-360 below. Tedesco reported to Defendant Walker.

99. CW 21 was a quality control fraud investigator at Fremont from 2002 until March 2007. From April to May 2007, she worked in the Due Diligence Department helping Ellington Capital Management audit several pools of loans that it was planning to purchase. After working in the Due Diligence Department, CW 21 returned to corporate headquarters to handle investor repurchases from May to September 2007. As a quality control fraud investigator, CW 21 observed that instances of obvious fraud in Fremont's stated-income loan program increased significantly by 2006. "The last year was horrific," she said. "It just got stupid towards the end," as Fremont was just about "giving anyone a loan who wants one." According to CW 21, at least 80% of the early payment defaults that occurred in 2006-07 occurred on loans that were issued despite some type of improper supporting documentation, and the balance of the defaults were due to improper underwriting exceptions. An example was finding 40 loans files from the same broker that had exactly the same banking statements. According to CW 21, the increase in overstatements of income at Fremont occurred in large part because

Fremont did not require or even permit its underwriters to verify the borrower's income figures on stated loans. In addition, CW 21 said that Fremont often failed to adequately verify a borrower's employment. As proof of employment, Fremont typically accepted two letters of reference. But employees of the broker submitting the loan often served as the references; CW 21 discovered this simply by calling the broker's company and asking for the people who had signed the letters. According to CW 21, the types of fraud she routinely encountered were so pronounced – including bank statements with hand-written numbers – "you have to be brain dead if you didn't see it." In her view, management deliberately turned a blind eye to it. CW 21 recorded her findings of fraud and poor underwriting on a spreadsheet that she gave to her supervisor. Each month, these reports were transmitted to Fremont's branch heads nationwide. But no improvements were made to Fremont's lending practices despite the distribution of these reports. Fremont management, including executive management, also was briefed on the issue of rising early payment defaults and the reasons behind the trend. According to CW 21, the issue of increasing early payment defaults was first raised around mid-2006 in conference calls with Fremont upper management and office branch employees. Defendant Walker would review Early Payment Default reports ("EPD Reports") and lead these calls. CW 21 produced EPD Reports that set forth both the delinquencies the loans exhibited on a monthly basis, and the kinds of loans that had defaulted most often, such as stated-income loans or loans originated by a particular broker. In addition, each month, Brian Whitham, Fremont's senior vice president of quality control and CW 21's supervisor, presented Quality Control Reports, EPD Reports, and Suspicious Activity Reports ("SARs") to Fremont executives, including Defendant Walker. Whitham also discussed the SARs and EPD Reports with Defendant Walker on a monthly basis. At approximately the end of 2006, Whitham asked CW 21 to do a special presentation explaining the

reasons for the increase in early payment defaults; Defendant Walker received certain reports that she generated for that project. During her time auditing loans in the Due Diligence Department and later, in connection with her review of investor repurchase claims, CW 21 discovered misstated or incomplete documentation on the large majority of the loans she audited. These instances concerned, among other things, incomplete appraisals; appraisals that did not match the address of the property; appraisals that described the home as owner-occupied when it was rented; failure to verify the borrower's employment; inflated credit scores given to borrowers who previously had missed more than one mortgage payment; income statements that she found to be false; credit scores too low to qualify for the loan under the Company's guidelines; incomplete or fabricated W-2 forms; the absence of required bank statements; and the absence of required Homeowners Association Certificates. While CW 21 worked on investor repurchase requests, in August of 2007, three representatives of the buyout group led by Gerald Ford (discussed further below) asked her what percentage of the loans she had reviewed were misstated in some way. She told them that up to 75-80% of the loans she reviewed fit that category.

100. CW 22 was a quality control auditor at Fremont from March 2004 through March 2006. He thereafter worked as a broker channel manager from March 2006 to March 2007. CW 22 explained that none of Fremont's loans went through quality control before they were funded; his group only looked at funded loans. Fremont, he said, "made a lot of bad loans" because it performed its quality control review after the loans had been funded. In fact, CW 22 said that he encountered a great deal of obvious fraud, often including fake pay stubs and fraudulent bank statements. Also, incomes on stated loans were obviously inaccurate, as cooks at "Jack in the Box" claimed to make $90,000 per year. But CW 22 was allowed only to verify employment and position; it was against

Fremont's policy to verify income on stated loans. Not only did brokers submit a lot of obviously fraudulent documentation, according to CW 22, but they also talked customers into programs that the customer clearly did not understand. But all these kinds of loans were approved. Fremont started auditing loans prior to funding only a few months before the Company closed. As CW 22 would audit a loan, he could see what exceptions had been made and who had made them. All of that exception information was catalogued in the Uniform loan origination system. During his final year, CW 22 was a broker channel manager. His job was to review the loan submissions of new brokers and brokers who had been caught submitting fraudulent loan applications. If CW 22 recommended that a broker be terminated, Defendant Walker or Nicolas ultimately made the final decision. CW 22 explained that several brokers consistently sent over 150 loans per month, approximately 30 of which were obviously fraudulent or improperly documented. But because these brokers brought in a substantial volume of loans, CW 22 reported that "the people who had the say" refused to stop doing business with them. CW 22 stated that Fremont's top executive management was well aware of the problems plaguing Fremont's underwriting practices and its broker relationships. During the summer of 2005, Jane Lucas, the most senior quality control underwriter, assigned CW 22 to compile Quality Control Reports showing the number of exceptions made to Fremont's loans and who made those exceptions. CW 22's managers took this report to meetings with Defendants Walker and Nicolas. Moreover, each month senior executives of Fremont, including Walker, Nicolas, and Murray Zoota (before he retired), received management reports both on quality control and broker channel management findings. The Broker Channel Management Reports noted how many brokers Fremont dealt with, how many were on the watch list, how many had pending litigation or penalties imposed against them, and which loan centers had the most

fraud. The Quality Control Reports, which were based on loans that the quality control auditors had reviewed, reflected the centers that were originating bad loans, the types of bad loans, and the types of exceptions made on those loans. The Quality Control Reports reflected information for loans that had defaulted as well as loans that had not defaulted. Charts submitted with these reports compared these results on a month-to-month basis. CW 22 said that the reports presented the information in very simple, straightforward format.

101. CW 23 worked for Fremont from August 2003 to May 2007. She was a senior underwriter from August 2003 until September 2006, and, thereafter, worked as a compliance assistant operations manager, performing internal audits on funded and unfunded loans. CW 23 reported that approximately seven out of 10 Fremont loans had some kind of exception to the underwriting criteria. The exceptions were made to loan limits, credit profiles, FICO scores, and loan-to-value ratios. According to CW 23, the Company made these exceptions because it was "all about volume" and it was "very easy to bend the guidelines."

102. CW 24 was a quality control auditor at Fremont's Anaheim, California center for about a year, leaving in March 2007. Her main responsibility was supposed to be to ensure that Fremont's underwriters and funders followed Company guidelines. She also was supposed to ensure that the documentation supporting a loan application was bona fide. According to CW 24, during her tenure at the Company, she observed numerous irregularities. In addition to numerous exceptions to loan guidelines, CW 24 observed that underwriters and funders often failed to verify employment on stated-income loans, and when loan auditors went back to verify employment, auditors often learned that the borrower did not work where he or she claimed to work. CW 24 further observed that underwriters often approved loan applications containing bank statements on which the original name had been whited-out and a new name had been placed

over it. She stated that borrower or broker fraud, such as a false pay stub or W-2, was obvious and easy to identify and repeatedly appeared in mortgage applications. Typically, her manager would instruct her to just ignore these types of serious irregularities, which generally occurred because of the pressure put on underwriters to underwrite as many files as quickly as possible. CW 24's audit group regularly met with the underwriters and operations managers and communicated their findings but Fremont's underwriting did not improve. The overriding goal at Fremont, she said, was "to approve the loan period." According to CW 24, auditors were instructed to review as many files as they could without spending a lot of time on them, which amounted to approximately six to eight loans per day. Management made it very clear that they were interested in production rather than quality. If anyone complained too loudly about the Company's lending practices, she became an "ugly duckling" at the Company. The ultimate philosophy, she said, was "shut up and do what they wanted or you were out of here." During her tenure at the Company, CW 24 raised these concerns with Fremont's Human Resources Department, but her concerns were ignored.

103. CW 25 was a senior compliance officer at Fremont's Concord, California center from September 2004 through May 2007. She was responsible for auditing the credit file on funded loans to ensure that the documentation was complete. According to CW 25, Fremont paid volume-based incentives to its account executives, underwriters and account managers.

104. CW 26 was a compliance auditor at Fremont's Concord, California center from February 2004 through May 2007. He was responsible for auditing funded loans. According to CW 26, everyone at Fremont received incentives based on the number of funded loans, including account managers, account executives, funders and underwriters.

105. CW 27 worked for Fremont from April 2002 to May 2007. She started as a senior funder at Fremont's operations center in Anaheim, California and was promoted to broker channel analyst II at Fremont's corporate headquarters in mid-2005. Her job was to determine whether Fremont's relationship with particular brokers across the country was profitable based on the kinds off loans that the broker submitted, the delinquency rate, and the status of the broker's license. CW 27 stated that ultimately, Defendant Walker decided whether to cut off a broker. According to CW 27, Fremont continued to do business with brokers who were providing obviously fraudulent documentation. In one instance, CW 27 discovered that a broker had used, in multiple loan files, an identical, mass-produced and falsified letter to verify the borrower's income. But Fremont management told CW 27 to stop her investigation and decided not to terminate the Company's relationship with the broker because the broker brought in a large volume of loans. CW 27 was informed that Defendant Walker decided to continue doing business with the broker. According to CW 27, Fremont continued to accept loans from many brokers who submitted obviously fraudulent applications because they were "heavy hitters" who brought in a lot of business. CW 27 also said that the FDIC's concerns with Fremont's practices were discussed at a meeting she attended around March 2006 with her supervisor. CW 27 stated that she was interviewed by the FDIC directly around the same time.

106. CW 28 was a broker coordinator at Fremont's Downers Grove, Illinois center for two years until March 2007. According to CW 28, when she found that a broker had submitted fraudulent information, her supervisors instructed her to disregard it and signed up the brokers anyway. CW 28 said that Fremont would even approve brokers who were not licensed in the state they were selling in. CW 28 reviewed approximately 30 new broker packages a day, but could only recall one or two during her tenure that were turned down by Fremont.

107. CW 29 was a loan resolution specialist at Fremont's Irving, Texas center from July 2006 to December 2006. He handled collections on loans that were anywhere from 30 days late up to foreclosure. CW 29 had extreme difficulty contacting delinquent borrowers because approximately 50% of the loans that he received had no listed phone numbers or references and the borrowers could not be located. "Even with subprime paper I never saw anything that ridiculous," said CW 29, who had six years of subprime experience. "As far as subprime paper, that was the worst I've ever seen."

108. CW 30 was a senior underwriter at Fremont's Elmsford, New York center from 2003 until January 2007. According to CW 30, he did not understand why Fremont allowed W-2 wage earners to apply for mortgages with stated-income applications. CW 30 reported that at monthly "roar call" meetings Fremont executives would report on early payment defaults and repurchase claims from whole loan purchasers. In addition, this information would be distributed in monthly reports from Fremont's executive management to regional production managers.

109. CW 31 was an account manager at Fremont's Downers Grove, Illinois center. CW 31 reported that Fremont did little if anything to verify stated-income loans beyond calling the numbers provided and asking "the person who answered the phone" if the borrower had been working for more than two years. CW 31 reported that at least half of Fremont's mortgages consisted of these types of loans and that, "It was pretty easy to get a loan." CW 31 stated that there were regular monthly "roar call" meetings led by Defendant Walker during which underwriting guidelines and early payment defaults were discussed.

110. CW 32 was a vice president and manager responsible for the Company's Sarbanes-Oxley ("SOX") financial compliance from July of 2004 through March of 2005. He reported to Defendant Lamb and was responsible for

reviewing the Company's internal controls and ensuring that the Company complied with SOX 404 regulations. CW 32 said that the Company did not have an independent loan review group reviewing the credit quality of loans. He raised this concern several times to Defendant Lamb and Monique Johnson, who was Fremont's senior vice president of internal audit. Lamb and Johnson informed CW 32 that since SOX did not require an independent loan review group, they were not interested in hearing about it. CW 32 also was concerned about Fremont's compensation plans. He said that the compensation plans primarily were based on the volume of business that employees generated rather than the quality. CW 32 said that it was pretty common knowledge that the employees who originated the loans all received volume-based incentives. CW 32 believed that employees should not be incented in that manner because home loans do not go bad right away, before they are sold into the secondary market. Therefore, employees were incented to push anything through regardless of the quality. Again, CW 32 discussed this concern with Defendant Lamb and Monique Johnson, who were unresponsive. In CW 32's opinion, there was a pattern in Fremont General's dealings with its subsidiaries – both in residential mortgage lending and in the Company's discontinued insurance business. In both cases, the parent company would "get as much out of it as it could and then just dump it on the government."

111. CW 33 was a loan counselor and senior loan specialist at Fremont's Ontario, California center from April 2003 until February 2007. CW 33 observed that poor underwriting greatly increased near the end of her tenure with the Company and that there was obvious fraud from her review of loan documentation, but that when she tried to discuss such red flags with her superiors, including

"blatant" broker fraud, Fremont management told her to ignore the fraud and was not interested in discussing her concerns with her.[3]

112.    CW 35 was a senior underwriter at Fremont from 2002 through 2007, first at Fremont's Anaheim, California center and second at Fremont's Ontario, California center. CW 35 reports that Fremont was operating with a large volume of poor quality loans and engaging in unsatisfactory lending practices. CW 35 states that underwriters were expected to underwrite six files per day and that the Company was only interested in volume. CW 35 reports that Fremont's practices became "worse and worse" beginning in 2005 and that Fremont executives were "fully aware" of significant fraud in its files including landscapers and housekeepers claiming to make $10,000 per month, fraudulent paystubs, W2s and bank statements. CW 35 states that everyone at the Company knew that the reported income levels were not reasonable, but Fremont would let it go. CW 35 further reports that there were numerous exceptions to get poor quality loans approved and that "everything was an exception."

113.    CW 36 was a senior underwriter at Fremont from 2003 through March 2007, at Fremont's Anaheim, California center. CW 36 reports that on numerous loans, stated income "did not make any sense," but Fremont accepted the claimed numbers. CW 36 states that Fremont's lending guidelines were a little stricter when he started at the Company, but it got to the point "where they were meaningless," with everything based on volume rather than common sense or the borrower's ability to pay. CW 36 reported that it was a hard fought battle to decline any loan and often a pointless battle because even if CW 36 "won," he would eventually be overruled at the next level.

---

[3] CW 34 is described in paragraphs 13 and 74 above.

114.   CW 37 was a senior underwriter at Fremont from June 2004 through March 2007, at Fremont's Downers Grove, Illinois center.  CW 37 reports that if underwriters rejected loans, the loans were pushed through over their heads.  CW 37 states that there was significant pressure from sales managers and brokers to make loans.  CW 37 further states that underwriters were instructed that Fremont's guidelines and policy were a "guide" and instructed to "think outside the box."

115.   CW 38 was a senior underwriter at Fremont from August 2002 through March 2007, most recently at Fremont's Downers Grove, Illinois center.  CW 38 reports that Fremont was making loans that he did not agree with, but that he was instructed to approve the loans or find a job somewhere else.  CW 38 states that because account executives and sales managers did not make money unless they closed loans, there was a lot of pressure to approve loans.  If an underwriter was not comfortable approving a loan, CW 38 states that the loan would be brought to the operations manager for approval.  CW 38 states that Fremont became more and more lax in its lending guidelines in order to generate higher volume and revenue.  CW 38 states that when Kyle Walker replaced Murray Zoota as President of FIL, Fremont adjusted its underwriting guidelines to become more aggressive.

116.   CW 39 was a senior underwriter at Fremont's Downers Grove, Illinois center from February 2005 to March 2007.  CW 39 reports that she knew that borrowers were not making as much income as they claimed, including, for example, self-employed landscapers claiming to make $8,000 per month, however, when she questioned these incomes, she was instructed by management to just put the loan through.  CW 39 states that another big issue was that if underwriters failed to approve loans, operations managers would simply override the underwriters' decisions at the request of sales representatives.  CW 39 states that Fremont approved borrowers without appropriate documentation or verification

and offered loans that likely required frequent refinancing. CW 39 reports that Fremont's underwriting became more lax in the summer of 2005 and that the Company did not start to pull back until "things started getting really ugly" and the Company already had made an enormous amount of loans.

117. CW 40 was a lead auditor in Fremont's Credit Compliance Department where she worked from 1999 until 2007. CW 40 led audits of funded Fremont loans in accordance with FDIC guidelines. CW 40 issued written reports to senior FIL management, including to Kyle Walker via email, which repeatedly identified income documentation fraud (whether by the borrower or broker) as an issue over and over again. CW 40 states that the reports were very detailed and included a breakdown of every single loan that was reviewed and the findings for each loan. CW 40 stated that senior management also were always able to request additional information. CW 40 states that, in accordance with FDIC requirements, FIL's Credit Compliance Department audited approximately 10% of FIL's loan production and that, given the numerous problems she uncovered in just 10% of the files, she was often concerned "what did the other 90% look like?" CW 40 states that she was frustrated with the quality of Fremont's underwriting and that the Vice President of Quality Control gave her the impression that he was also appalled and found the quality of the underwriting unacceptable.

118. CW 41 also worked as a quality control auditor from May 2005 to February 2007. CW 41 reports that his group reviewed approximately 10% of Fremont's funded loans based on a random sampling of post-funded loans from all ten Fremont loan centers. CW 41 states that he came across a significant amount of fraudulent loans and that everyday he would discover some kind of fraud with the loans such as fraudulent bank statements, W2s or VORs [verification of rent]. For example, CW 41 states that during his audits he would find brokers who submitted loans that had fraudulent bank statements, with names changed on the

statements from one borrower to another. CW 41 states that he submitted reports on his findings on a weekly basis.

### 3. The Documents That Fremont Distributed To Brokers Further Establish That Fremont's Underwriting Was Dangerously "Unsafe and Unsound"

119. In addition, through its investigation, Lead Counsel has obtained Fremont marketing documents employed in the Company's Elmsford, New York office that aggressively describe several of Fremont's uniquely risky mortgage products and further demonstrate how its underwriting was dangerously "unsafe and unsound." Fremont account executives used these documents to market Fremont's mortgages to brokers. These documents were not shared with homeowners or investors.

120. In one such document, Fremont touts its "Expanded flexible underwriting guidelines." Those guidelines permit "up to 100% LTV full/easy/stated 1st liens," *i.e.*, mortgages with loan-to-value ratios of 100% even on loans with no verification of the borrower's income. The guidelines also permit "80/20 Combo loans to $937,500" and loans for "N/O/O/ [non-owner occupied properties] up to $750K." Fremont also offered this product with an "extended" "Interest only period . . . to 5 years for 2/28 and 3/27 [ARMs]" – thus creating a mortgage layered with risk as to loan-to-value ratio, adjustable rates, and interest only payments. As if that weren't enough, Fremont also offered the loan at a "55% DTI [debt-to-income ratio] to 90% LTV and 50% [DTI] for over 90% LTV."

121. In another such document, titled "100% LTV Jumbo Special," Fremont offers mortgages up to $750,000, with up to 90% loan-to-value ratios, for stated-income borrowers with a 620 FICO score. Fremont specifically notes "(W2 ok)" – even though stated-income loans were supposed to be available only to the self-employed. Again layering risk, Fremont further notes that "No min. consumer

credit history" is required for loans with loan-to-value ratios up to 90% for full-documentation loans, and 80% for state-income loans. Also, Fremont notes that "Max. 1 YSP allowed" – expressly incenting brokers to charge yield spread premiums to convince borrowers to accept a higher interest rate than that for which they qualify. Continuing to escalate the risk in this product, Fremont also offers the loan package with an "I/O [interest only]" option. Finally, Fremont notes that its offer is "Avail. in all Fremont approved states."

122. In another marketing document titled "100% CLTV Jumbo Special," Fremont further loosened its already lax underwriting on the offer described directly above by making that offer available with "No Min. Consumer Credit History Required" – regardless of the loan-to-value ratio of the loan. Further, Fremont raised the amount of the loan to "$850K!" Fremont reiterated that the offer was available for "Stated (W2 OK) combined loan amounts to $750K w/ 620 [FICO] score," such that W-2 wage earners did not have to verify their income, even though they were supposedly required to do so. Moreover, Fremont again offered "1 YSP" to brokers willing to sell their customers loans with rates higher than those for which the borrowers actually qualified.

123. In another marketing document, titled "B/C Special  How Low Can You Go?," Fremont advertises that with respect to "B" and "C" grade loans, it accepts "All credit scores," "All doc types," and "All property types" – despite its purported minimum underwriting requirements – for "B grade loans with LTVs up to 85%" and "C grade loans with LTVs up to 80%." Fremont again provides that this "Special [is] available in all Fremont approved states." Yet again, Fremont compounds the risk inherent in such irresponsible underwriting by making this product "Available on ARMs."

124. In another document distributed to brokers, Fremont further loosens the underwriting criteria on its "B/C Special." In a document heralding Fremont's

"Back-to-School Special," the Company exhorts its account executives and brokers to "Get the Grade That Counts! Check out our Back to School perks for 'B' and 'C' Grades." Fremont notes that for its "B" loans, the "LTVs [have] increased up to 90% w/ min. 550 [FICO] score." For its "C" loans, Fremont notes that "LTVs [have] increased up to 85% w/ min. 580 [FICO] score."

125. In another marketing document titled "Combo Special," Fremont offers piggyback loans up to "$625K" with "100% CLTV" for full-documentation loans and "90% CLTV" for stated-income loans. In the latter instance, the borrower could get a loan for 90% of the property value and did not even have to prove his income (and, as set forth above, Fremont's underwriters were not permitted to verify any stated income). Fremont adds that this mortgage product is available to borrowers with "No min. consumer credit history" at a cost of another 25 basis points, and that "private party VOR [verification of rent] [is] OK" – even though Fremont underwriters were supposed to require official rent receipts to prove rent payments. Fremont further extends this offer to "O/O [owner occupied] Primary Residence and 2nd Homes." Fremont again escalates the risk already inherent in this product by offering an "I/O [interest only] option" to full-documentation borrowers, and making the offer "Available on Refi's!"

126. In yet another such document, Fremont trumpets that its "40-year loan is here!" Fremont notes that pursuant to its 40-year loan, "your borrowers can enjoy the flexibility of their loan being amortized over 40 years with a balloon payment due in 30." Fremont extends its offer with virtually no underwriting criteria whatsoever by opening it to borrowers with "Credit scores as low as 500," "All credit grades," "All doc types," "100% LTV/CLTV," "All property types," including "O/O [owner occupied], N/O/O [non-owner occupied], & 2nd homes." In another marketing document, Fremont writes that "Fremont Makes It Easy To Qualify your Borrowers for their Dream Home" by offering extremely loose

underwriting criteria, namely, "100% Financing," "No Trade Lines Required," "Private party VOR ok (Great for 1st time home buyers!)" and "I/O payments available on 1[st] liens."

127. These documents demonstrate that, at the same that Fremont was (undisclosed to investors) downgrading its underwriting standards as set forth above, the Company was deliberately and dramatically raising the risk profile of its loan products. These products should have caused Fremont to tighten, rather than loosen, its dangerously "unsafe and unsound" underwriting standards in accordance with then-existing Interagency Guidance for subprime lending.

### 4. The Massachusetts Attorney General's Enforcement Action Further Establishes That Fremont's Underwriting Was Virtually Non-Existent And Not In Accordance With Interagency Guidance for Subprime Lending

128. In response to Fremont's dangerous subprime lending practices, the Commonwealth of Massachusetts has brought an enforcement action against Fremont for an array of "unfair and deceptive business conduct" "on a broad scale," including abdicating underwriting standards, providing misleading or incomplete information to borrowers, making subprime loans that it knew would fail, and lending in a predatory fashion.

129. Specifically, on October 4, 2007, the Massachusetts Attorney General commenced an enforcement action pursuant to the Massachusetts Consumer Protection Act titled *Massachusetts v. Fremont Investment & Loan, and Fremont General Corporation*, No. 07-4373 (Sup. Ct. Ma.), in which Massachusetts seeks a range of civil penalties against Fremont on account of the lending practices described above. Massachusetts' action against Fremont was its first enforcement against a mortgage lender under the Predatory Home Practices Act of 2004.

130. In the complaint, Massachusetts asserts that:

> [A]s early as 2004, Fremont began to purposefully relax its underwriting guidelines and sell increasingly risky loan products to increase its loan origination volume. Fremont's requirements eventually grew so lax that in many instances, its underwriters took no meaningful steps to determine whether Fremont borrowers could actually repay a loan.

Massachusetts further alleges that:

> Fremont's business model has generated a variety of aggressive, exceedingly risky, and unfair loan products reflecting Fremont's indifference to whether homeowners can afford its loan. Specifically, Fremont, through its sales representatives and the mortgage brokers it contracted with, induced borrowers into purchasing subprime residential loan products that Fremont knew or should have known would result in foreclosure, absent serial financing into even higher cost loans.

Massachusetts also alleges that:

> Fremont's business model of making loans for quick resale rendered Fremont indifferent to whether a borrower could afford the loan beyond a very short term, *i.e.*, after Fremont has sold the loan to the secondary market. This indifference has translated into Fremont's maximizing loan resale profits through unfair and exceedingly risky loan products, unfair underwriting practices, deceptive loan sales practices through its own conduct and the conduct of mortgage brokers, and unsuspecting borrowers facing unfair or deceptive Fremont loans they cannot afford.

131. According to the Massachusetts Attorney General's complaint, Fremont's loans were "structurally unfair due to their multiple layers of risk with

no meaningful consideration whether borrowers [could] afford to pay the loans." Fremont "approve[ed] borrowers without considering or verifying the relevant documentation related to the borrower's credit qualifications, including the borrower's income;" "approv[ed] borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses;" "failed to meaningfully account for [ARM] payment adjustments in approving and selling loans;" "approved borrowers for these ARM loans based only on the initial fixed 'teaser' rate, without regard for borrowers' ability to pay after the initial two year period;" "consistently failed to monitor or supervise brokers' practices or to independently verify the information provided to Fremont by brokers;" and "ma[de] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores."

