1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10   NEW YORK STATE TEACHERS')        Case No. 2:07-cv-5756-FMC-FFMx
     RETIREMENT  SYSTEMS,)
11   Individually and on Behalf of All)
     Others Similarly Situated,            )
12                                         )   ORDER  GRANTING  MOTION  TO
                                           )   DISMISS THE SECOND AMENDED
13                  Plaintiff,             )   CONSOLIDATED  CLASS  ACTION
                                           )   SECURITIES COMPLAINT
14   vs.                                   )
                                           )
15   FREMONT GENERAL                       )
     CORPORATION, et al.,                  )
16                                         )
                    Defendant(s).          )
17   _____  )

18          This matter is before the Court on Defendants' Motion to Dismiss the Second

19   Amended Consolidated Class Action Securities Complaint (docket no. 110), filed on

20   March 25, 2009.   The Court has considered the moving, opposition and reply

21   documents submitted in connection with this Motion.   The matter came on for

22   hearing on September 21, 2009, at which time the parties were in possession of the

23   Court's tentative decision to grant Defendants' Motion with prejudice.   Following

24   oral argument, the matter was taken under submission.   For the reasons and in the

25   manner set forth below, Defendants' Motion is GRANTED WITHOUT

26   PREJUDICE.

27                      **I. EVIDENTIARY RULINGS**

28          Defendants request that the Court take judicial notice of a variety of SEC

filings; transcripts from earnings calls and an investor presentation during the class

period; a HUD lender list used by Plaintiff to conduct an analysis of Fremont General Corporation's industry "peers," *see* SAC ¶ 157; a LexisNexis report of Fremont General Corporation's daily common stock prices; publicly filed documents from other federal court proceedings; accounting rules; and analyst reports referenced in the SAC. Lead Plaintiff made no objection to the Court taking judicial notice of any of these items, and the items of which Defendants ask the Court to take judicial notice are either (a) publicly-filed records, (b) otherwise capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questions, or (c) documents on which the allegations Plaintiff's SAC necessarily rely. Accordingly, the Court GRANTS Defendants' requests for judicial notice (docket nos. 111 and 117).

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This putative class action arises out of a decline in the price of shares in Defendant Fremont General Corporation ("Fremont General"). Fremont General is a financial services holding company whose lending operations included national sub-prime residential real estate loans; it operated its commercial and residential real estate lending business in the United States through its wholly-owned California industrial bank subsidiary, Fremont Investment & Loan ("FIL").[1] On behalf of itself and other putative class members who purchased or acquired Fremont General common stock during the time period between October 27, 2005 and March 2, 2007 (the "Class Period"), Lead Plaintiff alleges that Defendants made a series of materially false and misleading statements in press releases, conference calls with investors and analysts, and in Securities and Exchange Commission ("SEC") filings.

On September 4, 2007, this litigation commenced with the filing of a Complaint against Fremont and several of the former officers of Fremont and FIL.

---

[1]For purposes of this Order, the Court refers to Defendant Fremont General and FIL collectively as "Fremont."

1    On March 5, 2008, Lead Plaintiff New York State Teachers' Retirement System

2    ("Lead Plaintiff") filed its Amended Consolidated Class Action Securities Complaint

3    ("AC") against Fremont General and the following individuals who were senior

4    officers of Fremont during the class period ("Individual Defendants"):   Louis

5    Rampino, former President and CEO of Fremont General; Wayne R. Bailey, former

6    Executive Vice President and COO of Fremont General; Patrick E. Lamb, former

7    Senior Vice President, CFO, and Chief Accounting Officer, and Treasurer of

8    Fremont General; Kyle R. Walker, former President and CEO of FIL; Ronald J.

9    Nicolas, Jr., former Executive Vice President and CFO of FIL; and James A.

10   McIntyre, a former Chairman of the Board and director of Fremont General.

11        On June 16, 2008, Fremont and the Individual Defendants moved to dismiss

12   the AC for failure to allege facts sufficient to satisfy the PSLRA pleading

13   requirements for the "material misrepresentation or omission" (or "falsity") and

14   "scienter" elements of Plaintiff's Section 10(b) and Rule 10b–5 claims.[2] Briefing on

15   Defendants' motion to dismiss the AC closed on October 2, 2008.  On October 28,

16   2008, the Court granted that motion without prejudice to Plaintiff filing a Second

17   Amended Consolidated Class Action Securities Complaint ("SAC").  In the October

18   28, 2008 Order, the Court explained various ways in which the allegations in the AC

19   were insufficient:

20        Although the materiality allegations at pages 107-112 do explain

21        the materiality of certain statements (*e.g.*, valuation of residual interest

22        important because it served as a benchmark for the quality of

23        underwriting, AC ¶207; repurchase reserves, alleged to be materially

24        misstated in 3Q of 2006, important because the need to increase them

25        by 300% the next quarter was reflected in the reported net loss for that

26

27        [2]On July 9, 2008, Fremont filed a Notice of Filing of Chapter 11 Bankruptcy.
     Thereafter, the action was stayed as to Fremont but proceeded against the Individual
28   Defendants.

1    quarter, AC ¶208), they do not link that materiality analysis to
2    particular statements by one or more of the defendants. Additionally,
3    the allegations of material misstatements at pages 125-166 cross
4    reference[] allegations made throughout the AC (but not necessarily
5    those in the "materiality" section at pages 107-111) without further
6    explanation. . . .

7        In the "material misstatements" section of the AC, Lead Plaintiff
8    lists, in no particular order with regard to chronology, individual
9    defendant, or theory of materiality, a variety of statements made during
10   the Class Period about Fremont's loan origination and underwriting
11   standards, financial statements, and internal controls. AC ¶¶244-270.

12       The Court has scoured the 175 pages of the AC in an effort to
13   link Lead Plaintiff's allegations of specific statements with the alleged
14   reason(s) those statements are misleading. However, in many cases, the
15   internal cross references to other allegations in the AC fail to
16   substantiate Lead Plaintiff's conclusory allegations that the statements
17   were false and, in nearly all cases, they fail to illuminate why or how
18   the falsity was material. Additionally, the numerous references to
19   representations by or knowledge of "Defendants," collectively, do not
20   facilitate a reasoned assessment of the statements and knowledge
21   attributable to the Individual Defendants. . . . Beyond that, more often
22   than not, the cross-referenced allegations intended to evidence the
23   falsity of the alleged misrepresentations fail to adequately plead
24   scienter in connection with those statements.

