1  BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
2  DAVID R. STICKNEY   (Bar No. 188574)
   (davids@blbglaw.com)
3  IAN D. BERG (Bar No. 263586)
   (ianb@blbglaw.com)
4  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
5  Tel:   (858) 793-0070
   Fax:   (858) 793-0323
6          -and-
   SALVATORE J. GRAZIANO
7  (sgraziano@blbglaw.com)
   JOHN RIZIO-HAMILTON
8  (johnr@blbglaw.com)
   KATHERINE M. SINDERSON
9  (Katherine@blbglaw.com)
   1285 Avenue of the Americas
10 New York, NY 10019
   Tel:   (212) 554-1400
11 Fax:   (212) 554-1444

12
   Lead Counsel for Lead Plaintiff
13 New York State Teachers' Retirement System

14
                UNITED STATES DISTRICT COURT
15
                CENTRAL DISTRICT OF CALIFORNIA
16

17 NEW YORK STATE TEACHERS'          Case No. CV 07-5756 JHN (FFMx)
   RETIREMENT SYSTEM,
18 Individually and On Behalf of All    **LEAD PLAINTIFF'S OPPOSITION**
   Others Similarly Situated,           **TO DEFENDANTS' MOTION TO**
19                                       **DISMISS THE THIRD AMENDED**
                                         **CONSOLIDATED CLASS ACTION**
20                Plaintiff,             **SECURITIES COMPLAINT**

21        v.
                                         Date:     February 1, 2010
22                                       Time:     9:30 a.m.
   FREMONT GENERAL                       Place:    Courtroom 1600
23 CORPORATION, et al.,                            Los Angeles – Spring
                                                   Street
24                Defendants.           Judge:    Hon. Jacqueline H. Nguyen

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................... iii-vi

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   STATEMENT OF FACTS ....................................................................... 4

III.  ARGUMENT ........................................................................................ 6

    A.    The Complaint Sets Forth Each Statement
          And  Explains Why It Is False Or
          Misleading When Made .............................................................. 7

          1.    Defendants' Statements Regarding
               Underwriting And Improvements
               Were False When Made ................................................ 7

          2.    Defendants Materially Misstated
               Fremont's Financial Results ....................................... 11

               a.    Fremont's Residual Interests Were
                      Materially Overstated ................................. 12

               b.    Fremont's Repurchase Reserves Were
                      Materially Misstated .................................. 14

          3.    Defendant Bailey Falsely Stated That
               Underwriters Were Not Paid Volume-
               Based Compensation .................................................. 15

    B.    The Complaint Raises A Strong Inference
          Of Scienter Against Each Defendant ............................... 16

          1.    The Serious Problems With
                Fremont's Business ..................................................... 17

          2.    The FDIC Order Is Strong Evidence
                That Statements Of Improved
                Underwriting Were Knowingly False ...................... 20

          3.    Defendants' GAAP Violations And
                Attempts To Obstruct Outside
                Auditors ...................................................................... 21

          4.    Defendants' Required Departures ............................. 22

          5.    Defendants' Motive .................................................... 23

    C.    The Complaint States A Section 20(a) Claim .................... 24

    D.    The Complaint Correctly Repleads
          Dismissed Statements ........................................................ 24

IV.    CONCLUSION................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrego v. Dow Chem. Co.*,
   443 F.3d 676 (9th Cir. 2006) .................................................................25

*In re Adaptive Broadband Sec. Litig.*,
   2002 U.S. Dist. LEXIS 5887 (N.D. Cal. 2002) ...................................23

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ...........................................................................6

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ......................................passim

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) .................................................................11

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364 (C.D. Cal. 2008) ....................................................21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................6

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .................................................3, 17, 20

*Betz v. Trainer Wortham & Co.*,
   519 F.3d 863 (9th Cir. 2008) ...............................................................16

*BE & K Const. Co. v. NLRB*,
   536 U.S. 516 (2002)...............................................................................24

*In re Cadence Design Sys. Sec. Litig.*,
   2009 WL 2950815 (N.D. Cal. 2009) ....................................................22

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................................................22

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005)...............................................10

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...............................................11

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................passim

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .........................................................passim

*Desaigoudar v. Meyercord*,
    223 F.3d 1020 (9th Cir. 2000) ...................................................................7

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. 2009) ........................................................21

*Farrakhan v. Gregoire*,
    2010 U.S. App. LEXIS 141 (9th Cir. 2010) ...........................................25

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ................................................................24

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..........................................................6, 13

*Hall v. The Children's Place Retail Stores*, Inc.,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................22

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................24

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................16

*Howard v. Everex Sys. Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ........................................................16, 20

*McCasland v. FormFactor Inc.*,
    2009 WL 2086168 (N.D. Cal. 2009) ....................................................18

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...................................................................7

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................passim

*No. 84 Empl.-Teamster Joint Counsel Pens. Tr. Fnd. v. Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...............................................20, 23, 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ....................................................................18, 23

*Parrino v. FHP, Inc.*,
   146 F.3d 699 (9th Cir. 1998) ...............................................................................25

*In re RAIT Financial Trust Sec. Litig.*,
   2008 WL 5378164 (E.D. Pa. 2008) ...............................................................9, 22

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .....................................................................................2

*S.E.C. v. Mozilo*,
   2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ...........................................3, 8, 24

*SEC v. Yuen*,
   2006 U.S. Dist. LEXIS 33938 (C.D. Cal. 2006) ...............................................11

*Sechrest v. Ignacio*,
   549 F.3d 789 (9th Cir. 2008) ...............................................................................25

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ....................................................................passim

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................16, 17, 18

*In re Syncor Int'l Corp. Sec. Litig.*,
   327 F. Supp. 2d 1149 (C.D. Cal. 2004) ..............................................................20

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..................................................................7

*Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*,
   633 F. Supp. 2d 763 (D. Ariz. 2009) ..................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007)...........................................................................6, 16, 17, 23

*U.S. v. Reyes*,
   577 F.3d 1069 (9th Cir. 2009) .............................................................................15

*U.S. v. U.S. Smelting Refining & Mining Co.*,
   339 U.S. 186 (1950)..............................................................................................25

*In re Verifone Holdings, Inc., Sec. Litig.*,
  2009 WL 1458211 (N.D. Cal. 2009) ....................................................................23

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*
  2009 WL 3517630 (W.D. Wash. 2009)...........................................................passim

*In re Wells Fargo Sec. Litig.*,
  12 F.3d 922 (9th Cir. 1993) ...........................................................................passim

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ......................................................................12, 23

## S<small>TATUTES</small>, R<small>ULES</small> & R<small>EGULATIONS</small>

15 U.S.C. § 78u-4(b)(1)(B)..........................................................................................7

17 C.F.R. § 210.4-01(a)(1)..........................................................................................11

OPPOSITION TO MOTION TO DISMISS
Case No. CV 07-5756 JHN (FFMx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    PRELIMINARY STATEMENT

This is a securities class action brought by the New York State Teachers' Retirement System, on behalf of purchasers of Fremont General Corporation (with its subsidiary Fremont Investment & Loan ("FIL"), "Fremont" or the "Company") securities between October 27, 2005 and March 2, 2007 (the "Class Period") against former Fremont officers for violations of the Securities Exchange Act of 1934 ("Exchange Act"), §§ 10(b) and 20(a), 15 U.S.C. § 78j(b).[1]

Until February 2007, when the Federal Deposit Insurance Company ("FDIC") ordered Fremont to cease operations in a severe regulatory action, Fremont was one of the nation's largest "subprime" lenders – originating subprime mortgages and then selling them to investment banks.[2]  For subprime lending, careful loan underwriting assumes particular importance precisely because subprime borrowers have higher-risk credit profiles that will not qualify for prime loans.  During the Class Period, Defendants publicly represented that Fremont's underwriting standards assessed the ability and willingness of the borrower to repay the debt.  Defendants further represented that Fremont's underwriters were not awarded volume-based compensation.  Importantly, Defendants each claimed in various settings to have "dramatically" improved underwriting standards by the end of the first quarter of 2006 ("1Q 2006") as part of a "flight to quality."  ¶36.

