Jason D. Russell (SBN 169219)
(Jason.Russell@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Tel: (213) 687-5000  Fax: (213) 687-5600

Robert E. Zimet (admitted pro hac vice)
(Robert.Zimet@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Tel: (212) 735-3000  Fax: (212) 735-2000

Attorneys for Defendants
Wayne R. Bailey, Patrick E. Lamb, James A. McIntyre,
Louis J. Rampino and Kyle R. Walker

George B. Piggott (SBN 68227)
A Member of George B. Piggott, a Professional Corp.
(gbpapc@aol.com)
2 Park Plaza, Suite 300
Irvine, California 92614-8513
Tel: (949) 261-0500  Fax: (949) 261-1085

Attorney for Defendant
Ronald J. Nicolas, Jr.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

NEW YORK STATE TEACHERS'
RETIREMENT SYSTEM,
Individually and On Behalf of All
Others Similarly Situated,

                Plaintiff,

      v.

FREMONT GENERAL
CORPORATION, et al.,

                Defendants.

This Document Relates To:
ALL ACTIONS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 07-5756 JHN (FFMx)

**INDIVIDUAL DEFENDANTS'
REPLY MEMORANDUM OF
POINTS AND AUTHORITIES IN
FURTHER SUPPORT OF THEIR
MOTION TO DISMISS THE THIRD
AMENDED CONSOLIDATED
CLASS ACTION SECURITIES
COMPLAINT**

Date:   February 1, 2010
Time:  9:30 a.m.
Judge:  Hon. Jacqueline H. Nguyen

1

# TABLE OF CONTENTS[1]

2

3

I.  PRELIMINARY STATEMENT ........................................................................... 1

4

II. ARGUMENT ...................................................................................................... 5

5

   A. Plaintiff Fails To Allege a Material Misstatement (Opp. 7-16) ...................... 5

6

     1. Alleged Underwriting-Related Misstatements (Opp. 7-11) ...................... 5

7

       (a)  The Preclusive Effect of Judge Cooper's Order ............................. 5

8

       (b)  Statements About Underwriting Practices (Opp. 8-9) .................... 6

9

       (c)  Statements About Underwriting Improvements (Opp. 9-11) .......... 8

10

11

       (d)  Plaintiff's Authorities Are Distinguishable (Opp. 8-11) ................. 9

12

     2. Alleged GAAP-Related Misstatements (Opp. 11-15) .............................. 12

13

       (a)  Residual Interests (Opp. 12-13) ...................................................... 12

14

       (b)  The Q3 2006 Repurchase Reserve (Opp. 14-15) ........................... 13

15

     3. Bailey's Statements About Compensation (Opp. 15-16) ........................ 15

16

17

   B. Plaintiff Fails To Plead a Strong Inference of Scienter (Opp. 16-23) ........... 16

18

     1. Allegations Relating To Underwriting (Opp. 17-20) .............................. 16

19

       (a)  Internal Reports (Opp. 17-18) ........................................................ 16

20

       (b)  Conclusory Assertions of Knowledge By CW's (Opp. 19) ........... 18

21

       (c)  Defendants' So-Called Admissions (Opp. 19-20) .......................... 18

22

23

     2. The FDIC's Cease & Desist Order (Opp. 20-21) ..................................... 20

24

     3. Alleged GAAP Violations (Opp. 12-13, 21-22) ...................................... 21

25

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to

26

them in the Individual Defendants' Memorandum of Points and Authorities in Support of Their Motion to Dismiss the Third Amended Consolidated Class Action

27

Securities Complaint, dated December 14, 2009 ("Motion" or "MTD").  (*See* Dkt. 153.)  Unless otherwise indicated, exhibit references are to the Individual

28

Defendants' Request for Judicial Notice.  (*See* Dkt. 154.)

4.  Executive Departures (Opp. 22-23) ........................................................22

5.  Implausible Allegations of Motive (Opp. 23 & n.33)..............................23

C.  Plaintiff's Section 20(a) Claim Fails as a Matter of Law (Opp. 24)..............24

D.  Dismissal Should Be With Prejudice and Sanctions (Opp. 24-25)...............24

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

Case No. CV 07-5756 JHN (FFMx)

# TABLE OF AUTHORITIES

## CASES

*In re 2007 Novastar Financial, Inc., Securities Litigation*, No. 07-0139-CV,
2008 WL 2354367 (W.D. Mo. June 4, 2008),
*aff'd*, 579 F.3d 878 (8th Cir. 2009)......................................................................7

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) .........................................................................................24

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008).........................................................11, 14

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005)..................................................................................9

*Berson v. Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008)................................................................................16

*In re Countrywide Financial Corp. Derivative Litigation*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)....................................................14, 17, 21

*In re Countrywide Financial Corp. Securities Litigation*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008)...........................................9, 10, 16, 17

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002)................................................................................21

*In re Downey Securities Litigation*, No. CV 08-3261,
2009 WL 736802 (C. D. Cal. Mar. 18, 2009) ............................................*passim*

*In re Downey Securities Litigation*, No. CV 08-3261,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)......................................................21

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008)..................................................................7

*Leslie Salt Co. v. United States*, 55 F.3d 1388 (9th Cir. 1995) ..............................5

*Massachusetts v. Fremont Investment & Loan*, No. 07-4373,
2008 WL 517279 (Mass. Super. Ct. Feb. 26, 2008),
*aff'd*, 897 N.E.2d 548 (Mass. 2008) .................................................................7, 8

*In re Metawave Communications Corp. Securities Litigation*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003).............................................................12

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008).................................................................................2

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008)......................................................*passim*

*NYSTRS v. Fremont General Corp.*, No. 2:07-CV-5756,
  2008 WL 4812021 (C.D. Cal. Oct. 28, 2008) ............................................*passim*

*NYSTRS v. Fremont General Corp.*, No. 2:07-CV-5756,
  2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) .........................................*passim*

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America
  West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) .......................................20

*In re Peerless Systems Corp. Securities Litigation*,
  182 F. Supp. 2d 982 (S.D. Cal. 2002) ...................................................14

*Pegasus Holdings v. Veterinary Centers of America, Inc.*,
  38 F. Supp. 2d 1158 (C.D. Cal. 1998) ....................................................9

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance
  Corp.*, No. 08-10446, 2009 WL 3149775 (D. Mass. Sept. 30, 2009) ...............7

*In re RAIT Financial Trust Securities Litigation*, No. 2:07-cv-03148,
  2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ..................................................12

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ...................................................................19

*SEC v. Mozilo*, No. CV 09-3994,
  2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ....................................................10

*Shields v. Amoskeag Bank Shares, Inc.*,
  766 F. Supp. 32 (D.N.H. 1991) .................................................................14

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ................................................................15

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .................................................................16

*In re Syncor International Corp. Securities Litigation*,
  327 F. Supp. 2d 1149 (C.D. Cal. 2004)....................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................5

*Tripp v. IndyMac Financial Inc.*, No. CV07-1635,
  2007 WL 4591930 (C.D. Cal. Nov. 29, 2007)...........................................22

*United States v. Lummi Indian Tribe*,
  235 F.3d 443 (9th Cir. 2000)....................................................................5

*In re Vantive Corp. Securities Litigation*,
  283 F.3d 1079 (9th Cir. 2002).......................................................2, 5, 6, 10

*In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*,
  259 F.R.D. 490 (W.D. Wash. 2009)............................................................11

iv

*In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*,
  No. 2:08-md-1919, 2009 WL 3517630 (W.D. Wash. Oct. 27, 2009) ......*passim*

*In re WatchGuard Securities Litigation*, No. C05-678LR,
  2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ............................................19

*In re Wells Fargo Securities Litigation*,
  12 F.3d 922 (9th Cir. 1993)...........................................................................14

*Yourish v. California Amplifier*,
  191 F.3d 983 (9th Cir. 1999)..........................................................................20

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).........................................................................18

## STATUTES

12 U.S.C. § 1820(d)(1) ........................................................................................21

15 U.S.C. § 78j-1(b)(4).........................................................................................22

15 U.S.C. § 78u-4(b)(1)(B) ...................................................................................3

# I.    <u>PRELIMINARY STATEMENT</u>

In the roughly two years since Plaintiff has been attempting to find a plausible cause of action, it has filed three complaints accusing Defendants of committing securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act.  The first two complaints were dismissed in their entirety for failing to plead falsity and scienter with the particularity required by the Private Securities Litigation Reform Act ("PSLRA").  *See NYSTRS v. Fremont Gen. Corp.*, No. 2:07-CV-5756, 2008 WL 4812021 (C.D. Cal. Oct. 28, 2008) ("*Fremont I*"); 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ("*Fremont II*").  But one would hardly know it from reading Plaintiff's latest opposition brief ("Opposition" or "Opp."), which mentions *Fremont II* only in passing and does not even bother to cite *Fremont I*.