132.   In addition, Massachusetts alleges that:

> Fremont failed to explain and/or disclose in a meaningful manner the terms and conditions of their loan products and instead provided borrowers with incomplete or confusing information relative to product features, material loan terms and product risks, prepayment penalties, and the borrower's obligations for property taxes and insurances.

Fremont "exacerbated the predictable harm inherent in these multiple-risk layered ARM products by combining these terms with 100% financing . . . which provided one loan for 80% and another 'piggyback loan' for 20% of the purchase price, to finance 100% of the borrower's home purchase."

133. Further, Massachusetts charges that Fremont paid its brokers "excessive 'yield spread premiums' and other inducements, which encouraged

mortgage brokers to steer borrowers to Fremont's loan products that were excessively riskier and more costl[y] than those for which consumers were otherwise qualified." "In other words, Fremont directly compensated brokers for selling a more expensive loan to the broker's client." In addition, Massachusetts alleges that "Fremont deliberately pitted its own sales representatives, whose primary compensation was based on the amount of mortgages they originated, against each other for mortgage brokers' business" and that Fremont sales representatives "could solicit mortgage brokers across America without any geographic restrictions."

134. These lending practices ultimately resulted in "Fremont's routinely qualifying borrowers for loans they could not actually afford" such that "Fremont knew or should have known substantial numbers of its subprime loans, especially absent prompt refinancing, would foreseeably fail and result in foreclosure, but nonetheless made the loans to promptly package and sell to the secondary market," according to the Massachusetts complaint. "Fremont made hundreds, and probably thousands, of loans that were excessively risky and unsound in relation to a borrower's ability to repay the loan and/or the value of a borrower's property."

135. As alleged by Massachusetts, "Ultimately, Fremont's illegal conduct has contributed to the high number of foreclosures in Massachusetts and caused significant harm to the public, the market, and scores of Massachusetts borrowers and homeowners."

136. Plaintiffs' Counsel also has obtained and reviewed the affidavits of Jeffrey McKay and Tai Lee, filed in the Massachusetts action. McKay worked as a Fremont outside account executive from March of 2003 to March of 2006. As an "outside" account executive, McKay worked in the field and personally marketed Fremont's loan products to brokers in Massachusetts and New Hampshire. Once brokers produced loans, McKay worked with other Fremont employees, such as

underwriters and account managers, to process and close the loans. In his affidavit, McKay states that:

> Fremont's key and highly-marketed product was an adjustable rate mortgage ("ARM") loan with 100% financing (or a loan or loans for the full value of the home). The ARM loan was typically fixed for two or three years and then adjusted for the remaining twenty-seven or twenty-eight years. <u>For all of its ARM loans, Fremont qualified borrowers at the initial interest rate during the short-term time period, but not when the interest rate adjusted. This was also true of the interest-only products, where borrowers were qualified at the interest-only payment</u>. [Emphasis added.]

137. As stated by McKay in his affidavit, these loans were designed as "temporary solutions" and "would need to be refinanced prior to, or immediately upon, the loan's adjustment."

138. McKay further stated in his affidavit that:

> Fremont aggressively marketed products with 100% financing, as was evident by Fremont's aggressive pricing of and interest rates related to its 100% financing products. For example, Fremont offered a 100% LTV special ("Fremont's LTV Special") in an ARM loan with no reserves and no minimum consumer credit history. <u>It was made clear to me that if a borrower had a pulse, a 580 FICO, and a private VOR (verification of rent), then he or she could qualify for one of Fremont's products</u>, such as a Fremont's LTV Special. I, and other account executives, referred to a Fremont's LTV Special as the "pulse product" and marketed it as such to brokers. [Emphasis added.]

139. McKay also stated in his affidavit that Fremont continued to do business with brokers who were suspected of submitting fraudulent documentation:

When dealing with mortgage brokers, if I saw questionable or fraudulent activity I refused to process these brokers' applications or deal with these brokers. When I discussed certain mortgage brokers' activities with my manager [Peter] DiNardo, I received the impression that Fremont did not want to cancel the brokers' accounts for fear of upsetting the brokers or losing business. I was told that this was not the decision of DiNardo, [regional sales manager Paul] Impagliazzo or anyone in the NY center, but that it would be dealt with by corporate. After that, I heard nothing further.

140.    McKay also stated in his affidavit that Defendant Walker strategically pitted "inside" account executives against "outside" account executives – both of which were compensated based on loan volume – in a competition that was a race to the bottom in terms of loan quality:

During my tenure at Fremont, Fremont installed a new Chief Executive Officer, Kyle Walker ("CEO Walker"). While there, Walker began hiring inside sales representatives ("inside reps") or employees with the same responsibilities as outside reps.

Unlike outside reps, however, these inside reps worked next to Fremont's underwriters in Fremont's processing centers in New York, Chicago, Florida and California. In addition, unlike outside reps, inside reps were not permitted to visit brokers but were supposed to deal with brokers by telephone.

During my tenure at Fremont, CEO Walker kept flooding the market with an increasing number of inside reps and hired approximately 700-800 inside reps to solicit new broker accounts and to monitor broker business for Fremont. There were no geographic restrictions as to where these inside reps could solicit business. The

flood of inside reps created tension and competition between the outside reps and inside reps that competed for the same business and were paid based on loan volume. Massachusetts, California, and New York were heavily solicited by the inside reps because loan amounts were on average higher so the inside reps could make more money by closing the same number of loans. [Emphasis added.]

141. Tai Lee worked as an outside account executive for Fremont from January of 2003 until March of 2006. In his affidavit, Lee states that beginning in the summer of 2005, he became seriously concerned that Fremont was irresponsibly underwriting its loans:

Around July of 2005, Fremont rolled out a niche product ("Fremont's niche product") that was available either as an adjustable-rate mortgage or fixed-rate mortgage. Fremont's niche product:

a) provided 100% financing in the form of an 80-20 piggy-back arrangement (*i.e.*, one loan was approved for 80% of the home's value and a second loan was approved for 20% of the home's value) for up to $800,000 for a one or two-family property;

b) only required a minimum credit score of 620;

c) only required three tradelines to be open, provided that one was open and active for 24 months and another had a $2,000 credit limit;

d) required no assets; and

e) permitted a private verification of rent.

I viewed the guidelines associated with Fremont's niche product as very lax, because historically:

a) lenders required more stringent credit tradeline requirements, including a requirement that the borrower have three credit accounts

open for at least 24 months, with one tradeline having at least a $5,000 credit limit;

   b) lenders required at least two months of reserves (or two months of savings necessary to pay borrower bills); and

   c) private verifications of rent were widely acknowledged by the industry as having a high incidence of fraud and other abuses.

142.   Lee further stated in his affidavit:

In essence, I thought that if a borrower had a pulse, he or she could qualify for one of Fremont's products, and this was a sales tool that I used during a sales call with a broker.

143.   In a recent decision, dated December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction obtained by the Attorney General in the Massachusetts action preventing Fremont from foreclosing on thousands of its loans issued to Massachusetts residents.  The <u>unanimous</u> seven-judge Supreme Judicial Court noted that the preliminary injunction record suggested:  "<u>Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan</u>.'"  (Emphasis added).  The Supreme Judicial Court further emphasized the trial judge's findings that "unless residential real estate values continued to rise indefinitely," an assumption that the trial judge found unreasonable as of January 2004, "<u>Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow</u>."  (Emphasis added.)  Based on the record, the high court concluded that the Attorney General was "likely to succeed on her claim" that Fremont's loans were unfair.

144.   Specifically, the Massachusetts Supreme Judicial Court held:

The record here suggests that Fremont made no effort to determine whether borrowers could "make the scheduled payments under the terms of the loan." Rather, as the judge determined, loans were made in the understanding that they would have to be refinanced before the end of the introductory period. Fremont suggested in oral argument that the loans were underwritten in the expectation, reasonable at the time, that housing prices would improve during the introductory loan term, and thus could be refinanced before the higher payments began. However, it was unreasonable, and unfair to the borrower, for Fremont to structure its loans on such unsupportable optimism. [Emphasis added.]

145.  Moreover, the Massachusetts high court soundly rejected the notion that Fremont was caught by a surprise market downturn.  The court concluded that "[a]s a bank and mortgage lender, Fremont had been warned repeatedly before 2004" that its practice of underwriting loans on the assumption that property values would continue to rise, rather than on the ability of the borrower to repay the debt, would lead to widespread defaults.  Indeed, the high court cited a plethora of official government warnings on this precise point, including Interagency Guidance on Subprime Lending issued in 1999 and 2001 ("Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound.") (Emphasis added by Massachusetts Supreme Judicial Court).  Given all those warnings, the Massachusetts high court concluded that, "Fremont cannot now claim that it was taken by surprise by the effects of an economic decline, or that it should not be held responsible."  (Emphasis added.)

146.  Finally, the Massachusetts Supreme Judicial Court noted:  "The fact that the FDIC ordered Fremont to cease and desist from the use of almost precisely

the loan features that are included in the judge's list of presumptively unfair characteristics indicates that the FDIC considered that under established mortgage lending standards, the marketing of loans with these features constituted unsafe and unsound banking practice with clearly harmful consequences for borrowers." (Emphasis added.)

147. The Massachusetts Attorney General action, the first-hand affidavits submitted in that case, and the recent findings of the Massachusetts Supreme Judicial Court all further corroborate that Fremont's subprime lending was dangerously "unsafe and unsound" and not the product of "appropriate" and "sound" underwriting as Defendants repeatedly stated during the Class Period.

5. **Fremont's Own Business Partners Assert That Its Underwriting Was Deeply Flawed and Its Loans Were Not As Fremont Described Them**

148. Further corroborating this Complaint's allegations, even Fremont's own business partners have alleged that Fremont originated and sold large amounts of loans that were terribly underwritten.

149. In October of 2007, Morgan Stanley Mortgage Capital Holdings LLC sued Fremont for breach of contract for Fremont's failure to repurchase loans that Fremont sold from May of 2005 through December of 2006 to Morgan Stanley's predecessor-in-interest, Morgan Stanley Mortgage Capital, Inc. (referred to collectively with Morgan Stanley Mortgage Capital Holdings LLC as "Morgan Stanley"). That action was titled Morgan Stanley Mortgage Capital Holdings LLC, as Successor-in-Interest to Morgan Stanley Mortgage Capital Inc. v. Fremont Investment & Loan, No. 07-Civ.-9457 (S.D.N.Y.). According to the complaint in that case, when Fremont sold the loans at issue, Fremont warranted, inter alia, that the loans met its underwriting criteria and that Fremont had adequately verified the underlying information, such as the borrower's income, credit history, and assets.

Further, according to the complaint, Fremont agreed to repurchase any loans that materially violated the warranties and indemnify Morgan Stanley for any damages it suffered due to the defective loans.

150.   Morgan Stanley alleged that shortly after it purchased the loans, it discovered that "hundreds" of the loans were improperly underwritten.   In particular, Morgan Stanley alleged that the "loans fail[ed] to meet Fremont's underwriting guidelines" because Fremont had "fail[ed] to verify assets prior to closing," performed "defective verification of rent, failed[ed] to obtain the minimum credit history information, and [made] loans . . . to borrowers that did not have the requisite credit score."   Morgan Stanley also alleged, consistent with the statements of former Fremont employees set forth above, that the "loan documents" contained "misrepresentations of the income or employment of the borrower" and "misrepresentations concerning appraisal values."   Morgan Stanley further alleged that the loans contained "misrepresentations of the occupancy of the residence," "misrepresentations of the assets of the borrower," and "misrepresentations of the condition of the property."

151.   Morgan Stanley additionally alleged that once it notified Fremont of the defective loans, Fremont refused to repurchase them or indemnify Morgan Stanley for the damages it suffered as a result of the impaired mortgages.

152.   Morgan Stanley is not the only one of Fremont's business partners to sue the Company for its improper underwriting.   In June of 2007, Lehman Brothers Holdings, Inc. and Lehman Brothers Bank, FSB (collectively, "Lehman Brothers") also sued Fremont for breach of contract and unjust enrichment for Fremont's failure to repurchase loans that Lehman Brothers had purchased beginning in March of 2004.   That action was titled <u>Aurora Loan Services LLC f/k/a Aurora Loan Services, Inc. as Master Servicer or Loan Administrator and on behalf of Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series</u>

2006-BC2, Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2005 S-3, Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2005 S-4, Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2005 S-5, Lehman Brothers Holdings, Inc. and Lehman Brothers Bank, FSB v. Fremont Investment & Loan Corporation, No. 07-cv-01284-RPM (D. Colo.).

153.  In that case, Lehman Brothers, just like Morgan Stanley, alleged that when Fremont sold the loans at issue, Fremont warranted that the loans met its underwriting criteria and that the underlying documentation was accurate as to the borrower's identity, income, employment, credit history, and assets, among other things.  Further, according to the complaint, Fremont agreed to repurchase those loans that violated the warranties and indemnify Lehman Brothers for any damages it suffered due to the defective loans.

154. After Lehman Brothers purchased the loans, according to its complaint, loan servicers and other third parties notified Lehman of "certain issues" concerning the loans.  When Lehman Brothers "conducted further due diligence," it "confirmed that Fremont breached one or more representations and/or warranties" concerning the loans.  According to the Lehman complaint, the breached warranties include the "[t]he conformance of the Mortgage Loans with applicable underwriting guidelines and loan program requirements"; "[t]he accuracy and integrity of all information and documentation regarding borrower identity, income, employment, credit, assets, and liabilities used to originate the Mortgage Loans"; "[t]he validity of all Mortgage Loan documentation"; "[t]he ownership, nature, condition, and value of the real property securing the respective Mortgage Loans"; and "[b]orrower occupancy of the property securing the Mortgage Loans."

155. Lehman Brothers also alleged that once it notified Fremont of the defective loans, Fremont refused to repurchase them or indemnify Lehman Brothers for the damages it suffered as a result of the impaired mortgages. Lehman Brothers seeks an unspecified amount in damages.

6. **Data Establish That Fremont's Underwriting Was the Worst Among Comparable Subprime Lenders and <u>Further Declined After The Second Quarter of 2006</u>**

156. Lead Counsel's own investigation of Fremont's lending practices also has included an assessment of Fremont's loan performance throughout the Class Period, and a comparison of Fremont's lending practices to those of its peer subprime lending companies. As set forth herein, that comparison (in conjunction with the other facts obtained by counsel's investigation set forth above) reveals the following. First, Fremont was far less discriminating in choosing among subprime borrowers than were Fremont's peers. Indeed, Fremont made loans to its applicants far more often than did its peers, and rejected applicants far less often than did its peers. This difference is consistent with the facts set forth above that Fremont's subprime underwriting practices were "unsafe and unsound" and, in fact, far looser than those of its subprime peers. Second, once Fremont approved an applicant, Fremont made certain to offer the loan on terms that the borrower would not reject – regardless of whether those terms were properly underwritten or disclosed. In fact, throughout the Class Period, approved borrowers almost never rejected a Fremont loan, while borrowers approved by Fremont's peers rejected loans at appreciable rates.

157. To make this comparison, Lead Counsel compiled and reviewed data concerning Fremont's residential mortgage loans for one-to-four-family homes that Fremont reported pursuant to the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§ 2801-2810, ("HMDA"), which became publicly available in September

2007. Lead Counsel also compiled and reviewed the same data reported by approximately 200 other companies that the U.S. Department of Housing & Urban Development categorized as subprime lenders in 2006. These other companies have been collectively designated as Fremont's "Peers" in Graph 1 below.

158. Graph 1 below reflects the rates at which Fremont and its peer companies originated first lien loans based upon the number of applications they received. As this graph illustrates, Fremont, as compared to its peer lending companies, was far more likely to make a first lien loan to any given applicant. The reported origination data are summarized as follows:



159. Similarly, Fremont rejected first lien applicants far less often than did its peers. Graph 2 below reflects how often (according to the reported data) Fremont and its peers rejected applicants. (In fact, Fremont's rejection rate was even lower than revealed by the data below because the Company had a practice of instructing rejected full-documentation mortgage applicants to re-submit their applications as "stated-income" loans, which were consistently approved, as set forth in ¶¶ 79 and 88 above):



160.   Moreover, Fremont, unlike its peers, underwrote and structured its first lien loans so loosely and/or disclosed their terms to borrowers so misleadingly that an approved borrower almost never rejected a Fremont mortgage.   Graph 3 below reflects how often approved borrowers rejected loans offered by Fremont and its peers, respectively.   Based on the reported data set forth below, in 2005, borrowers approved by Fremont's peers were 41.6 times more likely to reject the loan than were borrowers approved by Fremont.   In 2006, borrowers approved by Fremont's peers were 28.7 times more likely to reject the loan than were borrowers approved by Fremont.   These data are summarized as follows:



161.   The data reflected in Graph 3 above is all the more remarkable because Fremont's first lien loans, which comprise the overwhelmingly large majority of the loans it issued, were <u>more expensive for borrowers</u> than those issued by its subprime peer companies.   According to data reviewed by Lead

Counsel, in 2005, approximately 95% of Fremont's first lien loans carried an interest rate three or more points higher than the comparable U.S. Treasury instrument. More specifically, those loans were priced 5.22 points higher than the comparable Treasury instrument, on average. By contrast, approximately 82% of loans issued by Fremont's peer companies carried an interest rate three or more points above the comparable U.S. Treasury instrument. And on average, those loans carried an interest rate that was priced 4.89 points above the comparable U.S. Treasury instrument. The same holds true for first lien loans made in 2006. That year, approximately 94% of Fremont's first lien loans carried an interest rate three or more points above the comparable U.S. Treasury instrument. On average, those loans were priced 6.02 points higher than the comparable Treasury instrument. By contrast, approximately 86% of loans issued by Fremont's peer companies carried an interest rate that was three or more points above the comparable U.S. Treasury instrument. And on average, those loans carried an interest rate 5.63 points above the comparable U.S. Treasury instrument. Yet borrowers almost never rejected Fremont's more expensive loans while rejecting at appreciable rates loans issued by Fremont's peers. This counterintuitive trend occurred because, as reflected by the first-hand accounts of former Fremont employees and as alleged by the Massachusetts Attorney General, Fremont failed to ensure that its borrowers understood the loan terms.

162. Fremont also was far less discriminating than its peers when making second lien loans. Graph 4 below reflects the rates at which Fremont and its peers reportedly originated loans based upon the number of applications they received:



**Graph 4: Second Lien Loans Originated / Applications Received**

1    163.   Further, Fremont rejected second lien applicants less often than did its

2    peers.  Graph 5 below reflects (according to the reported data) how often Fremont

3    and its peers rejected second lien applicants.   (Once again, Fremont's actual

4    rejection rates were even lower given its practice, described in ¶¶ 79 and 88 above,

5    of instructing rejected full documentation mortgage applicants to re-submit their

6    mortgages as "stated-income" loans):



164.  Just as it did with first lien loans, Fremont underwrote and structured its second lien loans so loosely and/or disclosed their terms to borrowers so misleadingly that, unlike Fremont's peers, an approved Fremont borrower almost never rejected the Fremont offer.  Graph 6 below reflects how often approved second lien borrowers reportedly rejected the loan they had been offered.  Based on those reported data, in 2005, borrowers approved by Fremont's peers were 72 times more likely to reject the loan than were borrowers approved by Fremont.  In 2006, borrowers approved by Fremont's peers were 44 times more likely to reject the loan than were borrowers approved by Fremont.



165.  In addition to the data that Lead Counsel has compiled and set forth above, data compiled by Moody's Investor Service, first presented at the Australian Credit Forum on July 26, 2007, after the end of the Class Period, illustrate that Fremont's vintage 2006 loans performed <u>the worst</u> among loans of the same

vintage made by several other large, and even troubled, subprime lenders. Specifically, Fremont consistently posted the highest percentage (measured by original balance) of 2006 first lien loans that became delinquent. Importantly, Fremont's loans performed the worst <u>as soon as they were made</u> – just one month after closing. This immediate delinquency rate establishes that the loans defaulted because they were underwritten (contrary to Defendants' repeated Class Period statements) in an "unsafe and unsound" manner, rather than because of general market conditions. (This is further supported by numerous first-hand accounts by former Fremont employees responsible for underwriting and issuing Fremont loans, as set forth in ¶¶ 76-118 above.) Poor market conditions, which generally affect loan performance during a refinancing, could not have affected these loans so quickly. Further, this bottom-of-the-barrel performance continued up to almost a year after the loans closed. The data illustrating the "significant performance variance" between Fremont and its peers are set forth in Graph 7 below:

**Graph 7: July 26, 2007 Moody's Investor Services Presentation**



166.   Similarly, Fremont loans of the 2006 vintage topped UBS Investment Bank's list of subprime loans that were 60 days or more delinquent.

167.   One of the reasons for this substantially poor performance is Fremont's aggressive underwriting practices with regard to stated income loans set forth above, whereby Fremont allowed brokers or borrowers to claim that home purchasers earned substantially more than they actually did.  Consistent with those reports, Lead Counsel's data analysis establishes that Fremont borrowers claimed to earn substantially higher income than the borrowers of Fremont's subprime lending peers.  This disparity further supports Plaintiffs' allegations set forth above that Fremont routinely approved loans to stated income borrowers who listed materially inflated – and facially implausible – incomes.

168.   To make this comparison, Lead Counsel reviewed the incomes listed by Fremont's borrowers in 2005 and 2006, and then compared them to the incomes listed by the borrowers of Fremont's subprime peers.   To control for income fluctuations by geographic location, Lead Counsel separated the Company's loans by census tract, and then compared them to loans made by Fremont's peers in the same census tract.  Lead Counsel then calculated the weighted average disparity between these income figures.

169.   The statistically significant data resulting from these comparisons demonstrate that, for 2005, Fremont's borrowers claimed incomes that were 10% higher than the incomes reported by the borrowers of Fremont's peer companies. This statistically significant disparity widened in 2006.   For 2006, Fremont's borrowers claimed incomes that were 13.2% higher than the incomes reported by the borrowers of Fremont's peer companies.   These differences demonstrate that despite Defendants' repeated statements regarding purported "appropriate" and "sound" lending practices, Fremont's "unsound and unsafe" lending practices

allowed borrowers to obtain mortgage loans that they could not afford by overstating their income levels, leading to substantially poor loan performance relative to Fremont's subprime peer companies.

170. Given that Fremont's lending practices were far worse than the practices of its peer subprime lending companies, Fremont's loans were substantially riskier than the loans of its peer companies. As that risk materialized, the Company experienced a dangerous surge in its first payment defaults and early payment defaults during the second quarter of 2006. Shortly thereafter, as set forth more fully in Section VIII below, Defendants Rampino, Bailey, Lamb, Walker, Nicolas and McIntyre each repeatedly and falsely claimed that Fremont had tightened its underwriting practices. Set forth below as Graph 8 is the relevant portion of a graph that Defendants presented at the February 2007 ABS Investor Presentation in support of their claims that they had substantially improved Fremont's underwriting practices. In Graph 8, Defendants compare how Fremont loans actually performed against how those loans purportedly would have performed if they had been underwritten according to Defendants' supposedly improved criteria:



**Graph 8: Fremont's February 2007 ABS Investor Presentation**

**FPD Effect to \*Guideline Changes**
**2006 Underwriter Tightening Changes**
(FPD at 30 days from payment due date)

**% of Boarded Production**

- FPD Actual Monthly Rates
- FPD with Guideline Changes in Place

▶ FPD's are reflected at the boarded month rather than the month the first payment was due

| \*Guideline changes included in this study |
|---|
| 1    2nd lien/piggy FICO scores 550-579 eliminated for Full Doc & Easy |
| 2    1st liens that belong to the 2nds above |
| 3    Minimum loan amount on ALL 2nds will now be $15K (includes 5% pig) |
| 4    Michigan restriction on CLTV <= 90 on Full/Easy |
| 5    Michigan restriction on CLTV <= 80 on Stated |
| 6    CORE PRODUCTS Stated Earner, was 500 now 550 |
| 7    COMBO- 80/20 Stated Doc to 640 wage earner (was 620 for wage and self) |
| 8    COMBO- 80/20 Stated Doc 620 Self Employed |
| 9    COMBO- 80/20 Full Doc to 600 FICO (was 580) |
| 10   Reflects impact of the first time buyers to May thru August 2006 |
| 11   100% LTV/CLTV Stated Income and Purchase Money |
| 12   Non-Fil Combos |

171. Through the slide set forth above and in other statements set forth in Section VIII below, Defendants asserted that Fremont allegedly improved underwriting practices would have reduced the monthly first payment default or

**SECOND AMENDED CONSOLIDATED CLASS ACTION SECURITIES COMPLAINT**
**Case No. 2:07-cv-05756-FMC-FFMx**

"FPD" rate on its existing loans by between 9% and 44%. Graph 8(a), set forth below, summarizes Defendants' claims as to the effect of Fremont's allegedly improved underwriting on existing FPD rates. The "Actual FPD Rate" concerns the rate at which Fremont's loans actually experienced FPDs. The "Corrected FPD Rate" reflects the rate at which, according to Defendants, Fremont's loans would have experienced FPDs if they had been made pursuant to its purportedly improved underwriting practices. The "Decrease in FPD Rate" reflects the difference between the Actual and Corrected FPD Rates expressed as an approximate percentage. These data are summarized as follows:

| Graph 8(a): Purported Effect of Fremont's Allegedly Improved Underwriting on FPDs | | | |
|---|---|---|---|
| Month | Actual FPD Rate | Corrected FPD Rate | Decrease in FPD Rate |
| October 2005 | 3.22 | 1.96 | 39 % |
| November 2005 | 2.96 | 1.65 | 44 % |
| December 2005 | 3.32 | 2.03 | 39 % |
| January 2006 | 3.11 | 2.22 | 29 % |
| February 2006 | 3.75 | 2.57 | 31 % |
| March 2006 | 4.52 | 3.08 | 32 % |
| April 2006 | 5.51 | 3.92 | 29 % |
| May 2006 | 5.82 | 4.20 | 28 % |
| June 2006 | 5.33 | 3.85 | 28 % |
| July 2006 | 4.76 | 3.34 | 30 % |
| August 2006 | 3.81 | 2.66 | 30 % |
| September 2006 | 3.05 | 2.54 | 17 % |
| October 2006 | 3.04 | 2.27 | 25 % |
| November 2006 | 2.16 | 1.96 | 9 % |

172. In that same presentation, these Defendants acknowledged that, "Increasing loan quality is the key strategy to improving asset characteristics and performance." The truth, however, is that the loans that Fremont underwrote and originated after Defendants claimed to have improved its practices during the

second quarter of 2006 performed <u>even worse</u> than the loans Fremont originated just before it allegedly tightened its underwriting.