25   Oct. 28, 2008 Order at 7:28-9:13 (footnote omitted). The Court went on to discuss
26   illustrative examples of the shortcomings of the allegations in the AC, *id.* at 10:1-
27   12:27, concluding that:

28       [A]s pleaded, the allegations in the AC do not clearly articulate

4

1  the bases of Lead Plaintiff's Section 10-b and Rule 10b-5 claims
2  against the Individual Defendants.   It follows that the Motion to
3  Dismiss is also granted as to Plaintiff's Section 20(a) claims.

4  *Id.* at 12:28-13:3.

5  On January 9, 2009, Lead Plaintiff filed its 215-page Second Amended
6  Complaint ("SAC"), in which Lead Plaintiff asserts the following claims against all
7  Defendants:   (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. §
8  78(j)(b), and Rule 10b-5, 17 C.F.R. §240; and (2) violations of Section 20(a) of the
9  Exchange Act, 15 U.S.C. § 78(t)(a).

10  The SAC describes Fremont's business model as follows: "Fremont made
11  money principally by originating a growing volume of subprime mortgages and then
12  quickly selling those mortgage loans to investment banks and other purchasers of
13  real estate-related debt."   SAC ¶ 5.   Fremont also securitized some of its loans.
14  Securitization was treated as a sale, and the loans were removed from the balance
15  sheet.[3]   Regarding Fremont's growth, the SAC explains:

16

17  [3]Regarding the securitization and sale of the loans Fremont originated, the SAC
18  explains:

19  Fremont originated subprime residential real estate loans
    nationwide on a wholesale basis through independent loan brokers in
20  nearly all of the 50 states.  Generally, Fremont sold most of the subprime
    loans it originated to other financial institutions through whole loan
21  sales.  After the sale, the Company retained no interest in the loans.
22  Depending upon market conditions, Fremont also securitized some of its
    subprime loan production and retained a required junior residual interest
23  in the cash flows earned from the loans.  Fremont earned income from
    the gains realized upon selling or securitizing its loans.  Fremont's
24  originations grew quickly and reached a record $36.2 billion in 2005.
25  During 2005, Fremont sold $29.5 billion in whole loan sales and
26  securitized $6.5 billion of its loan origination volume.

27  SAC ¶ 55; *see also* SAC ¶ 60 (explaining that, Fremont was required to provide
    representations and warranties to purchasers of the loans and "[i]f a purchaser of the
28  mortgage loans determined that Fremont violated its representations and warranties

5

1
2
3
4
5
6
7

Beginning in 1999[,] and continuing through the Class Period, the Company originated subprime loans, lending to individuals who did not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers.  By the beginning of the Class Period, Fremont was one of the largest subprime mortgage lenders in the nation[,] and the Company's reported 2004 and 2005 earnings were the highest in the Company's 42-year history.

SAC ¶54.  However, at the end of the first quarter of 2006 ("1Q 2006"), subprime delinquencies and repurchases began to increase.   In response, Defendants "repeatedly described 'modifications' to Fremont's loan underwriting practices purportedly 'designed to lower early payment defaults' and 'to improve the overall credit performance of the loans.' " SAC ¶ 63.  However, "the loans that Fremont underwrote and originated after Defendants claimed to have improved its practices during the second quarter of 2006 performed even worse than the loans Fremont originated just before it allegedly tightened its underwriting." SAC ¶ 172 (emphasis in original).

Plaintiffs also allege that Fremont's financial statements were materially misstated throughout the Class Period in that Defendants both (a) overvalued Fremont's reported residual interest in the loans Fremont securitized and (b) set Fremont's repurchase reserves artificially low in the third quarter of 2006 ("3Q 2006"). SAC ¶¶ 182-224. In the same vein, Lead Plaintiff alleges that, in Fremont's quarterly financial statements, Defendants Rampino and Lamb made repeated material misstatements certifying the design, operation and effectiveness of

---

or if a borrower defaulted during the early months of the loan, the purchaser could require Fremont to repurchase the mortgage loan").

1   Fremont's internal controls.  SAC ¶¶ 225-235.[4]

2        As it did previously, Lead Plaintiff alleges that, on February 27, 2007,

3   Fremont announced that it would have to delay the release of its financial statements;

4   after the close of trading on March 2, 2007, Fremont announced that it would

5   consent to a "Cease and Desist" order (the "Cease and Desist Order") with the FDIC,

6   which provided that the FDIC "had reason to believe that [Fremont] had engaged in

7   unsafe or unsound banking practices and had committed violations of law and/or

8   regulations."  SAC ¶¶8-9 (internal quotations omitted).[5]  On this news, Fremont's

9   stock experienced a drop of over 32% (from a close of $8.71 on March 2, 2007, to

10  a close of $5.89 on March 5, 2007, the next trading day).  SAC ¶ 8.  Lead Plaintiff

11  summarizes its allegations against Defendants as follows:

12

13        [4]The SAC also includes sections containing allegations grouped as follows:  (1)

14  materiality of misstatements and omissions, SAC ¶¶ 236-259 (section spanning pages
    123 to 131 entitled "Defendants' Misstatements and Omissions During the Class

15  Period were Material"); (2) scienter, SAC ¶¶ 260-303 (section spanning pages 131 to

16  159 entitled "Defendants Acted with Scienter"); (3) falsity of class-period statements,
    SAC ¶¶ 304-381 (section spanning pages 159-207 entitled "Defendants' Materially

17  False and Misleading Statements During the Class Period and Subsequent Post-Class

18  Period Disclosures").

19        [5]The SAC further explains that the FDIC's March 7, 2007 Cease and Desist

20  Order:

21        [S]ought to prevent Fremont from operating "without effective
          risk management policies and procedures in place in relation to the

22        Bank's primary line of business of brokered subprime mortgage
          lending;" operating "with inadequate underwriting criteria and excessive

23        risk;" and making "mortgage loans without adequately considering the
          borrower's ability to repay."   The FDIC determined (contrary to

24        Defendants' repeated public statements to investors) that, among other
          things, Fremont "had been operating without adequate subprime

25        mortgage loan underwriting criteria, and that it was marketing and

26        extending subprime mortgage loans in a way that substantially increased

27        the likelihood of borrower default or other loss to the bank."

28  SAC ¶ 9.

                                        7

Despite causing Fremont to be one of the country's most deliberately reckless and harmful subprime lenders, Defendants Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre each told investors repeatedly that Fremont's underwriting and lending practices were "sound," "appropriate," and "improved" and that its accounting was "conservative" and presented in accordance with Generally Accepted Accounting Principles ("GAAP"). Plaintiffs allege that Defendants' statements regarding: (1) Fremont's purportedly "appropriate" and "sound" underwriting standards, including specific claims that the underwriting standards purportedly were "improved" and "tightened" beginning on August 8, 2006; (2) Fremont's purported compliance with GAAP; and (3) the purported adequacy of Fremont's internal controls, were each materially false and misleading when made, causing substantial harm to Fremont investors when investors were shocked to learn of the FDIC's findings and severe regulatory action against Fremont in March 2007. In fact, Fremont was the first bank to be cited so extensively for such "unsafe and unsound" practices related to subprime mortgage lending in over five years since the implementation of the Interagency Expanded Guidance for Subprime Lending Programs in 2001.