The truth, however, was that Fremont systematically disregarded its underwriting standards and continued to originate loans to increase volume, without regard to the borrowers' ability to repay.  Fremont also published false financial statements in violation of Generally Accepted Accounting Principles ("GAAP") by overstating Fremont's assets and understating Fremont's liabilities.[3]

---

[1] "Defendants" refers to **Louis J. Rampino** (President and CEO); **Wayne R. Bailey** (Executive V.P. and COO); **Patrick E. Lamb** (Senior V.P., CFO, CAO & Treasurer); **Kyle R. Walker** (President and CEO of FIL); **Ronald J. Nicolas, Jr.** (Executive V.P. and CEO of FIL); and **James A. McIntyre** (Chairman).

[2] ¶29. "¶_" refers to paragraphs of the Third Amended Consolidated Class Action Complaint (the "Complaint").

[3] GAAP are the accounting profession's conventions, rules and procedures necessary to report financial results accurately.  ¶88.

1    In their motion to dismiss, Defendants omit a statement of facts for a

2 transparent reason:  Recounting the well-supported allegations in the Complaint

3 would force them to admit that the Complaint identifies each false and misleading

4 statement, sets forth contemporaneous facts explaining why the statements were

5 false and misleading and cures the deficiencies identified in the Court's September

6 25, 2009 Order (the "Order") dismissing the prior complaint with leave to amend.

7    The Complaint's allegations are not mere fraud by hindsight, as Defendants

8 claim.  Def. Mem. at 9, 14.[4]  Rather, the Complaint alleges contemporaneous facts

9 that show the falsity of Defendants' statements when made.[5]  Indeed, all fraud, by

10 its very nature, is discovered after the fact.  Accordingly, plaintiffs may "rel[y] on

11 post-class period data to confirm what a defendant should have known during the

12 class period." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72, 77 (2d Cir. 2001).

13 Here, Plaintiffs have not only shown that the FDIC, based on its investigation,

14 singled-out Fremont for its "unsafe and unsound" subprime lending practices even

15 after its underwriting standards were purportedly improved (¶¶39-50), and that the

16 Supreme Judicial Court of Massachusetts found that Fremont disregarded basic

17 principles of loan underwriting (¶¶72-79), but also have alleged the consistent

18 accounts of over 40 percipient witnesses to corroborate that Fremont's

19 underwriting was virtually non-existent (¶¶51-57) and that its financial statements

20 violated GAAP (¶¶87-129).  These facts are as compelling, if not stronger, than

21 those in numerous cases upheld by this District and in this Circuit.  *See, e.g., In re*

22 *New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008); *In re Countrywide Fin.*

23 *Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008).

24    Likewise, the Complaint raises a strong inference of each Defendant's

25 scienter.  While Defendants pretend to have been in the dark about Fremont's

---

[4] "Def. Mem." refers to Defendants' Memorandum Of Points And Authorities In
Support of Defendants' Motion To Dismiss The Third Amended Consolidated
Class Action Securities Complaint.

[5] *See*, *e.g.*, *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 925 (9th Cir. 1993) (rejecting
"fraud by hindsight" arguments where omitted facts are identified).

OPPOSITION TO MOTION TO DISMISS
                    Case No. CV 07-5756 JHN (FFMx)

1   lending practices, they were the top officers actually responsible for directing the
2   Company and knew of significant issues affecting its core business.  *See Berson v.*
3   *Applied Signal Tech., Inc.*, 527 F.3d 982, 988-89 (9th Cir. 2008) (it was "'absurd to
4   suggest' that top management was unaware of" problems significantly affecting
5   company's revenue).  Here, the Complaint further alleges that Defendants directly
6   received adverse reports, including those from Fremont's Regulatory Risk
7   Management Group that mirrored the FDIC's eventual findings.   ¶48.   The
8   inference of scienter is further bolstered by the temporal proximity between
9   Defendants' statements and the revelation of the truth, as well as by the departures
10  of Fremont's auditors and Defendants' financial motives and later terminations.

11      Defendants incorrectly contend that the Complaint alleges nothing more than
12  corporate mismanagement.   Def. Mem. at 17-18.   Certainly, Defendants
13  mismanaged Fremont for their own gain.  Order at 13.  But the focus here is on
14  what Defendants **said** and ***omitted to say*** publicly to investors about Fremont's
15  lending practices.  Conduct that constitutes mismanagement will also raise a claim
16  under the federal securities laws when, as here, defendants knowingly or recklessly
17  misrepresented facts.  *See Wells Fargo*, 12 F.3d at 927 (citation omitted).

18      Contrary to Defendants' assertions, the Complaint amply addresses the
19  Court's prior order.  As Lead Plaintiff understands the main concern of Judge
20  Cooper, the previous complaint suffered from inadequate organization and internal
21  cross-references that lacked specificity.  *See* Order at 12-13.  The operative
22  Complaint, however, has been re-organized for greater clarity and alleges
23  additional facts.  Moreover, since the prior order, this District has again sustained
24  claims based on closely similar allegations.  *See S.E.C. v. Mozilo*, 2009 WL
25  3807124, at **10-11 (C.D. Cal. Nov. 3, 2009).   Likewise, the Ninth Circuit
26  recently rejected many of the arguments that Defendants' make here.  *See*
27  *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1183 (9th Cir. 2009)
28  (reversing dismissal based on materiality and scienter).

1

## II. STATEMENT OF FACTS

Fremont operated through its subsidiary, FIL, to originate subprime mortgage loans. ¶1. Unlike traditional mortgage lenders, Fremont immediately sold most of its mortgages in pools of loans, retaining no interest in the loans. ¶30. A portion of Fremont's loans were securitized, with Fremont retaining only the required junior interest in the securitization. *Id*. Because Fremont profited by selling loans, through whole loans sales or securitization, the Company's profitability depended on volume. ¶31. However, the quality of the loans was also important because Fremont provided loan purchasers with representations and warranties regarding its underwriting standards. *Id*. If such warranties were breached, *or* if a borrower defaulted during the early months of the loan ("early payment default" or "EPD"), Fremont was required to repurchase the loan. *Id*.

As Defendants pursued increasing loan volume, Fremont abandoned any meaningful underwriting standards. ¶33. As a direct result, loan delinquencies and forced repurchases increased throughout the Class Period. ¶35. Defendants manipulated two important financial metrics on its public financial statements – residual interests in securitizations and loan repurchase reserves – to conceal the lack of underwriting and the resulting increasing repurchases. ¶87. Nevertheless, Rampino and Lamb repeatedly signed certifications regarding Fremont's financial statements and the adequacy of Fremont's internal controls. *Id.*

For 2Q 2006, Fremont reported disappointing financial results. ¶36. Throughout the remainder of the Class Period, Defendants publicly described purported "modifications" to Fremont's underwriting practices that were "designed to lower early payment defaults" and "improve the overall credit performance of the loans." *Id.* Bailey and Nicolas described the changes to Fremont's subprime origination practices as a "flight to quality." *Id.*

Despite Defendants' assurances of improved underwriting, Fremont continued to originate exceptionally low quality subprime loans. Internal

marketing documents demonstrate that Fremont deliberately and dramatically raised the risk profile of its loans at the same time it lowered underwriting standards. ¶71. Even though the Defendants claimed a "rather dramatic improvement," Fremont's loans immediately *performed much worse* after the underwriting modifications were supposedly implemented and deteriorated too quickly for general market forces to be blamed. ¶37; Appx. B ¶¶17-25.