This oversight is no accident, and provides an obvious clue as to what is afoot. Plaintiff, it turns out, spends much of its 25-page Opposition trying to sweep these inconvenient historical events under the rug as if they never happened.  The most blatant example in this regard, of course, is Plaintiff's decision to reassert every allegation that Judge Cooper directed it to exclude from "any amended pleading." But Plaintiff's attempt to rewrite history does not end there.  It also contends that the "main concern of Judge Cooper" was not with the previous complaint's legal merit, but rather with its "inadequate organization and internal cross-references."  (Opp. 3.) That assertion, however, does not pass the straight face test given the second half of *Fremont II* – i.e., the half in which Judge Cooper meticulously walks through what she calls just a "representative sampling of . . . ***major, substantive problems***" with Plaintiff's complaint.  2009 WL 3112574, at *6 (emphasis added).  Viewed holistically, Plaintiff's treatment of these decisions is symptomatic of a recurring theme, one that advocates simply ignoring the past.

But should we pretend that this case has not been dismissed twice before?  Or that Plaintiff's third complaint is basically no different from its second?  Or that Judge Cooper did not order Plaintiff to exclude numerous allegations from its current

1    pleading?  Or that the law-of-the-case doctrine does not apply?  Or that the

2    arguments made here were not raised before Judge Cooper through exhaustive

3    briefing and oral argument?  In short, should we proceed as if the past does not

4    matter?  For the reasons outlined below, the answer is:  of course not.

5          **Failure To Plead a Material Misrepresentation.**  As a threshold matter, the

6    law-of-the-case doctrine obviates the need for this Court to even reach those

7    allegations that were barred by Judge Cooper's Order.  But regardless, Plaintiff does

8    not come close to meeting the PSLRA's "exacting requirements for pleading

9    'falsity.'"  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th

10   Cir. 2008).  Since the TAC is largely the same as its predecessor, Plaintiff invests

11   heavily in trying to establish that *Fremont II* is an "outlier" decision – a decision that

12   cannot be reconciled with other cases sustaining securities fraud claims against

13   lenders.  But as discussed below, these cases (like *Countrywide* and *New Century*)

14   are not even vaguely similar to our own.  Rather, each addressed an alleged fraud

15   that was far more pervasive and statements that were far more specific than those

16   challenged here.  Notably, although the Opposition fails to mention it, Plaintiff

17   presented the exact same argument to Judge Cooper, who distinguished *Countrywide*

18   and *New Century* in the course of granting Defendants' last motion to dismiss.

19         Plaintiff's "outlier argument" also suffers from another problem:  Judge

20   Cooper's decision is hardly alone.  Contrary to the impression fostered by Plaintiff,

21   courts have not reflexively penalized mortgage lenders and their executives under the

22   federal securities laws simply because they were unable to weather the subprime

23   collapse.  As reflected in a growing line of decisions, where plaintiffs have failed to

24   identify objectively false statements or particularized evidence of deception (as in

25   this case), district courts have not hesitated to dismiss Section 10(b) claims, even

26   where those claims arguably painted a compelling portrait of misguided decision

27   making (i.e., corporate mismanagement).  The Opposition also contains nary a

28   mention of *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079 (9th Cir. 2002),

1  the Ninth Circuit precedent upon which Judge Cooper relied.  That omission is

2  inexcusable although not surprising, since *Vantive* requires litigants to allege

3  objectively false statements – not the generalized and aspirational statements about

4  "'seek[ing]'" and "'striv[ing]'" that Plaintiff leans on heavily here.

5    **<u>Failure To Plead a Strong Inference Of Scienter.</u>**  As with material falsity,

6  the hurdle that Plaintiff must overcome to plead scienter is steep:  it must raise a

7  strong inference of fraudulent intent against *each* Defendant, and it must do so with

8  respect to *each* material misstatement for which that Defendant is responsible.  *See*

9  15 U.S.C. § 78u-4(b)(1)(B).  Yet as the Opposition confirms, Plaintiff cannot link

10 any of these six individuals to the purported scheme.  After two years, there remains

11 not a single well-pled allegation that any Defendant ordered, encouraged or tolerated

12 "unsound" underwriting or fraudulent accounting.  And there is not even a

13 suggestion – through internal emails, firsthand accounts or otherwise – that any

14 Defendant harbored internal beliefs which were at odds with Fremont's disclosures.

15    What the Opposition does advance is a collection of circumstantial,

16 speculative and at times irrational inferences – virtually all of which are based on the

17 same confidential witness testimony that Judge Cooper flatly rejected as "not

18 sufficient to substantiate Plaintiff's allegations of . . . scienter."  *Fremont II*, 2009

19 WL 3112574, at *11.  Indeed, because Plaintiff's theory is built almost entirely with

20 allegations that were imported wholesale from its second complaint, its "new"

21 offering is plagued by the same defects as before – those of (1) particularity, (2)

22 reliability and (3) logic.  As to particularity, Plaintiff continues to give prominent

23 treatment to a host of so-called Company reports about early payment defaults and

24 other lending metrics.  But Plaintiff never supplies any hard facts about the scale or

25 severity of the identified problems, giving the Court no basis for concluding that

26 Defendants were exposed to *contradictory* information, the *sine qua non* of any

27 fraud claim.  As to reliability, Plaintiff's dilemma remains the same:  it must plead a

28 fraudulent state of mind for each Defendant; yet the CW allegations, as Judge

1  Cooper found, "do not establish that any of the confidential witnesses were in a
2  position to gain personal knowledge of what Defendants saw, knew, or thought." *Id.*
3      And as to logic, the TAC practically overflows with contradictions. For
4  instance, the entire premise of Plaintiff's claim is that Defendants deliberately
5  abandoned any effort to impose appropriate underwriting standards during the Class
6  Period. Yet its own complaint details numerous remedial actions that were taken
7  during this period to strengthen underwriting. Plaintiff alleges accounting violations
8  that, in its view, should have been patently obvious to anyone scrutinizing Fremont's
9  books. Yet it fails to dispute that Fremont's new auditor, with knowledge of this
10  securities fraud action, certified the Company's accounting judgments without
11  requiring a restatement. Plaintiff argues that all Defendants were motivated to inflate
12  Fremont's stock price. Yet it now admits that five Defendants did not make a ***single***
13  unusual and suspicious trade – a concession that these individuals did not engage in
14  the kind of self-interested behavior that one would expect to see from insiders who
15  are trying to profit from a fraudulent scheme.

16                                         ********

17      As these and other examples illustrate, the flaws in Plaintiff's TAC are not just
18  minor or technical, and they cannot be corrected by simply rearranging a few
19  paragraphs or tightening up the complaint's "internal cross-references," as Plaintiff
20  suggests (Opp. 3). After two years, three complaints and nine legal briefs, it is clear
21  that this action is not about fraud. Rather, it is about a large institutional investor and
22  repeat player in class action litigation, NYSTRS, which hopes to capitalize on the
23  subprime meltdown by lumping Fremont together with lenders whose disclosures
24  were far less cautious. It is about an investor who wants to use the federal securities
25  laws not to punish legitimately deceptive conduct, but to second guess management's
26  decision making with the benefit of hindsight and, in the process, secure downside
27  protection for its own speculation in Fremont stock.

28

1  II.    **ARGUMENT**

2         At the outset, Plaintiff misstates the pleading standard for a Section 10(b)

3  claim, arguing that it need only demonstrate a "'plausible'" entitlement to relief.

4  (Opp. 6.)  Plausibility, however, suffices only for claims that are subject to notice

5  pleading under Rule 8.  This case, of course, is governed by the PSLRA, which

6  codified a heightened requirement for alleging falsity and scienter.  As the Supreme

7  Court has made clear, the relaxed standard against which Plaintiff measures its

8  complaint is not the law.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

9  308, 314 (2007) (a "strong" inference of scienter "must be ***more than merely***

10  ***plausible*** or reasonable") (emphasis added); *Vantive*, 283 F.3d at 1091 ("The stricter

11  standard for pleading scienter . . . results in a stricter standard for pleading falsity.").