173. In order to illustrate this point, Lead Counsel has compiled and reviewed data that Fremont reported pursuant to SEC Regulation AB, 17 C.F.R. § 229.1100-.1123. These data reflect the characteristics and performance of several large loan pools that Fremont securitized between November of 2005 and December of 2006. These data (as well as the first-hand accounts set forth in ¶¶ 76-118 above) establish two points. First, the loans that Fremont made after Defendants repeatedly claimed to have tightened the Company's underwriting standards performed <u>even worse</u> than the loans that Fremont made before it purportedly improved its underwriting. Simply stated, the loans that Fremont originated after the second quarter of 2006 were not the product of improved underwriting. Second, the loans that Fremont originated after the second quarter of 2006 performed so poorly, so quickly, that their demise could not have been the result of market forces. The fact that those loans defaulted so quickly establishes that Fremont lent to people who simply were not qualified to repay the debt. Indeed, beginning in the 2006 third quarter, Fremont began introducing a unique 50/30 ARM mortgage product, which in the short term should have <u>lowered</u> monthly payments even more so than its prior ARM products (because the mortgagee's principal payments would be amortized over a 50-year term instead of a 30-year term). With this new and exotic mortgage product, borrowers would enjoy smaller payments in the first 29 years of the mortgage term and owe a balloon payment of the remaining 20 years of amortization at the end of the mortgage, at which point (many years after receiving the loan) the borrower could refinance his or her mortgage. The 50/30 ARM product, which represented 20.6% of Fremont's first lien third quarter 2006 originations and 43.93% of Fremont's first lien fourth quarter 2006 originations, should have reduced early payment

defaults.  Nonetheless, default rates continued to rise, establishing that Fremont's underwriting did not improve.

174.  In making this comparison, Lead Counsel compiled and reviewed data concerning several loan pools that were issued at three time intervals: pools issued before Fremont allegedly improved its underwriting in April/May of 2006, which have been designated as "Group I"; pools issued just after Fremont allegedly improved its underwriting, which have been designated as "Group II"; and pools issued several months after Fremont purportedly improved its underwriting, which have been designated as "Group III."  By separating the data for Groups II and III, Lead Counsel has assured that Group III loans were originated after Fremont supposedly implemented its newly stringent underwriting procedures.

175.  Group I consists of three pools that Fremont issued between November of 2005 and May of 2006, Fremont Home Loan Trust Series 2005-D, which was issued in November 2005, Fremont Home Loan Trust Series 2005-E, which was issued in December 2005, and Fremont Home Loan Trust Series 2006-A, which was issued in May of 2006.  Group II comprises two loan pools that Fremont issued in August of 2006, Fremont Home Loan Trust Series 2006-B Pool I and Fremont Home Loan Trust Series 2006-B Pool II.  Group III includes three loan pools issued between September and December of 2006, *i.e.*, Fremont Home Loan Trust Series 2006-C, which was issued in September of 2006, Fremont Home Loan Trust Series 2006-D, which was issued in November of 2006, and Fremont Home Loan Trust Series 2006-E, which was issued in December of 2006.

176.  Graph 9 below reflects the delinquencies experienced by Groups I, II, and III in terms of loan balance, and how quickly those delinquencies occurred.  At all time intervals, Group II loans – which belong to pools issued in August 2006, just after Fremont purportedly tightened its underwriting – performed far worse than Group I loans, which belong to pools issued before the alleged improvements.

Even assuming, however, that some Group II loans were made before the claimed underwriting improvements took hold, Group III consists entirely of loan pools issued between September and December 2006 – months after Fremont purportedly had effected its supposed underwriting improvements. Yet Group III loans also performed <u>far worse</u> than Group I loans. Further, a mere six months after issuance, Group III loans performed just as badly as Group II loans. Finally, 12 months after issuance, Group III loans performed the worst of all three Groups, despite the fact that, according to Fremont, Group III loans were most rigorously underwritten. Importantly, all of the delinquencies reflected in the graph below occurred within one year – before the borrower typically refinances a loan and thus before deterioration in the housing and lending markets could impact loan performance. In short, these quick delinquencies occurred because the borrowers could not afford the loans in the first place (as further confirmed by the numerous first-hand accounts of former Fremont employees set forth above). These data are summarized as follows:



177. Lead Counsel also has isolated two large loan pools that Fremont issued and securitized before and after its purported underwriting improvements, respectively. This comparison further establishes that Fremont did not improve its underwriting, as Defendants stated, during the Class Period. The last loan pool that Fremont securitized in 2005, called 2005-E Trust Series, was issued approximately six months before Defendants claimed to improve Fremont's underwriting. The last loan pool that Fremont securitized in 2006, called 2006-E Trust Series, was issued approximately six months after Defendants claimed to improve Fremont's underwriting. As Graph 10 below reflects, for each month after issuance, the 2006-E Trust Series experienced considerably more 30-day defaults as a percentage of the pool balance than did the 2005-E Trust Series. Importantly, this heightened default rate occurred immediately after the pool was issued, before external market forces could cause the loans to default. This disparity establishes that the loans Fremont issued at the end of 2006, were substantially worse than those it issued at the end of 2005. These data are summarized as follows:



Graph 10: 30-Day Deliquencies

1

2      178.   Graph 11, below, reflects the same comparison for delinquencies of 90

3   days or more.   As the data establish, the disparity in performance is even more

4   pronounced with respect to 90-day delinquencies:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      179.   This trend of increasing defaults occurred not only in the several loan

20   pools analyzed in the graph above, but also across Fremont's entire portfolio of

21   securitized loans throughout the Class Period, as set forth in Graphs 12 and 13

22   below.   Lead Counsel compiled the data reflected in Graphs 12 and 13 from an

23   array of Reports of Condition and Income that Fremont submitted to the FDIC

24   pursuant to the Federal Deposit Insurance Act, 12 U.S.C. § 1817(a).   Graph 12

25   below reflects the rate at which all of Fremont's securitized loans exhibited

26   delinquencies of between 30 and 89 days.   Importantly, this rising trend continued

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION SECURITIES COMPLAINT
Case No. 2:07-cv-05756-FMC-FFMx

more than a year after Fremont supposedly improved its underwriting in the second quarter of 2006. These data are summarized as follows:



Graph 12: 30-89 Days Past Due

In similar fashion, Fremont's securitized loans exhibited increasing delinquencies of 90 or more days throughout the Class Period, and this trend continued more than a year after Fremont supposedly improved its underwriting. Graph 13 reflects those data:



SECOND AMENDED CONSOLIDATED CLASS ACTION SECURITIES COMPLAINT
Case No. 2:07-cv-05756-FMC-FFMx

The data above establish that Fremont's underwriting was considerably worse than that of its peer subprime lending companies, and that contrary to Defendants' repeated Class Period statements, Fremont's underwriting and loan quality declined rather than improved after the second quarter of 2006.

180. Consistent with these findings, in its November 28, 2007 "Special Report" on the impact of poor underwriting practices in the subprime lending context Fitch Ratings specifically noted that: "Increased risk caused by operational weakness oftentimes is not apparent in the collateral characteristics, but rather, manifests itself in the pool performance." Thus, Fitch Ratings concluded that simply looking at publicly reported attributes such as "loan-to-value (LTV), combined loan-to-value (CLTV) and FICO scores" ignores the "additional risk caused by inaccurate data and/or fraudulent or misrepresented factors [that] could materially affect the performance of pools. Losses are more likely to be low if the originator consistently applies underwriting policies and guidelines and has adequate quality control procedures . . ." (Emphasis added.) Fitch Ratings further concluded that these publicly reported loan attributes even though "technically accurate" did not "actually reflect the true credit risk due to poor underwriting, quality control, or property valuation. Fitch believes that data, which is correct but inaccurately reflects the credit risk (e.g., stated income was not reasonable), is a larger component of underperformance than data integrity issues (e.g., debt-to-income ratios [DTI] were incorrectly stated on tape)." (Emphasis added.)

* * *

181. The volume-driven, exception-ridden, extremely "unsafe and unsound" underwriting standards employed by the Company throughout the Class Period, exposed by the FDIC's Cease & Desist Order and confirmed by the first-hand accounts of numerous former employees and other data set forth above, created a recipe for disaster given the significant number of high-risk mortgage

products offered by the Company including adjustable rate, interest-only, high loan-to-value and stated-income loans to borrowers who could not afford them. At the same time, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's public statements during the Class Period about purportedly "good, sound" mortgage origination; underwriting that was purportedly focused upon "appropriate loan to collateral valuations and cash flow coverages;" and "modifications" in its underwriting beginning in the 2006 second quarter that purportedly "dramatically" and "much improved" the risk profile of Fremont's mortgages, were materially false and misleading when made. Each of these statements is set forth in Section VIII below.

## C. Fremont's Financial Statements Were Materially Misstated Throughout The Class Period

182. Throughout the Class Period, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre also caused the Company to issue financial statements that were materially misstated and not presented in accordance with GAAP at the time they were issued. In addition, Defendants Rampino and Lamb repeatedly signed sworn certifications regarding Fremont's financial statements and the adequacy of the Company's internal controls, which were materially false and misleading when made, as these sworn certifications failed to reveal the Company's then-existing violations of GAAP and poor internal controls.

183. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be

misleading, despite footnotes or other disclosures. As set forth below, Fremont's financial statements violated GAAP in a number of ways. These material misstatements helped disguise the Company's complete lack of appropriate underwriting practices and maintain the appearance of profitability.

1. **Defendants Materially Misstated Fremont's Assets and Financial Performance, Overvaluing Fremont's Residual Interests Throughout the Class Period**

184. During the Class Period, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre caused Fremont to report materially false and misleading financial statements by knowingly or recklessly overvaluing the Company's reported Residual Interests in the subprime mortgage loans the Company securitized, which were of increasingly poor quality, in order to disguise from investors the true, very poor, quality of the subprime loans Fremont issued.

185. Until the start of the Class Period, Fremont did not securitize a significant percentage of its loans. Instead, the Company, for the most part, quickly sold off the subprime mortgages it originated through whole loan sales. However, as Defendant Bailey explained in the Company's fourth quarter 2005 earnings conference call, Fremont increased its level of securitization because of less favorable secondary market execution for whole loan sales. Significantly, unlike its whole loan sales, Fremont was required to hold Residual Interests in the subprime mortgages it securitized and to appropriately value those Residual Interests on its balance sheet in accordance with GAAP. Fremont's reported Residual Interests quickly grew over ten fold in 2005, from $15.8 million as of December 31, 2004, to $170.7 million as of December 31, 2005.

186. In a securitization structured as a sale for financial reporting purposes, Fremont recognized a gain on sale at the time it securitized a pool of loans. Fremont also recorded on its balance sheet at the closing of a securitization

structured as a sale a valuation of the Residual Interests it retained in the securitized pool of loans.

187.   The Company attempted to minimize the amount of Residual Interests that it retained by structuring the securitizations so that they included the issuance of net interest margin securities ("NIMs").  The usage of NIMs concurrent with or shortly after a securitization allowed Fremont to cash out some of the Residual Interests it was required to assume in securitizations.   Nonetheless, because of Fremont's substantial securitization activity during the Class Period, Fremont's Residual Interests grew dramatically during the Class Period.

188.   Fremont's filings with the SEC signed by Defendants Rampino, Bailey, Lamb and McIntyre repeatedly represented that the Company valued and accounted for its Residual Interests in accordance with GAAP, Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("SFAS 140"), and that the Company evaluated its Residual Interests for impairment during each quarter.  As stated in Fremont's 2005 Form 10-K:

> The Company structures each securitization transaction to meet the sale requirements of SFAS No. 140 and, as a result, at the closing of each securitization, the Company removes from its balance sheet the carrying value of the loans held for sale and adds to its balance sheet the estimated fair value of the assets obtained from the sale of loans through the securitization transaction which generally include the cash received (net of transaction expenses), retained junior class interests (residual interests in securitized loans), and mortgage servicing rights. The carrying value of the loans sold generally is loan principal balance plus the direct costs of origination, less the net amount of fees received from the borrower.

* * *

The significant assumptions used by the Company to estimate the residual cash flows are anticipated prepayments of the loans, underlined credit losses and delinquencies, and future interest rate projections. These assumptions are inherently subject to volatility and uncertainty, and as a result, the estimated fair value of the residual interests will potentially fluctuate from period to period and such fluctuations could be significant. The Company evaluates its residual interests for impairment on a quarterly basis, taking into consideration trends in actual cash flows, industry and economic developments, and other relevant factors. [Emphasis added.]

189. However, Fremont's reported valuations for its Residual Interests were fraudulently and materially inflated throughout the Class Period, including at the time of the above-quoted 2005 Form 10-K. The Company failed to account for its extremely "unsafe and unsound" underwriting standards, very poor loan quality, and increasing defaults and delinquencies throughout 2005 and 2006. Rather than appropriately account for the value of its Residual Interests throughout the Class Period (which would have revealed to investors the true likelihood for repayment of Fremont's poorly-underwritten loans), Fremont only admitted the poor quality of its Residual Interests by taking a massive impairment of over $161 million on those interests after the end of the Class Period, in belatedly reporting its fourth quarter 2006 financial statements – an impairment equal to more than 50% of the Company's entire reported net income for 2005 and over 80% of the Company's reported net loss for 2006.

190. Because Fremont did not carry a significant amount of Residual Interests on its balance sheet before the third quarter of 2005, the impairment of the Residual Interests recognized in the fourth quarter of 2006 related almost

exclusively to loans securitized during the Class Period. As Fremont acknowledged in its 2006 Form 10-K: "This impairment was a result of losses occurring . . . for loans originated and securitized in 2005, and to a lesser degree, 2006." Indeed, the impairment recorded in the 2006 fourth quarter was the equivalent of <u>nearly all</u>, or 95.72% of all, the Residual Interests recorded during the entire Class Period.

191. As noted above, the Residual Interests were classified as "junior class interests" in a sequential pay structure in which Fremont received income from the Residual Interests only <u>after</u> the senior interests of the purchasers of the securities were satisfied. Thus, Fremont's income and the valuation of its Residual Interests depended upon the pool of subprime loans it sold as securities actually producing a stream of revenue in excess of that due to the senior certificates.

192. As the Company acknowledged in its 2005 Form 10-K:

The amount of estimated future cash flows are determined using the excess of the weighted-average coupon on the loans sold into the securitization trust <u>over the sum of the anticipated coupon on the senior certificates, applicable servicing fees, expected losses on the loans sold over their lives, and estimated other expenses and revenues associated with the securitization</u>. [Emphasis added.]

Accordingly, the value of the Residual Interests was directly related to the value of the subprime loans in the securitized pool and the strength of the Company's underwriting of those loans. In order to value the Residual Interests appropriately, the Company had to appropriately assess the underlying value of the securitized subprime loans which it knowingly or recklessly failed to do.

193. Nonetheless, as set forth below, Defendant Bailey went so far as to claim that the Company was "conservative" in valuing its Residual Interests during the Class Period and used only "the most appropriate assumptions" for those

valuations. Indeed, Defendant Bailey publicly claimed to use more conservative estimates of Residual Interests than did the Company's peers in the subprime mortgage market. These statements were each materially false and misleading when made.

194. Fremont's reported Residual Interests during the Class Period are set forth as follows:



**Graph 14: Residual Interests**

Fremont increased its securitizations from just over 10% of total sales or securitizations in 2004, to almost 28% in 2006. In the first quarter of 2006, Fremont performed a NIMs transaction that lowered Fremont's reported Residual Interests. This reduction was not the result of any impairment.

195. According to FSP Nos. FAS 115-1 and FAS 124-1, in each reporting period Fremont should have evaluated whether its Residual Interests were impaired. FSP Nos. FAS 115-1 and FAS 124-1 provide examples of "impairment

indicators" which include, but are not limited to, "a significant deterioration in the earnings performance, credit rating, asset quality, or business prospects of the investee." In Fremont's case, the relevant "asset quality" to evaluate was the quality of the securitized subprime loans. As discussed above and elsewhere, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre had ample notice that the quality of its securitized subprime loans was deteriorating due to the Company's very poor underwriting and, therefore, its Residual Interests were impaired.

196. As acknowledged by the Company's 2005 10-K:

In November 2005, the FASB issued FSP FAS 115-1 and FAS 124-1, "The Meaning of Other-Than-Temporary Impairment and its Application to Certain Investments." This FSP provides a three step model that should be applied each reporting period to identify investment impairments. In evaluating whether an impairment is other than temporary, this FSP indicates that companies should look to existing applicable guidance, including Emerging Issues Task Force ("EITF") Issue No. 99-20, "Recognition of Interest Income and Impairment on Purchased and Retained Beneficial Interests in Securitized Financial Assets."

197. The Company was required to report other-than-temporary impairments of its Residual Interests as reductions of other non-interest income. Nonetheless, in the third quarter of 2005, the Company reported an impairment of its Residual Interests of $0; in the fourth quarter of 2005, the Company reported an impairment of $509,000, or just .3% of the Residual Interests; in the first quarter 2006, the Company reported an impairment of $0; in the second quarter 2006, the Company reported an impairment of $5.7 million, or 5.08% of the Residual Interests (this was the last quarter before Ernst & Young LLP was dismissed as

Fremont's outside auditor, *see* ¶¶ 217-218 below); and in the third quarter 2006 (the last reported quarter during the Class Period), the Company reported an impairment of $0. Only in the belatedly-reported fourth quarter of 2006, reported well after the end of the Class Period, did the Company report an other-than-temporary impairment of over $161 million of the Company's Residual Interests. This is demonstrated in Graph 15 below:



198. The Company's reported Residual Interests grew by approximately $169 million during the Class Period (and approximately $92 million net of the NIMs transactions that reduced the Residual Interests). These Residual Interests were then impaired by <u>more than 95%,</u> or over $161 million, as of the fourth quarter 2006 financial statements (the very next quarter reported after the end of the Class Period), belatedly issued on October 17, 2007.

199. The deterioration of Fremont's Residual Interests was neither outside of the Company's control nor was it unforeseeable. Fremont consistently and increasingly underwrote very poor quality subprime loans with extremely "unsafe and unsound" underwriting standards while overvaluing the quality of the securitized loans as Residual Interests. However, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre deliberately ignored these clear impairment indicators both at the point of securitization and in the subsequent reporting periods, causing Fremont's reported financial statements to be materially overstated throughout the Class Period. These financial misstatements helped disguise the Company's very poor underwriting practices. Only when the FDIC's Cease & Desist order ended Fremont's "unsafe and unsound" subprime lending practices and a new outside auditor was retained were the true impairments finally reported.

200. According to CW 34, Fremont's Regulatory Risk Management group submitted adverse reports to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, as to Fremont's Residual Interest valuations before the FDIC's Cease and Desist order was issued. CW 34 further states that those reports were reviewed by the FDIC and were a part of the information the FDIC considered in reaching its conclusions.

201. According to CW 42, a former regional Vice President in Fremont's commercial lending operations from 1999 until July 2007, Fremont dismissed Ernst & Young LLP as outside auditor in the second quarter of 2006 over a dispute concerning the proper way to book Residual Interests on Fremont's subprime residential loans, claiming that Ernst & Young LLP did not understand the proper way to book Residual Interests. Phillip Grassbaugh, the former controller of FIL, also claimed that Ernst & Young LLP did not have "sufficient experience" in mortgage banking, despite the fact that Ernst & Young LLP had served as

Fremont's outside auditor for approximately 35 years out of its Los Angeles office which lists mortgage banking as one of its areas of expertise. Indeed, Ernst & Young LLP, a "Big 4" international accounting firm, reports that it has "served half of the top 20 mortgage lenders." CW 42 and other Fremont employees did not believe that Ernst & Young LLP was incapable of understanding the proper accounting and viewed Ernst & Young LLP's termination as an "eyebrow raiser." As set forth above, in the next quarter after Fremont fired Ernst & Young LLP, Fremont reported $0 impairment of its Residual Interests (immediately followed by massive impairment after the end of the Class Period).

202. Furthermore, the poor quality of subprime loans that Fremont originated throughout the Class Period was such that Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre were on notice that the Residual Interests Fremont was required to hold in the securitized subprime loan pools – the highest risk level of losses in the securitized pools – were worth far less than these individuals caused Fremont to report throughout the Class Period.

203. As admitted by the Company and as illustrated below in Graph 17 (at ¶ 212 below), Fremont was required to repurchase or re-price a burgeoning number of its loans sold to third parties as early as the end of the 2006 first quarter. Because the underwriting quality (or lack thereof) of the repurchased loans was the same as that for the securitized loans, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre were on notice, if only based on the rising numbers of loan repurchases and repricings, that the asset quality of the Company's Residual Interests was increasingly impaired. Yet, they failed to reduce their valuation of the Company's reported Residual Interests until after the FDIC Cease & Desist Order and the end of the Class Period.

204. Further evidence of the deteriorating quality of Fremont's securitized assets was the rising number of loans for which "reasonable doubt exist[ed] as to

collectibility or principal and interest [was] in default 90 days or more, in which case accrual of interest [was] discontinued and the loan [was] placed on non-accrual status" (the "Non-Accrual Loans"). As illustrated in Graph 16 below, Fremont's Non-Accrual Loans as a percentage of loans sold steadily rose throughout the Class Period:

| Graph 16: Non-Accrual Loans | | |
|---|---|---|
| Quarter | Value of Non-Accrual Loans | Percentage of Loans Sold |
| Q3'05 | $15,081 | 0.26% |
| Q4'05 | $16,736 | 0.31% |
| Q1'06 | $26,562 | 0.40% |
| Q2'06 | $42,299 | 0.69% |
| Q3'06 | $49,794 | 0.88% |
| Q4'06 | $64,652 | 1.24% |
| Q1'07 | $172,306 | 3.38% |

205. The growing number of repurchases, re-pricings, and Non-Accrual loans was significant mounting evidence to the Company that its failure to provide quality underwriting for its subprime loans was, unsurprisingly, causing a growing number of the loans to fail.

206. The data and numerous first-hand accounts set forth in ¶¶ 62-181 above further detail Fremont's deteriorating subprime loan quality. Nonetheless, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre caused the Company to materially overstate the value of Fremont's reported Residual Interests throughout the Class Period at the time they reported Fremont's quarterly results.

## 2. Defendants Set Artificially Low Reserves For Repurchase Losses After Dismissing Auditor Ernst & Young LLP

207. During the Class Period, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre also caused Fremont to issue materially false and misleading financial statements that did not fully account for Fremont's growing obligations to repurchase poorly-underwritten loans from third parties who purchased the loans from Fremont shortly after they were issued in whole loan sales. Fremont was required by GAAP to set aside and report reserves for any such anticipated repurchases ("Repurchase Reserves"). In the 2006 third quarter, Fremont's Repurchase Reserves did not correlate with either the growing number of repurchases that it was expected to make or the increasingly impaired quality of its loans sold to third parties; instead, the movement of Fremont's Repurchase Reserves correlated more closely with the Company's dismissal of its longtime outside auditor, Ernst & Young LLP, which was then followed by the acrimonious resignation of its replacement auditor, Grant Thornton LLP.

208. By way of background, Fremont sold loans to third parties, recognizing a gain on sale at the time of the sale, based primarily on the difference between the net sales proceeds and the book value of the loans sold. Fremont sold these loans pursuant to purchase agreements in which it was required to give "customary representations and warranties" regarding its loan characteristics and origination process. According to the Company's 2005 Form 10-K:

> In the ordinary course of business, as the loans held for sale are sold, the Company makes standard industry representations and warranties about the loans. The Company may have to subsequently repurchase certain loans due to defects that occurred in the origination of the loan[s]. Such defects are categorized as documentation errors, underwriting errors, or fraud. In addition, the Company is generally

required to repurchase loans that experience first payment defaults (and in limited cases, second payment defaults).

209.   As required by GAAP and as described by the Company, Fremont established, at the time that the whole loan sale was accomplished, Repurchase Reserves for the estimated losses expected to be realized for any repurchased loans when they are resold.  Defendants claimed to continually update the Company's loss estimates and adjust its Repurchase Reserves as needed through quarterly provisions.

210.   According to the Company's 2005 Form 10-K, "The [loss] estimates were based on an updated analysis of historical loan collateral vintage data. The Company continually evaluates the loss estimates utilized for its valuation and repurchase reserves based upon its analysis of historical and current data and the mix of loan characteristics."  Each time that the Company increased its Repurchase Reserves, it decreased its income by a corresponding amount.

211.   Contrary to Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's public statements and representations, Fremont's Repurchase Reserves were materially understated during the Class Period.  Initially, it is clear that the Repurchase Reserves did not correlate with the historical loan data.  Instead, in the third quarter of 2006, when loan repurchases and repricings more than doubled as a percentage of sales, the Repurchase Reserves were substantially decreased.

1    212.   As illustrated in Graph 17 below, loan repurchases and re-pricings,

2    with the exception of one quarter, rose steadily throughout the Class Period.  In the

3    second quarter 2005, directly prior to the Class Period, Fremont repurchased or re-

4    priced only $68.8 million of its loans, or .78% of the loans sold through whole loan

5    sales.   However, as illustrated by Graph 17 below, Fremont's repurchases

6    dramatically increased thereafter:



21    213.   In the third quarter of 2005, Fremont's repurchases and re-pricings

22    almost doubled to $126.7 million, or 1.54% of loans sold; in the fourth quarter of

23    2005, Fremont's repurchases and re-pricings totaled $123.3 million or 1.85% of

24    loans sold; in the first quarter of 2006, Fremont's repurchases and re-pricings

25    totaled $107.7 million, or 1.48% of loans sold; in the second quarter of 2006,

26    Fremont's repurchases and re-pricings totaled $238.3 million, or 2.67% of loans

27    sold; in the third quarter of 2006, Fremont's repurchases and re-pricings totaled

$345.67 million, or 6.45% of loans sold – <u>more than double</u> the prior quarter as a percentage of loans sold.

214.   In the Company's delayed 2006 year-end and 2007 quarterly financial statements, all filed after the end of the Class Period, the Company disclosed that this pattern of increasing loan repurchases and re-pricings continued.  In the fourth quarter of 2006, Fremont's repurchases and re-pricings totaled $399.3 million, or 8.4% of loans sold and, in the first quarter of 2007, Fremont's repurchases (the Company has not disclosed its re-pricings for 2007) totaled $322.2 million, or 7.69% of loans sold.   Thereafter, in the second quarter of 2007, Fremont's repurchases totaled $330.6 million, or 7.65% of loans sold; in the third quarter of 2007, Fremont's repurchases totaled $279.1 million, or 118.8% of loans sold.