SAC ¶ 2. Lead Plaintiff further alleges that "Defendants intended to and did . . . (I) deceive the investing public, including Plaintiffs and other members of the Class; (ii) artificially inflate and maintain the price of Fremont securities; and (iii) cause Plaintiffs and the members of the Class to purchase Fremont securities at artificially inflated prices." SAC ¶ 393. The class members "purchased Fremont common stock at artificially inflated prices during the Class Period" and, "[b]ut for the fraud," they would not have done so. SAC ¶ 397.

On March 25, 2009, Defendants filed this Motion to Dismiss, arguing the SAC

does not contain allegations sufficient to satisfy the PSLRA's standard for pleading falsity and scienter. On June 8, 2009, Lead Plaintiff filed its Opposition, and Defendants filed their Reply thereto on August 7, 2009. On August 14, 2009, the parties filed a stipulation to continue the hearing on this matter to September 21, 2009.

### III. APPLICABLE LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to seek dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Generally, all material factual allegations in the complaint are assumed to be true and construed in the light most favorable to the plaintiff. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1229 (9th Cir. 2004) ("The general rule for 12(b)(6) motions is that allegations of material fact made in the complaint should be taken as true and construed in the light most favorable to the plaintiff.") (citing *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000)). However, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot be reasonably drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 755 (9th Cir. 1994) (internal citations omitted). Additionally, claims asserting violations of the Private Securities Litigation Reform Act of 1995 (the "PLSRA"), 15 U.S.C. §78u-4(b), must satisfy a heightened pleading requirement. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1021 (9th Cir. 2000).

If the Court dismisses the complaint, it must decide whether to grant leave to amend. Denial of leave to amend is "improper unless it is clear that the complaint could not be saved by any amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (citation omitted); *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir.1990) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

1
## IV.  DISCUSSION

2     The instant Motion challenges the adequacy of Lead Plaintiff's allegations

3 with respect to the falsity and scienter pleading requirements for securities fraud

4 cases.

5     Generally, Section 10(b) of the 1934 Act and Rule 10b-5 promulgated

6 thereunder "prohibit[] any person from using or employing any 'manipulative or

7 deceptive device' in connection with the sale of a security." *In re Verifone*

8 *Securities Litigation*, 11 F.3d 865, 868 (9th Cir. 1993) (citing 17 C.F.R. §

9 240.10b-5); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S.

10 148, ___, 128 S.Ct. 761, 768 (2008) ("Rule 10b-5 encompasses only conduct

11 already prohibited by §10(b)."). A violation of Section 20(a) of the 1934 Act

12 requires : "(1) a primary violation of federal securities laws . . . and (2) that the

13 defendant exercised actual power or control over the primary violator." *Howard*

14 *v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). A primary violation

15 consists of the "transactions giving rise to the alleged securities violation." *Id.*

16 (internal citations omitted). Accordingly, if the SAC fails to articulate a Section

17 10(b) claim, Lead Plaintiff's Section 20(a) claim must also be dismissed.

18     "In a typical §10(b) private action a plaintiff must prove (1) a material

19 misrepresentation or omission by the defendant;[6] (2) scienter; (3) a connection

20 between the misrepresentation or omission and the purchase or sale of a security;

21 (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)

22 loss causation." *Stoneridge*, 128 S.Ct. at 768. The PSLRA requires that both

23 falsity and scienter be pleaded with particularity. *In re Vantive Corp. Securities*

24 *Litigation*, 283 F.3d 1079, 1084 (9th Cir. 2002). The Ninth Circuit has

25 summarized the pleading requirement as follows:

26         The PSLRA significantly altered pleading requirements in

27 _____

28     [6]This requirement is also referred to as the "falsity" requirement.

private securities fraud litigation by requiring that a complaint plead
with particularity both falsity and scienter.  The purpose of this
heightened pleading requirement was generally to eliminate abusive
securities litigation and particularly to put an end to the practice of
pleading "fraud by hindsight."  A securities fraud complaint must
now "specify each statement alleged to have been misleading, the
reason or reasons why the statement is misleading, and, if an
allegation regarding the statement or omission is made on
information and belief, the complaint shall state with particularity all
facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  If
the challenged statement is not false or misleading, it does not
become actionable merely because it is incomplete.  Further, the
complaint must "state with particularity facts giving rise to a *strong*
inference that the defendant acted with the required state of mind."
15 U.S.C. § 78u-4(b)(2) (emphasis added). Thus the complaint must
allege that the defendant made false or misleading statements either
intentionally or with deliberate recklessness or, if the challenged
representation is a forward looking statement, with "actual
knowledge . . . that the statement was false or misleading." 15 U.S.C.
§ 78u-5(c)(1)(B)(I).

*Id.* at 1084-85 (footnotes omitted and citations to all but quoted statutory
provisions omitted) (emphasis in original).  Regarding the scienter requirement,
the Ninth Circuit has also explained that the required state of mind consists of
defendants acting "with the intent to deceive or with deliberate recklessness as to
the possibility of misleading investors." *Berson v. Applied Signal Technology,
Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).  "It does not suffice that a reasonable
factfinder plausibly could infer from the complaint's allegations the requisite state
of mind.  To qualify as 'strong' within the intendment of § 21D(b)(2), . . . an

11

1    inference of scienter must be more than merely plausible or reasonable – it must

2    be cogent and at least as compelling as any opposing inference of nonfraudulent

3    intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127

4    S.Ct. 2499, 2504-05 (2007) (emphasis added).  Accordingly, the factual basis for

5    the scienter requirement must be pleaded with particularity:

6            It is not enough for [a plaintiff] to state facts giving rise to a

7        mere speculative inference of deliberate recklessness, or even a

8        reasonable inference of deliberate recklessness. . . .  We understand

9        this to mean that [plaintiff] must plead in great detail facts

10       demonstrating, at a minimum, a degree of recklessness that strongly

11       suggests the required degree of intent.

12   *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 985 (9th Cir.

13   1999) (internal citation omitted).

14       Here, as an initial matter, the Court notes that despite an effort to add

15   allegations that would address the problems identified in the Court's October 28,

16   2008 Order, the SAC still suffers from inadequate organization and insufficient

17   specificity to adequately plead falsity and the requisite level of scienter.  *Cf.*

18   *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1244 (N.D.Cal. 1998) (citing several

19   "securities class action complaints, [in which] courts have repeatedly lamented

20   plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the

21   statements and match them with the corresponding adverse facts to solve the

22   'puzzle' of interpreting Plaintiffs' claims" and refusing to do so where the plaintiff

23   "failed to craft a Complaint in such a way that a reader can, without undue effort,

24   divine why each alleged statement was false or misleading" (internal citations and

25   quotations omitted)).