On August 11, 2006, just prior to the expected date for Fremont to report its financial results for 3Q 2006, Fremont fired its long-time auditor, Ernst & Young LLP ("E&Y"). ¶106. After firing E&Y, Fremont suspiciously reported *zero* impairment on its residual interests for the 3Q 2006 (¶91) and also *reduced* its repurchase reserves by 41%, despite the fact that loan repurchases had more than doubled as a percentage of sales. ¶107. Fremont's next audit firm, Grant Thornton LLP ("Grant Thornton"), later resigned without issuing an audit opinion and reported Fremont to the Securities Exchange Commission ("SEC"). ¶¶108-110.

During the Class Period, the FDIC conducted an on-site investigation of Fremont's lending practices. ¶47. CW 34, a regulatory risk examiner at Fremont, was specifically involved with the FDIC investigation, including providing the FDIC with information throughout its investigation. *Id.* The FDIC concluded that Fremont was, in fact, "operating with inadequate underwriting criteria and excessive risk," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices" throughout the Class Period. ¶42. These findings mirrored the internal reports that Defendants' received from Fremont's Risk Management group during the Class Period. ¶48.

On February 27, 2007, Fremont announced that it would postpone reporting its 4Q 2006 and year-end results. *Id.* As a result, the price of Fremont stock fell 24%. ¶198. Then, on March 2, 2007, the end of the Class Period, Defendants announced that Fremont would enter into the FDIC's Cease & Desist Order and *exit the subprime lending business*. ¶199. Fremont also clarified that its results

1  would be delayed due to impairment on residual interests and increased repurchase
2  reserves. *Id.* In response, Fremont's stock fell an additional 32%. ¶200.

3    In the aftermath, each Defendant was terminated or forced to resign, and an
4  entirely new board of directors was appointed. ¶¶208-209, 213-215, 217. On
5  February 28, 2008, Fremont announced that a third auditor was unable to complete
6  a year-end 2007 audit and that Fremont might need to record even more asset
7  write-downs and reserves. ¶216. On June 18, 2008, Fremont filed for bankruptcy.
8  ¶218. While Defendants profited during the Class Period as a result of lucrative
9  bonus payments and insider trades, investors suffered substantial losses.

10 III.   ARGUMENT

11    A motion to dismiss under Rule 12(b)(6) should be denied if the complaint
12 "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that
13 is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), *quoting*
14 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This is not a "probability
15 requirement . . . it simply calls for enough fact to raise a reasonable expectation
16 that discovery will reveal evidence of" a claim to relief. *Twombly*, 550 U.S. at
17 556. In deciding a motion to dismiss, the Court must "accept all factual allegations
18 in the complaint as true" and in the light most favorable to plaintiff.[6] As explained
19 by the Ninth Circuit, "a district court ruling on a motion to dismiss is not sitting as
20 a trier of fact … so long as the plaintiff alleges facts to support a theory that is not
21 facially implausible, the court's skepticism is best reserved for later stages of the
22 proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In*
23 *re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

24    To state a claim under Section 10(b) of the Exchange Act, and Rule 10b-5,
25 investors must allege "(1) a material misrepresentation or omission of fact, (2)
26 scienter, (3) a connection with the purchase or sale of security, (4) transaction and

27
28

---

[6] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007); Further, it is well-established that no inferences may be drawn "in favor of defendants from judicially noticed facts." *In re Wash Mut., Inc. Sec., Deriv. & ERISA Litig.* ("*WaMu*"), 2009 WL 3517630, at *2 (W.D. Wash. Oct. 27, 2009).

OPPOSITION TO MOTION TO DISMISS
Case No. CV 07-5756 JHN (FFMx)

loss causation, and (5) economic loss." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Defendants contest only "material misstatements" and scienter.

### A. The Complaint Sets Forth Each Statement And Explains Why It Is False Or Misleading When Made

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *see also Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000). The Ninth Circuit "recognize[s] that statements literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Here, the Complaint identifies each of Defendants' misleading statements and omissions, explains why each was false and misleading when made, and details facts supporting each allegation.

### 1. Defendants' Statements Regarding Underwriting And Improvements Were False When Made

The Complaint pleads an extraordinary collection of facts establishing that Defendants' statements about Fremont's underwriting were false when made, including: (i) the findings of the FDIC, after an extensive investigation, that Fremont's underwriting was the exact opposite of Defendants' representations (¶¶39-50); (ii) the first-hand accounts of dozens of former Fremont employees detailing an abandonment of underwriting standards (¶¶51-57); (iii) the conclusions of the Massachusetts Attorney General and Supreme Judicial Court that Fremont "made no effort" to underwrite its loans (¶¶72-79); (iv) internal Fremont documents describing the Company's high-risk mortgage products (¶¶62-71); (v) empirical analysis of poor loan performance (¶¶58-61); and (vi) evidence from Fremont's own business partners (¶¶80-86).[7]

---

[7] Contrary to Defendants' contention (Def. Mem. at 7, n.5), McIntyre signed the false and misleading 2005 Form 10-K. ¶146. Further, as the most senior officers at FIL, Walker and Nicolas issued false statements about Fremont's "improved underwriting" and provided information in Fremont's SEC filings and press releases. ¶¶177-79, 188; *see also In re Take-Two Interactive Sec. Litig.*, 551 F.

1       Indeed, Defendants ignore decisions from this District and Circuit that hold

2  virtually identical statements actionable based on closely similar allegations, even

3  without the findings of a government agency that directly contradict those

4  statements, as the FDIC issued here. *See Mozilo*, 2009 WL 3807124, at **10-11

5  (statement that company "manage[d] credit risk through … underwriting" was

6  false where allegations of abandoned underwriting and resulting poor quality

7  loans); *WaMu*, 2009 WL 3517630, at *8 (statement that company "seeks to

8  mitigate the credit risk in this [subprime] portfolio by ensuring compliance with

9  underwriting standards" was false where company "systematically granted

10  exceptions," as corroborated by CWs and data analysis); *New Century*, 588 F.

11  Supp. 2d at 1225 (statements about "improved underwriting controls" false where

12  CWs described "riskier loan origination practices," as corroborated by data

13  analysis); *Countrywide*, 588 F. Supp. 2d at 1153 ("references to 'underwriting

14  standards'" that "assess collateral adequacy" false where CWs described

15  widespread exceptions to underwriting standards, falsified borrower incomes, and

16  marketing of high-risk loans); *Atlas v. Accredited Home Lenders Holding Co.*, 556

17  F. Supp. 2d 1142, 1149-50, 1154 (S.D. Cal. 2008) (statements regarding

18  underwriting were false because company deviated from standards).[8]

19       In response to these compelling facts and legal authorities, Defendants claim

20  that their statements were not false because the Complaint does not allege

21  "objective" underwriting standards that they should have followed. Def. Mem. at

22  10. In truth, however, the Complaint pleads the subprime lending standards that

23  the FDIC specifically communicated to Fremont (¶¶39, 74-76, 223, 259), and

24  which the FDIC itself determined that Fremont abrogated. ¶199. Based on these

25  same facts, the Massachusetts Supreme Judicial Court rejected a virtually identical

26

27  Supp. 2d 247, 268 (S.D.N.Y. 2008) (subsidiary may be liable for parent's
misstatement when information within subsidiary's control) (collecting cases).

28  [8] Contrary to Defendants' argument (*see* Def. Mem. at 11, n.7), the companies in
these cases did not "hide" their subprime exposure, but rather misrepresented their
subprime underwriting practices in the same way as Fremont.

argument, holding that the FDIC's findings established that Fremont "clearly" violated "established subprime lending standards" that require that borrowers have the ability to repay their loans "as structured" rather than presuming they could refinance their mortgages.  ¶74.