12  A.    **Plaintiff Fails To Allege a Material Misstatement (Opp. 7-16)**

13         1.    **Alleged Underwriting-Related Misstatements (Opp. 7-11)**

14              (a)    **The Preclusive Effect of Judge Cooper's Order**

15         Plaintiff confirms what is obvious from the TAC:  it has reasserted claims

16  based on every statement that Judge Cooper barred from being included "in any

17  amended pleading."  *Fremont II*, 2009 WL 3112574, at *15.  Even though this Order

18  represents a final dismissal as to the identified disclosures, Plaintiff now argues that

19  this Court may disregard it.  (Opp. 25 n.36.)  The law-of-the-case doctrine, however,

20  provides that a court "is generally precluded from reconsidering an issue previously

21  decided by the same court . . . in the identical case," *United States v. Lummi Indian*

22  *Tribe*, 235 F.3d 443, 452 (9th Cir. 2000), unless there is "an intervening change of

23  controlling authority, new evidence has surfaced, or the previous disposition was

24  clearly erroneous and would work a manifest injustice," *Leslie Salt Co. v. United*

25  *States*, 55 F.3d 1388, 1393 (9th Cir. 1995).

26         Not one of these extenuating circumstances is present here.  Plaintiff does not

27  argue that there has been an intervening change in the law.  And Plaintiff does not

28  seriously dispute that it has made largely cosmetic changes to the underwriting

1  allegations Judge Cooper dismissed last September, thereby eliminating "new

2  evidence" as a relevant factor.  There is likewise no credible argument that adherence

3  to the Order would "work a manifest injustice."  Indeed, as explained below, Judge

4  Cooper's detailed opinion dispels any concern that it is erroneous at all, much less

5  clearly erroneous.  Accordingly, there is no basis for departing from the Ninth

6  Circuit's preference for sustaining prior judicial determinations, and no need for the

7  Court to even reach the underwriting-related statements precluded by the Order.

8  (*See* MTD 2 n.2 (identifying statements).)

9      **(b)    Statements About Underwriting Practices (Opp. 8-9)**

10     Relying on disclosures that were barred by Judge Cooper's Order, Plaintiff

11  argues that Fremont misled investors by making general statements about, among

12  other things, "'seek[ing]'" and "'striv[ing]'" to "balance appropriate loan to collateral

13  valuations with a borrower's credit profile.'"  (TAC ¶¶ 160, 185.)  Because the TAC

14  pleads no new facts in support of this claim, Plaintiff's Opposition represents, in

15  effect, a *de facto* motion for reconsideration of Judge Cooper's prior Order – one that

16  focuses, to a very large degree, on casting this decision as an "outlier."  (Opp. 25.)

17  Ultimately this attack on *Fremont II* fails, for it ignores both the Ninth Circuit

18  precedent upon which Judge Cooper relied and the district court rulings which have

19  dismissed subprime-related securities suits that are (as in this case) predicated on

20  vague and subjective disclosures about underwriting.

21     Plaintiff, for instance, fails to even mention the Ninth Circuit's decision in

22  *Vantive*.  As Judge Cooper observed, under this precedent, the "failure to provide an

23  objective measure against which allegedly 'false' statements can be compared or

24  quantified renders generalized allegations insufficient under the heightened PSLRA

25  pleading standard."  *Fremont I*, 2008 WL 4812021, at *6.  Since Fremont's

26  disclosures were general, restrained and missing concrete assurances, and since

27  Plaintiff had failed to provide an objective reference point for assessing whether

28  these statements (e.g., about "'seek[ing],'" "'striv[ing],'" etc.) were false, Judge

6

1  Cooper held that they were far too broad and vague to be actionable. *See Fremont II*,

2  2009 WL 3112574, at *10, *15.[2]

3         Contrary to the impression fostered by Plaintiff, this holding has plenty of

4  support. As reflected in a growing line of cases, courts have carefully examined

5  allegations against lenders and have not hesitated to dismiss Section 10(b) claims

6  where those allegations failed to measure up to the PSLRA's rigorous pleading

7  requirements for falsity and scienter. *See, e.g.*, *In re Downey Sec. Litig.*, No. CV 08-

8  3261, 2009 WL 736802, at *3 (C.D. Cal. Mar. 18, 2009) (dismissing 10(b) claim

9  despite allegations that lender "misrepresented the quality of [its] loan portfolio and

10  its underwriting practices").[3]  Notably, at least one case involved representations that

11  are similar to the vague statements challenged by Plaintiff here. *See Plumbers'*

12  *Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-10446,

13  2009 WL 3149775, at *4-5 (D. Mass. Sept. 30, 2009) (statement, that non-prime

14  mortgage originator "adhered to 'underwriting guidelines [that] are primarily

15  intended to evaluate the prospective borrower's credit standing and ability to repay

16  the loan,'" was not actionable).  In the end, Judge Cooper's prior ruling is not an

17  "outlier" – not even close.  Rather, it fits comfortably within this developing line of

18  precedent, and provides ample support for a third and final dismissal.[4]

19  _____

20  [2]  The relevant inquiry is not whether Fremont was successful in following so-called "'objective' underwriting standards" (Opp. 8), because the Company never made such

21  a specific guarantee. This distinction is critical, for without a representation, Plaintiff's question becomes nothing more than an inquiry into whether the business

22  was properly managed, and therefore falls outside the scope of the federal securities laws. *See Fremont II*, 2009 WL 3112574, at *7, *11 (citing *Santa Fe Indus., Inc. v.*

23  *Green*, 430 U.S. 462, 479-80 (1977)).

    [3]  *See also In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083,

24  1096-97 (C.D. Cal. 2008) (statement about "'continued solid loan production'" was not actionable despite claims of weakened underwriting); *In re 2007 Novastar Fin.,*

25  *Inc. Sec. Litig.*, No. 07-0139-CV, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) (rejecting claim that lender "weakened" underwriting despite describing its standards

26  as "'strong'" and "'effective'"), *aff'd*, 579 F.3d 878 (8th Cir. 2009).

    [4]  Plaintiff's argument is not helped by *Massachusetts v. Fremont Investment & Loan*,

27  No. 07-4373, 2008 WL 517279 (Mass. Super. Ct. Feb. 26, 2008), *aff'd*, 897 N.E.2d 548 (Mass. 2008), which addressed only a narrow subset of loans – namely,

28  adjustable rate mortgages exhibiting each of four risk characteristics, such as a loan-

*(cont'd)*

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF                    Case No. CV 07-5756 JHN (FFMx)
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

1

        **(c)**    **Statements About Underwriting Improvements (Opp. 9-11)**

2

      The Opposition does not argue that Fremont failed to make the specific

3

modifications to underwriting described in its public filings, nor does it contend that

4

any Defendant misstated figures when quantifying the initially positive impact of

5

these changes (such as a 33% decrease in second mortgages). (TAC ¶¶ 187-88; Ex.

6

10, at 4.) Instead, Plaintiff revives a tactic from its prior briefs: it strings together –

7

without context – a collection of "sound bites" from oral statements made by certain

8

Defendants at various points during the Class Period. (Opp. 9-10.) Plaintiff then

9

posits that these disembodied quotes from the mouths of different individuals

10

somehow coalesced to form a misleading impression – to wit, that Fremont had

11

conclusively resolved all of its underwriting-related problems. If one examines the

12

actual statements in full,[5] however, it becomes apparent that Defendants made no

13

such sweeping declaration.[6] This rhetorical sleight of hand – piecing together tiny

14

_____

*(cont'd from previous page)*

15

to-value ratio of 100% or a substantial prepayment penalty. *See id.* at *10. As to

16

these loans *only*, the court preliminarily ruled that Fremont's debt-to-income analysis, which compares a borrower's outstanding debt (inclusive of the new mortgage) to his

17

or her income, should have been measured using the "fully-indexed" interest rate (i.e., the rate that applies when the loan adjusts in 2-3 years) rather than the introductory

18

rate. *See id.* at *11. The court did not, however, suggest that Fremont was systematically disregarding the creditworthiness of potential borrowers, as Plaintiff

19

argues. (Opp. 8-9.) To the contrary, on the broader issue of underwriting practices, the court found that the borrower's debt-to-income ratio was, on average, well below

20

50%. *See* 2008 WL 517279, at *5 n.4 ("For all . . . originated loans during the relevant time period . . . the average debt-to-income ratio was 42.76 percent.").