215.  During the Class Period, the amount of Fremont's Repurchase Reserves did not track the upward path of the loan repurchases and re-pricings, as it would if the Company were taking into account historical data and the Company's knowledge of its own repeated violations of the representations and warranties provided at sale.  Instead, in the third quarter of 2006, the Company's Repurchase Reserves inexplicably dropped significantly even while loan repurchases were surging.  This establishes that the Company's Repurchase Reserves were materially understated at the time Fremont's 2006 third quarter financial statements were issued:



Graph 18: Repurchase Reserves
$70,000
$60,000
$50,000
$40,000
$30,000
$20,000
$10,000
$0
(thousands of dollars)
Termination of Ernst & Young LLP
$10,200
$23,700
$14,600
$23,300
$57,586
$34,192
Q2'05
Q3'05
Q4'05
Q1'06
Q2'06
Q3'06

Graph 19: Loan Repurchases and Repurchase Reserves
Loan Repurchases and Repricings
Repurchase Reserves
$400,000
$350,000
$300,000
$250,000
$200,000
$150,000
$100,000
$50,000
$0
(in thousands of dollars)
Termination of Ernst & Young LLP
$345,670
$238,300
$126,700
$123,262
$107,700
$68,800
Q2'05
Q3'05
Q4'05
Q1'06
Q2'06
Q3'06

216.  The lack of correlation between the Company's Repurchase Reserves, which was putatively based upon the Company's estimates of bad loans that it would have to repurchase, and the Company's actual repurchases, establishes that another factor drove the Company's Repurchase Reserves policy.

217.  That other factor was the Company's termination of its longtime auditor, Ernst & Young LLP, which had served as outside auditor for approximately 35 years.  According to the Company's Form 8-K filed with the SEC on or about August 11, 2006, on August 8, 2006 – the day that the Company issued a news release reporting its earnings for the second quarter of 2006 – the Company also "dismissed Ernst & Young LLP ('E&Y') as the Company's independent registered accounting firm."  This announcement came just four months after Fremont's shareholders approved the retention of Ernst & Young LLP for the full-year 2006 audit.  The Company further announced that it replaced Ernst & Young LLP with Grant Thornton LLP.

218.  Prior to the Company's dismissal of Ernst & Young LLP, the Company's Repurchase Reserves had been trending upward during the first and second quarters of 2006, as reflected in Graph 18 above.  But in the quarter just after the Company dismissed Ernst & Young LLP – and, importantly, before Grant Thornton LLP performed any year-end audit of the Company's financial statements – the Company's Repurchase Reserves dropped precipitously even though loan repurchases and re-pricings more than doubled as a percentage of sales.  Specifically, as loan re-pricings and repurchases spiked from $238.3 million (2.67% of loans sold) to $345.67 million (6.45% of loans sold), the Company's Repurchase Reserves dropped from approximately $58 million to $34 million – a material decline of approximately 41%.

219.  And when the time came for Grant Thornton LLP to complete the audit of the Company's 2006 financial statements for its year ended December 31,

2006 – including the Company's Repurchase Reserves – Grant Thornton surprisingly resigned in a noisy and acrimonious fashion.

220. On February 27, 2007, the Company issued a press release announcing that it would postpone the release of its 2006 fourth quarter and full-year results of operations, and would not timely file its 2006 Form 10-K.  On April 2, 2007, Fremont filed a Form 8-K with the SEC in which the Company disclosed Grant Thornton's resignation.  According to the Company's Form 8-K:

> Grant Thornton has taken the position that, in light of the Company's current operating environment and the industry in which it operates, [] they needed to expand significantly the scope of their audit. Grant Thornton had asked for additional information in connection with its audit beginning in the latter part of February and stated at that time that it needed to perform additional procedures and testing in connection with completing its audit. At no time did the Company either fail to provide to Grant Thornton any requested information on a timely basis or communicate to Grant Thornton that it was opposed to any additional procedures or testing or that it was opposed to such an expanded audit scope. The Company repeatedly has requested that Grant Thornton complete its audit and did not at any time seek to place any limitations on Grant Thornton in connection with the audit.

221.  Exhibit 16.1 to the Company's April 2, 2007, Form 8-K was a letter from Grant Thornton <u>disputing</u> the Company's account.  The letter states:

> Dear Sir or Madam:
>
> We have read Item 4.01 of Form 8-K of Fremont General Corporation dated March 27, 2007. We believe it should be supplemented and, in part, amended as follows.

We believe that our communications to the Company as described in the third paragraph is a "reportable event" as described in to Item 4.01 of Form 8-K in accordance with Item 3.04(a)(1)(v)(C)(1)(i). Additionally, we communicated to the Company that in addition to its current operating environment and industry conditions, there were other significant events that have occurred at the Company that were a factor in our determination to expand the scope of our audit.

The third paragraph also notes that "...at no time did the Company either fail to provide to Grant Thornton any requested information on a timely basis...." During the course of the audit there were instances where the Company did not provide certain requested information to Grant Thornton on dates previously agreed upon with management. Additionally, as we resigned prior to completion of the audit, we are unable to evaluate or determine the completeness, sufficiency or timeliness of the information provided in response to our requests.

Very truly yours,

GRANT THORNTON LLP (signed manually) [Emphasis added.]

222. On April 4, 2007, citing securities analysts, MarketWatch reported: "When an auditor resigns, it can sometimes spark concerns about a company's financial reporting. When an auditor publicly disagrees with its former client about the reasons for quitting, that's very unusual and can raise more red flags." (Emphasis added.) On April 16, 2007, the Orange County Business Journal reported that of particular concern to Grant Thornton and its resignation was the Company's Repurchase Reserves. In addition, the Orange County Business

Journal reported that the soundness of the Company's internal controls was "in question" because <u>Fremont's controls of its loan approval and review process were weak</u>." (Emphasis added.)

223. On April 25, 2007, the Company announced that it had engaged a third auditor, Squar, Milner, Peterson, Miranda & Williamson, LLP ("Squar Milner"), to complete the audit of the Company's financial statements for the period ending December 31, 2006.

224. Following the engagement of Squar Milner – well after the end of the Class Period – the Company finally began to provision the Repurchase Reserves proportionate to the dismal quality of its loans. In its Form 10-K for 2006, filed on October 17, 2007, the Company recorded Repurchase Reserves of approximately $141 million, as compared to its third quarter 2006 Repurchase Reserves of approximately $34 million – a material increase of approximately 315% and material in comparison to Fremont's reported net income. As noted above, the adverse repurchase and re-pricings continued into 2007, and the Company's reported Repurchase Reserves continued to increase after the end of the Class Period. These facts collectively establish that the Company's third quarter 2006 Repurchase Reserves were materially misstated when issued. (By alleging that the Company's third quarter 2006 Repurchase Reserves were materially misstated, Plaintiffs do not concede at this time that the Repurchase Reserves were properly stated at other times throughout the Class Period.)

3. **Defendants Rampino and Lamb's Repeated Certifications of Internal Controls Were Materially Misstated When Issued**

225. Throughout the Class Period, Defendants Rampino and Lamb each repeatedly certified the design, operation and effectiveness of Fremont's internal

controls in the Company's quarterly financial statements. Each of these statements was materially misstated and misleading when made.

226. The Company has <u>admitted</u> that, as of March 31, 2007, and December 31, 2006, it did not maintain appropriate internal controls over the reporting of financial data and disclosures. Specifically, as disclosed in the Company's delayed 2006 Form 10-K, filed October 17, 2007, after the end of the Class Period:

> As of March 31, 2007 and December 31, 2006, we did not maintain effective operation of internal control over the application of accounting principles generally accepted in the United States of America, resulting in material adjustments to the Company's preliminary annual consolidated financial statements for the year ended December 31, 2006. Specifically, the Company misapplied the application of subsequent event accounting literature to its residential real estate loans held for sale, residual interests in securitized assets, and repurchase reserves as of December 31, 2006.

<div align="center">*  *  *</div>

> As of March 31, 2007 and December 31, 2006, we did not maintain effective monitoring controls over the Company's commercial real estate business. Specifically, the following deficiencies were noted:
>
> • The grading of some commercial loans were not consistent with the Company's loan grading guidelines; and
>
> • the valuation methodology used for collateral dependant loans was inappropriate.
>
> As a result, there was an understatement of the allowance for loan loss in the preliminary consolidated financial statements as of December 31, 2006 of approximately $35.7 million. This adjustment to the

allowance for loan loss is properly reflected in the Company's consolidated financial statements in its 2006 Annual Report.

227. However, Fremont's failure to maintain appropriate internal controls over its financial reporting and disclosures was not limited to quarterly periods ended March 31, 2007, and December 31, 2006, or to the specific business sectors addressed in the above disclosures. Indeed, the weakness in Fremont's internal controls was longstanding and intrinsic to the Company's failures to appropriately control its subprime loan underwriting and reporting of related financial data throughout the Class Period. In fact, as disclosed by CWs 32 and 34, discussed in ¶¶ 110 and 74 above, respectively, Defendants deliberately disregarded specific warnings from Fremont employees regarding the Company's internal controls. Throughout the Class Period, Fremont failed to maintain effective monitoring controls over its subprime mortgage operations.

228. In the Cease & Order, the FDIC specifically sought to address Fremont's failure to institute proper policies and procedures that would ensure appropriate financial reporting. For example, the FDIC ordered the Company to cease:

- Operating FIL without effective risk management policies and procedures in place in relation to FIL's brokered subprime mortgage lending and commercial real estate construction lending businesses;

- Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses; and

- Operating with inadequate provisions for liquidity in relation to the volatility of FIL's business lines and the kind and quality of assets held by FIL.

229. Further, the FDIC ordered the Company to:

- <u>revise and implement written lending policies to provide effective guidance and control over FIL's residential lending function</u>;

- <u>implement control systems to monitor whether FIL's actual practices are consistent with its policies and procedures</u>; and

- implement a comprehensive plan for the methodology for determining the adequacy of the allowance for loan and lease losses. [Emphasis added.]

230. The FDIC's determinations, as illustrated by the FDIC's Cease & Desist Order and disclosed communications with the Company—as well as the Company's volume-driven, exception-ridden, extremely "unsafe and unsound" subprime underwriting practices – demonstrate that Fremont's internal controls were materially deficient throughout the Class Period. Contrary to Defendants Rampino's and Lamb's repeated internal control certifications, the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting standards. Further, Fremont was operating without policies in place to ensure the soundness of its valuation of its assets, including its Residual Interests. These failures demonstrate serious deficiencies in the Company's internal controls and contributed to materially distorting the Company's reporting of financial data.

231. As noted above, Fremont terminated its outside accounting firm Ernst & Young LLP after the end of the 2006 second quarter ended June 30, 2006. Moreover, when Grant Thornton, Fremont's second auditor in as many years, resigned on April 2, 2007, Grant Thornton took the extremely unusual step of documenting and reporting to the SEC its disagreements with the Company and the occasions on which the Company did not provide the materials necessary for Grant

Thornton to complete its audit of Fremont's financial statements for the year ended December 31, 2006.

232. As discussed above in ¶ 221, Grant Thornton filed a letter with the SEC which stated, among other things, that Grant Thornton believed that the Company did not appropriately characterize in its SEC filings Grant Thornton's requests for more information and the necessity of further testing. Further, Grant Thornton disagreed with the Company's assessment that the "current operating environment and industry conditions" were the sole factors in Grant Thornton's determination to expand the scope of its 2006 audit.

233. Grant Thornton informed the SEC that it disagreed with the Company's representations to the SEC that "at no time did the Company either fail to provide to Grant Thornton any requested information on a timely basis[.]" Instead, Grant Thornton informed the SEC that, "[d]uring the course of the [2006] audit there were instances where the Company did not provide certain requested information to Grant Thornton on dates previously agreed upon with management."

234. Grant Thornton's "noisy" withdrawal letter illustrates that Fremont did not appropriately disclose material events or provide all of the necessary information to its auditors to complete an audit in accordance with Generally Accepted Auditing Standards ("GAAS"). These factors further demonstrate serious deficiencies in the Company's internal controls and financial reporting, which were inconsistent with Defendants Rampino and Lamb's repeated internal control certifications throughout the Class Period.

235. Contrary to Defendants Rampino and Lamb's repeated certifications, as set forth herein, serious deficiencies existed in the Company's internal controls throughout the Class Period and at the time these certifications were issued.

# VI. DEFENDANTS' MISSTATEMENTS AND OMISSIONS DURING THE CLASS PERIOD WERE MATERIAL[4]

236. As set forth in Section VIII below, Defendants each made numerous misstatements and omissions during the Class Period. The subjects of Defendants' misstatements and omissions – the Company's subprime underwriting practices, the valuation of its Residual Interests and Repurchase Reserves, and its control over internal reporting – were of fundamental importance to the Company's financial well-being and thus of material importance to investors. In addition, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's false and misleading statements and omissions on those subjects caused foreseeable and substantial consequences to the Company and its investors.

## A. Underwriting Statements

237. The FDIC found the Company's subprime underwriting to be such a critical subject that it addressed the topic at great length in its Cease & Desist Order, as set forth above in ¶¶ 65-75. The FDIC had previously issued Interagency Guidance on Subprime Lending in 1999 and 2001. In addition, the Director, Division of Supervision and Consumer Protection, of the FDIC specifically cited this serious FDIC enforcement action against Fremont in testimony before the U.S. Congress on March 22, 2007. Further, the Cease & Desist order set forth that FIL's, and by extension the Company's, "primary line of business" was "brokered subprime mortgage lending." Consequently, Defendants' public statements as to the manner in which the Company underwrote that business were of primary importance to investors.

---

[4] This section of the Complaint summarizes the materiality of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's Class Period misstatements and omissions. The materiality of specific misstatements and omissions is further alleged in Section VIII below (along with the other elements of falsity and scienter).

238. Indeed, the Company underwrote and originated massive amounts of subprime residential loans in 2005 and 2006 – $36.2 billion and $32.6 billion, respectively. The income that the Company booked in 2005 from its sale and securitization of residential mortgage loans, as well as interest on residential loans, accounted for approximately 65% of all the income that the Company booked for that year, according to the 2005 Form 10-K.

239. In short, subprime mortgage loans were the Company's most important product. Given the Company's reliance on its primary business of subprime mortgage lending, loans sales, and securitizations – both in terms of its balance sheet and its income statement – Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's statements as to the manner in which Fremont underwrote its subprime mortgage loans were of crucial importance to investors. This is especially true given the heightened importance of appropriate underwriting for the higher risk type of loans that Fremont was issuing.

240. Interagency Guidance on Subprime Lending issued in 1999 specifically warned subprime lenders: "If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound" and that subprime loans were at "special risk for fraud or misrepresentation" given the "incentives for originators to produce a high volume of loans." Then in 2001, the Expanded Guidance for Subprime Lending Programs again highlighted the importance of sound underwriting for subprime loans: "Although subprime lending is generally associated with higher inherent risk levels, properly managed this can be a sound and profitable business. . . . Sound underwriting practices and effective control systems can provide the lead time necessary to react to deteriorating conditions . . . ." (Emphasis added.)

241. Further demonstrating the materiality of Defendants' statements regarding Fremont's purported "sound," "appropriate" and "improved"

underwriting, securities analysts and rating agencies specifically commented on the purported credit quality of Fremont's subprime mortgage loans, both before and during the Class Period. For example, Hoefer & Arnett analyst Don Worthington issued a "Strong Buy" rating for Fremont common stock on or about August 8, 2005, which specifically noted his then-existing belief that "The company's credit quality has improved markedly over the past 12 months." While the information set forth in Sections V A.-B. above demonstrates that, in fact, Fremont's underwriting and credit quality had declined substantially during that time period, the analyst's specific focus on credit quality demonstrates the materiality of that subject to Fremont investors.

242. During the Class Period, Standard & Poor's also specifically cited Fremont's purported improvements in subprime underwriting standards as a "Major Rating Factor" and stated: "Standard & Poor's Ratings Services sees steps taken to improve the RRE [Residential Real Estate] loan origination asset quality and reduce repurchase requests through tighter underwriting standards as positive ratings factors." Additional such reports issued during the Class Period, including after the Company purportedly tightened its subprime underwriting standards, are set forth in Section VIII below.

243. On November 28, 2007, Fitch Ratings published a "Special Report" regarding "The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS [Residential Mortgage Backed Securities] Performance." In its report, Fitch Ratings demonstrated the materiality of statements such as those repeatedly made by the Fremont individual Defendants during the Class Period regarding Fremont's subprime underwriting by concluding that subprime lending became particularly dangerous when combined with the absence of effective underwriting. Fitch Ratings stated that: "In addition to the inherent risk of these products, evidence is mounting that in many instances these risks were not controlled

through sound underwriting practices. Moreover, in the absence of effective underwriting, products such as 'no money down' and 'stated income' mortgages appear to have become vehicles for misrepresentation or fraud by participants throughout the origination process." (Emphasis added.) Fitch Ratings further noted: "High risk products, which require sound underwriting and which are easy targets for fraud, account for some of the largest variances to expected default rates."

244. In other words, "poor underwriting" should not be ignored or deemed immaterial in the subprime lending context, but was even more important with subprime lending and is now understood to have been a material contributor "in many instances" to the very poor performance of the loans. As concluded by Fitch Ratings, "it is important to understand the impact that loans originated with poor underwriting practices and fraud can have."

245. Nor was this "poor underwriting" ascertainable to investors in light of Defendants' Class Period statements or from publicly-reported loan data. To the contrary, Fitch Ratings "Special Report" noted that prior to 2007, "much of the poor underwriting and fraud . . . was masked by the ability of the borrower to refinance or quickly re-sell the property prior to the loan defaulting, due to rapidly rising home prices."

246. Accordingly, Defendants' repeated statements regarding Fremont's purported "appropriate," "sound" and "improved" underwriting during the Class Period set forth in Section VIII below were material to investors.

### B. Residual Interests

247. Additionally, the Company's reported valuation of its Residual Interests also was of material importance to investors. During the Class Period, securitizations became an increasingly substantial component of Fremont's business. Fremont increased its securitizations from just over 10% of total sales or

securitizations in 2004, to almost 28% in 2006. Accordingly, by 2006, Fremont securitized almost one-third of the loans that it originated. Moreover, according to Fremont's 2005 Form 10-K, the Company's Residual Interests were its fourth-largest asset at approximately $171 million, and had increased more than 10 times over the ending balance of $15.7 million in 2004.

248. During the Class Period, rating agency Fitch Ratings further noted the materiality of the Company's reported Residual Interests in observing that "debt at the holding company level is currently mainly being serviced by cash flows from residual interests." In addition, the impact of the write-down to Residual Interests that the Company booked in its 2006 Form 10-K establishes the importance of fairly accounting for the Residual Interests to the Company's financial well-being. When the Company wrote down its Residual Interests by $161 million in the 2006 Form 10-K, that single impairment equaled more than 50% of the Company's entire reported net income for 2005 and over 80% of the Company's reported net loss for 2006. That impairment was unquestionably material and devastating.

249. Further, the value at which Fremont recorded its Residual Interests in securitized loans purportedly reflected the quality of the subprime loans that Fremont was originating. Thus, the value that Fremont assigned to its Residual Interests served as an important benchmark to investors for the quality of its underwriting, the materiality of which is set forth directly above.

250. Finally, the FDIC considered the valuation of Residual Interests to be so crucial that it specifically ordered the Company to "perform quarterly valuations and cash flow analyses on [FIL's] residual interests . . . from its residential lending operation."

## C.    Repurchase Reserves

251. Similarly, Repurchase Reserves were a critical reserve to investors and were materially understated in the 2006 third quarter. As noted above, these

reserves had to be increased by over 300% in the very next quarter – an unquestionably material increase of approximately $107 million – which directly impacted the Company's reported net loss for that quarter.

252.   In the same way as the reported Residual Interests communicated to Fremont investors regarding the purported underlying quality of Fremont's loans and underwriting, had Defendants timely reported required increases to Fremont's Repurchase Reserves, investors would have learned material information regarding the underlying quality of Fremont's subprime loans and underwriting.

### D.   **Internal Controls**

253.   The Company's failure to maintain adequate and effective internal control over financial reporting also was material to investors.  Without adequate and effective controls, the Company's financial statements were unreliable and misleading statements of fiscal performance, including those statements of greatest importance to investors, such as its balance sheet and statements of income.  Further, without adequate controls, the Company failed to properly correct the serious flaws in its underwriting – in other words, the lack of control over internal reporting allowed the Company's irresponsible subprime underwriting to continue unchecked.

254.   The FDIC found the lack of internal controls over financial reporting so material that it specifically addressed the subject in its Cease & Desist Order.  The FDIC ordered the Company to cease "[o]perating FIL without effective risk management policies and procedures in place."  To specifically remedy that crucial defect, the FDIC ordered the Company to "develop, adopt, and implement strong control systems to monitor whether [FIL's] actual practices are consistent with their policies and procedures."  The FDIC further required that the Company's "control systems" shall include "[m]onitoring compliance with appropriate laws and regulations, applicable third party agreements, and internal policies."  In addition,

the FDIC found Fremont's control over internal reporting so lacking that it ordered the Company to replace its management. Specifically, the FDIC ordered the Company to cease "operating with management whose policies and practices are detrimental to [FIL]" and to replace its then-current management with "qualified management acceptable to the Regional Director of the San Francisco Office ('Regional Director') and the Commissioner of the Department of Financial Institutions for the State of California ('Commissioner')."

255. Thereafter, as set forth more fully below at ¶¶ 287-292, Defendant Walker was terminated in June of 2007, Defendant Lamb resigned from the Company in early July of 2007, Defendants Rampino and Bailey were removed in November of 2007, and Defendant McIntyre was replaced in November of 2007.

256. Moreover, the FDIC ordered the Company to establish a system of proper internal controls. In particular, the FDIC ordered FIL's board of directors to, within 60 days of the Cease & Desist Order, "obtain an independent study of the management and personnel structure of [FIL] to determine whether additional personnel are needed for the safe and profitable operation of [FIL]." The FDIC also ordered Fremont to form a committee of independent directors to monitor the Company's corrective actions and to "submit [every 30 days] to the board of directors for consideration at its regular monthly meeting a written report detailing [FIL's] compliance with this ORDER." The FDIC also ordered FIL to, on a quarterly basis, "furnish written progress reports to the Regional Director and the Commissioner detailing the form and manner of any actions taken to secure compliance with this ORDER and the results thereof."

257. Further demonstrating the materiality of the Company's internal controls to investors, prior to the start of the Class Period, credit rating agency Fitch Ratings actually upgraded its rating for Fremont on or about July 26, 2005,

based on its then-existing belief that Fremont had "tightened internal procedures and controls."

\* \* \*

258. The materiality of these subjects – i.e., Company's subprime underwriting, the reported valuation of its Residual Interests and Repurchase Reserves, and its control over internal reporting – is further established by the fact that the Company's false and misleading statements on those topics triggered foreseeable and grave consequences. In particular, because the Company's underwriting was so inadequate; its accounting flawed; and its internal controls were so lacking, the FDIC stepped in and effectively put the Company out of the subprime lending business with its Cease & Desist Order. As far back as 1999 and 2001, the FDIC repeatedly had warned subprime lenders in its Interagency Guidance on Subprime Lending that, "If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high risk activity that is unsafe and unsound." Further, Fremont's over-valuation of its Residual Interests throughout the Class Period, and its understatement of its Repurchase Reserves in the 2006 third quarter, foreseeably caused it to take huge write-downs in the fourth quarter of 2006.

259. Importantly, neither of those occurrences were the product of independent market forces. The FDIC acted against Fremont for problems specific to Fremont, as the terms of the Cease & Desist order, described above at ¶¶ 65-75, make clear. The Cease & Desist Order exclusively references specific underwriting, internal control, and accounting problems at the Company. Moreover, Fremont's write-downs of its Residual Interests and increase of its Repurchase Reserves occurred because Fremont specifically originated very poor loans and not because of general market conditions, as set forth above in ¶¶ 165-

180, and because Fremont maintained inadequate internal control over financial reporting.

## VII.  DEFENDANTS ACTED WITH SCIENTER[5]

260.  Throughout the Class Period, Defendants Rampino, Bailey, Lamb, Walker, Nicolas and McIntyre each acted with scienter in making materially false and misleading statements to the investing public.  The facts alleged herein collectively demonstrate a strong inference that each of these individual Defendants had actual knowledge that the statements made by them were false and misleading when made, or acted with deliberate reckless disregard for the truth or falsity of those statements.

### A.    Defendants Knew or Deliberately Disregarded What Was Happening At Fremont's "Primary Line of Business"

261.  As the FDIC noted in the Cease & Desist Order, Fremont's "brokered subprime mortgage lending" operation was the Company's "primary line of business."  Fremont became particularly dependant on subprime lending after it was forced to exit the workers compensation business.  In 2005, Fremont's subprime mortgage operation accounted for over 80% of the Company's total pre-tax income.

262.  As reported by CW 34, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre set the policies and procedures for the Company with regard to the kind of subprime residential loans that the Company originated.  Thus, these individuals were well aware of the rising levels of high-risk, piggyback, and stated-income loans that the Company originated, as well as the increasingly exotic and

---

[5] This section of the Complaint alleges numerous facts demonstrating, collectively, a strong inference that each Defendant acted with scienter.  In Section VIII below, Plaintiffs allege in chronological order each false and misleading statement made by each individual Defendant during the Class Period, the reasons why each statement was false and misleading when made and cross reference all facts demonstrating falsity, materiality and, collectively, supporting a strong inference of scienter for each Defendant.

high-risk loans devised by the Company, such as 50/30 loans, where payments were amortized over 50 years during a 30-year term, with the last mortgage payment a huge balloon payment for the remaining 20 years of amortization. These products placed all of the individual Defendants, each of whom had extensive industry experience, on actual notice of the core importance of appropriate underwriting in the Company's primary line of business.

263. In addition, senior management determined the method and manner of compensation for Fremont's account managers, underwriters, operations managers, and other critical employees. As known by all of the individual Defendants and reported by CWs 1, 7, 8, 9, 13, 15, 25, 26, and 32, and alleged by the Massachusetts Attorney General, these employees were financially incented to generate an increasing volume of high-risk, subprime loans without appropriate underwriting, even in the face of adverse market conditions. In addition, as demonstrated by CW 1, and as alleged by the Massachusetts Attorney General, Fremont's external brokers were paid higher incentives to place borrowers in more expensive and risky loans. (Yet, when Defendant Bailey was specifically asked about this compensation at the start of the Class Period, he falsely stated that Fremont's underwriters and other responsible employees were not compensated based on volume-driven incentive plans, as set forth in ¶ 309 below.)