26       With Section VII(A) of the SAC, Plaintiff sets out in chronological order

27   each challenged statement but still merely "cross references all facts

28   demonstrating falsity, materiality and, collectively, supporting a strong inference

12

of scienter for each Defendant." SAC at 159 n.6. This "puzzle pleading" makes it extremely difficult for the Court to identify or follow Plaintiff's reasoning and to determine – with specificity – which allegations are intended to establish the falsity and scienter requirements in relationship to each challenged statement identified in Section VII(A). This, in turn, renders it both difficult and unnecessary for the Court to discuss the insufficiency of each and every cross-referenced allegation. Although the Court believes it would be justified in dismissing the SAC on this basis alone, the following discussion identifies and briefly addresses a representative sampling of some of the major, substantive problems with the SAC that support dismissal with prejudice.

Simply put, Lead Plaintiff's factual allegations are neither sufficient, nor sufficiently particularized, to satisfy the pleading standard for the falsity requirement, nor they do they articulate facts sufficient to give rise to the requisite *strong* inference that one or more of the Defendants made the challenged statements with the requisite level of scienter. Stated otherwise, although the allegations in the SAC set out a strong case for finding – particularly with the benefit of hindsight – that Fremont's underwriting was woefully inadequate and that some or all of the Defendants utterly failed to implement policies and procedures sufficient to halt the company's downward spiral, the factual allegations in the SAC are not sufficient to substantiate Plaintiff's conclusions that each Defendant, knowingly or with deliberate recklessness, made statements (or omissions) that were, in fact, materially false or misleading at the time. Rather, even taking all the factual allegations in the SAC as true, they are less likely to support an inference of securities fraud than they are to support an inference of profoundly misguided corporate mismanagement. *Cf. Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479-80, 97 S.Ct. 1292, 1304 (1977) ("We thus adhere to the position that Congress by [§] 10(b) did not seek to regulate transactions which constitute no more than internal corporate management. There may well be a need

1  for uniform federal fiduciary standards to govern mergers such as that challenged

2  in this complaint.  But those standards should not be supplied by judicial

3  extension of § 10(b) and Rule 10b-5 to cover the corporate universe." (internal

4  quotations, citations, and footnotes omitted)).

5      Lead Plaintiff describes in considerable detail how and why information

6  about Fremont's underwriting practices, valuation of residual interests, statement

7  of repurchase reserves, use of GAAP, and maintenance of adequate internal

8  controls are material.[7]  Opp'n at 3-7; SAC ¶¶ 237-259.  However, the question

9  before the Court is not whether information about Fremont's handling of these

10  areas of its operations was material; rather, the question is whether Plaintiff has

11  adequately alleged (a) that the challenged statements about Fremont's

12  underwriting practices, GAAP compliance, and internal controls were *materially*

13  *false when they were made*, and (b) that one or more of the Defendants made the

14  challenged statements *with an intent to deceive, or with deliberate recklessness* as

15  to the possibility of misleading, investors.

16      The Court has considered all the allegations, separately and as a whole, in

17  the SAC.  The following discussion addresses a few of the overarching problems

18  with Plaintiff's pleading by examining several of the Plaintiff's challenges to

19  statements regarding both (a) underwriting practices and (b) GAAP compliance

20  (namely, residual interests and repurchase reserves) and internal controls.

21

22

23      [7]"[A] fact is material if there is a substantial likelihood that a reasonable
investor would consider it important in his or her decision making."  *In re Immune*

24  *Response Secs. Litig.*, 375 F.Supp.2d 983, 1020 (S.D.Cal.2005) (quoting *America*
*West*, 320 F.3d 920, 934 (9th Cir. 2003) (internal citations omitted)); *see also Basic*

25  *Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (expressly adopting the following

26  standard for materiality in Section 10(b) cases: "there must be a substantial likelihood
that the disclosure of the omitted fact would have been viewed by the reasonable

27  investor as having significantly altered the 'total mix' of information made available"

28  (internal citations omitted)).

14

1  **A. Allegations and Argument Regarding "Defendants," Collectively**

2       Despite the Court's previous admonition to Plaintiff that "the numerous

3  references to representations by or knowledge of 'Defendants,' collectively, do

4  not facilitate a reasoned assessment of the statements and knowledge attributable

5  to the Individual Defendants[,]" Oct. 28, 2008 Order at 8:28-9:10, Plaintiff has not

6  presented the relevant facts in a manner or format that permits the Court (or

7  Defendants) to readily identify the allegations relevant to each individual

8  defendant's scienter.[8]  As the discussion in Sections IV(B) & (C) *infra* further

9  illustrates, although the SAC identifies to which of the individual Defendants

10  (Rampino, Bailey, Lamb, Walker, Nicolas, and McIntyre) each challenged

11  statement is attributable, neither the SAC nor Plaintiff's Opposition to the instant

12  Motion ties *each* challenged statement to factual allegations regarding the

13  specified Defendant's knowledge of (or reckless disregard for) the possibility of

14  the challenged statement misleading investors.[9]  The Court is left to conclude that

15  ─────────────

16      [8]Defendants somewhat overstate the matter in their Reply.  Although Plaintiff

17  does make reference in its Opposition to "Defendants' representations," the portions
    of the Opposition cited by Defendants are not so impermissibly vague as to be

18  misleading.  Reply at 2 n. 2 (citing Opp'n at 21 n.10 and Opp'n at 17).  It is possible

19  to discern to which particular statements Plaintiff is referring in the referenced
    portions of the Opposition.