Defendants contend that statements concerning seeking "to mitigate … credit risk through underwriting standards" are not actionable because there is no way to determine "whether executives were *trying*" to do so.  Def. Mem. at 10-11. Courts, however, repeatedly hold that such statements are misleading and actionable under these circumstances.  *See WaMu*, 2009 WL 3517630, at *8; *In re RAIT Financial Trust Sec. Litig*., 2008 WL 5378164, at *5 n.12, *6 (E.D. Pa. Dec. 22, 2008).   Moreover, as the Complaint alleges – and as the Massachusetts Supreme Judicial Court determined – Fremont "*made no effort*" to mitigate the risk of default and abrogated underwriting standards to increase loan volume.

Beginning in 2Q 2006, Defendants each repeatedly reassured investors that Fremont had "dealt with this problem" of declining credit quality by "tightening" its underwriting, ceasing "aggressive underwriting," and creating a "flight to quality."  ¶¶164, 176, 179, 181, 188.  These statements were false.  According to the FDIC (¶¶47-49), the reports of numerous former Fremont employees (¶¶51-57) and analysis of Fremont's loan performance data (¶¶58-61), Fremont's underwriting was virtually non-existent.  Courts in this Circuit routinely hold that similar allegations plead the falsity of Defendants' statements.  *See, e.g., WaMu*, 2009 WL 3517630, at **8, 17 (statements of "improve[d]" loan performance and "tighten[ed] [] underwriting guidelines" were false where underwriting guidelines continued to be "disregarded"); *New Century*, 588 F. Supp. 2d at 1215, 1225-26 (statements underwriting was "improved," and "'better' than in the past" credit quality were materially false where complaint "recites data and confidential witness statements" showing "rising rates of delinquent [] loans … and lenient loan origination standards").   Notably, both *WaMu* and *New Century* were sustained

OPPOSITION TO MOTION TO DISMISS
Case No. CV 07-5756 JHN (FFMx)

1    after leave to amend.   Moreover, these authorities make clear that Defendants'
2    statements were not immaterial puffery, as Defendants claim.[9]

3        Ignoring their own admissions and the analysis of the Federal Reserve
4    Chairman and other experts (¶¶139, 226), Defendants contend that no connection
5    exists between underwriting and loan performance.   Def. Mem. at 7-8.
6    Defendants, however, previously admitted that Fremont's loan performance was
7    the direct result of underwriting.   *See* ¶188 (Fremont "can control" EPDs through
8    proper underwriting).   Indeed, this Court and others in this Circuit hold that
9    performance data establishes the falsity of underwriting-related statements.   *See*
10   *New Century*, 588 F. Supp. 2d at 1215, 1225; *WaMu*, 2009 WL 3517630, at *8.

11       Defendants next concede (as they must) that Fremont's underwriting
12   continued to be "loose" after 2Q 2006, but assert that this does not necessarily
13   mean that Fremont's underwriting was not "improved."   Def. Mem. at 7-8, 11.
14   Defendants, however, did not merely claim to have made discrete, incremental
15   underwriting improvements, as they now contend.   Rather, Defendants falsely
16   claimed to have "dealt with" Fremont's declining credit quality by creating a
17   "dramatic," wholesale "flight to quality."   These broad reassurances were
18   indisputably misleading given the FDIC's findings just three months later.
19   Moreover, contrary to Defendants' assertions that the Complaint supposedly
20   "acknowledges" that they improved underwriting and loan performance after 2Q
21   2006, the opposite is true: the Complaint provides detailed allegations that
22   Fremont's underwriting did not improve (¶¶37, 199; Appx. A ¶¶9-10, 17, 20, 31-
23   35, 42, 53, 58), and its loans performed even worse after the supposed "flight to
24   quality."   ¶61; Appx. B ¶¶17-25.

25   [9] *See Countrywide*, 588 F. Supp. 2d at 1144.  *In re CornerStone Propane Partners,*
     *L.P. Sec. Litig.*, 355 F. Supp. 2d 1069  (N.D. Cal. 2005), is distinguishable. Def.
26   Mem. at 9 n.6,  In *CornerStone* the court held that the CEO's statements were "a
     parade of rosy adjectives-unmoored to any objective measures - combined with
27   general reiterations of the pursuit of Cornerstone's growth strategy."  355 F. Supp.
     2d at 1087. In contrast, Defendants knew or recklessly disregarded that their
28   statements regarding Fremont's underwriting could not be relied upon.  *See id.*
     (puffery rule has "outer boundary" the speaker is aware of undisclosed facts
     tending seriously to undermine the statement's accuracy).

Last, Defendants spin the facts to contend that the Complaint alleges only that they "fail[ed] to predict the future." Def. Mem. at 9. Yet, the Complaint alleges specifically that Defendants' statements were false **when made** because Fremont **had not** really addressed its problems. Moreover, Defendants knew the consequences of their actions. Prior to the Class Period, the FDIC warned Defendants that substandard underwriting would jeopardize the Company's viability and lead to severe FDIC enforcement action.[10] Based on these warnings, the Massachusetts Supreme Judicial Court expressly rejected Defendants' same argument, holding that Fremont "cannot now claim that it was taken by surprise by the effects of an economic decline…." Appx. C ¶17. Indeed, the Ninth Circuit and this Court have rejected Defendants' "fraud by hindsight" argument in this context. *See, e.g., Wells Fargo,* 12 F.3d at 926; *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1065 (C.D. Cal. 2008) (rejecting argument that defendants were "simply unable to shield themselves as effectively as they anticipated" because complaint alleged "widespread violations of underwriting standards").[11]

2.    Defendants Materially Misstated
Fremont's Financial Results

Financial statements that are not "prepared in accordance with GAAP [are] presumptively misleading or inaccurate." *SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938, at *116 (C.D. Cal. Mar. 16, 2006) (citing SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1)); *see also Daou*, 411 F.3d at 1018-19 (reversing dismissal where the district court found accounting subjective). Here, the Complaint details the GAAP violations, which masked Fremont's unsafe lending practices.[12]

---

[10] ¶¶39, 74-76, 223, 259. Thus, "clairvoyance" is not required. Def. Mem. at 9.

[11] Contrary to Defendants' contention (*see* Def. Mem. at 9, n.6), all Defendants are liable for false oral statements made in their presence concerning this supposed "flight to quality." *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005) (officer cannot "sit quietly" knowing that another is making a false statement or omission, and would be liable for failing to correct the statement).

[12] Defendants again ignore the Complaint's allegations of Fremont's admittedly flawed internal controls. ¶¶114-129. Several recent subprime decisions confirm that Defendants' misrepresentations regarding internal controls, **including internal**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.    Fremont's Residual Interests
Were Materially Overstated

Residual interests are "junior" interests in securitized loans that Fremont was required to hold and value on its balance sheet. ¶93. To report its residual interests under GAAP, Fremont was supposed to properly value the underlying loans in the securitized loan pools. Fremont's residual interests were materially overstated throughout the Class Period because Defendants used "traditional" mortgages assumptions to value the loans and failed to account for its "unsafe and unsound" lending practices and increased defaults and delinquencies. ¶¶90-91.

According to CW 43, Nicolas and Walker continually evaluated Fremont's residual interests, and the Company continued to rely on traditional loan assumptions, rather than historical subprime data, causing Fremont's auditors to be "uncomfortable."[13]    Indeed, CW 43 explained that there were ***"ongoing" discussions about residual interest valuations with Fremont's auditors and regulators from late 2006 through early 2007*** – which coincided with the firing of Fremont's first auditor, E&Y, the resignation of Fremont's second auditor, Grant Thornton, and the FDIC Cease & Desist Order. The timing of these discussions and events is squarely probative. *Contra* Def. Mem. at 13 (CW 43's statements are "ambiguous as to timing" and "not probative of anything"); *see also Daou*, 411 F.3d at 1015 (falsity and scienter often inferred from same set of facts).

CW 42, a former regional vice president, affirms that Fremont dismissed E&Y over a dispute concerning residual interests valuation. ¶95. CW 34

---

***control certifications***, are material. *See New Century*, 588 F. Supp. 2d at 1229-30, *Countrywide*, 588 F. Supp. 2d at 1178, *WaMu*, 2009 WL 3517630, at *10.