21

Notably, Plaintiff's arguments concerning the Mass. AG have already been considered and rejected. *See Fremont II*, 2009 WL 3112574, at *12 (holding that the Mass. AG proceeding "does not bolster the strength of [Plaintiff's] allegations").

22

[5] Plaintiff relies heavily on a quote from Nicolas that "'we've dealt with this

23

problem.'" (TAC ¶ 188; *see* Opp. 9.) The inference Plaintiff wishes to draw is that Nicolas had declared an end to underwriting-related problems. But the remainder of

24

Nicolas's statement (i.e., the part omitted from Plaintiff's brief) makes clear that he did no such thing. Instead, Nicolas described a series of discrete measures – such as

25

reducing the number of second mortgages from 10% to 6% of total production – that had been taken to "'deal[] with'" (i.e., alleviate) rising delinquencies, defaults and

26

repurchase requests. (TAC ¶ 188.) Nicolas then added, in another passage left out of the Opposition, that while he was "optimistic" about Fremont's progress, "*we're*

27

*not where we need to be*." (Ex. 21, at 5 (emphasis added).)

28

[6] This stands in contrast to *In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*, No. 2:08-md-1919, 2009 WL 3517630 (W.D. Wash. Oct. 27, 2009)

*(cont'd)*

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF           Case No. CV 07-5756 JHN (FFMx)
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

1  phrases from different individuals and then ascribing them to "Defendants" as a

2  group – was rejected by Judge Cooper.  *See Fremont II*, 2009 WL 3112574, at *8

3  (criticizing the "'the numerous references to representations by or knowledge of

4  "Defendants," collectively.'").[7]

5              **(d)      Plaintiff's Authorities Are Distinguishable (Opp. 8-11)**

6          Unable to address either Judge Cooper's well-reasoned decision or the

7  precedent upon which it relies, Plaintiff instead charts a different path:  it tries to ride

8  the coattails of *Countrywide*, *New Century* and several other decisions, claiming that

9  they involve "closely similar allegations."  (Opp. 8.)  But even a cursory look reveals

10  that the representations in these cases are not "closely" – or even vaguely – similar.

11  In fact, each proceeding addressed an alleged fraud that was far more pervasive and

12  statements that were far more specific than those challenged here.

13          *Countrywide*, for instance, contained allegations so severe that Judge Pfaelzer

14  made specific note of its "extraordinary" facts.  *See In re Countrywide Fin. Corp. Sec.*

15  *Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008).  Included among these

16  allegations was a scheme by Countrywide to persuade investors that it was not really

17  a subprime lender – even though it was aggressively increasing its issuance of

18  subprime and other nonconforming loans.  To this end, Countrywide officers

19  reportedly told investors that the company had "'for the most part, been on the

20  sidelines'" of the subprime market, and that its loans were "'[k]ind of the opposite of

21

_____

22  *(cont'd from previous page)*
("*WaMu*") (Opp. 9-10).  There, defendants coupled their statements about

23  underwriting modifications with specific guarantees.  *See id.* at *8 (citing statement
that "'tightening of underwriting'" would "***ensure*** that we can generate higher

24  margins and receive the required returns on the product'") (emphasis added).  Also,
there were no allegations in *WaMu* or in *In re New Century*, 588 F. Supp. 2d 1206,

25  1225-26 (C.D. Cal. 2008), that specific modifications had been made or that these
changes had produced objectively verifiable improvements (as is undisputed here).

26  [7]  Citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005), Plaintiff
argues that Defendants can be held liable for oral statements by others.  But courts

27  within the Ninth Circuit disagree.  *See, e.g., Pegasus Holdings v. Veterinary Ctrs. of
Am., Inc.*, 38 F. Supp. 2d 1158, 1165 (C.D. Cal. 1998) ("[O]ral statements

28  attributable to . . . defendants are actionable against only those defendants.").

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF                          Case No. CV 07-5756 JHN (FFMx)
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

1  subprime.'"  *Id.* at 1154, 1192.  Countrywide also tried to mask its growing exposure

2  to borrowers with poor credit by allegedly using an undisclosed definition of

3  subprime that was narrower than the industry standard.  *See id.* at 1146.  Fremont, of

4  course, did not suffer from such an identity crisis.  Indeed, "being subprime" was a

5  defining characteristic of Fremont's business model, and was prominently disclosed

6  in the Company's quarterly and annual SEC filings.  In distinguishing *Countrywide*,

7  Judge Cooper drew this precise distinction.  *See Fremont II*, 2009 WL 3112574, at

8  *10 (unlike Countrywide, "Fremont never held itself out to be anything other than a

9  sub-prime lender").

10      Yet another fundamental difference is that Countrywide hyped the rigor of its

11 underwriting practices and the credit quality of its loans with a drumbeat of specific

12 declarations that are absent here.  Time and again, it is alleged, officials hailed

13 "'proprietary underwriting systems . . . that . . . help to prevent fraud,'" promoted the

14 company's "'loan underwriting guidelines'" as "'conservative,'" and characterized its

15 "'loan quality'" as "'extremely high.'"  *Countrywide*, 588 F. Supp. 2d at 1153, 1193.

16 By coupling these statements with repeated and allegedly false claims that it made

17 mostly prime (and not subprime) loans, Countrywide created the firm and discernible

18 reference point for measuring falsity that *Vantive* requires.[8]

19      The story is much the same in *In re New Century*, 588 F. Supp. 2d 1206 (C.D.

20 Cal. 2008).  Borrowing heavily from the detailed findings of a scathing, 550-plus

21

22 [8]  Plaintiff also purports to derive support from an SEC action brought against three
   former Countrywide executives.  (Opp. 3, 8.)  But *SEC v. Mozilo*, No. CV 09-3994,
23 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009), hurts – rather than helps – Plaintiff by
   comparison.  For one thing, the decision notes that the complaint was filed by the
24 SEC's Los Angeles Regional Office – the same office with jurisdiction over Fremont
   and its former executives.  *See id.* at *1.  There is, of course, no allegation here that
25 the SEC took adverse action against Fremont, the Defendants or any other former
   executive.  *Mozilo* also closely parallels the allegations from *Countrywide Securities*
26 *Litigation*.  For instance, contrary to Plaintiff's cursory description (Opp. 8),
   defendants were accused of much more than merely stating that the lender
27 "'manage[s] credit risk through . . . underwriting.'"  Instead, they "tout[ed] the
   superior quality of [Countrywide's] underwriting guidelines and its loan portfolio,"
28 *Mozilo*, 2009 WL 3807124, at *11, assurances that are missing here.

1    page Bankruptcy Examiner's Report, *see id.* at 1218 ("It appears . . . that Plaintiffs'

2    approach . . . was to reproduce much of the Bankruptcy Examiner's Report . . . ."),

3    Plaintiff cites multiple statements in *New Century* that emphasized credit quality,

4    touted rigid underwriting standards and, perhaps most importantly, disavowed any

5    deviation from those standards – thereby establishing a specific benchmark for

6    measuring performance and assessing falsity.  For instance, New Century suggested

7    that loans would not be originated unless they met its guidelines, thereby ruling out

8    any tolerance for underwriting exceptions.  (*See* Supplemental Request for Judicial

9    Notice ("RJN Supp.") Ex. A ¶ 260 ("'We designed our underwriting standards and

10   quality assurance programs to ***ensure*** that ***loan quality is consistent and meets our***

11   ***guidelines***, even as the documentation type mix varies.'") (emphasis added).)

12        Further, on multiple occasions, New Century's officers "made public

13   statements regarding the company's 'strong,' 'excellent,' [and] 'very high' credit

14   quality."  588 F. Supp. 2d at 1215 (citations omitted).  They also tied these

15   superlatives to the company's purported use of underwriting standards that were

16   "'strict'" and "'strong.'"  *Id.*  (*See also* RJN Supp. Ex. A ¶ 259 ("'We believe our ***strict***

17   ***underwriting guidelines*** and the ***stronger credit characteristics*** of these loans

18   mitigate their perceived higher risk'") (emphasis added); *id.* ("'We adhere to ***high***

19   ***origination standards*** . . .'") (emphasis added).)[9]  Judge Cooper cited several of these

20   "more concrete statements" in distinguishing *New Century*.  *Fremont II*, 2009 WL

21   3112574, at *10.[10]

_____

[9]  As previously noted (MTD 11 n.7), *WaMu* exhibits all of the distinguishing
characteristics described above.  First, defendants fed investors a steady stream of
qualitative assurances about "'vigilant'" underwriting and "'strong'" credit quality.
*See* 2009 WL 3517630, at *8 (citing additional statements). Defendants then went
even further by representing that WaMu "'ensur[es] compliance with its underwriting
standards,'" *id.*, thereby creating a false impression that exceptions would not be
tolerated.  And finally, WaMu tried to mask its exposure to subprime borrowers.  *See
In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 500, 505-06
(W.D. Wash. 2009) (company represented that "Option ARMs" were only given to
prime borrowers, when in fact they were provided to subprime borrowers).