264. Further, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre, by their own public statements during the Class Period, were admittedly aware of the poor performance of their "primary line of business" subprime loans and thus were aware of the rising levels of delinquencies, forced loan repurchases, repricings, and Non-Accrual Loans. These individuals, all of whom have extensive backgrounds in finance and/or the mortgage industry, as set forth in ¶¶ 35-40 above, knew or were deliberately reckless in not knowing that, contrary to their repeated public statements, these red flags signaled that the Company's subprime

underwriting and loan origination were not as publicly described and that its subprime loans were destined to perform poorly. Their practice, however, was to sell off the subprime loans quickly, through whole loan sales or securitizations. Thus, these individuals were more interested in increasing subprime loan volume than loan quality.

265. These allegations are further confirmed by CW 34 who, as set forth in ¶ 74 above, states that Fremont's Regulatory Risk Management Group submitted numerous, repeated adverse written findings to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, in 2005 and 2006 which "mirrored" the FDIC's eventual Cease & Desist Order, one to two years later. CW 34 states that these repeated adverse reports specifically highlighted, inter alia, unfair and deceptive acts that Fremont was engaged in and "pretty obvious" poor underwriting. CW 34 reports that Defendants McIntyre, Rampino, Bailey and other senior executives "dictated policy and procedures" and that their push was to make more and more loans with "no restraints" to increase their own personal compensation at Fremont with increasing loan volume while ignoring the repeated adverse findings from Regulatory Risk Management.

266. CW 40, a lead auditor in FIL's Credit Compliance Department from 1999 until 2007, also reports that she issued adverse written reports to senior FIL management, including to Defendant Walker via email, which repeatedly identified income documentation fraud as an issue over and over again. CW 40 states that her department audited about 10% of FIL's loan production and that the reports were very detailed and included a breakdown of every single loan that was reviewed and the findings for each loan.

267. Further, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre admittedly paid close attention to the number and kind of exceptions that Fremont made to its underwriting guidelines, and thus knew or deliberately

disregarded throughout the Class Period that underwriting exceptions were rampant. In a November 9, 2006 conference call, during which Defendants repeatedly stressed the improvements they purportedly had made to Fremont's subprime underwriting, an analyst from Credit Suisse specifically asked Defendants Bailey, Lamb, Walker, and Nicolas, "Do you track your underwriting exceptions to your guidelines? And if so, can you share those numbers with us?" Defendant Walker replied, "We do track them."

268. According to CWs 21, 30, and 31, throughout the Class Period, Defendant Walker, as CEO of FIL, led monthly "roar-call" meetings with Fremont employees, during which early payment defaults and overall loan performance were discussed. Indeed, according to CW 21, Fremont executives "absolutely, 100%" knew about the exceptions made on loans. According to CW 21, the executives received monthly reports on early payment defaults, including the kinds of loans that defaulted most often, such as stated-income loans or loans from a particular broker.

269. According to CW 21, Defendant Walker also received Quality Control Reports and Suspicious Activity Reports, and had monthly meetings with the Company's Senior Vice President of Quality Control, Brian Witham, to review the reports. According to CWs 22, 27 and 34, Defendant Walker, himself, was in charge of deciding whether to cut off any particular outside brokers, and Walker decided to continue doing business with brokers who were providing obviously fraudulent documents in support of the loans they were originating because they were "heavy hitters" who brought in a significant amount of loan volume. CW 22 reported that, each month, Defendants Walker and Nicolas received Broker Channel Management Reports, which showed brokers on watch lists and which Fremont loan centers reported the most broker fraud. CW 22 also prepared Quality Control Reports that were presented to Defendants Walker and Nicolas, which

showed the number and type of exceptions to Fremont's loans, as well as defaults. CW 34 also states that some of the broker fraud was "so egregious" yet nothing was being done about "obvious problems."

270.    Further, according to CWs 1 and 15, each loan originated by the Company and all of the relevant origination information, including exceptions, was entered into the Company's computer system.    Initially the Company used a program called "Uniform" and during the Class Period transitioned to a program called "NetOxygen."  According to CW 1, NetOxygen generated exception reports that all senior management received on a regular basis.

271.    The FDIC's severe action against Fremont revealed that contrary to Defendants' repeated Class Period statements of "sound," "appropriate" and "improved" underwriting, Fremont was in fact "operating with inadequate underwriting criteria and excessive risk," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices." As found by the FDIC, Fremont was marketing and extending subprime loans in "an unsafe and unsound manner that greatly increase[d] the risk that borrowers [would] default on the loans or otherwise cause losses" and contrary to then-existing Interagency Guidance for subprime lending issued in 1999 and 2001.

272.    In addition, the fact that the accounts of all of the former employees set forth in ¶¶ 76-118 above, and as further revealed by the Massachusetts Attorney General and the loan data analyses performed by Plaintiffs, are so strikingly similar and demonstrate such obvious weaknesses in Fremont's subprime underwriting, establishes at the very least that had any of the individual Defendants been interested in taking even the most superficial look at the Company's subprime underwriting practices, they would have quickly discovered these core facts that were directly contrary to their repeated public statements regarding "appropriate," "sound" and "improved" underwriting.

273. Moreover, beginning on August 8, 2006 (as set forth ¶¶ 335-360 below), Defendants Bailey, Nicolas, Lamb, Rampino, McIntyre and Walker each publicly claimed to have engaged in a thorough analysis of Fremont's subprime underwriting practices and that modifications were made to Fremont's subprime underwriting that already was resulting in better-performing mortgages and a "flight to quality." However, as demonstrated by the data set forth in detail in ¶¶ 171-180 above, the mortgages originated at the time these statements were made and thereafter actually performed <u>even worse</u>, and in a manner so quickly that general industry conditions could not be to blame.

274. That these individual Defendants repeatedly described Fremont's origination and underwriting standards during the Class Period in a manner that was directly contrary to actual facts is strong evidence of their scienter. Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre each made these repeated false statements either knowingly or with deliberate reckless disregard for the true facts that were available to them at the time of their statements.

**B.**  **Defendants' Obligations To The FDIC And the FDIC's Wide-Ranging Findings Are Further Evidence of Scienter**

275. As an FDIC-insured institution, Fremont was required under federal regulations to institute policies and procedures to ensure that Fremont management and the Board of Directors were informed about the type and quality of loans that Fremont originated. As set forth in the Company's 2005 Form 10-K:

> *Safety and Soundness Standards.* As required by the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") as amended, the federal banking agencies have adopted guidelines designed to assist the federal banking agencies in identifying and addressing potential safety and soundness concerns before capital

becomes impaired. The guidelines set forth operational and managerial standards relating to: (i) internal controls, information systems, and internal audit systems, (ii) loan documentation, (iii) credit underwriting, (iv) asset growth, (v) earnings, and (vi) compensation, fees, and benefits. In addition, the federal banking agencies have also adopted safety and soundness guidelines with respect to asset quality and earnings standards. These guidelines provide six standards for establishing and maintaining a system to identify problem assets and prevent those assets from deteriorating. Under these standards, an insured depository institution should: (i) conduct periodic asset quality reviews to identify problem assets, (ii) estimate the inherent losses in problem assets and establish allowances that are sufficient to absorb estimated losses, (iii) compare problem asset totals to capital, (iv) take appropriate corrective action to resolve problem assets, (v) consider the size and potential risks of material asset concentrations, and (vi) provide periodic asset quality reports with adequate information for management and the Board of Directors to assess the level of asset risk. These guidelines also set forth standards for evaluating and monitoring earnings and for ensuring that earnings are sufficient for the maintenance of adequate capital and reserves. [Emphasis added.]

276. Interagency Guidance on Subprime Lending issued in 1999 specifically provide that lenders must maintain "well defined and specific underwriting parameters" and "an origination strategy that allows for after-the-fact assessment of underwriting performance." The Guidance states that institutions also must maintain "procedures for separate tracking and monitoring of loans approved as exceptions to stated policy guidelines." The Guidance further

provides that: "Deterioration in the quality of purchased loans or in the portfolio's actual performance versus expectations requires a thorough reevaluation of the lenders or dealers who originated or sold the loans, as well as a reevaluation of the institution's criteria for underwriting loans and selecting dealers and lenders. Any such deterioration may also highlight the need to modify or terminate the correspondent relationship or make adjustments to underwriting and dealer/lender selection criteria."

277. Fremont represented that at all times during the Class Period it was in compliance with its obligations as an FDIC-insured institution. Indeed, Defendant Nicolas, as CFO of FIL, was responsible for compiling, signing, and filing the "Call Reports," submitted to regulators on a monthly basis, which contained detailed information about the type, quality, and performance of loans originated by Fremont.

278. Because Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre were required, as officers and directors of an FDIC-insured institution or its affiliate, to constantly monitor the credit quality of the subprime mortgage portfolio and assess performance variances, they were fully aware, or were deliberately reckless, in not being aware, of the deteriorating quality of Fremont's subprime underwriting and the underlying reasons causing that very poor performance (including broker or borrower fraud which they refused to take any meaningful steps to curtail in the interest of volume).

279. As highlighted by the Massachusetts high court, these individual Defendants also were placed on specific notice of the problems with Fremont's subprime underwriting practices by Interagency Guidance on Subprime Lending issued in 2001 which they knowingly failed to follow: "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound."

(Emphasis added by court).  Instead, all of these individual Defendants knew or deliberately disregarded that Fremont regularly and repeatedly issued loans to subprime borrowers who could not afford to repay them "as structured," but would need to refinance them as the loan interest rates adjusted higher (provided that home values continued to increase to support such a refinancing).

280.  The individual Defendants' obligations to monitor Fremont's subprime lending underwriting practices, to evaluate the reasons for poor performance and to ensure compliance with Interagency Guidance contrasted with the FDIC's widespread findings of "unsafe and unsound" lending practices inconsistent with Interagency Guidance further supports a strong inference of scienter – i.e., that all individual Defendants acted knowingly or with deliberate recklessness in making their repeated Class Period statements of purportedly "sound," "appropriate" or "improved" underwriting in light of the true, undisclosed facts.

## C.  Defendants' Fraudulent Accounting Further Supports A Strong Inference Of Scienter

281.  The magnitude and pervasiveness of the dangerous "unsafe and unsound" subprime underwriting employed by Fremont, as demonstrated by the data and first-hand accounts set forth in ¶ 74 and ¶¶ 76-118 above, as well as the actions by the FDIC, Massachusetts Attorney General and some of Fremont's own business partners, further support a strong inference of scienter on the part of all Defendants.  In addition, appropriate accounting for the poor quality of the loans would have affected multiple line items on the Company's balance sheets and income statements, including the Company's reported Residual Interests and Repurchase Reserves.

282.  Notwithstanding their industry expertise and experience and knowledge of the Company's extremely "unsafe and unsound" subprime

underwriting standards, Defendants McIntyre, Rampino, Bailey, and Lamb repeatedly signed the Company's filings with the SEC which described the controlling GAAP requirements for measuring Residual Interests at fair value and setting Repurchase Reserves in accordance with GAAP. Fremont claimed in its SEC filings to have established accounting policies that were in conformity with GAAP in the preparation of its financial statements. At the same time, the individual Defendants repeatedly failed to follow these same GAAP requirements, as set forth in ¶¶ 182-235 above, because doing so would have revealed to investors the very poor quality of the subprime loans Fremont was originating. Thus, minimal to zero impairments were recorded to Fremont's reported Residual Interests throughout the Class Period and its Repurchase Reserves were reduced, rather than increased, in the final quarter reported during the Class Period. Moreover, Defendants Rampino and Lamb each signed sworn certifications that Fremont maintained adequate internal controls and presented its financial statements in accordance with GAAP at the end of every quarterly reporting period, when that was not true at the time of their repeated certifications.

283. For example, with regard to the Company's valuation of Residual Interests, Fremont's 2005 Form 10-K stated that the Company purportedly reviewed its underlying assumptions on a quarterly basis and adjusted the carrying value of the Residual Interests based on actual experience and industry experience. However, as set forth in ¶ 197 above, the Company reported little to no impairment of its Residual Interests throughout the Class Period. Only in the belatedly-reported 2006 fourth quarter filing did the Company report an other-than-temporary impairment of over $161 million of the Company's Residual Interests, representing an impairment of nearly all, or over 95%, of the Residual Interests actually recorded during the Class Period.

284.   Given the very poor quality of the loans originated by Fremont, all of the individual Defendants knew or deliberately disregarded that Fremont's Residual Interests – which represented the highest risk tranche in its securitizations – were impaired and likely to result in far less value.   Nonetheless, meaningful impairments of the Company's reported Residual Interests were not recognized until after the FDIC effectively put Fremont out of the subprime business and Fremont was working with its third outside auditing firm in less than one year.  At that time, the Company's reported Residual Interests were impaired by <u>over 95%</u>. These Residual Interests did not lose nearly all of their value in that one quarter after the FDIC's Cease & Desist Order, but were impaired throughout the Class Period.  Indeed, as set forth above, CW 34 states that Regulatory Risk Management submitted written adverse reports to senior Fremont executives, including Defendants Walker, Nicolas and Bailey, as to Fremont's loan loss reserves and Residual Interest valuations long before the FDIC's Cease & Desist Order was issued.

285.   Furthermore, as discussed above in ¶¶ 201, 216-218, the Company disputed Ernst & Young's views on the valuation of Residual Interests and materially reduced its reported Repurchase Reserves immediately after terminating its long-term outside auditor Ernst & Young LLP, despite the fact that its repurchases more than doubled in the prior quarter.   That reserve was then increased <u>by over 300%</u> in the immediately following quarter – the reporting of which was delayed until after the end of the Class Period and Fremont was working with its third outside accounting firm.

286.   These facts, as well as the facts surrounding Grant Thornton LLP's surprisingly "noisy" withdrawal as Ernst & Young LLP's replacement, further support a strong inference of scienter as to all individual Defendants.

## D.    The Required Departures Of Nearly All Defendants Further Support A Strong Inference of Scienter

287.    In the Cease & Desist Order, the FDIC ordered the Company to cease "operating with management whose policies and practices are detrimental to the Bank."   The Cease & Desist Order further ordered that FIL "have and retain qualified management acceptable to the Regional Director of the San Francisco Regional Office and the Commissioner of the Department of Financial Institutions for the State of California."

288.    Following the disclosure of the Cease & Desist Order, the Company terminated Defendants Rampino, Bailey, and Walker.   Defendant Lamb also resigned at about the same time, and Defendant McIntyre was replaced around the same time.   Each of these individual Defendants had been at the Company for many years; Defendant Rampino was fired after thirty years with the Company, Defendant Bailey was fired after twenty-one years with the Company, and Defendant Walker was fired after thirteen years with the Company.   Defendant McIntyre had been with the Company for forty-four years.

289.    A strong inference of Defendants Rampino, Bailey, Lamb, Walker and McIntyre's knowledge or deliberate recklessness is further supported by the fact that these Defendants all were terminated or resigned in the wake of the exposure of the fraud, after the Company had been ordered to retain management whose policies and practices were not destructive to Fremont.   Defendant Nicolas also "separated" from Fremont at the request of the FDIC after the end of the Class Period.

290.    According to the Company's Form 8-K filed on July 7, 2007, Defendant Walker, President and CEO of FIL, was terminated on June 29, 2007.

291.    According to the Company's Form 8-K filed on November 15, 2007, Defendants Rampino and Bailey, CEO and COO of Fremont General, respectively,

were "removed" from office when the Company assembled a new management team. According to the Company's press release issued the same day, subject to regulatory approval, the new management team would be appointed to the same executive positions at FIL.

292. In a September 26, 2008 filing in the Bankruptcy Court, Fremont specifically asserted that McIntyre's "removal (along with other executive officers and directors) was sought by the federal and state banking regulators after presiding over crippling losses at the Debtor's bank." The Company further asserted: "The Debtor continues to suffer the effects of McIntyre's prior reign over the Debtor's affairs." (Emphasis added.)

### E. Defendants' Special Pre-Tax Bonus Incentives Further Support A Strong Inference of Scienter

293. Pursuant to their employment agreements, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas were entitled to participate in the Company's Executive Officer Annual Bonus Plan ("Annual Bonus Plan") and Executive Officer Long Term Incentive Compensation Plan ("Long Term Plan") (collectively, the "Executive Compensation Plans"). Pursuant to the Annual Bonus Plan, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas each were entitled to annual bonuses if they achieved their "Performance Target[s]." According to the Company's Schedule 14A Proxy Statement filed with the SEC on or about April 13, 2006 (the "2006 Proxy"), the Performance Targets for 2005 were pegged to the Company's pretax earnings. That Proxy sets forth as follows: "The Company places significant emphasis on attaining predetermined pretax earnings." (Emphasis added). Specifically, if the Company recorded pretax earnings between 80% and 120% of the established Performance Targets, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas were entitled to receive: (1) up to 150% of their salary in cash; and (2) up to 150% of their salary in restricted stock.

294.   According to the 2006 Proxy, Defendants Rampino, Bailey, and Lamb received the <u>highest possible</u> cash and restricted stock bonuses for 2005, which were paid in March of 2006, because the Company ostensibly satisfied its pretax income targets.   Defendant Walker also achieved his financial incentives. (Information for Defendant Nicolas is not publicly-available.)   The available information is summarized in Graph 20 below:

| Graph 20: Defendants' Bonuses | | | |
|---|---|---|---|
| **Defendant** | **2005 Salary** | **2005 Cash Bonus** | **2005 Stock Bonus ($)** |
| Rampino | $800,000 | $1,200,000 | $1,200,000 |
| Bailey | $700,000 | $1,050,00 | $1,050,00 |
| Lamb | $350,000 | $552,500 | $525,000 |
| Walker | Not available | $663,750 | $663,755 |

295.   According to the Company's Form 8-K filed with the SEC on or about March 3, 2006, the Performance Targets for 2006 annual bonuses also were pegged to the Company's pretax earnings.   Again, if the Company recorded pretax earnings between 80% and 120% of the Performance Targets, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas each were entitled to receive:  (1) up to 150% of their salary as an annual bonus <u>and</u> (2) up to 150% of their salary in restricted stock.

296.   Certain individual Defendants received bonuses even though the Company did not meet its earnings targets for 2006.   According to Fremont's Form 8-K filed with the SEC on or about November 20, 2006, the Company decided to reward Defendant Lamb a "one-time cash award" of $200,000 "in lieu of cash amounts that would have been paid if the pre-tax earnings targets were achieved under the Company's 2006 Executive Officer Annual Bonus Plan.  The Company does not expect those targets to be achieved."  Further, Defendant Lamb also received 50,000 shares of restricted stock valued at $822,500 based on the closing price of Fremont common stock on the date of the grant.  Likewise, Defendant

Rampino received 125,000 shares of restricted stock valued at $2,056,250, and Defendant Bailey received 110,000 shares of restricted stock valued at $1,809,500. According to the Company's 2006 Form 10-K, Defendant Walker received a "one-time" cash bonus of $250,000 and 63,000 shares of restricted stock valued at $1,036,350 on the date of the grant. The stock award was worth more than twice Defendant Walker's 2006 salary of $490,385. The "one-time" cash bonuses handed to Defendants Walker and Lamb, although granted on November 15, 2006, were payable in February of 2007, according to the 2006 Form 10-K.

297. In addition to those annual bonuses, and according to the Long Term Plan and the 2006 Proxy, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas also were entitled to receive long-term bonuses. According to the Company's Form 8-K filed with the SEC on or about March 30, 2005, these long-term bonuses were "dependent upon the Company achieving a predetermined cumulative pretax earnings target during the three-year period" from January 1, 2005 through December 31, 2007. According to that Form 8-K, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas were each entitled to receive a special bonus (in addition to any annual bonus) of: (1) up to 150% of their salary in cash, and (2) up to 150% of their salary in restricted stock, so long as the Company satisfied between 80% and 120% of the cumulative pretax income target for the years 2005 through 2007.

298. Thus, Defendants Rampino, Bailey, Lamb, Walker, and Nicolas each had powerful financial incentives to inflate Fremont's pretax earnings by aggressively increasing subprime loan volume and improperly accounting for Residual Interests and Repurchase Reserves, in order to achieve multi-million dollar cash and stock bonuses in the near and long term. CW 34 states that those financial incentives motivated these senior executives to make more and more loans with "no restraints" to increase loan volume while deliberately ignoring the

repeated adverse written reports from Regulatory Risk Management. Moreover, the California Attorney General has alleged that this same bonus structure caused very similar aggressive and harmful behavior in the Company's past workers compensation crisis, which involved half of these same individual Defendants and destroyed that prior business segment. Consequently, these incentives further support a strong inference of scienter as to Defendants Rampino, Bailey, Lamb, Walker, and Nicolas.

299. The Attorney General of California has alleged in a civil suit filed in 2006 (the "California Complaint") that Fremont's executives, including Defendants McIntyre, Rampino and Bailey, breached their fiduciary duties in a scheme that drove up the Company's insurance revenues but resulted in enormous losses and resulted in the State of California assuming control of the insurance subsidiary. According to the California Complaint, in the late 1990s Fremont executives instituted a "dramatic shift in the underwriting philosophy" at its insurance subsidiary, which significantly increased the risk levels borne by the Company's reinsurers. The California Complaint asserts that Defendant Rampino was a "prime mover" behind the push to radically increase the Company's workers compensation insurance business and was intimately involved in the scheme to defraud the Company's reinsurers. Furthermore, the California Complaint alleges that Defendants McIntyre and Bailey were also aware of and participated in the scheme. According to the California Complaint, Fremont's dramatic shifts in its insurance underwriting led to its reinsurers withdrawing from reinsurance treaties, which left the Company to bear the entire burden of a significantly riskier insurance portfolio. According to the California Complaint, the executives perpetrated this scheme to gain massive personal compensation driven by the Company's annual bonus plan, which was tied to the Company's pretax income.

The close similarity between these allegations and those in this case further support a strong inference of scienter as to these individual Defendants.

### F. Defendant McIntyre's Unusual Insider Stock Sales Support a Strong Inference of Scienter

300. Defendant McIntyre also personally capitalized on Fremont's artificially inflated stock price, including by selling over 627,000 shares of Fremont stock during August of 2006 for proceeds of more than $9.6 million. Those sales are set forth in Graph 21 below:

| Graph 21: Defendant McIntyre's August 2006 Insider Sales | | | |
|---|---|---|---|
| Date | Shares Sold | Price ($) (Approx) | Proceeds ($) |
| 8/14/2006 | 36,594 | 15.68 | 577,453 |
| 8/14/2006 | 3,600 | 15.75 | 56,700 |
| 8/14/2006 | 3,215 | 15.78 | 50,765 |
| 8/14/2006 | 65,513 | 16.00 | 1,071,793 |
| 8/14/2006 | 200 | 16.14 | 3,228 |
| 8/15/2006 | 88 | 15.79 | 1,390 |
| 8/16/2006 | 60,500 | 15.56 | 949,850 |
| 8/16/2006 | 4,500 | 15.66 | 70,470 |
| 8/17/2006 | 120,207 | 15.50 | 1,872,825 |
| 8/18/2006 | 74,000 | 15.50 | 1,158,100 |
| 8/21/2006 | 693 | 15.26 | 10,575 |
| 8/23/2006 | 68,997 | 14.85 | 1,028,055 |
| 8/24/2006 | 89,320 | 14.81 | 1,328,188 |
| 8/30/2006 | 50,090 | 14.07 | 712,781 |
| 8/31/2006 | 50,000 | 14.10 | 711,500 |
| **Total** | **627,517** | | **$9,603,673** |

301. The sales set forth above were highly unusual because they were dramatically out of line with Defendant McIntyre's prior trading practices and other Class Period sales. In contrast to the sales set forth in the table above, Defendant McIntyre typically sold Fremont stock during the first week of January each year, as he did on January 2, 2005, January 5, 2006, and January 4, 2007. Further, he typically made those annual sales in one tranche, rather than in several different tranches reflected above. Moreover, in each of those regularized sales, he

typically sold far less stock than he did in August of 2006.  Specifically, on January 2, 2005, he sold 271,700 shares; on January 5, 2006, he sold 306,531 shares; and on January 4, 2007, he sold 142,214 shares – in each case, less than half the shares he sold in August of 2006.  Further, these sales were suspicious because they accounted for approximately 8% of Defendant McIntyre's entire cache of Fremont stock, and were made immediately after the Company suspiciously terminated Ernst & Young LLP on August 8, 2006, as discussed in ¶¶ 216-218 above.

302.  Moreover, at the time of these sales, Defendant McIntyre knew of material undisclosed adverse information, including the facts surrounding Ernst & Young LLP's termination (the firm where he previously worked and with which he had a long-standing relationship while at Fremont); the FDIC's pending investigation (which, according to CWs 27 and 34, had commenced months earlier and was expected to result in an adverse action by the FDIC before these insider sales were made); and the Company's aggressive, volume-driven subprime underwriting, improper accounting and deteriorating financial health.  Consequently, the insider sales set forth above further support a strong inference of scienter as to Defendant McIntyre.  By contrast, Defendant McIntyre did not purchase any of his Fremont shares on the open market during the Class Period.

*    *    *

303.  All of these facts, viewed collectively, demonstrate a strong inference of scienter as to each individual Defendant and are summarized as follows:

Defendant McIntyre:  • set the policies and procedures for the Company's core business, subprime lending;

• was aware of the critical importance of appropriate subprime underwriting;

• monitored loan performance and underwriting exceptions;

- was required by the FDIC to monitor loan quality and risk and was aware of Fremont's failure to comply with Interagency Guidance for subprime lending;
- received adverse reports from Regulatory Risk Management that were inconsistent with repeated public statements, including those in Fremont's press releases and Forms 10-Q and 10-K issued during the Class Period for which he was responsible;
- pushed for a growing volume of subprime loans without regard for appropriate underwriting controls in an effort to increase his own personal compensation and allegedly engaged in similar conduct with the Company's now defunct workers compensation business;
- incentivized Fremont's account managers, underwriters, operations managers and other critical employees and external brokers to generate an increasing volume of high-risk subprime loans;
- profited from the artificial inflation to Fremont common stock, including by selling over 1 million shares of Fremont stock for proceeds of over $19 million during the Class Period, including highly unusual sales in August 2006;
- was removed from office as a result of the FDIC's findings;

- disregarded obvious weaknesses in Fremont's subprime underwriting practices that were directly inconsistent with public statements he was personally responsible for, including specific claims beginning on August 8, 2006, that Fremont had improved its subprime underwriting; and

- issued financial statements correctly describing controlling GAAP, but failed to conform Fremont's financials with GAAP notwithstanding written adverse reports from Regulatory Risk Management, particularly after Ernst & Young LLP was terminated after 35 years of service, and further demonstrated by Grant Thornton LLP's subsequent "noisy" withdrawal as the replacement outside auditor for Fremont.