20

21      [9]As illustrated in greater detail *infra* in Section IV(B), the Court has endeavored
    to link the allegations related to each statement by each Defendant to allegations

22  relevant to (a) falsity and (b) scienter.  Both the format and content of the SAC render
    this task both unduly tedious and unfruitful.  For example, the challenged statements

23  made by Defendant Bailey on an October 27, 2005 conference call are set out in

24  paragraph 305.  The SAC then directs the Court to paragraphs 62 through 181 and
    paragraphs 237 through 246 to locate allegations relevant to the materiality and falsity

25  of Bailey's statements.  Only some of the allegations contained in the referenced 128

26  paragraphs relate specifically to Bailey, and those paragraphs do not adequately plead
    falsity.  Additionally, although the Court was not able to locate a specific cross-

27  reference to paragraphs setting out allegations relating to Bailey's scienter in

28  connection with the challenged October 27, 2005 statements, the various allegations

1   Plaintiff has not made separate allegations regarding the knowledge attributable to

2   each separate defendant in relationship to each challenged statement because

3   Plaintiff cannot do so.

4   **B.  Underwriting Statements**

5        The challenged statements regarding Fremont's underwriting practices, and

6   the referenced support for finding that the falsity and scienter requirements are

7   satisfied, include:

8   •       On an October 27, 2005 conference call, in response to a question

9           about whether Fremont had seen "any inkling of any cracks" in the credit

10          of its residential mortgage customers, Defendant Bailey responded, in part:

11          "Not really, no.  I think , again, the subprime spectrum, it's a wide

12          spectrum.  And we tend to play at the upper end of that spectrum. . . .  And

13          I think that we have a pretty good reputation as a good, sound originator."

14          SAC ¶305.

15  •       The 10-Q for the third quarter of 2005 ("3Q 2005") signed by

16          Defendants Rampino and Lamb and filed with the SEC explained the

17          company's subprime underwriting practices and stated that "FIL seeks to

18          mitigate its exposure to credit risk through underwriting standards that

19          strive to ensure appropriate loan to collateral valuations."  SAC ¶ 306.

20       The SAC references paragraphs 62 through 181 as setting forth "in detail,

21  numerous sources of evidence demonstrat[ing] that Fremont, in fact, employed

22  extremely 'unsafe and unsound' underwriting practices . . ."  and paragraphs 237

23  through 246 as containing allegations that establish the material falsity of the

24  above statements.  The SAC also references a May 17, 2007 speech by Federal

25  

26  that are clearly intended to relate to scienter, *e.g.*, paragraphs regarding confidential
    witness statements, statements in the FDIC Cease-and-Desist Order, and subsequent
27  statements by the Massachusetts Attorney General, are not sufficient to create the
28  requisite inference of knowledge or reckless disregard.

1   Reserve Chairman Ben Bernanke as evidence of the "materiality of Fremont's

2   subprime underwriting to investors." SAC ¶ 308.

3       •    The Form 10-K filed for the year 2005 and signed by Defendants

4           McIntyre, Rampino, Bailey and Lamb described Fremont's underwriting

5           as follows: "Lending is substantially all done on a senior and secured basis

6           and the Company seeks to minimize credit exposure through loan

7           underwriting that is focused upon appropriate loan to collateral valuations

8           and cash flow coverages." It goes on to explain that the residential loans

9           are "sub-prime" and "[t]o mitigate the higher potential for credit losses

10          that accompanies these types of borrowers, the Company attempts to

11          maintain underwriting standards that require appropriate loan to collateral

12          valuations. The underwriting guidelines are primarily intended to assess

13          the ability and willingness of the potential borrower to repay the debt and

14          to evaluate the adequacy of the mortgaged property as collateral for the

15          loan." SAC ¶ 323.

16      The SAC again references paragraphs 62 through 181 as setting forth "in

17  detail, numerous sources of evidence demonstrat[ing] that Fremont, in fact,

18  employed extremely 'unsafe and unsound' underwriting practices . . ." and

19  paragraphs 237 through 246 as containing allegations that establish the material

20  falsity of the above statements. SAC ¶ 324. Plaintiff also references paragraphs

21  260 through 303 as substantiating the allegation that "there is a strong inference

22  that all individual Defendants responsible for these specific material

23  misstatements acted with scienter in making their materially false and misleading

24  statements on March 9, 2006 in Fremont's 2005 Form 10-K." SAC ¶ 326.

25      The SAC contains similar allegations regarding statements in Fremont's 10-

26  Q for 1Q 2006. SAC ¶¶ 327-334. The SAC goes on to allege that numerous

27  important misrepresentations were made in the second quarter of 2006:

28      •    August 8, 2006 press release stated "with an objective of reducing its

early payment delinquencies, the Company made modifications in its loan origination parameters during the second quarter of 2006, including eliminating or reducing certain higher loan-to-value products and lower FICO bands."  SAC ¶ 335.

- On an August 8, 2006 conference call Defendant Bailey stated that, in response to an increasing trend in early payment defaults developing at Fremont and throughout the industry, "[w]e determined that we needed to tighten up some of our loan sale conditions and that modifications in our loan production parameters required adjustments."  Bailey went on to state that "[t]hese changes were implemented during the second quarter and we've begun to see impact on our production of these during July" and that "[w]e have really gone through to identify where these loan repricing and repurchases are coming from, and again, we have made changes and it appears from our production that these changes are altering what we are producing."  SAC ¶ 336.

- The Form 10-Q for 2Q 2006 again contained the statement that "FIL seeks to mitigate its exposure to credit risk through underwriting standards that strive to balance appropriate loan to collateral valuations with a borrower's credit profile."  The 10-Q also noted the modifications including modification or elimination of "certain higher loan-to-value products and lower FICO bands."  SAC ¶¶ 337-228.

The SAC again references paragraphs 62 through 181 as setting forth "in detail, numerous sources of evidence demonstrat[ing] that Fremont, in fact, employed extremely 'unsafe and unsound' underwriting practices . . ." and paragraphs 237 through 246 as containing allegations that establish the material falsity of the above statements.  The SAC also references paragraphs 172 through 180 as containing allegations showing that the subprime loans Fremont originated at the time the above statements were made in late 2006 performed "even worse,

1    rather than improved" and "performed so poorly, so quickly, that their demise

2    could not have been the result of general market forces."  SAC ¶ 339.

3          None of the following "strongly demonstrate" that any one or more of the

4    individual Defendants made materially false statements with the requisite scienter:

5    (a) the above-referenced statements regarding Fremont's underwriting practices;

6    (b) the statements contained in SEC filings and made during conference calls

7    during 3Q 2006, SAC ¶¶ 345-352; or (b) the further decline in the price of

8    Fremont's common stock, SAC ¶ 354.  More specifically, neither Bailey's

9    generalization that he thought the company *tended* to play "at the upper end" of

10   the sub-prime spectrum nor the 10-Q statement that the company *sought* to

11   mitigate its exposure through standards that *strove* to ensure valuations constitute

12   materially false statements.  *Compare In re Impac Mortg. Holdings, Inc.*

13   *Securities Litig.*, 554 F.Supp.2d 1083, 1097 (C.D.Cal. 2008) ("[T]he word 'solid,'

14   like the words 'robust' and 'strong,' is such a vague expression of optimism that it

15   would not have conveyed a misleading impression of the future on which a

16   reasonable investor would rely."); *with In re New Century*, 588 F.Supp.2d 1206,

17   1225 (C.D.Cal. 2008) (finding actionable a sub-prime lender's more concrete

18   statements describing, *inter alia*, " 'a strategy [of selecting borrowers with