[13] ¶94. CW 43 is described with sufficient particularity to support the probability that a person in CW 43's position – ***an FIL board member*** – would possess the information alleged. *Id., see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (in the absence of additional factual evidence, plaintiff must show a person in the position occupied would possess the information alleged). Furthermore, the Complaint states that CW 43 reported directly to Walker and regularly reported and answered to Rampino and Bailey. ¶94; *see also Daou*, 411 F.3d at 1016 (finding exact title of witness and naming to which executive the witness reported sufficient to meet PSLRA's requirements).

OPPOSITION TO MOTION TO DISMISS
Case No. CV 07-5756 JHN (FFMx)

explained that **prior** to the FDIC's Cease & Desist Order, Fremont's Regulatory Risk Management group submitted adverse reports regarding the Company's residual interests to Fremont executives, including Walker, Nicolas and Bailey. ¶96. Furthermore, Defendants were aware that Fremont's loan repurchases and repricings were increasing as early as 1Q 2006 (¶¶97, 104), as were the number of loans over 90 days delinquent or where collectability was doubtful. ¶98. To avoid write-downs, Defendants ignored these clear impairment indicators. ¶99.

For each quarter from 2Q 2005 through 1Q 2006, Fremont reported zero or near-zero impairment of its residual interests. Then, for 2Q 2006, Fremont recorded impairment of $5.7 million, which was ten times more than the highest quarter in the previous year. ¶91. After that, Fremont terminated E&Y and again reported zero impairment for 3Q 2006. *Id.* When Fremont finally reported its 4Q 2006 results – which occurred only after Grant Thornton resigned over an obstructed audit (¶¶108-111) and the FDIC **"ordered them out of business"** (¶40) – it reported impairment of $161 million, an amount equal to nearly all, or 95.72%, of the residual interests value recorded during the entire Class Period.[14]

Based on virtually identical allegations, in *New Century*, this District concluded that such claims were actionable: "The Complaint details declining loan performance, an increase in defaults, and a concomitant rise in repurchase claims, which were baldly disregarded in setting the reserve and valuing residual interests." 588 F. Supp. 2d at 1226-27. This reasoning is particularly apt here.[15]

---

[14] Defendants do not dispute that the misstatement of residual interests was material. *See Daou*, 411 F.3d at 1018 (finding "some" specific allegations of how accounting adjustments affected the company's financial statements sufficient to show they were material in light of company's overall financial position).

[15] Defendants inappropriately request the Court consider Fremont's "estimate for net credit losses" and determine that its residual interest valuations were made in good faith. Def. Mem. at 14 (requesting judicial notice). This inherently factual contention should not be considered. *See Gilead*, 536 F.3d at 1057 (district court not trier of fact on motion to dismiss); *WaMu*, 2009 WL 3517630, at *2 (no inference may be drawn in favor of defendants from judicially-noticed facts).

1

2

### b. Fremont's Repurchase Reserves Were Materially Misstated

3
4
5
6
7
8
9
10
11
12
13

Fremont's repurchase reserves were materially misstated during the Class Period because Defendants did not correctly account for the Company's growing obligations to repurchase loans when the borrower failed to pay in the early stages of repayment (early payment default) or violated Fremont's underwriting standards.  ¶100.  Defendants caused Fremont to materially understate its repurchase reserves, thereby avoiding a charge to the Company's income. *Id.* Indeed, an increase in reserves would have decreased income in a corresponding amount.  ¶103; *see also Daou,* 411 F.3d at 1019 (finding material misstatement where plaintiff described how improper accounting affected company's bottom financial line); *Accredited*, 556 F. Supp. 2d at 1155 (finding material misstatement where alleged manipulations of reserves caused overstatement of income).

14
15
16
17
18
19
20
21

Under GAAP, Fremont was required to maintain a reserve for repurchases that, at a minimum, kept pace with the Company's already received repurchase requests **and** requests that could be anticipated given Fremont's poor underwriting. ¶100; *New Century*, 588 F. Supp. 2d at 1226-27.  In 2Q 2006, loan repurchases and repricings **doubled** from the previous quarter, and then nearly **doubled again** in 3Q 2006, increasing by over $100 million.  ¶104.  Yet, Fremont's repurchase reserves failed to correlate, as it would if Defendants were taking into account historical subprime loan performance, as GAAP required.  ¶105.

22
23
24
25
26
27

Instead of increasing the Company's reserves to account for rising repurchase obligations, Defendants opportunistically **reduced** Fremont's repurchase reserves **by over 40%** ($23 million) in 3Q 2006 – the quarter immediately following its firing of E&Y, and before any year-end audit.  ¶¶105-07. The very next quarter, after the FDIC's Cease & Desist Order (¶117), Defendants were forced to **increase the reserve by 315%**.  ¶113.

28

In *Wells Fargo,* the Ninth Circuit rejected many of the same arguments

---

OPPOSITION TO MOTION TO DISMISS
                    Case No. CV 07-5756 JHN (FFMx)

Defendants make here, including "fraud by hindsight" (Def. Mem. at 14), explaining, "this is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted" by defendants. *Wells Fargo*, 12 F.3d at 927. As in *Wells Fargo*, the Complaint alleges that Defendants "knew of certain 'contingencies' which rendered its loan reserves 'inadequate,' and failed to disclose this information to purchasers of its stock." *Id.* at 927. Specifically, Defendants failed to disclose that Fremont abandoned its underwriting standards and corresponding repurchase trends, which required it to ***increase, not decrease*** its reserves. ¶¶100, 105. Defendants' "deliberate failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact which cannot be dismissed as a mere matter of internal mismanagement, unsound business practice, or poor accounting judgment." *Wells Fargo*, 12 F.3d at 926.

### 3. Defendant Bailey Falsely Stated That Underwriters Were Not Paid Volume-Based Compensation

During the October 27, 2005, conference call that starts the Class Period, a securities analyst specifically asked Bailey if Fremont's "loan underwriters" were paid volume-based compensation. ¶¶130, 138. Defendants do not dispute that Bailey's response was false, and attempt to argue only that the statement was "immaterial." Def. Mem. at 9-10. Defendants are wrong. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important…." *Matrixx*, 585 F.3d at 1177 (citations omitted); *accord U.S. v. Reyes*, 577 F.3d 1069, 1075 (9th Cir. 2009). Questions of materiality "involve assessments peculiarly within the province of the trier of fact" and should only be resolved "as a matter of law" where the omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Matrixx*, 585 F.3d. at 1178 (quotations omitted).

Bailey's misrepresentations were material. Federal regulators, securities

1    analysts, rating agencies and banking experts were especially concerned about

2    volume-based compensation for underwriters – *as distinguished from sales people*

3    – because underwriters were responsible for assuring adherence to underwriting

4    guidelines.    ¶¶130-134.    Indeed, this District recognizes that volume-based

5    underwriter compensation impacts a company's underwriting practices and

6    financial health, and is thus material.  *See New Century*, 588 F. Supp. 2d at 1229-

7    30 (noting volume-based compensation caused company to abandon underwriting

8    standards); *Countrywide*, 588 F. Supp. 2d at 1148, n.12 (company's "incentive

9    system" encouraged underwriters to "approve as many loans as possible").[16]

10        B.    The Complaint Raises A Strong Inference
              Of Scienter Against Each Defendant

11

12        Allegations of knowledge or deliberate recklessness suffice to plead scienter.

13   *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).   A

14   defendant is deliberately reckless if "he had reasonable grounds to believe material

15   facts existed that were misstated or omitted, but nonetheless failed to obtain and

16   disclose such facts although [he] could have done so without extraordinary effort."