[10]  Plaintiff's other cases are distinguishable on similar grounds.  *See Atlas v.
Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149 (S.D. Cal. 2008)

*(cont'd)*

1    **2.    Alleged GAAP-Related Misstatements (Opp. 11-15)**

2    **(a)    Residual Interests (Opp. 12-13)**

3    Plaintiff argues that Fremont overstated the value of its residual interests

4    throughout the Class Period by failing to properly account for its "'unsafe and

5    unsound' lending practices and increased defaults and delinquencies." (Opp. 12.)

6    The Opposition, however, mostly repeats allegations from the TAC, and does little to

7    refute Defendants' arguments (MTD 12-14). For instance, the Motion details at

8    length how the allegations attributed to CW 43 fail the Ninth Circuit's threshold

9    requirements for crediting anonymous testimony. (*Id.*) Plaintiff's main rejoinder is

10   to declare without elaboration that CW 43 was in a position to "possess the

11   information alleged" because she was a FIL Board member. (Opp. 12 n.13.) But

12   since this assertion is not backed by well-pled facts detailing how this information

13   was acquired (e.g., through specific Board meetings, conversations, etc.), it

14   constitutes nothing more than speculation. *See In re Metawave Commc'ns Corp. Sec.*

15   *Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("Plaintiffs must plead 'with

16   substantial specificity' how confidential witnesses 'came to learn of the information

17   they provide in the complaint.'") (citation omitted).

18   This lack of particularity also carries over to the more scienter-focused

19   statements attributed to CW 43. For instance, this witness reportedly claims that

20   Walker and Nicolas were "'well aware'" of so-called flaws in the process for valuing

21   residual interests. (Opp. 22.) (No mention is made of what the other four

22   Defendants "knew.") But aside from Plaintiff's undeveloped reference to Board

23   membership, the only proffered "support" is an allegation that CW 43 reported to

_____

24   *(cont'd from previous page)*

25   (sustaining claims where lender stated that "underwriting procedures were better and more conservative than those of other sub-prime mortgage lenders," and that it "was

26   focused more on credit quality than merely increasing the volume of loans it originated"); *In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148, 2008 WL

27   5378164, at *5 n.12 (E.D. Pa. Dec. 22, 2008) (company represented that its underwriting included "'extensive due diligence'" and that its subsidiary employed a

28   "'disciplined underwriting process'").

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS    Case No. CV 07-5756 JHN (FFMx)

1  Walker.  (Opp. 12 n.13.)  The mere existence of a reporting relationship, however,

2  does not demonstrate or even suggest that CW 43 became privy to Walker's state of

3  mind about accounting for residential loans, especially when you consider that CW

4  43 headed commercial real estate, a division within Fremont that had nothing to do

5  with residential loans.  And of course, this so-called connection to Walker is

6  completely irrelevant to Nicolas's knowledge or awareness.

7          On the scienter front, Plaintiff also tries to draw support from CW 34, who

8  purportedly stated that Walker, Bailey and Nicolas were recipients of so-called

9  "adverse reports regarding the Company's residual interests."  (Opp. 13.)  Judge

10  Cooper, however, has already rejected comparable statements about "adverse"

11  reports as "lacking . . . specificity regarding precisely what information was

12  reported."  *Fremont II*, 2009 WL 3112574, at *11.  This Court should do the same.[11]

13              **(b)    The Q3 2006 Repurchase Reserve (Opp. 14-15)**

14          Plaintiff fares no better with its repurchase reserve claim.  At the outset, it

15  should be noted that the title of Plaintiff's argument – "Fremont's Repurchase

16  Reserves Were Materially Misstated" – is somewhat misleading.  (Opp. 14.)

17  Plaintiff is not alleging that Fremont's SEC filings misstated the actual reserve

18  maintained on the Company's books as of September 30, 2006.  Rather, it is second-

19  guessing Fremont's decision, arguing that the Company should have ***reserved more***.

20  (*Id.*)  As reflected in the Opposition, this theory is based not on a particularized

21  allegation that Fremont disregarded specific data in setting the reserve, or on a claim

22  that its underlying methodology was flawed.  Rather, it is predicated entirely on a

23

---

24  [11]  Plaintiff claims that the allegations in *New Century* are "virtually identical" to
    those pled here.  (Opp. 13.)  But New Century ***publicly admitted*** that errors had been
25  made in how it valued residual interests during the class period.  *See* 588 F. Supp. 2d
    at 1213-15 (noting restatement for 2005 and portions of 2006).  In other words, the
26  issuer itself confessed to the methodological errors that Plaintiff fails to particularize
    here.  Also, it was alleged that New Century "baldly disregarded" rising defaults in
27  valuing residuals.  *Id.* at 1226-27.  Here, by contrast, Plaintiff concedes that Fremont
    ***did*** consider declining fundamentals by repeatedly increasing its assumption for
28  estimated credit losses.  (Opp. 13 n.15.)

1  conclusory and generalized assertion – to wit, that the Q3 2006 repurchase reserve

2  must have violated GAAP (1) because it supposedly did not "correlate" or "ke[ep]

3  pace with . . . already received repurchase requests," and (2) because the reserve was

4  subsequently increased in later reporting periods.  (Opp. 14.)

5       This hindsight-driven pleading tactic – i.e., coupling generalized allegations

6  with evidence of later accounting adjustments – is frequently deployed against

7  lenders during economic downturns.  Even before the PSLRA was enacted, courts

8  routinely refused to entertain such claims, viewing them as impermissible attempts to

9  second-guess management.  *See, e.g.*, *Shields v. Amoskeag Bank Shares, Inc.*, 766 F.

10  Supp. 32, 33, 38 (D.N.H. 1991) (rejecting claim of inadequate loan loss reserves that

11  stemmed from the "deteriorating real estate markets and recessionary economic

12  conditions in the Northeast").  In the wake of this country's most recent crisis, courts

13  have viewed these claims against lenders with an equal degree of skepticism.  *See,*

14  *e.g.*, *Downey I*, 2009 WL 736802, at *7 (rejecting fraud based on understated

15  repurchase reserves where plaintiff "simply assume[d] that Downey ignored the

16  financial metrics in setting its reserves"); *In re Countrywide Fin. Corp. Deriv. Litig.*,

17  554 F. Supp. 2d 1044, 1063, 1069-70 (C.D. Cal. 2008) (dismissing allegation of

18  understated reserves, even though committee responsible for setting reserve was

19  cognizant of rising negative amortization and tripling of delinquency rates).[12]

20

---

21  [12]  Plaintiff of course disagrees.  But the main pillars of its response are citations to
22  *Accredited* and *New Century*, decisions in which lenders were forced to restate their
     reserves and, in so doing, ***admit*** that their class period financial statements were false.
23  *See Accredited*, 556 F. Supp. 2d at 1152, 1156-57 (identifying retroactive
     adjustments to two reserve accounts, plus an inflation of goodwill totaling $142.4
24  million); *New Century*, 588 F. Supp. 2d at 1213-14 (citing company announcement
     of "'errors in the . . . accounting and reporting of loan repurchase losses'").  In this
25  case, by contrast, Fremont's new auditor, Squar Milner, certified the very same
     accounting judgments that Plaintiff now challenges as fraudulent.  Plaintiff's reliance
26  on *In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993), is even more curious,
     since the case predates enactment of the PSLRA's heightened pleading requirements
27  by two years and is therefore not even good law.  *See In re Peerless Sys. Corp. Sec.
     Litig.*, 182 F. Supp. 2d 982, 991 (S.D. Cal. 2002) (reliance on *Wells Fargo* for "what
28  is sufficient to plead accounting fraud" was "misplaced" because it predated PSLRA).