<u>Defendant Bailey</u>:

- set the policies and procedures for the Company's core business, subprime lending;

- was aware of the critical importance of appropriate subprime underwriting;

- monitored loan performance and underwriting exceptions;

- was required by the FDIC to monitor loan quality and risk and was aware of Fremont's failure to comply with Interagency Guidance for subprime lending;

- received adverse reports from Regulatory Risk Management that were inconsistent with repeated

public statements, including those he made personally and those in Fremont's press releases and Forms 10-Q and 10-K issued during the Class Period for which he was responsible;

- pushed for a growing volume of subprime loans without regard for appropriate underwriting controls in an effort to increase his own personal compensation and allegedly engaged in similar conduct with the Company's now defunct workers compensation business;

- incentivized Fremont's account managers, underwriters, operations managers and other critical employees and external brokers to generate an increasing volume of high-risk loans, yet Bailey specifically denied that underwriters were paid with volume-driven incentives;

- profited from the artificial inflation in Fremont common stock by selling Fremont stock during the Class Period, realizing proceeds of over $6.8 million;

- was removed from office as a result of the FDIC's findings;

- disregarded obvious weaknesses in Fremont's subprime underwriting practices that were directly inconsistent with the public statements he was personally responsible for, including specific claims beginning on August 8, 2006, that Fremont

had improved its underwriting and experienced a "flight to quality;" and

- issued financial statements correctly describing controlling GAAP, but failed to conform Fremont's financials with GAAP notwithstanding written adverse reports from Regulatory Risk Management, particularly after Ernst & Young LLP was terminated after 35 years of service, and further demonstrated by Grant Thornton LLP's subsequent "noisy" withdrawal as the replacement outside auditor for Fremont.

Defendant Walker:

- set the policies and procedures for the Company's core business, subprime lending;
- was aware of the critical importance of appropriate subprime underwriting;
- monitored loan performance and underwriting exceptions as he admitted during the Class Period;
- led monthly "roar-call" meetings during which early payment defaults and overall loan performance were discussed;
- was required by the FDIC to monitor loan quality and risk and was aware of Fremont's failure to comply with Interagency Guidance for subprime lending;
- received adverse reports from Regulatory Risk Management and FIL's Credit Compliance Department that were inconsistent with repeated

public statements, including those he made
personally and those in Fremont's press releases
and Forms 10-Q and 10-K issued during the Class
Period for which he was responsible;

- pushed for a growing volume of subprime loans
  without regard for appropriate underwriting
  controls in an effort to increase his own personal
  compensation;

- incentivized Fremont's account managers,
  underwriters, operations managers and other
  critical employees and external brokers to generate
  an increasing volume of high-risk subprime loans;

- was personally responsible for cutting off
  fraudulent brokers, but refused to cut off brokers
  providing large volume of subprime loans
  notwithstanding egregious fraud;

- profited from the artificial inflation in Fremont
  common stock by selling Fremont stock during the
  Class Period, realizing proceeds of over $350,000;

- was terminated as a result of the FDIC's findings;

- disregarded obvious weaknesses in Fremont's
  subprime underwriting practices that were directly
  inconsistent with the public statements he was
  personally responsible for, including specific
  claims beginning on August 8, 2006, that Fremont
  had improved its subprime underwriting; and

- issued financial statements correctly describing controlling GAAP, but failed to conform Fremont's financials with GAAP notwithstanding written adverse reports from Regulatory Risk Management.

Defendant Rampino:
- set the policies and procedures for the Company's core business, subprime lending;
- was aware of the critical importance of appropriate subprime underwriting;
- monitored loan performance and underwriting exceptions;
- was required by the FDIC to monitor loan quality and risk and was aware of Fremont's failure to comply with Interagency Guidance for subprime lending;
- received adverse reports from Regulatory Risk Management that were inconsistent with repeated public statements, including those in Fremont's press releases and Forms 10-Q and 10-K issued during the Class Period for which he was responsible;
- pushed for a growing volume of subprime loans without regard for appropriate underwriting controls in an effort to increase his own personal compensation and allegedly engaged in similar conduct with the Company's now defunct workers compensation business;

- incentivized Fremont's account managers, underwriters, operations managers and other critical employees and external brokers to generate an increasing volume of high-risk subprime loans;

- profited from the artificial inflation in Fremont common stock by selling Fremont stock during the Class Period, realizing proceeds of over $8.5 million;

- was removed from office as a result of the FDIC's findings;

- disregarded obvious weaknesses in Fremont's subprime underwriting practices that were directly inconsistent with the public statements he was personally responsible for, including specific claims beginning on August 8, 2006, that Fremont had improved its subprime underwriting;

- issued financial statements correctly describing controlling GAAP, but failed to conform Fremont's financials with GAAP notwithstanding written adverse reports from Regulatory Risk Management, particularly after Ernst & Young LLP was terminated after 35 years of service, and further demonstrated by Grant Thornton LLP's subsequent "noisy" withdrawal as the replacement outside auditor for Fremont; and

|  | • | repeatedly certified Fremont's internal controls despite obvious core weaknesses admitted by the Company only after the FDIC's adverse findings. |
| <u>Defendant Lamb</u>: | • | set the policies and procedures for the Company's core business, subprime lending; |
|  | • | was aware of the critical importance of appropriate subprime underwriting; |
|  | • | monitored loan performance and underwriting exceptions; |
|  | • | was required by the FDIC to monitor loan quality and risk and was aware of Fremont's failure to comply with Interagency Guidance for subprime lending; |
|  | • | received adverse reports from Regulatory Risk Management that were inconsistent with repeated public statements, including those in Fremont's press releases and Forms 10-Q and 10-K issued during the Class Period for which he was responsible; |
|  | • | pushed for a growing volume of subprime loans without regard for appropriate subprime underwriting controls in an effort to increase his own personal compensation; |
|  | • | incentivized Fremont's account managers, underwriters, operations managers and other critical employees and external brokers to generate an increasing volume of high-risk subprime loans; |

- profited from the artificial inflation in Fremont common stock by selling Fremont stock during the Class Period, realizing proceeds of over $1.2 million;
- was required to resign from office as a result of the FDIC's findings;
- disregarded obvious weaknesses in Fremont's subprime underwriting practices that were directly inconsistent with the public statements he was personally responsible for, including specific claims beginning on August 8, 2006, that Fremont had improved its subprime underwriting;
- was a Certified Public Accountant;
- issued financial statements correctly describing controlling GAAP, but failed to conform Fremont's financials with GAAP notwithstanding written adverse reports from Regulatory Risk Management, particularly after Ernst & Young LLP was terminated after 35 years of service, and further demonstrated by Grant Thornton LLP's subsequent "noisy" withdrawal as the replacement outside auditor for Fremont; and
- repeatedly certified Fremont's internal controls despite obvious core weaknesses admitted by the Company only after the FDIC's adverse findings.

<u>Defendant Nicolas:</u>
- set the policies and procedures for the Company's core business, subprime lending;

- was aware of the critical importance of appropriate subprime underwriting;
- monitored loan performance and underwriting exceptions;
- was required by the FDIC to monitor loan quality and risk, submitted "Call" reports to the FDIC on a monthly basis regarding subprime loan quality and performance and was aware of Fremont's failure to comply with Interagency Guidance for subprime lending;
- received adverse reports from Regulatory Risk Management that were inconsistent with repeated public statements, including those he made personally and those in Fremont's press releases and Forms 10-Q and 10-K issued during the Class Period for which he was responsible;
- pushed for a growing volume of subprime loans without regard for appropriate underwriting controls in an effort to increase his own personal compensation;
- incentivized Fremont's account managers, underwriters, operations managers and other critical employees and external brokers to generate an increasing volume of high-risk loans;
- was required to separate from Fremont as a result of the FDIC's findings;

- disregarded obvious weaknesses in Fremont's subprime underwriting practices that were directly inconsistent with the public statements he was personally responsible for, including specific claims beginning on August 8, 2006, that Fremont had improved its subprime underwriting and experienced a "flight to quality;" and

- issued financial statements correctly describing controlling GAAP, but failed to conform Fremont's financials with GAAP notwithstanding written adverse reports from Regulatory Risk Management.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND SUBSEQUENT POST-CLASS PERIOD DISCLOSURES[6]

### A. Defendants' Materially False and Misleading Statements During the Class Period

#### 1. 2005 Third Quarter Statements

304. On October 27, 2005, the first day of the Class Period, Fremont issued a press release reporting the Company's financial results for the third quarter ended September 30, 2005. Fremont reported net income for the third quarter of $92.6 million, or $1.27 per share.

---

[6] In this section of the Complaint, Plaintiffs allege in chronological order each false and misleading statement made by each individual Defendant during the Class Period, the reasons why each statement was false and misleading when made and cross references all facts demonstrating falsity, materiality and, collectively, supporting a strong inference of scienter for each Defendant. Thereafter, at the end of this section, Plaintiffs allege the significant and material decline in the price of Fremont securities as the corrective disclosures were made at the end of the Class Period.

305. During a conference call on October 27, 2005 to discuss the reported third quarter 2005 financial results, Defendant Bailey was asked whether Fremont had "seen any inkling of any cracks in the credit of your residential mortgage customers at all?" He stated:

> Not really, no. I think, again, the subprime spectrum, it's a wide spectrum. And we tend to play at the upper end of that spectrum. And I think that from what we've see[n] and what we've been told about our portfolio of loans that have – that we've originated and moved along – they've been performing fairly well. . . . And I think that we have a pretty good reputation as a good, sound originator. [Emphasis added.]

306. On or about November 9, 2005, Fremont filed with the SEC a Form 10-Q for the Company for the third quarter ended September 30, 2005. The Form 10-Q was signed by Defendants Rampino and Lamb. The Form 10-Q stated that the Company sought to "mitigate its exposure to credit risk" through appropriate underwriting standards:

> FIL's residual real estate lending operation originates first and, to a lesser degree, second mortgage loans on a wholesale basis through a network of independent mortgage brokers. FIL offers mortgage products that are designed for borrowers who do not generally satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders, such as Fannie Mae and Freddie Mac and are commonly referred to as "non-prime" or "subprime." These borrowers generally have considerable equity in the properties securing their loans, but have impaired or limited credit profiles or higher debt-to-income ratios than conventional mortgage lenders allow. The borrowers also include individuals who, due to self-

employment or other circumstances, have difficulty documenting their income through conventional means. <u>FIL seeks to mitigate its exposure to credit risk through underwriting standards that strive to ensure appropriate loan to collateral valuations</u>. [Emphasis added.]

307. Defendant Bailey's October 27, 2005 statements that Fremont tended to "<u>play at the upper end</u>" of the subprime lending spectrum and had a reputation as a "<u>good, sound originator</u>" and the statements appearing in Fremont's 2005 Third Quarter Form 10-Q that the Company sought "<u>to mitigate its exposure to credit risk through underwriting standards that strive to ensure appropriate loan to collateral valuations</u>" (for which all individual Defendants are responsible) were each materially false and misleading when made. As set forth in ¶¶ 62-181 above in detail, numerous sources of evidence demonstrate that Fremont, in fact, employed extremely "unsafe and unsound" underwriting practices inconsistent with Interagency Guidance for subprime lending and originated and approved subprime loans to borrowers who could not afford them and who were likely to default. Defendants focused on growing subprime loan volume without regard for appropriate underwriting practices or then-existing Interagency Guidance for subprime lending. Rather than "playing at the upper end" of the subprime lending spectrum or "mitigating its exposure to credit risk" through "appropriate" or "sound" underwriting standards, the above facts demonstrate that Fremont was far worse than its subprime lending peers and singled out by the FDIC in a severe FDIC action that stunned investors. Defendants' above-quoted statements were each materially false and misleading in light of these undisclosed practices which materially affected the level of risk associated with Fremont's subprime loans. The materiality of these misstatements regarding the Company's subprime underwriting practices is set forth in ¶¶ 237-246 above.

308.   The materiality of Fremont's subprime underwriting to investors is further demonstrated by, <u>inter alia</u>, comments made by Ben S. Bernanke, Chairman of the Federal Reserve System in a May 17, 2007 speech at the Federal Reserve Bank of Chicago's annual conference regarding the subprime mortgage sector:

> <u>The practices of some mortgage originators have also contributed to the problems in the subprime sector</u>.   As the underlying pace of mortgage originations began to slow, but with investor demand for securities with high yields still strong, <u>some lenders evidently loosened underwriting standards</u>.  So-called risk-layering – combining weak borrower credit histories with other risk factors, such as incomplete income documentation or very high cumulative loan-to-value ratios – became more common.   <u>These looser standards were likely an important source of the pronounced rise in "early payment defaults" – defaults occurring within a few months of origination – among subprime ARMs, especially those originated in 2006</u>.
>
> <div align="center">*   *   *</div>
>
> <u>The accuracy of much of the information on which the underwriting was based is also open to question.  Mortgage applications with little documentation were vulnerable to misrepresentation or overestimation of repayment capacity by both lenders and borrowers, perhaps with the explanation that rising house prices would come to the rescue of otherwise unsound loans.   Some borrowers may have been misled about the feasibility of paying back their mortgages, and others may simply have not understood the sometimes complex terms of the contracts they signed</u>.  [Emphasis added.]

309. Also during the October 27, 2005 conference call, Defendant Bailey specifically stated in response to an analyst's questions that Fremont's loan underwriters did not receive incentive compensation based on loan volume:

Analyst:     Now, the other one I wanted to ask you on your loan underwriters, are they under any incentive compensation, and, if so, to what extent is it predicated on volume of loans and at what percent – or what percent is predicated on profitability?

Bailey:      I don't think they're on – <u>they're not on any kind of volume driven incentive plans</u>.  Some of the senior people are – their bonuses could be – are probably tied, like our bonuses are, to the overall profitability of the Company as opposed to individual or section profitability or loan volume profitability.

Analyst:     Yes.  But, no volume?

Bailey:      Most of us senior executives or even a lot of the mid level Executives are all tied to Fremont General profitability.

Analyst:     But not on the loan volume?

Bailey:      <u>No.  The only ones that are tied to loan volume are the commissioned salespeople</u>.  [Emphasis added.]

310. Defendant Bailey's statements that Fremont's loan underwriters did not receive incentive compensation based on loan volume was false when made. Contrary to Bailey's statements, Fremont's loan underwriters, reviewers, funders, and other employees, did, in fact, receive incentive compensation based on volume, a fact misstated by Bailey during the conference call.  This is demonstrated by CWs 1, 8, 13, 15, 25, 26 above.

311. Bailey's false statement regarding incentive compensation was material. On March 7, 2008, Professor Susan M. Wachter from the Wharton School, University of Pennsylvania, testified before the U.S. Congress on the material role of incentive compensation in the subprime lending crisis based on studies that she and others had authored on the causes and consequences of the subprime crisis. She stated:

> Incentives are <u>an important element</u> of the current debacle in the subprime mortgage markets. The focus of subprime market participants on short term compensation through fees rather than long term loan performance <u>is central to the outcome</u> we see today of unprecedented foreclosure rates in an economy that is currently not in recession.

> \* \* \*

> Short run volume drives compensation and therefore incentives to produce throughout the subprime mortgage supply chain. Long term loan performance or the likelihood that loans would fail did not slow down the production process until the failures actually did occur. Quite the contrary as the drive to expand markets and garner additional volume driven fees, <u>loans were underwritten at more risky terms and with less controls and less information on the borrower's ability to repay. Information that pointed to greater risk was ignored, and these loans were originated, underwritten and securitized, generating unprecedented growth in fees</u>.

> \* \* \*

> <u>In our current crisis, actors lacked incentives to underwrite loans carefully so that they would be sustainable; rather the incentive was to produce loans whatever their ultimate performance, with the</u>

consequence of loans that were designed to fail, failing in unprecedented numbers. [Emphasis added.]

Similarly, Professor John M. Quigley of the University of California, Berkeley, published a paper entitled "Compensation and Incentives in the Mortgage Business" in October, 2008, in which he concluded: "[E]ach specialized party to the mortgage had fee-based compensation that motivated a large volume of transactions with little or no concern about the performance of the mortgages. . . . The incentive structure that arose for firms in this specialized industry set the stage for the collapse." (Emphasis added.)  Ben Bernanke similarly noted in his May 17, 2007 speech: "[I]ncentive structures that tied originator revenue to the number of loans closed made increasing loan volume, rather than ensuring quality, the objective of some lenders."

312.  In the context of Bailey's October 27, 2005 statements regarding underwriter compensation, Bailey was specifically asked by a securities analyst if Fremont's underwriters were compensated with "volume driven incentive plans" and Bailey falsely stated that they were not.  The materiality of Bailey's false statements is demonstrated by both the analysts' specific concern about such incentives as well as the academic research that has followed demonstrating that such incentive compensation was "central to the outcome" and "set the stage for" the subprime mortgage crisis.  Indeed, even years before the subprime crisis, Standard & Poor's listed "compensation practices used for loan underwriters and loan originators" as an important factor in evaluating mortgage banks in the U.S. Mortgage Bank Rating Analysis Methodology Profile it issued on April 12, 2004.

313.  Fremont's 2005 Third Quarter Form 10-Q further stated that the Company's financial statements were presented in accordance with GAAP:

The accompanying consolidated financial statements include the accounts of Fremont General Corporation ("Fremont General") and its

subsidiaries (together the "Company"), including the Company's principal operating subsidiary, Fremont Investment & Loan ("FIL"), a California chartered industrial bank which is engaged in commercial and residential real estate lending on a nationwide basis. <u>The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")</u>. [Emphasis added.]

314.    The 2005 Third Quarter Form 10-Q also included signed certifications by Defendants Rampino and Lamb stating that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Fremont General Corporation (the "registrant");

2.    Based on my knowledge, <u>this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading</u> with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, <u>fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report</u>;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, <u>to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared</u>;

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles</u>;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the

registrant's board of directors (or persons performing the equivalent functions):

> a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

<div align="center">*   *   *</div>

The undersigned, Louis J. Rampino, the President and Chief Executive Officer and Patrick E. Lamb, the Senior Vice President, Chief Financial Officer, Chief Accounting Officer and Treasurer of Fremont General Corporation (the "Company"), pursuant to 18 U.S.C. ss.1350, hereby certify that, to the best of our knowledge:

(i) the Quarterly Report on Form 10-Q for the period ended September 30, 2005 of the Company (the "Report") fully complies with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934; and

(ii) the financial statements and disclosures contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.  [Emphasis added.]

315.   The above-quoted statement in the 2005 Third Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP (for which all individual Defendants are responsible); and Defendant Lamb's and Rampino's statements that the Company maintained adequate internal controls

were materially false and misleading when made because as set forth in ¶¶ 182-206, 225-235 above, the Company's Residual Interests were materially overstated in violation of GAAP and the Company failed to maintain adequate internal controls at the time of these statements. The materiality of these misstatements is set forth in ¶¶ 247-250, 253-259 above.

316. As set forth in ¶¶ 260-303 above, there is a strong inference that all individual Defendants responsible for these specific material misstatements acted with scienter in making their materially false and misleading statements on October 27, 2005 and in Fremont's 2005 Third Quarter Form 10-Q.

## 2. **2005 Fourth Quarter Statements**

317. On March 9, 2006, Fremont issued a press release reporting the Company's financial results for the fourth quarter and year ended December 31, 2005. Fremont reported net income for the fourth quarter of $54.5 million, or $0.75 per share. Fremont reported that the Company's Residual Interests in securitized loans were valued at $170.7 million as of December 31, 2005, a more than ten times increase compared to $15.8 million reported as of December 31, 2004.

318. During a conference call on March 9, 2006 to discuss the reported fourth quarter and year end 2005 financial results, Defendant Bailey stated that Fremont was more conservative than industry peers in valuing the Company's Residual Interests in residential mortgage securitizations. He stated: "We generally have realized a lower gain on securitizations as we utilize what we believe are the most appropriate assumptions for valuing residual interest that we retain. These residual interests are inherently volatile and we have observed other industry participants recording relative – higher relative levels for their retained interest." (Emphasis added.) Bailey further stated during the conference call that

Fremont booked its Residual Interests at "the most appropriate levels and assumptions." (Emphasis added.)

319. On or about March 16, 2006, Fremont filed with the SEC a Form 10-K for the Company for the fourth quarter and year ended December 31, 2005. The 2005 Form 10-K was signed by Defendants McIntyre, Rampino, Bailey and Lamb. The 2005 Form 10-K stated that the Company's financial statements were presented in accordance with GAAP:

> The Company's discussion and analysis of its financial condition and results of operations are based upon its consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). [Emphasis added.]

320. The 2005 Form 10-K included signed certifications by Defendants Rampino and Lamb in the form set forth in ¶ 314 above.

321. The above-quoted statement in the 2005 Form 10-K that the Company's financial results were reported in accordance with GAAP (for which all individual Defendants are responsible); Defendant Lamb's and Rampino's statements that the Company maintained adequate internal controls; and Defendant Bailey's March 9, 2006 statements that the Company used "the most appropriate levels and assumptions" to value its Residual Interests conservatively were each materially false and misleading when issued because as set forth in ¶¶ 182-206, 225-235 above, the Company's Residual Interests were materially overstated in violation of GAAP and the Company failed to maintain adequate internal controls at the time of these statements. The materiality of these misstatements is set forth in ¶¶ 247-250, 253-259 above.

322. Further demonstrating the materiality of Bailey's March 9, 2006 statements, Sky Capital LLC analyst Theodore P. Kovaleff issued a report on or

about March 22, 2006, which specifically noted his then-existing belief that "in comparison to some other companies that do securitizations, FMT [Fremont] apparently has adopted a more conservative valuation."  While the above information demonstrates that, in fact, Fremont's reported Residual Interests in securitizations were materially overstated at the time they were publicly reported, the analyst's belief that Fremont was accounting for its securitizations "conservatively" demonstrates the materiality of Defendants Bailey's specific false and misleading statements during the March 9, 2006 conference call.  By making the comparison to Fremont's subprime peers and asserting that Fremont booked its Residual Interests at "the most appropriate levels and assumptions," Bailey was specifically telling investors that the massive growth in the Company's reported Residual Interests was not a cause for concern when, in fact, those reported Residual Interests were materially overstated when reported as set forth in ¶¶ 182-206 above.

323.  In the 2005 Form 10-K, Fremont further purported to describe the Company's underwriting standards:

> Lending is substantially all done on a senior and secured basis and the Company seeks to minimize credit exposure through loan underwriting that is focused upon appropriate loan to collateral valuations and cash flow coverages.

> *  *  *

> The [residential] loans are generally made to borrowers who do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders, such as Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation) and are commonly known as "subprime" or "non-prime."  These borrowers generally have

considerable equity in the properties securing their loans, but have impaired or limited credit profiles or higher debt-to-income ratios than traditional mortgage lenders allow. The borrowers also include individuals who, due to self-employment or other circumstances, have difficulty verifying their income through conventional means. To mitigate the higher potential for credit losses that accompanies these types of borrowers, the Company attempts to maintain underwriting standards that require appropriate loan to collateral valuations. The underwriting guidelines are primarily intended to assess the ability and willingness of the potential borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the loan. [Emphasis added.]

324. The statements in Fremont's 2005 Form 10-K that the Company sought to "minimize" and "mitigate" its exposure to credit risk through maintaining loan underwriting standards that were "focused upon appropriate loan to collateral valuations and cash flow coverages" and that were "intended to assess the ability and willingness of the potential borrower to repay the debt and to evaluate the adequacy of the mortgage property as collateral for the loan" (for which all individual Defendants are responsible) were each materially false and misleading when made. As set forth in ¶¶ 62-181 above in detail, numerous sources of evidence demonstrate that Fremont, in fact, employed extremely "unsafe and unsound" underwriting practices inconsistent with Interagency Guidance for subprime lending and originated and approved subprime loans to borrowers who could not afford them and who were likely to default. Defendants focused on growing subprime loan volume without regard for appropriate underwriting practices or then-existing Interagency Guidance for subprime lending. Defendants' above-quoted statements were materially false and

misleading in light of these undisclosed practices which materially affected the level of risk associated with Fremont's subprime loans. The materiality of these misstatements regarding the Company's subprime underwriting practices is set forth in ¶¶ 237-246 above.

325. Further demonstrating the materiality of such statements, Hoefer & Arnett analyst Don Worthington issued a report on or about March 9, 2006, which specifically noted his then-existing belief that "the company's overall credit quality has improved markedly on a year-over-year basis." Similarly, analyst firm Columbine Capital issued several reports on Fremont specifically noting that according to the Company, "Its lending is done on a senior and secured basis, <u>minimizing credit exposure through loan underwriting focused upon appropriate loan to collateral valuations and cash flow coverages</u>." (Emphasis added.) While the information set forth in ¶¶ 62-181 above demonstrate that, in fact, Fremont's underwriting and credit quality had declined substantially, these analysts' specific focus on credit quality and Defendants' statements regarding how the Company purportedly focused upon "appropriate loan to collateral valuations and cash flow coverages" demonstrates that materiality of that subject to Fremont investors.

326. As set forth in ¶¶ 260-303 above, there is a strong inference that all individual Defendants responsible for these specific material misstatements acted with scienter in making their materially false and misleading statements on March 9, 2006 and in Fremont's 2005 Form 10-K.

### 3. **2006 First Quarter Statements**

327. On May 9, 2006, Fremont issued a press release reporting the Company's financial results for the first quarter ended March 31, 2006. Fremont reported net income for the first quarter of $31.7 million, or $0.43 per share.