19   increasing credit scores],' 'strict underwriting and risk management disciplines,'

20   and 'better credit quality.' ").  Additionally, although Plaintiff argues that

21   Defendants failed to take *any* steps to employ improved or adequate underwriting

22   standards, the internal cross reference to all of paragraphs 62 through 181 of the

23   SAC does not represent pleading that is sufficiently specific or clear to

24   substantiate that conclusion.  Moreover, the fact that subsequent disclosures

25   revealed that the remedial measures were not sufficient does not render false the

26   individual Defendants' contemporaneous statements about those measures.  *See,*

27   *e.g., In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994),

28   *superseded by statute on other grounds* ("In order to allege the circumstances

1   constituting fraud, plaintiff must set forth facts explaining why the difference

2   between the earlier and the later statements is not merely the difference between

3   two permissible judgments, but rather the result of a falsehood."). Similarly, the

4   SAC identifies no objective measure against which Defendants or the Court can

5   evaluate the adequacy of the underwriting standards actually employed. *See*

6   *Vantive*, 283 F.3d at 1086 (explaining that a failure to provide an objective

7   measure against which allegedly "false" statements can be compared or quantified

8   renders generalized allegations insufficient under the heightened PSLRA pleading

9   standard).

10       At oral argument, Plaintiffs re-asserted their contention that a fairly recent

11  decision in this district found securities fraud claims were adequately pleaded on

12  facts similar to those now before the Court and, as such, compels the conclusion

13  that the pleading in this action is adequate. This argument ignores the fact that

14  Fremont never held itself out to be anything other than a sub-prime lender; in

15  contrast, *Countrywide* involved allegations of a lender's "systematic shift *from*

16  sound underwriting" to "the point of nearly abandoning" its underwriting

17  guidelines over the course of less than three years." *In re Countrywide Financial*

18  *Corp. Securities Litigation*, 588 F.Supp.2d 1132, 1145, 1159 (C.D.Cal. 2008)

19  (emphasis added).

20       As for the allegations of statements from the 42 confidential witnesses set

21  out at paragraphs 13, 74, 78 through 118, and 201 of the SAC, those allegations

22  are not sufficient to support a determination of either falsity or scienter with

23  respect to the challenged statements about underwriting. The strongest allegations

24  are that confidential witness 34 ("CW 34"), an Assistant Vice President in

25  Fremont's Regulatory Risk Management ("RRM") group during the Class Period,

26  "states that the RRM group "submitted numerous, repeated adverse written

27  findings to senior Fremont executives, including Defendants Walker, Nicolas and

28  Bailey, in 2005 and 2006, which 'mirrored' the FDIC's eventual Cease & Desist

1     Order, one to two years later." SAC ¶ 13. Lead Plaintiff further alleges:

2

> CW 34 states that these repeated adverse reports specifically
> highlighted, *inter alia*, unfair and deceptive acts that Fremont was
> engaging in, "pretty obvious" poor underwriting and problematic
> incentive compensation. CW 34 reports, however, that Defendants
> McIntyre, Rampino, Bailey and other senior executives "dictated
> policy and procedures" and that their push was to make more and
> more loans with "no restraints" to increase their own personal
> compensation at Fremont with increasing loan volume, while
> deliberately ignoring the repeated adverse findings from Regulatory
> Risk Management . . .

SAC ¶ 13. The SAC contains allegations that other confidential witnesses employed as senior underwriters, account executives, and sales managers provided information about the number of exceptions made to Fremont's underwriting standards, the fact that those exceptions were reported to Fremont's executive management, and that "everyone" knew that stated-income loans were based on falsified documents. *See, e.g.,* SAC ¶¶ 78-84. Although these allegations point to evidence of serious mismanagement, they are not sufficient to substantiate Plaintiff's allegations of falsity or scienter. The allegations are lacking in specificity regarding precisely what information was reported regarding exceptions to underwriting standards and how Defendants' statements can be judged to be materially false in light of those practices. *See Silicon Graphics*, 183 F.3d at 985 ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.").[10] Additionally,

_____

[10]In *Silicon Graphics*, the Ninth Circuit went on to further explain how the absence of specific factual allegations hindered its analysis:

1   although allegations in the SAC are sufficient to establish that the various

2   confidential witnesses have personal knowledge of the work they did, the reports

3   they made, and their own experiences as Fremont employees, the allegations do

4   not establish that any of the confidential witnesses were in a position to gain

5   personal knowledge of what Defendants saw, knew, or thought. *See Zucco*

6   *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (explaining

7   that "a complaint relying on statements from confidential witnesses must pass two

8   hurdles to satisfy the PSLRA pleading requirements.  First, the confidential

9   witnesses whose statements are introduced to establish scienter must be described

10  with sufficient particularity to establish their reliability and personal knowledge.

11  Second, those statements which are reported by confidential witnesses with

12  sufficient reliability and personal knowledge must themselves be indicative of

13  scienter.").  Finally, even taking all the confidential witness statements as true,

14  they are not sufficient to establish that Defendants' general statements about

15  tending to play at the upper end of the sub-prime spectrum or *striving* to maintain

16  particular loan-to-value ratios were *false* when they were made.

17       The Court also notes that Plaintiff's reliance on statements in the FDIC's

18  Cease & Desist Notice and statements by the Massachusetts Attorney General

19

20  _____

21          In the absence of such specifics, we cannot ascertain whether there
    is any basis for the allegations that the officers had actual or constructive

22  knowledge of SGI's problems that would cause their optimistic
    representations to the contrary to be consciously misleading.  In other

23  words, in the absence of such specifics, we cannot determine whether
    there is any basis for alleging that the officers knew that their statements

24  were false at the time they were made – a required element in pleading
    fraud.  Brody would have us speculate as to the basis for the allegations

25  about the reports, the severity of the problems, and the knowledge of the
    officers.  We decline to do so.

26
    *Silicon Graphics*, 183 F.3d at 985 (internal citation omitted).
27

28

does not bolster the strength of the allegations in the SAC and does not support a determination that the challenged statements were false *when they were made* or that they were made with the requisite intent.

**C. Statements Regarding GAAP Compliance and Internal Controls**

The challenged statements regarding Fremont's GAAP compliance and internal controls, and the referenced support for finding that the falsity and scienter requirements are satisfied, include:

- Statements in Fremont's Form 10-Q for 3Q 2005 indicating that the financial statements were prepared in accordance with GAAP, that the report did not contain any material misstatements, and that the company maintained appropriate internal controls. SAC ¶¶ 313, 314(1)-(5).