17   *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

18        The appropriate inquiry at this stage of the litigation "is whether *all* of the

19   facts alleged, taken collectively, give rise to a strong inference of scienter, not

20   whether any individual allegation, scrutinized in isolation, meets that standard."

21   *Tellabs*, 127 S. Ct. at 2509.   Circumstantial evidence alone is an appropriate basis

22   for pleading scienter.  *See Betz v. Trainer Wortham & Co.*, 519 F.3d 863, 873 (9th

23   Cir. 2008); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 (1983)

24   ("[P]roof of scienter required in fraud cases is often a matter of inference from

25   circumstantial evidence.").   The inference of scienter "need not be irrefutable, *i.e.*,

26   of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"

27
28   [16] Spinning the facts, Defendants contend that Bailey's "only error []  was in falsely
     describing the extent to which such incentives were being used."  Def. Mem. at 10.
     Such contentions are "better made on the kind of record which a motion for
     summary judgment affords."  *Wells Fargo*, 12 F.3d at 930.

1  *Tellabs,* 127 S. Ct. at 2510 (citation omitted).  Rather, a plaintiff adequately pleads

2  scienter if "a reasonable person would deem the inference of scienter cogent and at

3  least as compelling as any [plausible] opposing inference one could draw from the

4  facts alleged."  *Id.*; *see also Teamsters Local 617 Pension & Funds v. Apollo*

5  *Group, Inc.*, 633 F. Supp. 2d 763, 792 (D. Ariz. 2009) ("tie goes to the Plaintiff").

## 1.    The Serious Problems With Fremont's Business

7          When false statements involve an important aspect of a company's business

8  or conceal a company's deep financial difficulties, courts find a strong inference of

9  scienter as to the company's highest ranking officers.  In *Berson*, the Ninth Circuit

10  held that it was "'absurd to suggest' that top management was unaware" of stop-

11  work orders, a core component of their company's business, even though the

12  plaintiffs "allege[d] [no] particular facts" indicating that the executives "actually

13  knew about" them.[17]  Likewise, this District found it "absurd to suggest" some key

14  insiders lacked knowledge about Countrywide's mortgage-related operations.

15  *Countrywide*, 588 F. Supp. 2d at 1189.  Here, subprime lending produced over

16  80% of the Company's revenue (¶244), and Defendants were directly responsible

17  for running the business and spoke publicly about it.

18          Throughout 2005 and 2006, Walker, Nicolas, and Bailey received written

19  reports from Fremont's Regulatory Risk Management group, which "mirrored" the

20  FDIC's eventual findings in March 2007 that Fremont's underwriting was virtually

21  non-existent.[18]  Moreover, Defendants had access to regular and extensive reports

22

23  [17] *Berson*, 527 F.3d at 987-89 (allegation that two contracts made up 80% of
company's revenue justified application of core operations inference to statements
24  related to revenue); *see also South Ferry*, 542 F.3d at 785 ("Allegations regarding
management's role in a corporate structure and the importance of the corporate
25  information about which management made false or misleading statements may
also create a strong inference of scienter when made in conjunction with detailed
26  and specific allegations about management's exposure to factual information
within the company.").
27  [18] ¶248.  Defendants contend that the Complaint does not "specifically" allege that
McIntyre, Lamb, and Rampino received these reports.  Def. Mem. at 15 n.10.
28  There is no such requirement.  Such reports contribute to an inference of scienter
where the complaint "suggest[s] that defendants had actual ***access*** to the disputed
information."  *South Ferry*, 542 F.3d at 786; *see also WaMu*, 2009 WL 3517630, at

OPPOSITION TO MOTION TO DISMISS
                                                     Case No. CV 07-5756 JHN (FFMx)

detailing (i) exceptions to Fremont's underwriting guidelines (¶¶250, 252-253); (ii) broker and borrower fraud, which Defendants deliberately ignored in furtherance of Fremont's profit goals (¶252); and (iii) early payment defaults, demonstrating the effects of these practices on the quality of Fremont's loans (¶251).[19]

Such allegations have proven more than sufficient to "bridge the gap between the existence of…reports and actual knowledge on the part of the defendants." *South Ferry*, 542 F.3d at 783.  In *WaMu*, the court held that facts demonstrating that senior officers "reviewed reports tracking exceptions to the underwriting guidelines" strongly supported an inference of scienter. 2009 WL 3517630, at *9.  Similarly, in *Countrywide*, 588 F. Supp. 2d at 1148, 1190, 1194, the court held that plaintiffs adequately alleged scienter where CWs accounted that defendants received reports on underwriting exceptions.[20]

In response, Defendants argue that even if Defendants reviewed all of these reports, the Complaint does not sufficiently allege that these reports actually portrayed the widespread failures in Fremont's underwriting policies and practices. However, the strong inference – indeed the ***only*** inference that can be drawn from the FDIC Order and the accounts of CW34 and others – is that the reports notified Defendants of Fremont's abandonment of underwriting standards.[21]

Moreover, the Complaint alleges that the abandonment of underwriting

---

[*13] (strong inference of scienter against CFO because underwriting critically important to financial health); *Countrywide*, 588 F. Supp. 2d at 1196 (same).

[19] Several CWs report that Walker repeatedly discussed early payment defaults at internal monthly "roar-call" meetings, further corroborating that he received these reports. ¶251; *see also WaMu*, 2009 WL 3517630, at *9 (terming "substantial" allegation that CEO issued internal emails and statements regarding underwriting guidelines, especially "in light of CW statements that WaMu senior management . . . reviewed reports tracking exceptions to the underwriting guidelines").

[20] *See also New Century*, 588 F. Supp. 2d at 1229 (same); *Accredited*, 556 F. Supp. 2d at 1150, 1156 (same); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (CW accounts combined with defendants' admission that they maintained and monitored a database helped give rise to a strong inference of scienter).

[21] Def. Mem. at 17-18 (conceding that Defendants closely monitored Fremont's underwriting and loan performance as "expected" of officers in Defendants' positions). By contrast, in *McCasland v. FormFactor Inc.*, 2009 WL 2086168 (N.D. Cal. July 14, 2009), cited by Defendants, the CWs failed to establish that reports were adverse to defendants' public statements.

OPPOSITION TO MOTION TO DISMISS
Case No. CV 07-5756 JHN (FFMx)

standards was not an accident, but was done at Defendants' direction.[22]  CW 34 accounts that McIntyre, Rampino, Bailey and other senior executives "dictated policy and procedures" at Fremont, and consciously decided to produce a high volume of loans with "no restraints."[23]  Similarly, Fremont itself admitted in a bankruptcy court filing that McIntyre's removal was sought by "banking regulators after presiding over crippling losses at [Fremont]," and that Fremont "continues to suffer the effects of McIntyre's prior reign over the [Company]'s affairs."  ¶275; *see also* ¶252 (Walker and Nicolas personally determined whether Fremont would buy loans from brokers who had been cited for fraud); ¶57 (Defendants decided to pay Fremont's underwriters and other employees based on volume, thus incenting them to abrogate underwriting standards); ¶¶53-56 (Fremont employees from across the country reported that managers overrode decisions to reject high-risk loans in order to increase loan volume).

Again, *WaMu* is instructive. There, the court found that the plaintiffs raised a strong inference of the President's scienter by alleging that he had "spearheaded the restructuring of credit risk reporting," and received weekly reports that "quantified the ways in which [WaMu] was exceeding risk parameters."[24]

Walker, Bailey, and Nicolas also have ***admitted*** Defendants' actual knowledge of Fremont's underwriting standards.  ¶164 (Bailey: "[w]e have really

---

[22] Defendants also claim that Walker's and Nicolas' deliberate dismissal of broker fraud reports is irrelevant because Defendants purportedly never suggested that its loans would be free of broker fraud.  Def. Mem. at 17.  Defendants contradict themselves in the same sentence by observing that they "specifically told investors that measures were being implemented to combat fraud."  *Id.*  CW reports demonstrate that, in fact, Defendants were deliberately ***ignoring*** loan fraud.  ¶55.