### 3.    <u>Bailey's Statements About Compensation (Opp. 15-16)</u>

Plaintiff does not dispute that Bailey disclosed Fremont's use of volume-based compensation during an October 27, 2005 earnings call. (Opp. 15.) It only contends that Bailey falsely described the ***extent*** to which this benefit was being used throughout the organization, when he said that volume-based compensation was paid to commissioned sales people but not to underwriters and other employees. (TAC ¶ 130.) In rejecting Plaintiff's first pleading, Judge Cooper held that Plaintiff had failed to explain why this incremental discrepancy would have ***materially*** misled a reasonable investor about Fremont's business. *Fremont I*, 2008 WL 4812021, at \*6.

Plaintiff's Opposition tries to save this theory not by pointing to new allegations, but rather by proffering the same facts that it presented to Judge Cooper in its prior complaint. For instance, Plaintiff claims that "[f]ederal regulators, securities analysts, rating agencies and banking experts" have all expressed special concern with the volume-based compensation that is paid to loan underwriters "as distinguished from sales people." (Opp. 16.) But this distinction is not recognized by the regulators and academics quoted in the TAC, who speak about compensation benefits paid throughout the mortgage origination chain – not just to underwriters. (*See, e.g.*, TAC ¶ 133 (addressing "[t]he focus of ***subprime market participants*** on short term compensation") (emphasis added).)[13] In the end, Plaintiff's complaint still fails to explain how Bailey's statement, which indisputably flagged incentive compensation as one part of Fremont's business model, could have materially misled investors.[14]

---

[13]  *New Century* and *Countrywide* (Opp. 16) are distinguishable, since there is no indication that either lender acknowledged the use of volume-based incentives in the way that Bailey did here. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178-79 (9th Cir. 2009), is also off point. That case focused narrowly on whether undisclosed negative information about a cold remedy product could be deemed immaterial as a matter of law based on a finding of statistical insignificance, a unique quantitative issue that is not implicated here.

[14]  And even if Plaintiff could plead materiality, there is no basis for alleging scienter. Common sense tells us that if Bailey had wanted to deceive investors, he would have denied Fremont's use of volume-based incentives altogether.

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS                    Case No. CV 07-5756 JHN (FFMx)

**B.** **Plaintiff Fails To Plead a Strong Inference of Scienter (Opp. 16-23)**

    **1.** **Allegations Relating To Underwriting (Opp. 17-20)**

        **(a)** **Internal Reports (Opp. 17-18)**

Plaintiff does not dispute the appropriate standard for assessing whether internal reports contribute to an inference of scienter. In the Ninth Circuit, it must not only proffer "detailed and specific allegations about management's exposure to factual information within the company," *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008), but also demonstrate how the reports actually ***contradicted*** Defendants' general and limited disclosures about underwriting. (*See* MTD 16 (citing cases).) The Opposition confirms that Plaintiff is not up to this task.[15]

As predicted (MTD 16-17), Plaintiff's lead argument is one that was raised before – and rejected by – Judge Cooper in *Fremont II*. Specifically, citing CW 34, Plaintiff contends that at unspecified points during the Class Period, certain Defendants received "adverse reports" from Regulatory Risk Management concerning "unfair and deceptive acts . . . and 'pretty obvious' poor underwriting." (TAC ¶ 248; *see also* Opp. 17.) But vaguely citing to reports about "poor underwriting," without supplying any details about the dimensions of this problem, is not probative – especially when you consider the size of Fremont's business ($32.6 billion worth of loans originated in 2006) and its target demographic (borrowers with poor credit). And it certainly is not surprising to learn that such information may

---

[15] Plaintiff suggests that fraudulent intent may be inferred from the so-called importance of subprime lending to Fremont. (Opp. 17.) But the Ninth Circuit recently clarified that this "core operations" doctrine is almost never sufficient on its own to raise the requisite inference of scienter. *See S. Ferry*, 542 F.3d at 785 n.3 (holding that core operations doctrine in its "bare form" is reserved only for "exceedingly rare" cases). To be sure, *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), fell into this narrow category. But the allegations in that case were far more serious than those pled here. *See id.* at 987-88 (catastrophic event (i.e., stop-work order on four major government contracts) had a "devastating effect" on revenue and caused layoffs that turned one company facility into a "'ghost town'"). The same is true for *Countrywide*, another "extraordinary" case that did not even rest on a bare core operations inference. *See Countrywide*, 588 F. Supp. 2d at 1194 n.77 (allegations went "beyond alleging scienter based on job positions").

1  have been emanating from a department – Regulatory Risk Management – whose

2  very purpose was to flag risks (i.e., issue "adverse findings").  As Judge Cooper held,

3  without well-pled facts concerning the magnitude of these problems and whether

4  they were ignored, there is simply no basis to conclude that Plaintiff's reports

5  contradicted Defendants' Class Period statements about underwriting.  *See Fremont*

6  *II*, 2009 WL 3112574, at *11 (finding that CW 34's statements "lack[ed] specificity"

7  and could not "substantiate Plaintiff's allegations of falsity or scienter").

8          Recycling another argument presented to Judge Cooper, Plaintiff next claims

9  that Defendants had "access to regular and extensive reports detailing," among other

10 things, the use of underwriting exceptions.  (Opp. 17-18.)  But neither the TAC nor

11 Plaintiff's Opposition identifies specific information from these reports that rendered

12 any public statement false or misleading.  Indeed, Plaintiff affirmatively pleads that

13 Fremont *disclosed* its use of underwriting exceptions to the public – an act which, of

14 course, is inconsistent with an intent to defraud.  (TAC ¶ 250.)  And unlike other

15 lenders,[16] Defendants never promised that exceptions would be subject to any

16 qualitative or quantitative restrictions.  In light of the foregoing, Judge Cooper

17 concluded that these same reports were not described with enough detail to establish

18 that Defendants had access to *contradictory* information, a necessary first step on the

19 road to establishing scienter.  *See Fremont II*, 2009 WL 3112574, at *11 ("The

20 allegations are lacking in specificity regarding precisely what information was

21 reported regarding exceptions to underwriting standards and how Defendants'

22 statements can be judged to be materially false in light of those practices.").

23

24 [16]  Plaintiff tries to draw support for its theory from *WaMu* and *Countrywide*.  (Opp.
   18.)  But *WaMu* represented that it would "*ensur[e]* compliance with its
25 underwriting standards," thereby signaling a no tolerance policy towards exceptions.
   *WaMu*, 2009 WL 3517630, at *8 (emphasis added).  Similarly, in *Countrywide*,
26 management assured investors that the vast majority of loans met exacting
   requirements for being labeled "prime," *see* 588 F. Supp. 2d at 1154 ("'over 90%'" of
27 loan originations were of "'prime quality'"), and that the company "'*only* retain[ed]'
   high credit quality mortgages in [its] loan portfolio,'" *Countrywide Deriv. Litig.*, 554
28 F. Supp. 2d at 1054 (emphasis added).

**(b)    Conclusory Assertions of Knowledge By CW's (Opp. 19)**

In an argument lifted from its last opposition brief, Plaintiff also contends that McIntyre, Rampino and Bailey "'dictated policies and procedures'" at Fremont and "consciously decided" to produce loans with "'no restraints,'" thereby leading to an effective "abandonment of underwriting standards." (Opp. 18-19.) But there is no well-pled allegation that the lone source for this contention – CW 34 – was in any position to know who set the "policy and procedures" at Fremont, nor is there any support for the conclusory assertion that these Defendants were "direct[ing]" (Opp. 19) employees to approve so-called restraint-free loans. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) (rejecting "conclusory assertions about the defendants' scienter"). As one court recently held in the lending context, naked assertions about what Defendants "knew" are not nearly enough. *See Downey I*, 2009 WL 736802, at *13 (refusing to credit CW allegation "that 'all of the top executives . . . knew that dangerously loose underwriting was occurring'") (citation omitted). In rejecting the same CW allegations as are pled here, Judge Cooper cited this defect. *See Fremont II*, 2009 WL 3112574, at *11 ("[T]he [CW] allegations do not establish that any of the confidential witnesses were in a position to gain knowledge of what Defendants saw, knew, or thought.").[17]

**(c)    Defendants' So-Called Admissions (Opp. 19-20)**

Plaintiff next contends that scienter is supported by so-called public admissions from Walker, Bailey and Nicolas that Fremont was taking steps to address rising early payment defaults, repurchase requests and other operational issues. (Opp. 19-20.) As previously demonstrated (MTD 18-19), these statements

---

[17]  Plaintiff declares that *WaMu* is "instructive" on this point. (Opp. 19.) And it is, but not in a way that helps Plaintiff. In that case, there were credible allegations from multiple sources that WaMu's President, Rotella, actually "halt[ed] efforts to tighten lending standards within the credit risk department." *WaMu*, 2009 WL 3517630, at *14. To this end, plaintiffs identified "internal emails and pre-recorded statements" in which Rotella confirmed that WaMu was loosening its underwriting, contrary to his public disclosures. *Id.* at *15. Nothing of the sort is pled here.