328. On or about May 10, 2006, Fremont filed with the SEC a Form 10-Q for the Company for the first quarter ended March 31, 2006. The 2006 First

Quarter Form 10-Q was signed by Defendants Rampino and Lamb. The Form 10-Q stated that the Company's financial statements were presented in accordance with GAAP:

> Fremont General Corporation ("Fremont General" or when combined with its subsidiaries "the Company" or "we") is a financial services holding company. Fremont General's financial services operations are consolidated within Fremont General Credit Corporation ("FGCC"), which is engaged in commercial and residential (consumer) real estate lending nationwide through its California industrial bank subsidiary, Fremont Investment & Loan ("FIL"). FIL's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC") up to the maximum legal limits.
>
> <u>The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").</u> The consolidated financial statements include the accounts and operations of Fremont General and its subsidiaries including those variable interest entities where the Company is the primary beneficiary. [Emphasis added.]

329. The 2006 First Quarter Form 10-Q included signed certifications by Defendants Rampino and Lamb in the form set forth in ¶ 314 above.

330. The above-quoted statement in Fremont's 2006 First Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP (for which all individual Defendants are responsible); and Defendant Lamb's and Rampino's statements that the Company maintained adequate internal controls were each materially false and misleading when issued because as set forth in ¶¶ 182-206, 225-235 above, the Company's Residual Interests were materially overstated in violation of GAAP and the Company failed to maintain adequate

internal controls at the time of these statements.   The materiality of these misstatements is set forth in ¶¶ 247-250, 253-259 above.

331.   In the 2006 First Quarter Form 10-Q, Fremont further stated that the Company sought to mitigate its exposure to credit risks through appropriate underwriting standards:

> FIL's residual real estate lending operation originates first and, to a lesser degree, second mortgage loans on a wholesale basis through a network of independent mortgage brokers.   FIL offers mortgage products that are designed for borrowers who do not generally satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders, such as Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation) and are commonly referred to as "non-prime" or "subprime."   These borrowers generally have considerable equity in the properties securing their loans, but have impaired or limited credit profiles or higher debt-to-income ratios than conventional mortgage lenders allow.   The borrowers also include individuals who, due to self-employment or other circumstances, have difficulty documenting their income through conventional means. <u>FIL seeks to mitigate its exposure to credit risk through underwriting standards that strive to balance appropriate loan to collateral valuations with a borrower's credit profile</u>.   [Emphasis added.]

332.   These statements in Fremont's 2006 First Quarter Form 10-Q that the Company sought to "mitigate" its exposure to credit risk through "<u>underwriting standards that strive to balance appropriate loan to collateral valuations with a borrower's credit profile</u>" (for which all individual Defendants are responsible) were materially false and misleading when made because as set forth in ¶¶ 62-181

above in detail, numerous sources of evidence demonstrate that Fremont, in fact, employed extremely "unsafe and unsound" underwriting practices inconsistent with Interagency Guidance for subprime lending and originated and approved subprime loans to borrowers who could not afford them and who were likely to default. Defendants focused on growing subprime loan volume without regard for appropriate underwriting practices of then-existing Interagency Guidance for subprime lending. Defendants' above-quoted statements were materially false and misleading in light of these undisclosed practices which materially affected the level and risk associated with Fremont's subprime loans. The materiality of these misstatements regarding the Company's subprime underwriting practices is set forth in ¶¶ 237-246 above.

333. Further demonstrating the materiality of these statements regarding underwriting, Sky Capital LLC analyst Theodore P. Kovaleff issued a report on or about May 18, 2006 giving Fremont an "Outperform" rating, which specifically noted that according to the Company, "FIL attempts to mitigate the credit risk [of its residential mortgage loans] by employing underwriting standards that balance the loan risk to the applicant's collateral." While the above information demonstrates that, in fact, Fremont's underwriting and credit quality had declined substantially, the analyst's specific focus on credit risk and Defendants' statement regarding the Company's underwriting standards demonstrate the materiality of that subject to Fremont investors.

334. As set forth in ¶¶ 260-303 above, there is a strong inference that all individual Defendants responsible for these specific misstatements acted with scienter in making their materially false and misleading statements in Fremont's 2006 First Quarter Form 10-Q.

### 4.    **2006 Second Quarter Statements**

335.    On August 8, 2006, Fremont issued a press release reporting the Company's financial results for the second quarter ended June 30, 2006.  Fremont reported net income for the second quarter of $51.9 million, or $0.70 per share.  The press release further stated:  "with an objective of reducing its early payment delinquencies, <u>the Company made modifications in its loan origination parameters during the second quarter of 2006, including eliminating or reducing certain higher loan-to-value products and lower FICO bands</u>."  (Emphasis added.)

336.    During a conference call on August 8, 2006 to discuss the reported 2006 second quarter financial results, Defendant Bailey stated that in response to increased early payment defaults, the Company took steps in the second quarter to tighten its underwriting:

> We saw the increasing trend developing both at our Company and in the industry <u>at the end of the first quarter</u> and we took steps to analyze the Company's loan production and sales process.  We determined that we needed to <u>tighten up</u> some of our loan sale conditions and that <u>modifications</u> in our loan production parameters required adjustments.
>
> We have made modifications in our loan originations to eliminate and/or reduce certain high loan to value product[s] and certain lower FICO band products which were creating these loan repurchases and repricings.  We also made modifications to our loan sale agreements with an objective of reducing the impact from these early payment delinquencies by minimizing the level of loan repurchases and repricings that can come back to the Company.
>
> <u>These changes were implemented during the second quarter</u> and we've begun to see impact on our production of these during July.

* * *

In our residential real estate lending operations, again, we are focused on improving our gain on sales levels. As we talked about, we have implemented changes to certain of our loan product[s] in an effort to improve our loan repurchase and repricing trends, and we have seen the impact of these changes in our July production.

Again, this is important to note. We have really looked through this book of business.

We have really gone through to identify where these loan repricing and repurchases are coming from, and again, we have made changes and it appears from our production that these changes are altering what we are producing. I think we have more room to go there, but I think we're doing a pretty good job on that front so far. [Emphasis added.]

337. On or about August 9, 2006, Fremont filed with the SEC a Form 10-Q for the Company for the second quarter ended June 30, 2006. The 2006 Second Quarter Form 10-Q was signed by Defendants Rampino and Lamb. In the Form 10-Q, Fremont stated that the Company sought to mitigate its exposure to credit risks through appropriate underwriting standards:

FIL's residual real estate lending operation originates first and, to a lesser degree, second mortgage loans on a wholesale basis through a network of independent mortgage brokers. FIL offers mortgage products that are designed for borrowers who do not generally satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders, such as Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation) and are commonly referred to as "non-

prime" or "subprime." These borrowers generally have considerable equity in the properties securing their loans, but have impaired or limited credit profiles or higher debt-to-income ratios than conventional mortgage lenders allow. The borrowers also include individuals who, due to self-employment or other circumstances, have difficulty documenting their income through conventional means. FIL seeks to mitigate its exposure to credit risk through underwriting standards that strive to balance appropriate loan to collateral valuations with a borrower's credit profile. [Emphasis added.]

338. In the 2006 Second Quarter Form 10-Q, Fremont also described purported modifications to the Company's loan origination parameters to designed to counteract increasing repurchases and re-pricings:

The Company's loan repurchases and re-pricings increased to $238.4 million and $346.1 million for the second quarter and first six months of 2006, respectively, as compared to $67.7 million and $143.8 million for the second quarter and first six months of 2005, respectively.

\* \* \*

Given these loan repurchase and re-pricing trends, with an objective of reducing its early payment delinquencies, the Company made modifications in its loan origination parameters during the second quarter of 2006, including eliminating or reducing certain higher loan-to-value products and lower FICO bands. [Emphasis added.]

339. Defendant Bailey's above-described statements on August 8, 2006 and the statements appearing in Fremont's August 8, 2006 press release and 2006 Second Quarter Form 10-Q (for which all individual Defendants are responsible)

were each materially false and misleading when made. Defendants' statements in Fremont's 2006 Second Quarter press release, conference call and Form 10-Q that the Company made "modifications" to its loan origination parameters in the 2006 second quarter to reduce early payment defaults and their statement in the Company's Form 10-Q that the Company sought "to mitigate its exposure to credit risk through underwriting standards that strive to balance appropriate loan to collateral valuations with a borrower's credit profile" were each materially false and misleading when made because as set forth in ¶¶ 62-181 above, numerous sources of evidence demonstrate that Fremont, in fact, continued to employ extremely "unsafe and unsound" underwriting practices inconsistent with Interagency Guidance for subprime lending and originated and approved subprime loans to borrowers who could not afford them and who were likely to default. In fact, as demonstrated in ¶¶ 172-180 above, Fremont's loans originated at the time of these statements performed even worse, rather than improved, because contrary to the materially misleading impression Defendants were creating, Fremont's underwriting practices were not meaningfully "modified" and its "unsafe and unsound" underwriting practices continued unabated until the FDIC Cease & Desist Order. As set forth in ¶¶ 172-180 above, the subprime loans that Fremont originated at the time of these statements and until the FDIC Cease & Desist Order performed so poorly, so quickly, that their demise could not have been the result of general market forces. Defendants' statements were each materially false and misleading in light of these undisclosed practices which materially affected the level of risk associated with Fremont's subprime loans. The materiality of these misstatements regarding the Company's subprime underwriting practices is set forth in ¶¶ 237-246 above.

340. Further demonstrating the materiality of such statements, analyst firm Howe Barnes Hoefer & Arnett issued a "Buy" report on or about August 10, 2006,

for Fremont stock which specifically noted Fremont's purported underwriting modifications:

> Given the loan repurchase and re-pricing trends, FMT [Fremont] has made modifications in its loan origination parameters, including the elimination or reduction of certain higher LTV products and lower FICO bands. By tightening its credit standards, FMT hopes to reduce the level of early payment delinquencies. The company expects to see the impact of these changes in 4Q06 and 1Q07.
>
>                    \*     \*     \*
>
> **Valuation.** We are maintaining our **BUY** rating on shares of FMT. The stock price dropped by over 8% based on the disappointing earnings report. While the company will continue to have difficulty generating significant loan sale profits in 3Q06, <u>it has made adjustments to its loan underwriting standards which should improve mortgage banking profitability beginning in 4Q06</u>. [Emphasis added.]

The analyst's specific focus on Fremont's purported underwriting modifications in maintaining its "Buy" rating further demonstrates that materiality of that subject to Fremont investors.

341.  The 2006 Second Quarter Form 10-Q also stated that the Company's financial statements were presented in accordance with GAAP:

> Fremont General Corporation ("Fremont General" or when combined with its subsidiaries "the Company" or "we") is a financial services holding company. Fremont General's financial services operations are consolidated within Fremont General Credit Corporation ("FGCC"), which is engaged in commercial and residential (consumer) real estate lending nationwide through its California industrial bank subsidiary, Fremont Investment & Loan

("FIL"). FIL's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC") up to the maximum legal limits.

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). The consolidated financial statements include the accounts and operations of Fremont General and its subsidiaries including those variable interest entities where the Company is the primary beneficiary.

342. The 2006 Second Quarter Form 10-Q included signed certifications by Defendants Rampino and Lamb in the form set forth in ¶ 314 above.

343. The above-quoted statement in the 2006 Second Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP (for which all individual Defendants are responsible); and Defendant Lamb's and Rampino's statements that the Company maintained adequate internal controls were each materially false and misleading when made because as set forth in ¶¶ 182-206, 225-235 above, the Company's Residual Interests were materially overstated in violation of GAAP and the Company failed to maintain adequate internal controls at the time of these statements. The materiality of these misstatements is set forth in ¶¶ 247-250, 253-259 above.

344. As set forth in ¶¶ 260-303 above, there is a strong inference that all individual Defendants responsible for these specific material misstatements acted with scienter in making their materially false and misleading statements on August 8, 2006 and in Fremont's 2006 Second Quarter Form 10-Q.

5. **2006 Third Quarter Statements**

345. On November 9, 2006, Fremont issued a press release reporting the Company's financial results for the third quarter ended September 30, 2006. Fremont reported net income for the second quarter of $29.5 million, or $0.40 per

share.  The press release further stated that the Company had made "various loan underwriting guideline adjustments designed to lower early payment defaults, reduce the level of second mortgages originated and to improve the overall credit performance of the loans."  (Emphasis added.)  It stated:  "the Company made modifications to its business processes during the second quarter, including changes in its loan origination parameters, with an objective of reducing its early payment defaults and overall loan repurchase levels."  (Emphasis added.)  The press release further reported that:  "In the third quarter of 2006, the Company began to see the positive impact of these measures."

346.  During a conference call on November 9, 2006 to discuss the reported third quarter financial results, Defendant Nicolas reported that in response to increased early payment defaults experienced by the Company beginning "early in 06" the Company "immediately started to make changes."  Nicolas observed that the early payment defaults were "driven largely by the higher interest rate scenario environment . . . softer housing prices . . .  [and] not surprisingly the 80/20 combo loans, particularly with stated documentation and based on . . . purchase type loans."  Nicolas stated that as a result of the Company's changes:

> [W]e started to see a much improved risk profile with our July originations.  We started to make those changes in the second quarter after we saw what was coming back and had done the diagnosis.  And we started to see the rather dramatic improvement in the risk profile of our production here in the third quarter.  [Emphasis added.]

347.  During the November 9, 2006 conference call, Defendant Walker further discussed the nature of the changes the Company purportedly made to tighten its underwriting:

> We created a Quality Enhancement Committee to oversee product and operational changes, looking at reducing the early

payment defaults and the repurchases. We brought our key senior managers to the corporate office, which included credit, operations, finance, production and they just physically looked [and] reviewed about 300 loans. <u>From that, we developed tighter loan approval process[es]</u>. So [we] determined which levels and which types of loans were to be looked at by management within the centers.

We had a higher underwriting scrutiny of purchase money transactions, stated income transactions, and we made the decision to eliminate 80/20 products under 640 FICO for stated [income] and under 600 [FICO] for full doc [loans]. This decision, I believe was probably one of the first lenders in the industry to make that decision. Within about 60 days, I believe most followed our decision to make that change because those we found were a high percentage of our early payment defaults.

* * *

We tightened down the appraisal process. Now rather than about 40% of loans going to license reviewers, there's an excess of 50% go to our license reviewers.

* * *

We developed a broker, kind of a customer relationship management system we called our CRMS to enable monitoring review of broker performance, including fraud and early payment default. And its based on loan level analysis. We've done a tremendous amount of analytics. And basically it's a scoring system.

We look at and we score delinquency by broker profitability. And which takes obviously in account the early payment default and

the performance of the loans. The Fremont fraud score or F-score. And then we look at the industry, so the F-scores they've given other lenders in the industry and compare our F-score to the industry F-score for that broker. And then their average loan grade. And we developed – this system was developed so that we can get an idea of who is a profitable broker and who is not a profitable broker. We've implemented a monthly pre-funding quality control review that checks for adherence to some of these new guidelines. And so we basically have quality control people into each center on a monthly basis, randomly reviewing on a pre-funding basis.

We require the regional managers who manage the production centers to review all first-payment default to determine where they're coming from and to communicate the results to their people. Yes, based on all of the analytics we've done, there are certain areas we see that there's high concentration and then the rest of it sprinkled throughout the production. So, just to give you an idea of September's first payment defaults, which were July's fundings, we reviewed those and again, the numbers have come down dramatically. But of those July fundings, we determined that half of those loans wouldn't be made in the system today based on the underwriting and guideline changes.

We created a separate and dedicated loan servicing group within our new servicing center in Irving, Texas focusing on improving the customer welcome call contact rate. And we've improved it from 50%, which is high for the industry to currently at that 75%. And that center and the people there are also focused on the first payment default and the early payment default. We've conducted

two levels of very extensive fraud training for all of our operations people. And we've recertified all of our underwriters in regard to the underwriting guidelines. [Emphasis added.]

348. During the call, Defendant Walker further stated that underwriting exceptions were tracked by the Company and had "gone down dramatically in the last six months." (Emphasis added.)

349. During the November 9, 2006 conference call, Defendant Bailey also stated:

[F]rom our perspective we feel that we now have our arms around it and are working through it . . . And from that perspective, I think it's important to remember that we were probably the first to surface this issue and announced that we had this issue. And to start reserving for this issue and we have continued to address this issue significantly over the past several months . . . I think that we have taken significant action to address the issue that we identified very early on. We're starting to see the results of that. [Emphasis added.]

Bailey added that "in the event that there are issues with our business, they will be a result of market force issues, which are beyond our control. They will not be a result of aggressive underwriting." (Emphasis added.) During the conference call, Bailey further stated: "we've had a flight to quality in terms of our originations as evidenced by the higher FICO and lower CLTV. . . . Again, what I said earlier, which is, again, we will not be aggressive on the underwriting side for volume. We will not go there." (Emphasis added.)

350. On or about November 9, 2006, Fremont filed with the SEC a Form 10-Q for the Company for the third quarter ended September 30, 2006. The 2006 Third Quarter Form 10-Q was signed by Defendants Rampino and Lamb. In the

Form 10-Q, Fremont stated that the Company sought to mitigate its exposure to credit risks through appropriate underwriting standards:

FIL's residual real estate lending operation originates first and, to a lesser degree, second mortgage loans on a wholesale basis through a network of independent mortgage brokers. FIL offers mortgage products that are designed for borrowers who do not generally satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders, such as Fannie Mae (Federal National Mortgage Association) and Freddie Mac (Federal Home Loan Mortgage Corporation) and are commonly referred to as "non-prime" or "subprime." These borrowers generally have considerable equity in the properties securing their loans, but have impaired or limited credit profiles or higher debt-to-income ratios than conventional mortgage lenders allow. The borrowers also include individuals who, due to self-employment or other circumstances, have difficulty documenting their income through conventional means. <u>FIL seeks to mitigate its exposure to credit risk through underwriting standards that strive to balance appropriate loan to collateral valuations with a borrower's credit profile</u>. [Emphasis added.]

351. In the 2006 Third Quarter Form 10-Q, Fremont also described purported modifications to the Company's loan origination parameters to designed to counteract increasing repurchases and re-pricings:

The Company's loan repurchases and re-pricings increased to $345.7 million and $691.8 million for the third quarter and first nine months of 2006, respectively, as compared to $126.7 million and $270.5 million for the third quarter and first nine months of 2005, respectively. The Company continually evaluates the loss severity

and repurchase frequency estimates utilized for its loan valuation, repurchase and premium recapture reserves based upon its analysis of historical and current data and the mix of loan characteristics.

Given these loan repurchase and re-pricing trends, with an objective of reducing its early payment delinquencies, the Company made modifications in its loan origination parameters during the second quarter of 2006, including eliminating or reducing certain higher loan-to-value products (including certain second mortgage products) and lower FICO bands. The Company has seen positive initial results based upon its third quarter loan production profile; these positive results include lower second mortgage loan production, higher FICO scores, less first time home buyer loans, and lower stated-income documentation loans. For instance, the Company has eliminated its 'combo' loans (a first mortgage originated in combination with a second mortgage) on stated-income documentation loans with FICO scores below 640. [Emphasis added.]

352. On November 28, 2006, Defendants Lamb, Walker and Nicolas participated in an investor conference presentation. During the investor conference, Defendant Nicolas again described purported changes made by the Company in terms of its underwriting and lending practices:

So the primary attributes, we've done a - quite a bit of analysis with respect to EPDs, as you can imagine, and it's pretty obvious where the problems have come up and we've taken some pretty significant actions as a result of our analysis. First of all, stated documentation loans, not surprisingly to many of you, is a primary attribute. In addition, purchase, high CLTV, predominantly your 80/20 combo loans, first time home buyers have been problematic as

well and as I mentioned, the combination or the risk layering that your see frequently in the industry with respect to both FICO and CLTV.

So these have been the areas of which we've discovered and started to take action.

\* \* \*

So, as you can see, we've done it, <u>we've dealt with this problem</u>, both in terms of repurchases and repricings from our comparable period in '05.

So what are the actions? What have we done to remedy the situation? Obviously, we can't control, by in large, what the investors ask us to buy back. <u>The numbers and - of what we can control are the early pay defaults. So that's what we have to aggressively address</u>.

So what have we done? We've raised our minimum FICOs, as an example, on our stated and full doc combo loans, our 80/20s, to 600 on the full doc and 640 on the stated.

What that's done is - and you'll see in just a moment, where we were doing about 10% of our total volume on a monthly basis was second liens, today it's about 6%. So that had a pretty dramatic impact on both the amount of seconds of which we are originating as well as the FICO of those originations, and you'll see that in a moment.

We've priced more attractively, meaning we've gotten a little bit more aggressive on the better FICO bands, the higher credit grades, <u>if you will, [a] flight to quality</u>. And at the same time, where we've had the layering of risk we've priced, we've increased our add-ons and we've priced up in those categories. So if we're going to do

those loans, we're going to make sure that we're adequately compensated for them.

*  *  *

As I mentioned earlier, we put greater restrictions with first time homebuyers, particularly with minimum credit history and we've done quite a bit on the appraisal process, enhancing that so that we can keep our severity and high CLTV loans well in check with respect to losses.

*  *  *

So as I mentioned, all of these actions, and those are just a few, we've done actually more than that, but at this point, we're pretty - feeling pretty good as far as the progress we've made to date. [Emphasis added.]

353.   The above-described statements appearing in the November 9, 2006 press release (for which all individual Defendants are responsible); Defendant Nicolas's, Walker's, and Bailey's above-described statements during the November 9, 2006 conference call; the above-described statements appearing in Fremont's 2006 Third Quarter Form 10-Q (for which all Defendants are responsible); and Defendant Nicolas's above-described November 28, 2006 statements were each materially false and misleading when made.  Defendants' statements in the press release, conference call, investor presentation and Form 10-Q that, inter alia, the Company "developed tighter loan approval process[es]" and made "adjustments" and "modifications" to its underwriting guidelines and loan origination parameters in the 2006 second quarter and took "some pretty significant actions" "to lower early payment defaults" and "to improve the overall credit performance of the loans" and that the Company had already began to see "the positive impact of these measures"; "a much improved risk profile"; and "rather dramatic improvement in

the risk profile" in the 2006 third quarter as a result of a purported "flight to quality" were each materially false and misleading when made because as set forth in ¶¶ 62-181 above, numerous sources of evidence demonstrate that Fremont, in fact, continued to employ extremely "unsafe and unsound" underwriting practices inconsistent with Interagency Guidance for subprime lending and originated and approved subprime loans to borrowers who could not afford them and who were likely to default.  In fact, as demonstrated in ¶¶ 172-180 above, Fremont's loans originated at the time of these statements performed even worse, rather than improved, because contrary to the materially misleading impression Defendants were creating, Fremont's underwriting practices were not meaningfully "modified" or "adjusted" and its "unsafe and unsound" underwriting practices continued unabated until the FDIC Cease & Desist Order.  As set forth in ¶¶ 172-180 above, the subprime loans that Fremont originated at the time of these statements and until the FDIC Cease & Desist Order performed so poorly, so quickly, that their demise could not have been the result of general market forces. Defendants' statements were each materially false and misleading in light of these undisclosed practices which materially affected the level of risk associated with Fremont's subprime loans.  The materiality of these misstatements regarding the Company's subprime underwriting practices is set forth in ¶¶ 237-246 above.

354.  Strongly demonstrating the materiality of these false and misleading statements, on November 9, 2006, in response to these disclosures, the price of Fremont common stock closed at $15.82 per share, an increase of $1.36 per share, or approximately 10%, from the prior closing price on November 8, 2006, on heavy trading volume.

355.  Further evidencing the materiality of these statements, on or about January 2, 2007, Standard & Poor's issued a "Full Analysis" on Fremont in which it specifically cited Fremont's claimed improvements in underwriting standards as

a "Major Rating Factor" and stated: "Standard & Poor's Ratings Services sees steps taken to improve the RRE [Residential Real Estate] loan origination asset quality and reduce repurchase requests through tighter underwriting standards as positive ratings factors."

356. During the 2006 Third Quarter conference call on November 9, 2006, in terms of setting reserves, Defendant Bailey also stated that Fremont was "very conservative and I think we've been at the forefront ahead of the curve here." (Emphasis added.)    Defendant Lamb also spoke of the purportedly conservative nature of Fremont's accounting during the conference call.  He stated:  "If you look at our assumptions, they're conservative" (Emphasis added.)

357. Fremont's 2006 Third Quarter Form 10-Q also stated that the Company's financial statements were presented in accordance with GAAP:

> Fremont General Corporation ("Fremont General" or when combined with its subsidiaries "the Company" or "we") is a financial services holding company.  Fremont General's financial services operations are consolidated within Fremont General Credit Corporation ("FGCC"), which is engaged in commercial and residential (consumer) real estate lending nationwide through its California industrial bank subsidiary, Fremont Investment & Loan ("FIL").  FIL's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC") up to the maximum legal limits.

> The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").  The consolidated financial statements include the accounts and operations of Fremont General and its subsidiaries including those variable interest entities where the Company is the primary beneficiary.  [Emphasis added.]

358.   The 2006 Third Quarter Form 10-Q included signed certifications by Defendants Rampino and Lamb in the form set forth in ¶ 314 above.

359.   Defendant Bailey's and Lamb's statements during the November 9, 2006 conference call that the Company was "very conservative" in setting reserves and with its accounting; the statements in the 2006 Third Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP (for which all individual Defendants are responsible); and Defendant Lamb's and Rampino's statements that the Company maintained adequate internal controls were each materially false and misleading when made because as set forth in ¶¶ 182-235 above, the Company's financial results were materially overstated in violation of GAAP because the Company's Residual Interests were materially overstated; its Repurchase Reserves were materially understated; and it failed to maintain adequate internal controls at the time of these statements.  The materiality of these misstatements is set forth in ¶¶ 247-259 above.

360.   As set forth in ¶¶ 260-303 above, there is a strong inference that all individual Defendants responsible for these  specific material misstatements acted with scienter in making their materially false and misleading statements on November 9, 2006, in Fremont's 2006 Third Quarter Form 10-Q and on November 28, 2006.

## B.   Fremont's February 27, 2007 And Subsequent Disclosures

361.   On February 27, 2007, Fremont received a Proposed Cease and Desist Order from the FDIC.  Later that day, after the close of trading, and just one day before the Company was scheduled to report 2006 fourth quarter and year-end results, Fremont issued a press release announcing that it would postpone the release of its financial results for the Company's 2006 fourth quarter and year-end. The press release stated:

Fremont General Corporation[], a nationwide residential and commercial real estate lender doing business primarily through its wholly-owned industrial bank, Fremont Investment & Loan, today announced that it will postpone the release of its fourth quarter and full-year 2006 results of operations, as well as the conference call to discuss such results, each previously scheduled for February 28, 2007. The Company also announced that it will not file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 by March 1, 2007 and that it intends to file a Form 12b-25 with the Securities and Exchange Commission explaining the reasons therefore.