- On a March 9, 2006 conference call to discuss the fourth quarter and year-end 2005 financial results, Defendant Bailey stated regarding Fremont's valuations of residual interest, "[w]e generally have realized a lower gain on securitizations as we utilize what we believe are the most appropriate assumptions for valuing residual interest that we retain. These residual interests are inherently volatile and we have observed other industry participants recording relative – higher relative levels for their retained interest" and that Fremont booked its residual interests at "the most appropriate levels and assumptions." SAC ¶ 318.

- The form 10-K filed on March 16, 2006, and signed by Defendants McIntyre, Rampino, Bailey, and Lamb, stated that the discussion and analysis of the company's financial condition was based on consolidated financial statements prepared in accordance with GAAP. SAC ¶ 319.

The SAC contains similar allegations regarding statements in Fremont's 10-Q for 1Q 2006. SAC ¶¶ 327-34.

**1. Falsity**

In support of the conclusion that the above statements were materially false

1    and misleading when issued, Plaintiff cross-references the following paragraphs in

2    the SAC:  62 through 181, 182 through 206, and 225 through 235.  The Court has

3    reviewed and considered those 153 paragraphs and concludes that, although

4    detailed, they do not establish falsity has been pleaded with the requisite

5    particularity as to any one or more of the individual Defendants.

6        Paragraphs 182 through 206 consist primarily of conclusory allegations that

7    Fremont's reported valuations of its residual interests were fraudulently inflated

8    throughout the Class Period.[11]  Paragraph 189 alleges that, despite the

9    representation that the company's accounting for its residual interests complied

10   with GAAP:

11        Fremont's reported valuations for its residual interests were

12        fraudulently and materially inflated throughout the Class Period,

13        including at the time of the above-quoted 2005 Form 10K.  The

14        Company failed to account for its extremely "unsafe and unsound"

15        underwriting standards, very poor loan quality, and increasing

16        defaults and delinquencies throughout 2005 and 2006.  Rather than

17        appropriately account for the value of its Residual Interests

18        throughout the Class Period (which would have revealed to investors

19   _____

20   [11]For example, paragraphs 182 and 184 contain conclusory allegations about the
21   falsity of information contained in financial statements issue by the company
     throughout the class period.  Paragraph 183 explain GAAP and how GAAP is
22   regulated.  Paragraphs 185 and 186 explains that Fremont was required to hold
     residual interests in the subprime mortgages it securitized in order to properly value
23   those residual interests according to GAAP.  Paragraph 187 alleges that the company
24   attempted to minimize the amount of residual interest that it retained on its books.
     Paragraph 188 sets out allegedly false statements about the company's compliance
25   with GAAP in accounting for its residual interests.  SAC ¶ 188 (quoting the 2005
26   10-K, in relevant part, as follows: "The Company evaluates its residual interests for
     impairment on a quarterly basis, taking into consideration trends in actual cash flows,
27   industry and economic developments, and other relevant factors.").

28

1    the true likelihood for repayment of Fremont's poorly-underwritten

2    loans), Fremont *only admitted the poor quality of its Residual*

3    *Interests by taking a massive impairment of over $161 million on*

4    *those interests after the end of the Class Period*, in belatedly

5    reporting its fourth quarter 2006 financial statements – an impairment

6    equal to more than 50% of the Company's entire reported net income

7    for 2005 and over 80% of the Company's reported net loss for 2006.

8    SAC ¶ 189 (emphasis added).

9      First, construing the above allegations in the light most favorable to

10   Plaintiff, the first half of the paragraph contains conclusory allegations that do not

11   constitute facts pleaded with the requisite particularity.  Second, other than

12   indicating that, in hindsight, it is clear that Plaintiff's valuation of its residual

13   interests was inflated, Plaintiff identifies no objective means for determining

14   whether Fremont's valuation of its residual interests was *fraudulently* inflated at

15   the time the referenced reports were signed.[12]  *See, e.g., In re Countrywide Fin.*

16   *Corp. Deriv. Litig.*, 554 F.Supp.2d 1044, 1069-70 (C.D. Cal. 2008) (concluding

17   falsity was not pleaded with requisite particularity where plaintiffs "allege[d] that

18   the loan loss reserves violated GAAP because they were inadequate to account for

19   the risk presented by the mortgages in Countrywide's portfolio" but "given the

20   discretion inherent in the setting of loan loss reserves, and the use of independent

21   auditors, Plaintiffs have not adequately pled particularized facts that show that the

22   loan loss levels were, in fact, so low that they were false and misleading").  Third,

23

24   —————————

25     [12] Plaintiff goes on to allege that Defendants Rampino, Bailey, Lamb, Walker,
     Nicolas, and McIntrye had "ample notice" that the quality of Fremont's securitized

26   subprime loans was deteriorating such that, in order to comply with GAAP, the
     company should have evaluated whether its interests were impaired.  SAC ¶ 195.

27   However, the allegations Plaintiff references in support of that notion are identified
     only as allegations that are "discussed above and elsewhere."  *Id.*

28

1  the SAC does not link the generalized allegation of GAAP violations to Fremont's

2  valuation of its residual interests during the relevant time period.  *See In re Daou*

3  *Systems, Inc.*, 411 F.3d 1006, 1018 (9th Cir. 2005) ("[A]lthough overstatement of

4  revenues in violation of GAAP may support a plaintiff's claim of fraud, the

5  plaintiff must show with particularity *how* the adjustments affected the company's

6  financial statements and whether they were material in light of the company's

7  overall financial position." (emphasis added)); *cf. also In re Countrywide Fin.*

8  *Corp. Derivative Litig.*, 554 F.Supp.2d 1044, 1070 n. 28 (C.D.Cal. 2008) (noting

9  that an over-700% increase of loan loss reserves compared with the prior year was

10  not, standing alone, sufficient to establish scienter).

11      Accordingly, as discussed above in connection with Plaintiff's allegations

12  purporting to establish the falsity of various statements related to underwriting

13  standards, the SAC also fails to plead with specificity facts that link one or more

14  of the individual Defendants' alleged exposure to internal reports flagging

15  underwriting exceptions and other allegedly improper practices to public

16  statements that *contradicted* the information the Defendants are alleged to have

17  gleaned from the internal reports.

18      **2.  Scienter**

19      In support of the conclusion that "there is a strong inference that all

20  individual Defendants responsible for these specific material misstatements acted

21  with scienter," Plaintiff cross-references paragraphs 260-303.  *See, e.g.,* SAC ¶¶

22  334, 344, 360.  These are the same paragraphs Plaintiff cross-references as

23  support for the allegation that "all individual Defendants" acted with scienter in

24  making the allegedly material misstatements regarding Fremont's underwriting

25  practices.