[23] ¶248.  Defendants claim that CW 34 was not in a position to know that Walker refused to terminate brokers.  Def. Mem. at 17.  However, as an Assistant Vice President and Regulatory Risk examiner, CW 34 was well-positioned to observe Walker's reaction to reports of fraud.

[24] *WaMu*, 2009 WL 3517630, at *14; *see also New Century*, 588 F. Supp. 2d at 1229 (strong inference of scienter where CWs reported that the "goal was to 'push more loans through'"); *Countrywide*, 588 F. Supp. 2d at 1190 (strong inference of scienter where underwriting policy "came from the top down and pervaded virtually every office"); *Accredited*, 556 F. Supp. 2d at 1156 (strong inference of scienter where CWs "assert that their managers pressured them to approve loans that did not comply with the company's own policies" to increase loan volume).

looked through this book of business" and "[w]e have really gone through to identify where these loan repricing[s] and repurchases are coming from"); ¶178 (Walker: "key senior managers" gathered at corporate headquarters to impose "higher underwriting scrutiny," and had "done a tremendous amount of analytics" to "monitor[] review of broker performance"); ¶188 (Nicolas: Defendants had done "quite a bit of analysis," "taken some pretty significant actions," "dealt with this problem"). In *WaMu*, the court found that a CFO's statements that the company was "taking steps now to reduce potential future exposure" indicated actual knowledge of the company's risk management. 2009 WL 3517630, at *11; *see also Countrywide*, 588 F. Supp. 2d at 1190 (finding scienter as to officers who "publicly professed" knowledge of underwriting practices at relevant time).[25]

### 2.    The FDIC Order Is Strong Evidence That Statements Of Improved Underwriting Were Knowingly False

The temporal proximity between Defendants' false statements and the disclosure of different facts "bolster[s]" an inference of scienter. *Berson*, 527 F.3d at 988 n.5. Defendants assured investors that Fremont had "dealt with its problem" underwriting (¶188) and created a "rather dramatic improvement" (¶177) and "a flight to quality" in Fremont's underwriting. ¶181. Similarly, Bailey denied that Fremont would use "aggressive underwriting" in pursuit of "volume." ¶181. But the FDIC's severe findings just three months later support the strong inference that Defendants' assurances were knowingly false when made. *No. 84 Empl.-Teamster Joint Counsel Pens. Tr. Fnd. v. Am. West Holding Corp.*, 320 F.3d 920, 942 (9th Cir. 2003) (FAA investigation and settlement supportive of allegations that senior officials knew of aircraft maintenance problems); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004) ("The Ninth Circuit has considered administrative investigations and settlements in evaluating scienter"),

---

[25] Contrary to Defendants' attempt to cast these admissions as exculpatory (Def. Mem. at 18-19), these admissions directly reveal Defendants' knowledge or recklessness in not knowing of Fremont's ongoing lack of underwriting. *Howard*, 228 F.3d at 1064; *Matrixx*, 585 F.3d at 1181-82 (finding recklessness where defendants did not know if drug had adverse affect after vouching for its safety).

1   *aff'd in part, rev'd in part on other grounds*, 239 Fed. Appx. 318 (9th Cir. 2007).

2       In response, Defendants claim that the fact that Fremont was a highly-

3   regulated entity without public adverse actions from the FDIC for some time

4   actually weighs against an inference of scienter.  Defendants ignore the numerous

5   sustained cases of similar highly-regulated banks without any public adverse

6   actions taken at all, much less a severe Cease & Desist order.  Defendants also

7   ignore that the FDIC was on-site investigating continuously for more than a year

8   before Defendants submitted to the Cease & Desist Order.[26]  Moreover, the fact

9   that the FDIC Cease & Desist Order did not accuse Fremont of securities fraud is

10  not surprising.  Def. Mem. at 20-21.  The FDIC's jurisdiction is to protect deposits,

11  not to enforce the federal securities laws.  *C.f., New Century*, 588 F. Supp. 2d at

12  1234 (bankruptcy examiner's failure to find securities fraud not dispositive).  Even

13  inaction by the SEC is not grounds for dismissal.[27]   The FDIC enforced its

14  mandate in the most severe and drastic way available to it: by effectively shutting

15  down Fremont. Defendants' proposed non-fraudulent inference, that Defendants

16  submitted to the FDIC Cease & Desist Order as a result of practices that only

17  began in the weeks between Defendants' statements and the issuance of the order

18  (Def. Mem. at 20), is both far-fetched and implausible.

19              3.      Defendants' GAAP Violations And
                        Attempts To Obstruct Outside Auditors
20

21      Defendants' firing of E&Y, the immediate changes in Fremont's accounting

22  thereafter, Grant Thornton's resignation, and Fremont's dramatic post-Class Period

23  impairment of residual interests and increases of repurchase reserves further

24  support a strong inference of scienter.  In *Accredited*, a strong inference of scienter

25  ─────────────
    [26] ¶197.  Defendants' reliance on *In re Downey Sec. Litig.*, 2009 WL 2767670, at
26  *6 n.5 (C.D. Cal. Aug. 21, 2009) is misplaced.  Def. Mem. at 21.  There, the
    regulatory order was issued months after the class period, with two full
27  examinations completed without incident during the class period.  *Id.*    Here,
    Defendants agreed to the Cease & Desist Order at the conclusion of the Class
28  Period, after a full year of on-site inspection.
    [27]*Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13, n.7 (C.D. Cal. Jul. 1
    2008) (rejecting that inaction by SEC was exculpatory and upholding claims).

existed where (1) defendants "permitted large decreases" in reserves, even as the company "had begun to deviate from its own underwriting policies;" and (2) Grant Thornton, the company's auditor, "refused to approve the company's 2006 financial statements," and then its replacement auditor required reserves to be increased.[28]  Moreover, CW 43, an FIL board member who reported directly to Walker, reported that due to escalating concerns about residual interests, Walker and Nicolas were "well aware" that Fremont's residual interests were valued based on assumptions regarding traditional, rather than subprime mortgages.[29]

Defendants contend that the unqualified audit opinions issued for Fremont's 2005 and 2006 financials indicated that they "corrected any material problems" flagged by the reports provided to Defendants and discussed amongst the senior executives.  Def. Mem. at 22.  Similarly, Defendants rely on E&Y's assertion that it had no "disagreement" regarding its prior audit work in an attempt to refute an inference of scienter.  Def. Mem. at 22.  These fact-intensive contentions are inappropriate at the pleading stage and also ignore Defendants' actual knowledge of the internal workings of Fremont's accounting and Fremont's suddenly-favorable accounting after dismissing E&Y, Grant Thornton's refusal to certify Fremont's 2006 financial statements because Fremont obstructed its audit, and the massive impairments suddenly taken before the final 2006 audit.[30]

### 4.    Defendants' Required Departures

The required departures of ***each and every Defendant*** (¶¶270-75) – many of whom were terminated at the FDIC's order – further support a strong inference of

---

[28] 556 F. Supp. 2d at 1156; *see also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (auditor's "resignation 'add[s] to the overall pleading of circumstantial evidence of fraud'"); *RAIT*, 2008 WL 5378164, at *13 (holding "sheer size of the impairment . . . adds to the inference that [defendants] must have had some awareness that the problem was brewing.").

[29] ¶94. Defendants' claim that CW 43 lacked "personal knowledge" (Def. Mem. at 22) ignores CW 43's position as an FIL board member.  *In re Cadence Design Sys. Sec. Litig.*, 2009 WL 2950815 (N.D. Cal. Sept. 11, 2009) is not to the contrary. Def. Mem. at 22. There, no witness reported to a defendant or could show that defendants "must have known" about the fraud. *Cadence*, 2009 WL 2950815 at *8.