1  are hardly suggestive of fraud.  Case in point is Plaintiff's reliance on a statement

2  from Walker to the effect that Fremont had convened a meeting of "'key senior

3  managers'" from across the organization to discuss "'higher underwriting scrutiny.'"

4  (Opp. 20.)  Since companies hold meetings every day to address problems, it is

5  difficult to fathom how this conduct, standing alone, can be viewed as sinister or

6  even remotely unusual.  *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)

7  ("Problems and difficulties are the daily work of business people.  That they exist

8  does not make a lie out of any of the alleged false statements.").  If anything,

9  Walker's actions show that Fremont was proactively tackling the deterioration of its

10  lending business – just as it disclosed to investors.[18]

11       Which leads to the second flaw in Plaintiff's theory.  The "admissions" that

12  Plaintiff cites are actually taken from ***public*** statements, in which certain Defendants

13  elaborated on discrete steps that Fremont had taken (and was taking) to strengthen its

14  lending practices.  (TAC ¶ 164.)  Since defendants who wish to deceive investors

15  typically conceal negative information rather than reveal it, courts recognize that

16  such disclosures raise a non-culpable inference.  *See, e.g.*, *In re WatchGuard Sec.*

17  *Litig.*, No. C05-678LR, 2006 WL 2927663, at *8 (W.D. Wash. Oct. 12, 2006)

18  (rejecting scienter where company disclosed and "took corporate-level actions to

19  address problems it discovered in its ground-level practices").  In rejecting Plaintiff's

20  "admissions argument," Judge Cooper reached the same sensible conclusion.  *See*

21  *Fremont II*, 2009 WL 3112574, at *14 ("The public disclosure of the company's

22  problems and its efforts to address those problems . . . weighs against a conclusion

23  that Defendants knowingly or recklessly made misleading public statements.").

---

24  [18]  Plaintiff's citation to *WaMu* (Opp. 20) is once again off the mark.  CFO Casey's

25  statement about steps taken to "reduce potential future [credit] exposure" was
probative of scienter only because plaintiffs had uncovered an undisclosed initiative

26  by senior management to do the exact opposite – i.e., to "purposefully roll[] back"
the authority of WaMu's risk management group and relegate it to a "'customer

27  service'" function.  *WaMu*, 2009 WL 3517630, at *6, *11.  In other words, scienter
turned not on knowledge of internal practices *per se*, but on knowledge of specific

28  facts that flatly ***contradicted*** Casey's more positive depiction of those practices.

19

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF                    Case No. CV 07-5756 JHN (FFMx)
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

1        2.        **The FDIC's Cease & Desist Order (Opp. 20-21)**

2        Plaintiff argues that the FDIC's March 2007 Order also supports a "strong

3    inference" that Defendants' statements about underwriting – some of which were

4    made *16 months earlier* (TAC ¶ 126) – were "knowingly false when made."  (Opp.

5    20.)  The Opposition, however, tacitly acknowledges that the March 2007 Order,

6    which was issued over three months after the final alleged misstatement, is silent as

7    to *when* Fremont's practices allegedly became "'detrimental'" and "'unsatisfactory'"

8    (TAC ¶ 199).  (Opp. 20-21.)  Plaintiff also concedes, as it must, that the FDIC did

9    not accuse Fremont, the Defendants or any other employees of engaging in deliberate

10    wrongdoing, nor did it suggest that Fremont's public disclosures were false or

11    misleading.  (Opp. 21.)  As a result, there is no basis to infer that the FDIC's findings

12    are retrospective in nature (i.e., refer back to the Class Period), or that they embody

13    anything more than regulators' views about Fremont as of March 2007, in light of the

14    turbulent operating environment for subprime lenders at that time.  For this reason,

15    Judge Cooper rightly found that "Plaintiff's reliance on statements in the FDIC's

16    Cease & Desist Notice . . . does not support a determination that the challenged

17    statements were false *when they were made* or that they were made with the

18    requisite intent."  *Fremont II*, 2009 WL 3112574, at *12 (emphasis in original).[19]

19        As previously explained (MTD 19-20), this conclusion is reinforced by

20    Fremont's regulatory status.  By law, the FDIC was obligated to conduct "full-scope"

21    examinations (erroneously labeled "investigations" by Plaintiff) at Fremont's offices

22

23    [19]  Plaintiff suggests that it can infer fraud from the temporal proximity between
Defendants' Class Period statements and the Order.  (Opp. 20.)  But in the Ninth
24    Circuit, "temporal proximity" is not probative unless it is accompanied by other well-
pled and contemporaneous facts.  *See Yourish v. California Amplifier*, 191 F.3d 983,
25    997-98 (9th Cir. 1999).  In Plaintiff's cases, such facts were credible and abundant.
*See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West*
26    *Holding Corp.*, 320 F.3d 920, 943-44 (9th Cir. 2003) ("largest FAA fine in history"
and internal directive to remedy massive maintenance issues supported inference that
27    directors knew costs would rise); *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d
1149, 1162 (C.D. Cal. 2004) (court "independently found . . . specific corroborating
28    facts").  Here they are absent.

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF                    Case No. CV 07-5756 JHN (FFMx)
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

1   every year, 12 U.S.C. § 1820(d)(1), typically culminating in the issuance of an

2   annual report.  Yet the Opposition does not contend that the FDIC's findings for its

3   prior examination, which would have been issued during the Class Period, resulted in

4   *any* violations.  While Plaintiff disputes that this sequence of events is exculpatory,

5   calling the notion "far-fetched and implausible" (Opp. 21), it closely parallels an

6   argument that Judge Walter recently credited in *Downey* based on almost identical

7   facts.  Federal regulators there had issued a Cease & Desist Order against a subprime

8   lender after the Class Period, just like in this case.  In refusing to find scienter, the

9   court noted that while federal regulators "presumably conducted 'full-scope'

10  examinations of Downey . . . during the height of the alleged misconduct," there was

11  no allegation "that OTS issued any Cease and Desist Orders . . . during that time

12  period."  *In re Downey Sec. Litig.*, No. 08-3261, 2009 WL 2767670, at *6 n.5 (C.D.

13  Cal. Aug. 21, 2009).  That is the precise scenario here.

14          **3.    Alleged GAAP Violations (Opp. 12-13, 21-22)**

15          Plaintiff does not dispute what it must show to plead fraud based on GAAP

16  violations – that each Defendant "knew or must have been aware" of the allegedly

17  improper accounting.  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d

18  385, 391 (9th Cir. 2002).  As discussed above in Part II(A)(2)(a), Plaintiff tries – but

19  fails – to meet this demanding standard with vague and conclusory allegations linked

20  to CWs 34 and 43.  That fact is fatal, for Plaintiff's remaining arguments are

21  grounded in little more than speculation and innuendo.

22          Take for instance Plaintiff's claim that scienter may be inferred from the size

23  of Fremont's post-Class Period accounting charges.  (Opp. 13, 21.)  Given the

24  prohibition against fraud by hindsight, courts routinely refuse to credit such a theory

25  where it is unaccompanied by other detailed allegations, as in this case.  *See, e.g.*,

26  *Countrywide Deriv. Litig.*, 554 F. Supp. 2d at 1070 n.28 (700% increase in loan loss

27  reserves at end of class period was not adequate, standing alone, to support fraud).

28  And that is especially true where, as here, the challenged financial reports have been

1    audited without restatement.  *See, e.g., Tripp v. IndyMac Fin. Inc.*, No. CV07-1635,

2    2007 WL 4591930, at *5 (C.D. Cal. Nov. 29, 2007) (that "IndyMac's financials

3    [were] audited without restatement" weighed against scienter, despite increases to

4    loan reserves occurring after class period).

5       The Opposition also tries to manufacture scienter from E&Y's resignation,

6    which it attributes to a claimed dispute over how to value Fremont's residual interests.