362. In response to the Company's disclosure, the price of Fremont common stock closed on February 28, 2007, the next trading day, at $8.81 per share, a decline of $2.84 per share, or approximately 24%, from the closing price of $11.65 per share on February 27, 2007, on extraordinary trading volume. Similarly, the price of Fremont preferred shares declined from a closing price per share of $22.55 on February 27, 2007, to a closing price per share of $19.80 on February 28, 2007, a decline of approximately 12%, on extraordinary trading volume. MarketWatch reported that the Company's decision to delay its 2006 fourth quarter results and annual Form 10-K filing with the SEC "sparked concern about the Company's subprime mortgage business and triggered downgrades from Fitch Ratings." MarketWatch quoted Vincent Arscott, a director at Fitch, as stating: "The market was surprised by this, as we were as well."

363. On March 2, 2007, the last day of the Class Period, the Company filed its Form 12b-25 Notification of Late Filing with the SEC. The Form 12b-5 stated:

In light of the current operating environment for subprime mortgage lenders and recent legislative and regulatory events, Fremont Investment & Loan, the Company's wholly owned industrial

bank subsidiary ("FIL"), <u>intends to exit its subprime residential real estate lending business</u>. Management and the board of directors are engaged in discussions with various parties regarding the sale of the business.

Additionally, the Company expects that it, FIL and the Company's wholly owned subsidiary, Fremont General Credit Corporation ("FGCC"), <u>will enter into a voluntary formal agreement, to be designated as a cease and desist order (the "Order"), with the Federal Deposit Insurance Corporation (the "FDIC"). Among other things, the Order will require FIL to cease and desist from the following</u>:

- Operating with management whose policies and practices are detrimental to FIL;

- <u>Operating FIL without effective risk management policies and procedures in place in relation to FIL's brokered subprime mortgage lending and commercial real estate construction lending businesses;</u>

- <u>Operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by FIL;</u>

- <u>Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses;</u>

- <u>Operating with a large volume of poor quality loans;</u>

- <u>Engaging in unsatisfactory lending practices;</u>

- Operating without an adequate strategic plan in relation to the volatility of FIL's business lines and the kind and quality of assets held by FIL;

- Operating with inadequate capital in relation to the kind and quality of assets held by FIL;

- Operating in such a manner as to produce low and unsustainable earnings;

- Operating with inadequate provisions for liquidity in relation to the volatility of FIL's business lines and the kind and quality of assets held by FIL;

- Marketing and extending adjustable-rate mortgage ("ARM") products to subprime borrowers in an unsafe and unsound manner that greatly increases the risk that borrowers will default on the loans or otherwise cause losses to FIL, including (1) ARM products that qualify borrowers for loans with low initial payments based on an introductory rate that will expire after an initial period, without adequate analysis of the borrower's ability to repay at the fully indexed rate, (2) ARM products containing features likely to require frequent refinancing to maintain affordable monthly payment or to avoid foreclosure, and (3) loans or loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral;

- Making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms;

- Operating in violation of Section 23B of the Federal Reserve Act, in that FIL engaged in transactions with its affiliates on terms and under circumstances that in good faith would not be offered to, or would not apply to, nonaffiliated companies; and

- <u>Operating inconsistently with the FDIC's Interagency Advisory on Mortgage Banking and Interagency Expanded Guidance for Subprime Lending Programs</u>.

The Order will also require FIL to take a number of steps, including (1) having and retaining qualified management; (2) limiting the Company's and FGCC's representation on FIL's board of directors and requiring that independent directors comprise a majority of FIL's board of directors; (3) <u>revising and implementing written lending policies to provide effective guidance and control over FIL's residential lending function</u>; (4) revising and implementing policies governing communications with consumers to ensure that borrowers are provided with sufficient information; (5) <u>implementing control systems to monitor whether FIL's actual practices are consistent with its policies and procedures</u>; (6) implementing a third-party mortgage broker monitoring program and plan; (7) developing a five-year strategic plan, including policies and procedures for diversifying FIL's loan portfolio; (8) implementing a policy covering FIL's capital analysis on subprime residential loans; (9) <u>performing quarterly valuations and cash flow analyses on FIL's residual interests</u> and mortgage servicing rights from its residential lending operation, and obtaining annual independent valuations of such interests and rights; (10) limiting extensions of credit to certain commercial real estate borrowers; (11) <u>implementing a written lending and collection policy to provide effective guidance and control over FIL's commercial real estate lending function, including a planned material reduction in the volume of funded and unfunded nonrecourse lending and loans for condominium conversion and construction as a percentage of Tier I</u>

capital; (12) submitting a capital plan that will include a Tier I capital ratio of not less than 14% of FIL's total assets; (13) implementing a written profit plan; (14) limiting the payment of cash dividends by FIL without the prior written consent of the FDIC and the Commissioner of the California Department of Financial Institutions; (15) implementing a written liquidity and funds management policy to provide effective guidance and control over FIL's liquidity position and needs; (16) prohibiting the receipt, renewal or rollover of brokered deposit accounts without obtaining a Brokered Deposit Waiver approved by the FDIC; (17) reducing adversely classified assets; and (18) implementing a comprehensive plan for the methodology for determining the adequacy of the allowance for loan and lease losses.

In addition, the Company is analyzing, in connection with the preparation of the Company's consolidated financial statements as of and for the period ended December 31, 2006, the FDIC's criticism with respect to the Company's methodology for determining the carrying value of the Company's residential real estate loans held for sale.

* * *

The Company will report a net loss from continuing operations for the fourth quarter of 2006 as compared to net income of $54.5 million for the fourth quarter of 2005. The net loss to be reported for the fourth quarter of 2006 will be due in part to increased provisions for loan repurchase and repricing, valuation and premium recapture reserves. In light of the Company's reported operating results for the nine months ended September 30, 2006, and the fact that the

Company will report a net loss for the fourth quarter of 2006, <u>the Company's operating results for the fiscal year ended December 31, 2006 will represent a significant change from the Company's operating results for the fiscal year ended December 31, 2005</u>.

The Company is unable to estimate its results of operations for the fourth quarter of 2006 and full-year 2006 until it completes its review of its methodology for determining the carrying value of its held-for-sale residential real estate loan portfolio, as discussed above. [Emphasis added.]

364. In response to the Company's shocking disclosures, the price of Fremont common stock closed on March 5, 2007, the next trading day, at $5.89 per share, a decline of $2.82 per share, or approximately 32%, from the closing price of $8.71 per share on March 2, 2007, on extraordinary trading volume. Similarly, the price of Fremont preferred shares declined from a close of $19.45 on March 2, 2007, to a close of $16.50 on March 5, 2007, a decline of over 15% on heavy trading volume.

## C.   <u>Post-Class Period Disclosures</u>

365. On March 7, 2007, the Company issued a press release after the close of trading in which it set forth that it consented to the Cease & Desist Order and made that order public.

366. On March 7, 2007, the FDIC also issued a press release, which stated:

The Federal Deposit Insurance Corporation (FDIC) today announced it had issued a cease and desist order again Fremont Investment & Loan, Brea, California ("Bank"), and its parent corporations, Fremont General Corporation and Fremont General Credit Corporation. The bank and its parents, without admitting or denying the allegations, consented to the order.

In taking this action, the FDIC found that the bank was operating without effective risk management policies and procedures in place in relation to its subprime mortgage and commercial real estate lending operations. <u>The FDIC determined, among other things, that the bank had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank</u>

The order sets forth a variety of corrective actions to be undertaken. The order requires that the bank adopt a five-year strategic plan for its business. The order also requires that the bank, within 90 days, <u>adopt a subprime mortgage lending policy with provisions designed to correct its lending practices, including that it underwrite future subprime loans with an analysis of the borrower's ability to repay at the fully indexed rate and provide borrowers with clear information about the benefits and risks of the products</u>. [Emphasis added.]

367. On April 2, 2007, Fremont filed a Form 8-K with the SEC in which the Company disclosed the resignation of its independent registered public accounting firm, Grant Thornton. The Form 8-K also contained a letter from Grant Thornton disputing the Company's account of the resignation as set forth in ¶ 221 above.

368. On April 16, 2007, the Company issued a press release announcing that it had agreed to sell $2.9 billion of its subprime mortgage portfolio and was in negotiations to sell the remainder to the same purchaser. According to the press release, the sale would result in a pre-tax loss of approximately $100 million.

369.   On April 25, 2007, the Company announced that it had engaged a new auditor, Squar Milner, to complete the audit of the Company's financial statements for the period ending December 31, 2006.

370.   On May 22, 2007, the Company announced:  (1) it had agreed to sell its commercial real estate lending business and outstanding loan portfolio to iStar Financial Inc., while retaining a 70% participation interest in the portfolio; (2) a minority investment by Mr. Gerald J. Ford ("Ford") of $80 million; and (3) upon completion of the minority investment transaction, the appointment of Ford as Chairman of the Board of Fremont General and FIL (replacing Defendant McIntyre, who was terminated) as well as other senior management changes (replacing Defendant Walker, who was terminated).

371.   The sale of Fremont's residential and commercial lending businesses – which the FDIC effectively forced through the Cease & Desist Order – is not the first time that governmental authorities have compelled Defendants McIntyre, Rampino, and Bailey to exit a business after causing devastating losses to Fremont's shareholders while reaping huge personal windfalls.  As reported by the New York Times in an article dated March 18, 2007:

> The company's management certainly has experience exiting a business at the request of regulators.  In 2000, many of the same executives were on hand when Fremont's workers' compensation insurance unit was placed under the supervision of the California Department of Insurance.
>
> Looking back at that debacle shows striking parallels between Fremont's troubles in insurance in the late 1990s and its current subprime woes.

In both cases, Fremont used questionable practices to generate great revenue growth, benefiting executives. Shareholders were left holding the bag. In other words, same plot, different decade.

The insurance part of the story begins in 1995, when California deregulated the workers' compensation insurance market. Fremont Compensation Insurance was poised to prosper. By the turn of the century, it was the nation's sixth-largest workers' compensation insurer.

The California attorney general said in a civil suit filed in October that Fremont executives ramped up the insurance business in 1998 by changing the way the company wrote workers' compensation policies.

The complaint says that the executives breached their fiduciary duties in a scheme that propelled the company's insurance revenues but resulted in enormous losses that contributed directly to its collapse. Defendants in the suit include Mr. Rampino; James A. McIntyre, Fremont's chairman; and Wayne R. Bailey, the company's chief operating officer.

Previously, the company had been willing to cover losses up to $1 million a claim, and struck reinsurance deals to cover additional losses. But its new practice shifted to its reinsurers any responsibilities for losses beginning at $50,000 a claim.

Then, according to the California lawsuit, to generate higher premiums, Fremont significantly increased the risks in the kinds of policies it wrote — without telling its reinsurers. For example, the company changed 139 so-called high hazard grade, or otherwise risky business classifications relating to potential policy holders, from

"prohibited" to "allowed," the lawsuit said. In addition, it said the underwriters were told "to give pricing discounts to insureds whose risk profile indicated that their losses would fall disproportionately on the reinsurers."

The complaint said Mr. Rampino was "the prime mover" behind the shift; he told underwriters at Fremont Indemnity, a subsidiary, that he wanted the company's revenues from premiums to grow to $1 billion by 1999 from $600 million in 1998.

Fremont almost got there. Income before taxes doubled, to $169 million, from 1995 to 1998. For 1999, Fremont generated premiums of $831 million. According to the lawsuit, the reinsurance scheme allowed Fremont executives to exceed the figure used to calculate executive pay "by a hair more than the necessary number." You know what happened then: substantial pay kicked in.

\* \* \*

The plan began unraveling in 1999 when a Fremont reinsurer recognized problems in the deal and ended it. The insurance company recorded a charge to earnings and a pretax loss for the year.

In the next year, other reinsurers balked, and Fremont's losses began to mount. Its shares plummeted to $1.50 in 2000 from $31 in 1998.

In November 2000, the California Department of Insurance took over supervision of Fremont's insurance company. The company agreed to stop writing insurance policies, stop paying out dividends and refrain from adding executives without permission from the department. Fremont Compensation Insurance was divested in

2002, and the insurance commissioner took over as liquidator of Fremont Indemnity in 2003.

Now fast-forward to the late, great real estate boom. In 2003, even as the insurance mess was unwinding, Fremont's subprime operations were astir. It originated $13.7 billion in residential subprime loans that year, but by 2005 had originated $36 billion. Last year, Fremont vaulted to third place in the subprime lender league.

Naturally, Fremont's shares also recovered. The stock climbed as high as $31 in 2004, but then began a descent as the housing market cooled. It closed 2006 at $16.21.

On Jan. 4, Mr. McIntyre and Mr. Rampino sold large stakes in the company at that price. Mr. McIntyre sold shares worth $2.3 million and Mr. Rampino sold $2.45 million in stock. The company said they decided to sell in early December.

Early March brought the cease-and-desist order from the F.D.I.C., which said it had reason to believe that Fremont had "engaged in unsafe or unsound banking practices and had committed violations of law and/or regulations."

The F.D.I.C. ordered Fremont to stop engaging in "unsatisfactory" lending practices, like providing borrowers with confusing information about loan terms and risks, approving borrowers without documenting their incomes, and using products likely to require frequent refinancing to avoid foreclosure or that include substantial prepayment penalties.

*    *    *

The Fremont saga is by no means over. But it certainly seems that the more things change at Fremont, the more they remain the same. [Emphasis added.]

372. On July 6, 2007, the Company announced that Defendant Walker had been terminated on June 29, 2007.

373. On July 9, 2007, the Company announced the resignation of Defendant Lamb, who was replaced as Fremont's Senior Vice President, CFO, and CAO by Defendant Nicolas.

374. On September 26, 2007, the Company issued a press release announcing that, "in light of certain developments pertaining to [Fremont]" Ford was not prepared to consummate the minority investment transaction announced on May 22, 2007. "The Company said that, while it does not necessarily agree with the factual positions taken by Mr. Ford, it is in discussions with Mr. Ford concerning revised terms under which an entity controlled by Mr. Ford would proceed" with the minority investment. In response to this disclosure, Fremont stock closed at $4.14 on September 26, 2007, a decline of approximately $1.00 per share, or 19%, from the closing price of Fremont stock on the prior trading day. Similarly, the price of Fremont preferred shares declined from a closing price of $18.90 per share on September 25, 2007, to close at $16.35 per share on September 26, 2007, a decline of over 13% on heavy trading volume.

375. On October 17, 2007, the Company finally filed the delayed financial statements from the fourth quarter and year-end 2006 and the first and second quarters 2007. The Company disclosed a net loss of over $200 million for the year ended December 31, 2006, and a loss of over $850 million in the first half of 2007. In response to these disclosures, analyst Theodore Kovaleff of Sky Capital LLC noted: "the final results are close to my worst-case scenario." (Emphasis added.) According to a Bloomberg News article dated October 17, 2007, the losses taken

by Fremont in October 2007 "<u>wip[ed] out all profit booked over the previous five years</u>." (Emphasis added.)

376. On October 30, 2007, the Company issued a press release announcing that Ford and the Company could not reach an agreement and the discussions of a minority investment had been terminated. Fremont's stock fell from a close of $3.06 on October 30, 2007, to a close of $2.77 on October 31, 2007, on increased trading volume – a decline of approximately 9.5%.

377. In the same October 30, 2007, press release, the Company disclosed that it was in discussions with a new management team and, upon the successful conclusions of those discussions, Defendants Rampino and Bailey would be terminated.

378. On November 12, 2007, the Company announced the appointment of a new management team and stated that its entire Board of Directors would be replaced. The Company announced that Defendants Rampino and Bailey had been terminated and replaced and, further, that Defendant McIntyre had been replaced as Chairman of the Board of Directors.

379. On January 9, 2008, Fremont issued a press release announcing the appointment of a new Board of Directors for the Company and, subject to regulatory approval, FIL.

380. On February 28, 2008, Fremont issued a press release announcing that, based upon ongoing reviews, the Company might need to record even more asset write-downs and reserves; the Company's outside auditors, Squar Milner, were unable to complete the audit for year ending December 31, 2007 in a timely manner; and that the Company was unable to timely file its Form 10-K for the year ended December 31, 2007. On this news, the price of Fremont stock declined over 57% and closed at just $1.00 per share on February 29, 2008. (Fremont's year-end 2007 financials were never completed as a result of its bankruptcy filing.)

381.   On March 12, 2008, Fremont issued a press release announcing that Defendant Nicolas had "separated" from the Company effective March 7, 2008.

382.   On June 18, 2008, Fremont issued a press release announcing that it had filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code.

## IX.   **LOSS CAUSATION**

383.   Throughout the Class Period, the prices of Fremont common stock and preferred shares were artificially inflated as a direct result of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's above-described materially false and misleading statements and omissions.   When the true facts became known by the market and investors, the prices of Fremont common stock and preferred shares declined precipitously as the artificial inflation was removed from the price of these securities, causing substantial damage to Plaintiffs and members of the Class.   Dates of Company-specific adverse disclosures and corresponding declines in the price of Fremont securities are set forth above.

384.   Moreover, the adverse consequences of Fremont's end of Class Period disclosures and the adverse impact of those circumstances on the Company's business going forward, were entirely foreseeable to Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre at all relevant times.   Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.   As set forth above, Defendants' "unsafe and unsound" underwriting practices, failure to maintain effective internal controls; and failure to report its 2005 and 2006 financial statements in accordance with GAAP not only were material, but they also triggered foreseeable and grave consequences for the Company.

## X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

385.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this complaint.  First, none of the statements complained of herein was a forward-looking statement.  Rather the statements complained of herein were historical statements or statements of purported current facts and conditions at the time the statements were made, including statements of reported underwriting standards, internal controls and financial results.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

386.   To the extent any of the false or misleading statements alleged herein can be construed as forward-looking statements, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

387.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Fremont who knew that the statement was materially false or misleading when made.

## XI.   THE PRESUMPTION OF RELIANCE

388.   The market for Fremont securities was, at all relevant times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the price of these Fremont securities.

389. Fremont securities were traded on the New York Stock Exchange, a highly efficient market. The Company was consistently followed, before and throughout the Class Period, by the media, which issued numerous news stories regarding the Company during the Class Period and by securities analysts who published analyst reports regarding Fremont during the Class Period. The price of Fremont securities reacted promptly to the dissemination of new information regarding the Company, as set forth above. Fremont securities were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation.

390. Accordingly, Plaintiffs and other members of the Class did rely and upon the integrity of the market price for Fremont securities and are entitled to a presumption of reliance on Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre's materially false and misleading statements and omissions during the Class Period.

## XII. CLAIMS FOR RELIEF

### COUNT ONE

**For Violations of Section 10(b) of the Exchange Act, On Behalf of Plaintiffs, Against All Defendants**

391. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

392. This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiffs and members of the Class against Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre.

393. As alleged specifically above, throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of

national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and other members of the Class; (ii) artificially inflate and maintain the price of Fremont securities; and (iii) cause Plaintiffs and the members of the Class to purchase Fremont securities at artificially inflated prices.

394. As specifically alleged herein, Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having prepared, approved, signed and/or disseminated documents or made statements which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

395. During the Class Period, Defendant Rampino personally signed the following materially false and misleading disclosure documents: Fremont General's Form 10-Q for the quarter ended September 30, 2005; Form 10-K for the quarter and year ended December 31, 2005; Form 10-Q for the quarter ended March 31, 2006; Form 10-Q for the quarter ended June 30, 2006; and Form 10-Q for the quarter ended September 30, 2006. During the Class Period, Defendant Bailey personally signed Fremont General's materially false and misleading Form 10-K for the quarter and year ended December 31, 2005, and made additional materially false and misleading statements on October 27, 2005, March 9, 2006, August 8, 2006 and November 9, 2006, as set forth above. During the Class Period, Defendant Lamb personally signed the following materially false and misleading disclosure documents: Fremont General's Form 10-Q for the quarter

ended September 30, 2005; Form 10-K for the quarter and year ended December 31, 2005; Form 10-Q for the quarter ended March 31, 2006; Form 10-Q for the quarter ended June 30, 2006; and Form 10-Q for the quarter ended September 30, 2006. Lamb also made materially false and misleading statements on November 9, 2006, as set forth above. During the Class Period, Defendant Walker made materially false and misleading statements on November 9, 2006, as set forth above. During the Class Period, Defendant Nicolas made materially false and misleading statements on November 9, 2006 and November 28, 2006, as set forth above. During the Class Period, Defendant McIntyre personally signed the Form 10-K filed by Fremont General for the quarter and year ended December 31, 2005, which contained materially false and misleading statements as set forth above. In addition, these individual Defendants were collectively responsible for the misstatements contained in the Company's press releases and SEC filings during the Class Period as set forth above.

396. As set forth above in detail, these Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Fremont common stock during the Class Period.

397. In ignorance of the false and misleading nature of these Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Fremont securities, Plaintiffs and other members of the Class purchased Fremont securities at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Fremont securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Fremont

common stock and preferred shares declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Fremont securities at artificially inflated prices and the subsequent decline in the price of Fremont common stock when the truth was disclosed.

398. By reason of the foregoing, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre are liable to Plaintiffs and the members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT TWO

### For Violations of Section 20(a) of the Exchange Act, On Behalf of Plaintiffs, Against All Defendants

399. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

400. This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre, on behalf of Plaintiffs and members of the Class.

401. Although not named as a defendant herein because of its bankruptcy filing, Fremont violated Section 10(b) and Rule 10b-5 promulgated thereunder by making false and misleading statements (those specifically alleged from the Company's the press releases and SEC filings quoted above) in connection with the purchase and sale of securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of Defendants Rampino, Bailey, Lamb, Walker, Nicolas, McIntyre, and others who knew of or acted with deliberate reckless disregard for

the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

402.    Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre were controlling persons of Fremont during the Class Period, due to their senior executive positions therewith; their direct involvement in its day-to-day operations, including its financial reporting and accounting functions as alleged herein in detail; and their signatures on and participation in the preparation and dissemination of the Company's public filings.

403.    By virtue of the foregoing, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Fremont, including the content of its financial statements, press releases and SEC filings quoted above.

404.    As set forth above, these Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Fremont securities during the Class Period.

405.    In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Fremont securities, Plaintiffs and other members of the Class purchased Fremont common stock or preferred shares at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased Fremont securities at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Fremont securities declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Fremont securities at artificially inflated prices and the

subsequent decline in the price of Fremont common stock when the truth was disclosed.

406. By reason of the foregoing, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre are liable to Plaintiffs and the members of the Class for violations of Section 20(a) of the Exchange Act.

## XIII. **JURY DEMAND**

407. Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## XIV. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff, the New York State Teachers' Retirement System, and Plaintiff Darryl Lazar as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C. Awarding rescission and/or rescissory damages in favor of Plaintiffs and the members of the Class;

D. Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E. Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F. Granting such other and further relief as the Court may deem just and proper.

Dated: January 9, 2009

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

_/s/ Blair A. Nicholas_
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:  (858) 793-0070
Fax:  (858) 793-0323
       -and-
SALVATORE J. GRAZIANO
JOHN RIZIO-HAMILTON
KATHERINE M. SINDERSON
1285 Avenue of the Americas
New York, NY  10019
Tel:  (212) 554-1400
Fax:  (212) 554-1444

Lead Counsel for Lead Plaintiff
The New York State Teachers' Retirement
System and the Class

LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160

Counsel for Plaintiff Darryl Lazar



1  BERNSTEIN LITOWITZ BERGER
       & GROSSMANN LLP
2  BLAIR A. NICHOLAS  (Bar No. 178428)
   (blairn@blbglaw.com)
3  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
4  Tel:   (858) 793-0070
   Fax:   (858) 793-0323
5          -and-
   SALVATORE J. GRAZIANO
6  (sgraziano@blbglaw.com)
   JOHN RIZIO HAMILTON
7  (johnr@blbglaw.com)
   KATHERINE SINDERSON
8  (katherine@blbglaw.com)
   1285 Avenue of the Americas
9  New York, NY 10019
   Tel:   (212) 554-1400
10 Fax:   (212) 554-1444

11 Lead Counsel for New York State
   Teachers' Retirement System

12

13

FILED

2009 JAN -9 PM 1:05

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

COPY

14
                 UNITED STATES DISTRICT COURT
15
            CENTRAL DISTRICT OF CALIFORNIA (WESTERN DIVISION)
16
   NEW YORK STATE              | **Case No. 07-CV-5756-FMC (FFMx)**
17 TEACHERS' RETIREMENT        |
   SYSTEM,                     |
18 Individually and On Behalf of | **DECLARATION OF SERVICE**
   All Others Similarly Situated, |
19                             | Judge: Hon. Florence-Marie Cooper
            Plaintiff,
20
21 v.

22 FREMONT GENERAL
   CORPORATION, et al.
23
            Defendants.
24

   This Document Relates To:
25
   ALL ACTIONS
26

27

28

                                    DECLARATION OF SERVICE
                                    Case No. 07-CV-5756-FMC (FFMx)

I, KRISTINA L. SOUSEK declare,

    1.    That I am and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that my business address is 12481 High Bluff Drive, Suite 300, San Diego, CA 92130.

    2.    That on January 9, 2009, I caused to be served the following document(s):

- SECOND AMENDED CONSOLIDATED CLASS ACTION SECURITIES COMPLAINT; and

- DECLARATION OF SERVICE

☐ **(BY U.S. MAIL)** I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collecting and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Diego, California.

☐ **(BY OVERNIGHT MAIL)** I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☐ **(BY FACSIMILE)** I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collection and processing of document(s) to be transmitted by facsimile and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

☒ **(BY ELECTRONIC MAIL)** Pursuant to Civil L.R. 5-5(a)(1) and F.R.C.P. 5(b), I am personally and readily familiar with the business practice of Bernstein Litowitz Berger & Grossmann LLP for collection and processing of document(s) to be transmitted electronically in Portable Document Format (PDF), and I caused such document(s) on this date to be filed with the Court via Electronic Case Filing (ECF).

☒ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

DECLARATION OF SERVICE
Case No. 07-CV-5756-FMC (FFMx)

1  I declare under penalty of perjury under the laws of State of CALIFORNIA
2  that the foregoing is true and correct. Executed this 9th day of January 2009, at
3  San Diego, California.

4
5                                        _/s/ Kristina L. Sousek_____

DECLARATION OF SERVICE
Case No. 07-CV-5756-FMC (FFMx)