26      Lead Plaintiff alleges that, taken together, the allegations regarding the

27  contents of the FDIC Cease-and-Desist Order, the statements by Confidential

28  Witness 34 and other confidential witnesses, and the general knowledge imputed

to the individual Defendants by virtue of their management roles with the company (*e.g.*, problems of the rising number of delinquencies, forced loan repurchases, repricings, and non-accrual loans ) "collectively demonstrate a strong inference that each of these individual Defendants had actual knowledge that the statements made by them were false and misleading when made, or acted with deliberate reckless disregard for the truth or falsity of those statements. SAC ¶¶ 260, 264-65. As discussed above, the cross-referenced paragraphs do not contain *factual* allegations sufficient to support Plaintiff's conclusion that any one or more of the individual Defendants "*deliberately ignored* . . . clear impairment indicators . . . , causing Fremont's reported financial statements to be materially overstated throughout the Class period." SAC ¶ 199 (emphasis added). Rather, they summarize and distill, *inter alia*, the allegations addressed – and found wanting – above.

In the same vein, Plaintiff alleges that the individual Defendants "by their own *public statements* during the Class Period, were admittedly aware of the poor performance of their 'primary line of business' subprime loans and thus were aware of the rising levels of delinquencies, forced loan repurchases, repricings, and Non-Accrual of Loans." However, the Court notes that this allegation does little, if anything, to lend support to Plaintiff's conclusion that other of Defendants' public statements were made with an intent to mislead. SAC ¶ 264. The public disclosure of the company's problems and its efforts to address those problems (no matter how inadequate the efforts ultimately proved to be) weighs against a conclusion that, taken together, the individual Defendants' knowingly or recklessly made misleading public statements.

Moreover, as Defendants point out and Plaintiff fails to adequately dispute, as alleged, Plaintiff's theory regarding scienter is undercut by the fact that Fremont's financial condition was deteriorating throughout the class period (October 27, 2005 and March 2, 2007). *See, e.g,* SAC ¶ 212 (describing how

1    Fremont's loan repurchases "dramatically increased" throughout 2006).  In light

2    of this reality, the theory that the individual Defendants sought to personally profit

3    from a fraudulent scheme by misleading investors is largely, if not wholly,

4    inconsistent with a continued intentional or reckless pursuit of a course that would

5    inevitably result in the demise of the company.  *Compare,* SAC ¶ 264 (alleging

6    that Defendants deliberately originated loans that were "destined to perform

7    poorly"); *with* SAC ¶ 298 (alleging that Defendants "had powerful financial

8    incentives to inflate Fremont's pretax earnings by aggressively increasing

9    subprime loan volume and improperly accounting for Residual Interests and

10   Repurchase Reserves, in order to achieve multi-million dollar cash and stock

11   bonuses in the near and long term."); *see, e.g, Fadem v. Ford Motor Co.*, 352

12   F.Supp.2d 501, 525 (S.D.N.Y. 2005) (concluding that the plaintiffs' scienter

13   theory "defie[d] economic reason" where it was "patently unreasonable to suggest

14   that [defendants] thought they would enhance their bonuses" by perpetrating a

15   fraud when they knew or should have known it was a "recipe for economic

16   disaster, which in fact came to pass, and [wa]s inconsistent with hopes for or

17   expectations of increased bonuses").  Similarly, the fact that only *one* of the

18   Defendants, McIntyre, is alleged to have engaged in insider trading in order to

19   benefit from the fraud they allegedly were perpetrating undercuts the allegations

20   of scienter as to the other individual Defendants, and Plaintiff fails to reconcile the

21   fact that McIntyre's stock in the company *lost* over $100 million in value during

22   the class period, *see* Defs' Mot. at 48 (citing Ex. 16 to Motion), with the theory

23   that the $9.6 million McIntyre earned on his sales of shares in August 2006 is

24   indicative of his "motive" to perpetrate the alleged fraud for his personal gain.

25   *See In re Hansen Natural Corp. Secs. Litig.,* 527 F.Supp.2d 1142, 1160 (C.D.Cal.

26   2007) (explaining that "insider stock sales are not inherently suspicious" that

27   "inference of scienter is defeated when an insider sells only a portion of his stock

28   holdings and ends up reaping the same large losses as did Plaintiff when the stock

1   price dropped" (internal citations, quotations, and alterations omitted).

2          For all the reasons discussed above, separately or taken together, *see South*

3   *Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels

4   us to consider the totality of circumstances, rather than to develop separately rules

5   of thumb for each type of scienter allegation."), Plaintiff's allegations are not

6   sufficient to show that the individual Defendants had the acted with the requisite

7   scienter when making the challenged statements about GAAP compliance in

8   various SEC filings during the Class Period.

9   **D.  Claim 20(a) Claim**

10         Because the factual allegations in the SAC are not sufficient to articulate

11  Section 10-b and Rule 10b-5 claims against Defendants, it follows that the Motion

12  to Dismiss is also granted as to Plaintiff's Section 20(a) claims.

13                            **V.  CONCLUSION**

14         Therefore, Defendants' Motion to Dismiss the Second Amended

15  Consolidated Class Action Securities Complaint (docket no. 110) is GRANTED

16  WITHOUT PREJUDICE.  Plaintiff may file an amended complaint within 30

17  days of the date of this Order; however the following statements are so broad or

18  vague as to not be actionable and may not be included in any amended pleading:

19         a.    Defendant Bailey's statements on the October 27, 2005 conference

20               call:  "I think , again, the subprime spectrum, it's a wide spectrum.

21               And we tend to play at the upper end of that spectrum. . . .  And I

22               think that we have a pretty good reputation as a good, sound

23               originator."

24         b.    Statement in 10-Q for the 3Q 2005 and Form 10-Q for 2Q 2006,

25               signed by Defendants Rampino and Lamb, stating that "FIL seeks to

26               mitigate its exposure to credit risk through underwriting standards

27               that strive to ensure appropriate loan to collateral valuations."

28         c.    Statement in Form 10-K for 2005, signed by Defendants McIntyre,

1    Rampino, Bailey and Lamb, also explaining that Fremont "seeks to

2    minimize credit exposure through loan underwriting that is focused

3    upon appropriate loan to collateral valuations and cash flow

4    coverages" and stating that "[t]o mitigate the higher potential for credit

5    losses that accompanies these types of borrowers [sub-prime

6    borrowers], the Company attempts to maintain underwriting standards

7    that require appropriate loan to collateral valuations.  The underwriting

8    guidelines are primarily intended to assess the ability and willingness

9    of the potential borrower to repay the debt and to evaluate the

10    adequacy of the mortgaged property as collateral for the loan."

11    **IT IS SO ORDERED.**

12

13    Dated: September 25, 2009.    _____

14    FLORENCE-MARIE COOPER, JUDGE
      UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26

27

28