[30] *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (*cited at* Def. Mem. at 22 n.11), failed to allege additional facts.

OPPOSITION TO MOTION TO DISMISS
Case No. CV 07-5756 JHN (FFMx)

scienter.[31]   Defendants incorrectly claim that the Complaint does not allege a "causal nexus" between these departures and the fraud at Fremont.  Def. Mem. at 23.   To the contrary, Defendants were fired at the behest of the FDIC after presiding over Fremont's catastrophic deterioration in underwriting standards, the subject that lies at the heart of the fraud.  ¶¶270-75.  This is a more than sufficient "causal nexus" to support a strong inference of scienter.  That Defendants were retained for a brief period to wind down Fremont's operations before the Company declared bankruptcy is hardly exculpatory, as Defendants suggest.  Def. Mem. at 23.  Having already been effectively neutralized by the FDIC's Order, there was very little else Defendants could do to further injure depositors.[32]

### 5.    Defendants' Motive

Defendants' personal financial motives further support a strong inference of scienter.  ¶¶276-85.  While not required to state a claim, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 127 S. Ct. at 2511.  In early 2006, Rampino, Bailey, Lamb, Walker and Nicholas received bonuses of ***300%*** of their 2005 salaries, based entirely on the Company's reported pretax earnings.  ¶¶276-82.  Thus, they had powerful motives to inflate the Company's short-term earnings.  *See Am. West*, 320 F.3d at 944.  In addition, McIntyre received proceeds of more than $9.6 million from unusual insider stock sales immediately after Fremont fired E&Y and when the FDIC's undisclosed internal investigation was expected to result in an adverse outcome.[33]  Such motives, while not the exclusive basis for finding scienter, support the inference of scienter.

---

[31] *Zucco*, 552 F.3d at 1002; *see also In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *43 (N.D. Cal. Apr. 2, 2002).

[32] *In re Verifone Holdings, Inc., Sec. Litig.*, 2009 WL 1458211 (N.D. Cal. May 26, 2009), is distinguishable. There, a senior officer was retained four months having already announced his resignation following only a minor restatement. *Id.* at 9.

[33] ¶¶283-85; *see also Am. West*, 320 F.3d at 938 (suspicious timing of insider sales supports strong inference of scienter); *Oracle*, 380 F.3d at 1232 (same). Defendants' contention that McIntyre's retained shares of Fremont suffered a loss is inapposite because there is no evidence that McIntyre incurred an actual loss. Def. Mem. at 24. Rather, Fremont granted those shares (or options) to McIntyre, who paid nothing out of pocket and still received proceeds from the insider sales.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.    The Complaint States A Section 20(a) Claim

Section 20(a) of the Exchange Act requires (1) a primary violation of the federal securities law and (2) that the defendant exercised actual power or control over the primary violator.  *See Am. West,* 320 F.3d at 945.  Here, the Complaint alleges primary violations of Section 10(b), and that each Defendant exercised control over a primary violator.  ¶¶310-17.  Defendants challenge "control" only as to Nicolas and Walker.  The Complaint alleges, however, that as CFO and CEO of FIL, respectively, Nicolas and Walker each exercised control over Fremont due to their senior executive positions and their direct involvement in its day-to-day operations, including its financial reporting.  ¶313.  Nothing more is required at the pleading stage.[34]

### D.    The Complaint Correctly Repleads Dismissed Statements

It is well settled law in the Ninth Circuit that "a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint."  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) (collecting cases).  In *USS-POSCO Indus. v. Contra Costa Bldg. & Const. Trades Council*, the Ninth Circuit clarified that the waiver rule does not extend to complaints that follow summary judgment.  31 F.3d 800, 812 (9th Cir. 1994), *aff'd in part, rev'd in part sub nom. BE & K Const. Co. v. NLRB*, 536 U.S. 516 (2002).

Here, preservation of the right to appeal is important because Lead Plaintiff respectfully submits that Defendants led the Court into error, and the Court's prior decisions appear to be incorrect and inconsistent with the mainstream of decisions from this District, such as *New Century, Countrywide*, and *Mozilo*.  Rather than risk forfeiting the right of appeal, Lead Counsel realleged certain dismissed

---

[34] *See Countrywide*, 588 F. Supp. 2d at 1201 (control "need not be pled with particularity").  In *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007), the court dismissed plaintiff's § 20(a) claim after finding (i) *no* primary violation of the security laws; and (ii) that the complaint failed to allege that defendants "exercised the requisite control for a Section 20(a) claim." *Hansen* did not conclude that subsidiary officers *could not*, as a matter of law, exercise control over a parent, as Defendants imply.  *C.f. Am. West*, 320 F.3d at 945 (whether defendant is a controlling person is an "intensely factual question").

1  statements based on a good faith interpretation of Ninth Circuit law and so

2  indicated in the Complaint.  ¶127, n. 1.  Defendants cite no decision where the

3  Ninth Circuit has faulted counsel for including dismissed claims for purposes of

4  appeal in amended complaints prior to summary judgment.  To the contrary, in

5  *USS-POSCO*, the Ninth Circuit **overturned** the District Court's award of Rule 11

6  sanctions for pleading dismissed claims, finding that "in the absence of authority

7  on point, counsel's decision to err on the side of caution cannot be faulted."  31

8  F.3d at 812.  The lone case cited by Defendants, *Sechrest v. Ignacio,* 549 F.3d 789,

9  804 (9th Cir. 2008), *cert. denied*, 130 S. Ct. 243 (2009), offers a modicum of

10  support that Lead Plaintiff **may** have been able to appeal the dismissed claims if

11  omitted from the Complaint.[35]  Although this supposition is somewhat supported

12  by the Ninth Circuit's decision in *Parrino v. FHP, Inc.*, 146 F.3d 699, 704 (9th Cir.

13  1998), *superseded by statute as stated in Abrego v. Dow Chem. Co.*, 443 F.3d 676

14  (9th Cir. 2006), Lead Counsel's interpretation of the law is justified and the claims

15  are asserted in good faith.  Defendants' request for sanctions should thus be denied.

16  IV.    CONCLUSION

17        For the foregoing reasons, the Court should deny Defendants' Motion to

18  Dismiss the Complaint in its entirety and avoid the outlier result Defendants seek.[36]

19

20  Dated:  January 8, 2010              Respectfully submitted,

21                                       */s/ David R. Stickney*

22                                       DAVID R. STICKNEY

23  [35] *Sechrest* addresses nuanced principles governing procedural default in a writ of
    *habeus corpus* for federal review of constitutional violations during sentencing in a
    state murder trial.    After initially mandating that certain "procedurally barred
24  claims" must be deleted, the Ninth Circuit noted intervening controlling authority
    and thus allowed petitioner to raise the deleted claims on appeal.  *Id.* at 801.
25  [36] Because this action is still *in fieri*, the Court is not bound by Judge Cooper's
26  prior Order.  *See U.S. v. U.S. Smelting Refining & Mining Co.*, 339 U.S. 186, 199
    (1950) (finding right to make a "new record" when case *in fieri* because the "law
27  of the case" doctrine requires a final judgment to sustain the application of the rule,
    and "is only a discretionary rule of practice."); *c.f. Farrakhan v. Gregoire*, 2010
28  U.S. App. LEXIS 141, at *21 (9th Cir. Jan. 5, 2010) (explaining that the "law of
    the case" doctrine states an appellate decision must be followed in subsequent
    proceedings of the same case).

OPPOSITION TO MOTION TO DISMISS
                                          Case No. CV 07-5756 JHN (FFMx)

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

DAVID R. STICKNEY
IAN D. BERG
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
-and-
SALVATORE J. GRAZIANO
JOHN RIZIO-HAMILTON
KATHERINE M. SINDERSON
1285 Avenue of the Americas
New York, NY  10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Lead Counsel for Lead Plaintiff*
*New York State Teachers' Retirement*
*System and the Class*