7    (Opp. 12, 21-22.)[20]  Plaintiff, however, does not dispute the substance of E&Y's

8    resignation letter, which confirms that there was ***no disagreement*** with Fremont over

9    matters of accounting.  Instead, Plaintiff tries to navigate around this document by

10    labeling it a mere "assertion" – as if E&Y's representations to the SEC are somehow

11    inherently suspect.  (Opp. 22.)  The TAC, however, contains not a shred of support

12    for the notion that E&Y was anything other than truthful in its dealings with

13    securities regulators.  And indeed, if E&Y had believed fraud was afoot, it would

14    have been required by statute to apprise the SEC of that fact, giving the auditor

15    powerful incentives to communicate accurately.  *See* 15 U.S.C. § 78j-1(b)(4)

16    (resigning firm must notify SEC of issuer's failure to report "illegal acts").[21]

17      **4.**    **Executive Departures (Opp. 22-23)**

18       Citing the FDIC's Order, Plaintiff claims once again that the executive

19    departures in this case raise a "strong inference" of scienter.  (Opp. 22-23.)  But as

20    Plaintiff concedes, the FDIC did not accuse any of the Defendants (even implicitly)

21    of engaging in fraud (Opp. 21) – an admission that, in and of itself, precludes

22

---

23    [20]  This contention is based solely on purported testimony from CW 42, a former

24    employee who worked in ***commercial*** (not residential) real estate.  Plaintiff does not
     even attempt to rebut Defendants' detailed challenge to this witness.  (MTD 22 n.11.)

25    [21]  Plaintiff also claims that Grant Thornton "refus[ed] to certify" Fremont's 2006
     financials after having its audit "obstructed."  (Opp. 22.)  The firm's resignation letter,

26    however, did not accuse Fremont of refusing to cooperate.  It merely flagged a
     timing issue – an alleged failure to supply information "'on dates previously agreed

27    upon.'"  (TAC ¶ 110.)  Also, the letter did not cite any difference with Fremont over
     accounting.  (*Id.*)  Thus, there is no foundation for asserting that Grant Thornton's

28    departure was based on any substantive disagreement.

1  Plaintiff from establishing the causal nexus required by case law. (MTD 23 (citing

2  cases).) Even more importantly, however, Plaintiff has no answer for why the FDIC

3  would have allowed the Defendants to remain at the controls for months – and in the

4  case of Nicolas, one full year (TAC ¶ 22) – if it thought these men were complicit in

5  fraud. It is exceedingly unlikely, of course, that the FDIC would have allowed a

6  federally regulated institution, with billions of dollars in consumer deposits, to be run

7  even for a day by individuals whom they suspected of deliberate malfeasance.[22]

8      5.  **Implausible Allegations of Motive (Opp. 23 & n.33)**

9      Plaintiff essentially waves the white flag on its motive allegations by devoting

10  only a single paragraph to them. (Opp. 23 & n.33.) Understanding why is not too

11  difficult. First, Plaintiff's silence confirms that *five of the six Defendants* are not

12  accused of making a single suspicious trade involving Fremont stock. As Judge

13  Cooper held, this "undercuts the allegations of scienter as to [these] Defendants."

14  *Fremont II*, 2009 WL 3112574, at *14. Plaintiff also cannot square its insider

15  trading allegations against McIntyre with two indisputable facts: McIntyre held onto

16  92% of his Fremont shares and, as a result, lost over *$100 million*, an amount that

17  dwarfs any alleged proceeds ($9.6 million) from the trades at issue. *See id.* (holding

18  that such facts were "inconsistent" with fraud).[23]

19      Plaintiff's counterintuitive incentive compensation theory is also beyond repair.

20  The central argument is that Defendants pushed Fremont to originate an increasing

21  number of loans that were "destined to perform poorly" (TAC ¶ 247), so that they

22

23  [22]  Unable to compete with this reasoning, Plaintiff resorts to conclusory declarations,
24  such as: "Defendants were fired at the behest of the FDIC." (Opp. 23.) The FDIC
    Order, however, only required Fremont to "'retain qualified management'" (TAC ¶
25  270), and did not request the removal of any executive.
    [23]  Plaintiff argues that McIntyre did not suffer an "actual loss" because his shares
26  were purportedly obtained through Company grants. (Opp. 23 n.33.) But even if
    true, it is hard to understand why this matters. For McIntyre, these shares
27  represented accumulated wealth from a lifetime of hard work at Fremont, which he
    joined in 1963. (TAC ¶ 23.) To say that this *nine figure* loss does not "count"
28  makes no sense and, not surprisingly, Plaintiff cites no supporting legal authority.

1  could increase pre-tax earnings and related bonuses in the short-term.  (Opp. 23.)

2  But Plaintiff's own complaint destroys the logic of this argument by alleging, for

3  instance, that Fremont's financial condition was "steadily" deteriorating from almost

4  the beginning of the Class Period.  (TAC ¶ 104 (121% increase in repurchases

5  between Q1 and Q2 2006).)  With loan performance and financial results trending

6  downward, it is inconceivable that Defendants would have promoted business

7  practices – such as "loose underwriting" – that were guaranteed to make matters even

8  worse.  *See Fremont II*, 2009 WL 3112574, at *14 (motive theory is implausible

9  because it presupposes that Defendants engaged in the "intentional or reckless

10  pursuit of a course that would inevitably result in the demise of the company").[24]

11  **C.    Plaintiff's Section 20(a) Claim Fails as a Matter of Law (Opp. 24)**

12         Plaintiff continues to assert that Walker and Nicolas controlled Fremont, the

13  alleged primary violator for 20(a) purposes.  (Opp. 24.)  Yet it cites no case in which

14  courts have deemed subsidiary-level officers to be controlling persons of a corporate

15  parent, particularly one with its own management team.  Instead, Plaintiff relies on

16  boilerplate allegations and bare conclusions (TAC ¶ 313 (Walker and Nicolas "were

17  controlling persons of Fremont")), an approach that fails even under notice pleading

18  rules.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("doors of discovery"

19  remain locked for a "plaintiff armed with nothing more than conclusions").

20  **D.    Dismissal Should Be With Prejudice and Sanctions (Opp. 24-25)**

21         Plaintiff predictably contests the imposition of sanctions, even though it

22  admits violating Judge Cooper's Order.  (Opp. 24-25.)  To justify its conduct,

23  Plaintiff cites a so-called good faith belief that it "risk[ed] forfeiting the right of

24  appeal" if these allegations were omitted, although it then cites two Ninth Circuit

25  cases suggesting that its concern was unfounded.  (*Id.*)  Regardless, the fact remains

---

26  [24]  Plaintiff's argument is not advanced by Defendants' receipt of bonuses in 2005.
27  (Opp. 23.)  As is undisputed, those payments were based on fully audited financials
    that have never been restated, and involve conduct that falls largely outside the
28  October 27, 2005 start date for Plaintiff's Class Period.

INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM OF          Case No. CV 07-5756 JHN (FFMx)
POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

1  that Plaintiff basically tossed Judge Cooper's Order to the side of the road, and

2  treated it as if compliance were optional.  As noted (MTD 5 n.4), this form of self-

3  help is not allowed.  If Plaintiff believed that waiver was a risk, its recourse under

4  the Federal Rules was to seek relief through a motion for reconsideration, not take

5  matters into its own hands.  Moreover, Plaintiff is not merely preserving these

6  allegations for appellate review, as it claims.  (TAC ¶ 127 n.1.)  Rather, as is

7  manifest (Opp. 8-9), Plaintiff is continuing to prosecute them at the district court

8  level as if Judge Cooper's Order never even existed (Opp. 25 n.36), thereby forcing

9  Defendants to incur unnecessary costs in response.  If anything, this behavior

10 reinforces, rather than refutes, the case for sanctions.

11 Dated:  January 18, 2010              SKADDEN, ARPS, SLATE, MEAGHER &
12                                          FLOM LLP

13                                       By:_____/s/ Jason D. Russell_____
14                                            Jason D. Russell
                                              Attorneys for Defendants
15                                          Wayne R. Bailey, Patrick E. Lamb, James A.
16                                          McIntyre, Louis J. Rampino and Kyle R. Walker

17                                       GEORGE B. PIGGOTT, A PROFESSIONAL
18                                          CORPORATION

19                                       By: _____[authorized for signature]_____
20                                            George B. Piggott
                                              A Member of George B. Piggott,
21                                            a Professional Corporation
22                                          Attorney for Defendant Ronald J. Nicolas, Jr.

23

24

25

26

27

28